# EXHIBIT A

00071306

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROBIN D. NICHOLS, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) Civil Action |
| v. | ) No. 05-555 |
| | ) |
| BENNETT DETECTIVE & PROTECTIVE | ) |
| AGENCY, INC., a Delaware corporation, | ) |
| and ALLEN'S FAMILY FOODS, INC., | ) |
| a Delaware corporation, | ) |
| | ) |
|       Defendants. | ) |

        Deposition of MARK HABICHT, taken
pursuant to notice at the law offices of
Schmittinger & Rodriguez, 414 South State Street,
Dover, Delaware, beginning at 11:05 a.m., on Friday,
January 6, 2006, before Dale C. Hawkins, Registered
Merit Reporter and Notary Public.

APPEARANCES:

        ADAM C. GERBER, ESQ.
        SCHMITTINGER & RODRIGUEZ, P.A.
         414 South State Street
         Dover, Delaware   19903
         for the Plaintiff

        ROGER D. LANDON, ESQ.
        MURPHY, SPADARO & LANDON
         1011 Centre Road, Suite 210
         Wilmington, Delaware   19805
         for the Defendant
         Bennett Detective & Protective Agency

APPEARANCES (Cont'd):

        ARTHUR M. BREWER, ESQ.
        LAURA A. PIERSON SCHEINBERG, ESQ.
        SHAWE & ROSENTHAL, LLP
         20 South Charles Street, 11th Floor
         Baltimore, Maryland 21201
         for the Defendant
         Allen's Family Foods, Inc.

ALSO PRESENT:

        Mr. Greg Miller
        Ms. Valerie Brittingham
        Mr. Wayne Keller

1    resources department?

2            A.   No, we don't have a human

3    resources manager or director so to speak.

4            Q.   Okay.  How many people currently

5    approximately are employed by Bennett?

6            A.   I would say around 140.

7            Q.   140?

8            A.   Yeah, approximately.  Just -- I

9    could get you the exact number if you needed it,

10   but it just depends on how many contracts we

11   have at the time.

12           Q.   As regards to that, approximately

13   how many different contracts are there

14   generally, or --

15           A.   A rough estimate based on the

16   amount of invoices we send out I would say

17   between fifty and fifty-five.

18           Q.   Mr. Bennett, is he the president?

19           A.   President and owner.

20           Q.   Okay.  If we could backtrack a

21   little bit, what's your prior work experience

22   before June of 1998?

23           A.   I spent six months working for the

24   State of Delaware as an investigator for the

1          Q.   Now, does Allen's have any say --

2    it says here they have say as to numbers, but in

3    your experience does Allen's have any say as to

4    specific employees, specific individual

5    employees?

6          A.   As far as if they knew somebody

7    that they wanted us to hire?

8          Q.   Yes, just in your practice?

9          A.   In the practice of our business,

10   if they identified an individual that they would

11   like us to hire, more than likely we would

12   accommodate them.

13         Q.   Okay.  That's all I wanted to look

14   at that, that contract.  Thanks.

15              Generally who do you deal with

16   primarily at Allen's Foods?

17         A.   At the Harbeson facility?

18         Q.   Yes, there are two facilities;

19   correct?

20         A.   Yes.  Originally there was three.

21         Q.   We're talking about the

22   Harbeson's.

23         A.   Yes.

24         Q.   Who do you deal with directly?

1    can all normally make those decisions

2    unilaterally, but normally we don't.

3         Q.   And you mentioned that would take

4    place with most disciplinary actions, too.

5    Would that apply to transfer of someone to a

6    different position?

7         A.   Could you clarify that, please?

8         Q.   Yes.  Sorry.

9         Does someone generally make a

10   unilateral decision whether to transfer someone

11   to a different assignment?

12        A.   From job site to job site?

13        Q.   Yes.

14        A.   Not normally from our end in my

15   experience, my experience has been that if we

16   move employees around, it's disruptive for our

17   company, it's disruptive for our customer, it

18   cost us more money in training, it cost us money

19   in overtime because we have to backfill the

20   position when we move the person out of there,

21   so therefore, the only time that I know that we

22   move somebody that I'm aware of is when our

23   customer request it.

24        Q.   Okay.  I want to turn now

1       how was Ms. Nichols' performance at work?

2              A.   I mean --

3              Q.   Did you have any problems with her

4       specifically?  That's of course prior to this

5       incident.

6              A.   I didn't, no.

7              Q.   Just what you know.  So you never

8       had to discipline her?

9              A.   No.

10             Q.   And you don't know that anyone

11      else did?

12             A.   No.

13             Q.   Did she receive evaluations

14      periodically?

15             A.   No.

16             Q.   No evaluations?

17             A.   No.

18             Q.   Was she ever promoted within

19      Bennett's?

20             A.   She originally started off at the

21      Harbeson facility as a security officer.  When

22      our supervisor at that facility left, we

23      promoted her into that position.

24             Q.   So she was promoted up to

1    about this incident involving Ms. Nichols and

2    this incident in December?

3           A.   I remember having a telephone

4    conversation with Greg Miller regarding the

5    incident.

6           Q.   Okay.  When was that, do you know?

7           A.   On the day of the incident,

8    December 11th, 2003.

9           Q.   Was that in the evening or in the

10   afternoon?

11          A.   It was in the afternoon.

12          Q.   And who was the other employee

13   involved?

14          A.   Joseph Whiteman.

15          Q.   That's on the police report.  Is

16   that your recollection?

17          A.   Yes, his name just slipped my mind

18   for a minute.

19          Q.   That's fine.

20               Now, before this conversation, you

21   knew Mr. Miller as the point of contact at

22   Allen's?

23          A.   Yes, I have spoken to Mr. Miller

24   several times.

```
 1              Q.   Okay.   During that conversation,

 2    what specifically to the best of your

 3    recollection did Mr. Miller tell you that

 4    happened?

 5              A.   This is to the best of my

 6    recollection because it's been a while, but I

 7    remember having the phone conversation with

 8    Mr. Miller and he says, "You know, I called out

 9    to the guardhouse a couple of times and Robin

10    answered the phone and there was yelling in the

11    background and then she slammed the phone down.

12    And I called back and she did the same thing."

13              And he says, "I can't have that

14    out there."  He says, "Enough is enough, she's

15    got to go."

16              Q.   So he told you she's got to go?

17              A.   That was my understanding.

18              Q.   Your understanding, or did he say

19    it in so many words?

20              A.   Like I said, it's not verbatim,

21    but that's the best of my recollection of what

22    was said.

23              So I said well, can I make an

24    appointment to come and see you tomorrow, the
```

1    next day.  So we set up a time, I believe it was

2    ten o'clock the next day.  I would have gone

3    down there that day but there were no more

4    company vehicles available to take down to

5    Harbeson, so I set it up for the next day.

6              I knew Wayne was out of the area,

7    out of the office.  Wayne came back, we talked,

8    I said we have an appointment at Harbeson

9    tomorrow.  I told him what I knew and then we

10   went down there the next day.

11             Q.  So you were the only one there in

12   the office to receive that phone call?

13             A.  Mr. Bennett was in the office, but

14   he wasn't on the other line.  I mean, he was in

15   the building with me.

16             Q.  Was Mr. Bennett informed of this

17   at any point?

18             A.  Sure.  I briefed him as soon as I

19   got off the phone what I knew had happened.

20             Q.  Okay.  Mr. Keller was out of the

21   area at that point, you told him later that

22   evening?

23             A.  I told him, but after I got off

24   the phone I talked to Mr. Bennett and I think I

1    called Mr. Keller on his cell phone and

2    explained to him, you know, we need to talk

3    about something when you get back here, so I

4    want to make sure we hooked up and I briefed him

5    on what was going on.

6              Q.   Okay.  And then you set up the

7    appointment for the next morning, that would be

8    December 12th?

9              A.   Yes.

10             Q.   And you went down to Harbeson?

11             A.   Yes.

12             Q.   With anyone, with Mr. Keller?

13             A.   Mr. Keller and I both went to

14   Harbeson the next day.

15             Q.   And you met with Mr. Miller?

16             A.   That's correct.

17             Q.   Just the three of you?

18             A.   Yes.

19             Q.   Did you make a record of any of

20   your conversations on December 11th, that

21   afternoon, evening of the incident?

22             A.   You mean a written record?

23             Q.   Yes.

24             A.   No.

```
 1              Q.   Did you make any record of the

 2     meeting, then, on the morning of the 12th?

 3              A.   No.

 4              Q.   Do you know if there is any

 5     written record?

 6              A.   Not that I'm aware of.

 7              Q.   Okay.  What happened at that

 8     meeting, what was discussed?

 9              A.   Basically went over what had

10     happened and, you know, I know that Mr. Miller

11     was upset about what had happened, the fact that

12     the state police had responded to the plant and

13     apparently he didn't know about it and this is

14     the second time it happened.

15              And, you know, my recollection is

16     that, you know, he reiterated the fact that she

17     had to go, that he couldn't have that kind of

18     activity going on in his plant, it was too

19     disruptive.

20              So we had asked if it would be

21     possible to have Robin work out her shift which

22     ended on Saturday and then Mr. Keller would call

23     Robin on one of her days off, probably on Monday

24     to let her know that she couldn't go back.  We
```

1    didn't want to exacerbate the situation by

2    telling her right then and there that she

3    couldn't come back, and we figured we would just

4    let things go as they were. We would try to

5    keep Mr. Whiteman away from her by asking him

6    just to wait in his car until Robin left because

7    he was the relief at three o'clock.

8              And so she finished out her week

9    up through Saturday without incident, and then

10   she took her days off Sunday and Monday.

11             Q.   Okay. I want to come back to that

12   in just a minute. I first want to ask you,

13   whenever you talked to Mr. Miller on the phone

14   right after the incident, did he tell you who

15   was responsible for this altercation, who

16   started it?

17             A.   No.

18             Q.   All he really said at that point

19   was something to the effect of she's got to go?

20             A.   Well, I mean, there was some

21   discussion about the incident, he just didn't

22   call up and say, you know, out of the clear blue

23   skies. I mean, there was talk about, you know,

24   an incident between Whiteman and Robin and the

1    fact that he called out there and like I said,

2    you know, she picked up the phone, they kept

3    slamming it down and he could hear yelling in

4    the background and he wasn't happy about that,

5    apparently.

6            Q.   Then at the meeting the next

7    morning, did you further discuss who might have

8    been responsible for this altercation?

9            A.   I don't remember discussing

10   assigning blame to anyone.

11           Q.   Okay.  So then if you weren't

12   really assigning blame to anyone, how did you

13   come to the decision to remove Ms. Nichols from

14   the situation?

15           A.   I wouldn't say that it was my

16   decision or Bennett Security's decision, we were

17   asked to remove her from the site.

18           Q.   You were specifically asked to

19   remove Ms. Nichols?

20           A.   If it was okay for her to stay

21   there, she may still work there up until the end

22   of the contract.  Like I said earlier, we're not

23   in the habit of removing people from a job site

24   just to move them.

1          Q.   But if someone, if a company with

2     whom you have a contract ask you to remove

3     someone, you try --

4          A.   Absolutely, not only in the case

5     of Allen Harbeson, but other locations routinely

6     throughout our company when a customer ask us to

7     replace someone, we do it, but we don't do that

8     on our own or unilaterally.

9          Q.   Did you conduct any investigation

10    on your own, anymore investigation into the

11    incident?

12         A.   No.

13         Q.   You didn't talk to Ms. Nichols

14    about it?

15         A.   I didn't.

16         Q.   Did anyone from Bennett's?

17         A.   I don't know.  I know I didn't.

18         Q.   Okay.  Did anyone talk to

19    Mr. Whiteman?

20         A.   I don't know.  I didn't talk to

21    Mr. Whiteman.

22         Q.   You're basically just relying on

23    Mr. Miller's request to remove Ms. Nichols?

24         A.   Yes.  I mean, at other job sites

1    we have had customers ask us to remove people

2    for nonperformance, bad performance.  You know,

3    it's their property and if they don't want

4    someone there, they want someone removed or

5    replaced, we accommodate them, or else we don't

6    keep the business, we lose the contract.

7            Q.   Now, this meeting on the 12th, did

8    you discuss with Mr. Miller any other possible

9    options as far as assigning Ms. Nichols

10   somewhere else, or even somewhere within

11   Allen's?

12           A.   Well, first of all, I don't think

13   we would ever suggest reassigning her within

14   Allen's.  I don't know if we discussed with him

15   what our future plans were for Robin, but I

16   would say in most cases, our goal is to -- I

17   mean, sometimes in some places it's not a good

18   fit for our employee and our customer, and since

19   we do have numerous work locations, it is easier

20   to relocate people when our customer ask us to.

21   And I think that was our goal, I know that was

22   our goal with Ms. Nichols.

23           Q.   Okay.  Do you know when

24   Mr. Whiteman was hired?

1          MR. BREWER:  Okay.

2     BY MR. BREWER:

3          Q.  Mr. Habicht, I have a few

4     questions for you.  Exhibit 1, that's this, the

5     agreement between Allen's, you were asked some

6     questions about that.  Go to page two on that

7     exhibit, paragraph five, please.  And this

8     paragraph says that it's mutually understood

9     that Bennett, meaning your company; correct?

10          A.  Yes.

11          Q.  Is an independent contractor, and

12     that's what you are, an independent contractor?

13          A.  That's correct.

14          Q.  And that all the guards employed

15     by Bennett to perform services are and shall be

16     employees of Bennett and not employees of

17     Allen's Family Foods; is that correct?

18          A.  That's correct.

19          Q.  So Ms. Nichols was an employee of

20     Bennett?

21          A.  That's correct.

22          Q.  And not Allen's?

23          A.  That's correct.

24          Q.  In fact, the last sentence talks

1  Keller, I wasn't around when Wayne Keller as I

2  talked to Robin Nichols.

3         Q.   If there were phone conversations,

4  you were not there to hear it?

5         A.   No.

6         Q.   Let me ask you this, did you have

7  any role in having Ms. Nichols removed from

8  Allen's to some other place?

9         A.   A role?

10         Q.   You, yes, did you have any input

11  into it?

12         A.   Just agreeing to accommodate

13  Mr. Miller's request.

14         Q.   I'm not sure if I understand what

15  that means.

16         A.   When he asked us to remove her

17  from the job site.

18         Q.   You didn't have to do that?

19         A.   If we wanted to keep the contract

20  we would have.

21         Q.   Did Mr. Miller say if you don't

22  remove her, you're going to lose the contract?

23         A.   No, he didn't say that.

24              MR. BREWER:  I don't have any

 1    further questions.

 2    BY MR. LANDON:

 3            Q.    Did Mr. Miller prior to this

 4    incident involving Robin Nichols ever ask

 5    Bennett to remove or transfer any other security

 6    guards from the Harbeson plant?

 7            A.    Yes, there was a couple of other

 8    individuals that I remember, one by the name of

 9    David Leggins and the other by the name of

10    Daniel Steele.

11            Q.    Do you remember when those

12    requests were made?

13            A.    I don't remember.  I could find

14    out those dates.

15            Q.    They were before the Nichols

16    incident?

17            A.    I believe they were, yes.

18            Q.    And David Leggins, was he white or

19    black?

20            A.    He was a black male.

21            Q.    What about the other person,

22    Daniel --

23            A.    Daniel.

24            Q.    Daniel?

1        A.    Daniel, male, D-A-N-I-E-L.

2        Q.    Steele?

3        A.    Yeah, I think it's S-T-E-E-L-E.

4        Q.    White or black?

5        A.    White male.

6        Q.    What were the circumstances that

7   led to those requests?

8        A.    I just remember that they had some

9   disagreements with the truck drivers down there,

10  and they were asked to be removed or replaced.

11       Q.    And how did those requests come

12  about, were they phone calls?

13       A.    Just a phone call.

14       Q.    From Mr. Miller to you?

15       A.    Yes.

16       Q.    To you?

17       A.    I don't remember.  I don't

18  remember if I talked to him and discussed it

19  with Wayne and Wayne took it and discussed it

20  with me.

21       Q.    On both of those instances, did

22  Bennett remove those individuals from the

23  Harbeson plant and reassign them?

24       A.    Yes.  Yes, we did.

1          Q.   Do you recall any instances where

2    Mr. Miller requested that a guard be reassigned

3    and Bennett refused to reassign the guard?

4          A.   No, I don't remember that ever

5    happening at Harbeson or anywhere since I have

6    been working at Bennett Security.

7          Q.   Was Robin Nichols replaced, was

8    there a guard that replaced her at the Harbeson

9    plant after you removed her?

10         A.   When she left Harbeson, that

11   created a forty-hour position which was

12   backfilled by not a supervisor, but another

13   security officer, an employee by the name of Amy

14   Stein.

15         Q.   Was she white or black?

16         A.   She was a white female.

17         Q.   Okay.

18         A.   But she was not the supervisor.

19         Q.   Was there a supervisor at that

20   point?

21         A.   At that time when Robin left, no,

22   there was not.

23         Q.   At some point was there a new

24   supervisor named?

```
 1              A.   Yes.

 2              Q.   Who was that?

 3              A.   Linda Fooks.

 4              Q.   Was she black or white?

 5              A.   She was a black female.

 6              Q.   How long after Robin left was

 7      Linda Fooks involved as the supervisor at the

 8      Harbeson plant?

 9              A.   I would say not being exact,

10      approximately four to six weeks.

11                   MR. LANDON:  I have nothing

12      further.

13                   MR. BREWER:  I just have two quick

14      questions, if I may.

15      BY MR. BREWER:

16              Q.   I just want to be sure.

17      Mr. Miller didn't ask you in this meeting on the

18      12th of December of 2003 to terminate

19      Ms. Nichols, did he?

20              A.   No.

21              Q.   And I believe I understood your

22      testimony to be that Ms. Nichols ultimately

23      resigned sometime the beginning of January,

24      latter part of December '03, beginning of
```