# EXHIBIT C

Case 1:05-cv-00055-KAJ   Document 44-4   Filed 01/27/2006   Page 1 of 19

00071306

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROBIN D. NICHOLS,                      )
                                       )
            Plaintiff,                 )
                                       )  Civil Action
v.                                     )  No. 05-555
                                       )
BENNETT DETECTIVE & PROTECTIVE         )
AGENCY, INC., a Delaware corporation,  )
and ALLEN'S FAMILY FOODS, INC.,        )
a Delaware corporation,                )
                                       )
            Defendants.                )


        Deposition of WAYNE A. KELLER, taken pursuant to notice at the law offices of Schmittinger & Rodriguez, 414 South State Street, Dover, Delaware, beginning at 12:06 p.m., on Friday, January 6, 2006, before Dale C. Hawkins, Registered Merit Reporter and Notary Public.


APPEARANCES:

            ADAM C. GERBER, ESQ.
            SCHMITTINGER & RODRIGUEZ, P.A.
             414 South State Street
             Dover, Delaware   19903
             for the Plaintiff


            ROGER D. LANDON, ESQ.
            MURPHY, SPADARO & LANDON
             1011 Centre Road, Suite 210
             Wilmington, Delaware   19805
             for the Defendant
             Bennett Detective & Protective Agency

APPEARANCES (Cont'd):

       ARTHUR M. BREWER, ESQ.
       LAURA A. PIERSON SCHEINBERG, ESQ.
       SHAWE & ROSENTHAL, LLP
        20 South Charles Street, 11th Floor
        Baltimore, Maryland  21201
        for the Defendant
        Allen's Family Foods, Inc.

ALSO PRESENT:
       Mr. Greg Miller
       Ms. Valerie Brittingham
       Mr. Mark Habicht

```
 1   it's in here.  Yes, contract may be terminated
 2   following thirty days written notice by either
 3   party of the other party's intention to
 4   terminate paragraph eight.  Yes, I think that's
 5   what it says.
 6          Q.  Now, I just want to turn directly
 7   to Ms. Nichols specifically.  Do you remember
 8   approximately when she was hired?
 9          A.  7/30/01.
10          Q.  So you remember specifically.
11              Did you play a role in her hiring?
12          A.  One of us, we were both probably
13   in the office that day because I don't know who
14   signed.  We have obviously employment forms, and
15   they have been in the disclosure packet, I
16   believe.  I don't know which one of us, but I
17   think I recall Robin had been in and out of our
18   office on different occasions picking up forms,
19   if she was in Dover she would stop by, so it
20   could have been either both of us, but yes, I
21   remember when she came on board.
22          Q.  Where is your office?
23          A.  In Dover, it's the Sorentino's
24   Restaurant now, there is a brick house in the
```

```
 1    were broken up in a utopian effort to say
 2    Mr. Habicht is in charge of these, Mr. Keller,
 3    you're in charge of those, but we each know each
 4    others because if he's away or I'm away and
 5    there is an issue with the client or we stop by
 6    to see them, we want to be able to interface
 7    with our contacts.
 8            Q.    And your duties overlap?
 9            A.    Yes, they do.
10            Q.    But you did know Mr. Miller?
11            A.    Absolutely.
12            Q.    We've also talked about
13    Ms. Nichols' performance.  Do you remember
14    having any disciplinary problems with her?
15            A.    I don't know if you would call
16    them disciplinary problems.  There were issues,
17    she had had.  She had had an issue with a driver
18    from one of the Allen's plants at the Harbeson
19    site one other time.  I remember, I don't know
20    if you would -- because I wasn't there.
21            Q.    Okay.
22            A.    And I don't know if it was an
23    offensive touching.  I believe someone, one of
24    their drivers had come in the guardhouse and
```

1   touched her, possibly even kissed her. She
2   called the state police, they responded, they
3   took a report on the matter.
4            She had a run in -- I won't say a
5   run in, she had a difference with Linda Fooks,
6   one of our security officers there. Robin was a
7   very religious person as were many of our people
8   that were there and I don't know what the
9   difference was involving that, but we -- she had
10  an issue there with an employee.
11           She had a Diane Stokes I believe
12  her name was, both were black females. She had
13  an issue with them that ultimately led to us --
14  Robin was not reassigned, Robin stayed, one girl
15  just terminated her service and Ms. Fooks said
16  she wasn't going to work with Robin and she said
17  transfer me or, you know, I'll go -- I'm just
18  not going to work with her, so do what you want.
19       Q.  And Ms. Fooks said that?
20       A.  Yes.
21       Q.  Do you remember approximately when
22  you said that Robin may have called the police
23  before?
24       A.  No.

```
 1         Q.   Okay.
 2         A.   It's in the notes.
 3         Q.   Was there any, ever any
 4   disciplinary action taken --
 5         A.   Robin was a victim, so there was
 6   no action taken against Robin.  No, she was a
 7   victim.
 8         Q.   And at some point was Robin
 9   promoted in Bennett's?
10         A.   Yes, she started out -- she might
11   have been one of the original security officers
12   when we received the Allen's contract, and when
13   I believe she replaced our original supervisor,
14   Kenny Cresage.
15         Q.   When was she promoted, do you
16   remember?
17         A.   No, I don't remember that.
18         Q.   So she had up until December 2003,
19   she had been there for --
20         A.   From 7/30/01 when she was hired,
21   that was the only site she worked at until such
22   time of the incident.
23         Q.   You said that was almost the
24   duration of the contract with that site with
```

```
 1   office that night, because I'm not sure -- I
 2   know the police had responded and I don't
 3   remember if they called our office.  Somebody
 4   from down there called the office and was --
 5   said that the police had responded but that they
 6   weren't going to charge anybody.
 7         Q.   Okay.  And then you did meet the
 8   next morning with Mr. Miller?
 9         A.   Yes, I did.
10         Q.   That was you and Mr. Habicht and
11   Mr. Miller?
12         A.   That's correct, the three of us.
13         Q.   Where did you meet?
14         A.   In Mr. Miller's office, Harbeson
15   plant.
16         Q.   What did Mr. Miller tell you in
17   that meeting specifically about the incident?
18         A.   I remember very clearly we got
19   there and you have to basically be signed in, so
20   we went to the guardhouse, they called in, we
21   walked down to Mr. Miller's office, waited
22   outside in the foyer for a little while and then
23   he came and got us, we walked in.  We sat down
24   and he looked at us and he said I like you guys,
```

| | |
|---|---|
| 1 | she's got to go.  And that was the opening of |
| 2 | the meeting. |
| 3 | Q.   That was the first thing he said? |
| 4 | A.   How you doing, you know, |
| 5 | pleasantries like that, but I remember that |
| 6 | specifically because you have to understand, in |
| 7 | our company, obviously Robin had been there a |
| 8 | long while.  She had done at least an adequate |
| 9 | job in our opinion. |
| 10 | Now, granted, she reports to |
| 11 | Mr. Miller for her daily issues.  If they wanted |
| 12 | to change how they did business, he wouldn't |
| 13 | necessarily call us, he would talk to the site |
| 14 | supervisor, which Robin was.  If they were |
| 15 | changing procedures or those types of things, |
| 16 | visitors coming, those types of things, they |
| 17 | interfaced more with her than we did obviously |
| 18 | on a daily basis. |
| 19 | And I lost track of where I was |
| 20 | with our question.  I'm sorry. |
| 21 | Q.   That's fine. |
| 22 | After he asked, started out by |
| 23 | asking that she be removed, did he give you more |
| 24 | details about the incident, for example, who was |

1   A.   He had asked at the beginning and
2   we didn't have to go over it. It's not an
3   enjoyable situation to go to a client because
4   one of your employees has gotten involved in
5   some type of an incident.
6            So I like Greg Miller, but I don't
7   want to be in his office anymore than I have to.
8   You tell me that there is a situation, my job
9   then is to handle it.
10          Q.   Did you discuss any other options
11  with Mr. Miller as to possibly transferring
12  Ms. Nichols?
13          A.   No, because as long as she wasn't
14  working at his plant, I don't think he really
15  cared.
16          Q.   Did you personally investigate the
17  facts of this altercation anymore?
18          A.   Not really. I had probably talked
19  to Joe because we had agreed with Mr. Miller,
20  that was the other part of the meeting, so it
21  was less disruptive to the Allen's because we
22  value their contract, we had a contract with
23  them, we valued their business and it wasn't
24  just there, we also worked at the Cordova plant

| | |
|---|---|
| 1 | which was a couple hundred hours of business a |
| 2 | week as well, so we're looking at them as a |
| 3 | company, not necessarily as an entity there, |
| 4 | that we would leave Robin there and she would |
| 5 | work two more days, which was the rest of her |
| 6 | normal schedule, Friday and Saturday, and she |
| 7 | would not return to work security there, that |
| 8 | way it was probably less disruptive because we |
| 9 | didn't want Robin to possibly go back to the |
| 10 | plant still if she was in an upset situation, to |
| 11 | go down there and raise any cane or anything |
| 12 | like that, since there had already been one |
| 13 | incident. |
| 14 | And we had instructed |
| 15 | Mr. Whiteman, and that might have been myself, I |
| 16 | don't remember, we told him that he would sit in |
| 17 | his car, because I think there was only one more |
| 18 | day until Ms. Nichols left so that there was no |
| 19 | interface, because at the plant there was also I |
| 20 | believe at the time, but I'm not sure, I think |
| 21 | there was another three o'clock guard who would |
| 22 | be coming on, so it wasn't like Robin would |
| 23 | drive away and there would be a lapse of thirty |
| 24 | seconds for the other officer to run into the |

1   guardhouse, I think we had two people working
2   the 3:00 to 11:00 shift.
3           Q.   So there were no subsequent
4   altercations between, or problems between
5   Ms. Nichols and Mr. Whiteman?
6           A.   None that were brought to my
7   attention, no.  And I don't think there was any
8   at all.
9           Q.   But you still tried to keep them
10  separated to some extent, is that what you're
11  referring to?
12          A.   Yes, exactly.  We didn't want it
13  to flare up.  I don't think -- I don't think the
14  incident -- if there was no -- that is my
15  understanding, there were no criminal charges
16  pressed, it wasn't an offensive touching that
17  I'm aware of filed, so there is no criminal
18  problem here, what we had was two officers who
19  apparently got in a disagreement.
20          Q.   So it's your understanding that
21  nothing was actually filed, no criminal charges
22  actually filed?
23          A.   That is correct.  Had they been
24  filed, we probably would have lost an officer

1  occurred.
2       Q.  So after this meeting, what action
3  did you take in regards to Ms. Nichols?
4       A.  Sure.  The meeting was over on the
5  12th, Robin worked the 12th and the 13th which
6  would have been a Friday and Saturday.  She was
7  off Sunday and Monday.  On December 15th at some
8  point I called her and asked her not to report
9  back in and at that point I believe it was an
10 answering machine, because I had conversation
11 with her, it had to be later that day, I'm sure
12 she called me back.
13      And I left a message saying
14 listen, it has nothing to do with Allen's, it's
15 just we need to have change because what I don't
16 want to have happen is for her to find out and
17 we had already had this meeting with Mr. Miller
18 saying we'll do it this way so that we don't
19 have Robin come back and make a scene at your
20 property because that has happened before to our
21 customers.
22      So I left a message saying Robin,
23 just time to move on, we have had some hiccups
24 down there and that was whether it was with

1  other personnel or the other incident where she
2  had called the police, it was just time to move
3  her and that I would offer her a position
4  elsewhere.
5      Q.  So you asked Mr. Miller if you
6  could let her complete her shift just so you
7  wouldn't have any problems when she --
8      A.  You have to understand, we have
9  business with Allen's like I said at two
10 locations, a lot of work, and you know, if Robin
11 had flared up because of whatever between her
12 and Joe, I didn't want her to return to that
13 again.  I valued Allen's business, I left her a
14 message, it's Bennett, because Greg wasn't going
15 to ask her to be transferred himself, so it was
16 my responsibility or Mr. Habicht's
17 responsibility to do that.
18     Q.  Right.  Ultimately it would be
19 your responsibility.
20          You also mentioned a couple of
21 other incidents at the Harbeson site.
22     A.  Uh-huh.
23     Q.  What were those incidents?
24     A.  She had gotten in shouting

1  thought I could fill right away for her for
2  forty hours, we only have limited positions, you
3  can't create customers, you only have so many
4  customers and there is only so many positions.
5  And I explained to her that I would look to get
6  her a position as soon as I could.
7        Q.   So how long was it until you were
8  able to provide a position for her?
9        A.   A couple of days went by, and you
10 know, it was maybe two days, I talked to her on
11 the 15th, maybe on the 18th I got a call from
12 someone, I want to say it was Social Services,
13 I'm not sure, I talked to a lady, I think Robin
14 was probably there, and she was trying to help
15 Robin. And I believe I talked to Robin at that
16 location, or later in the day I had talked to
17 her, but I had a person who was either going to
18 leave us, wasn't sure, but an opening came at
19 the Milford Perdue facility.
20       Q.   And --
21       A.   We had offered her thirty-two
22 hours, and I offered her thirty-two hours there
23 to start training, maybe the 19th and the 20th,
24 somewhere in that general area, of December.

1    Q.   And her position at Bennett was
2  full-time?
3    A.   Yes, it was, she was working forty
4  hours.  And this was thirty-two, but I told her
5  I would try to get her eight more hours because
6  that's not unusual.  We may have workers who are
7  twenty-four hours at site A and sixteen hours at
8  site B to get them at forty hours.  That was my
9  attempt to at least get her back into a position
10 where she was getting the bulk of her normal
11 forty hours.
12    Q.   Were you able to find her a
13 position with forty hours?
14    A.   No, never, ultimately I was not.
15    Q.   And then how long was it until
16 Ms. Nichols resigned?
17    A.   She -- initially she didn't want
18 to go to Milford Perdue, and then she said she
19 would.  And the first day she was supposed to go
20 in for training she called in sick and she was
21 really ill.  And I said well, you know what, I
22 can't have her -- she was working through the
23 Christmas holidays, the way her shift would have
24 taken her through there.  I said Robin, if you

can't go in, I understand that, people get sick, but I can't hold a position. I have to have a trained officer in there because you just can't throw a person into a customer's position.

If you owned a car lot and you're my client and you tell me make sure there is no dealer plates and all four doors are locked on a car, I don't have to give you a lot of training other than take you out there, show you it's a car lot, identify that four wheels and a body is a car, you can do that.

At the facilities she worked at to include Allen's and Milford Perdue, you had to lock trucks in, you had to lock trucks out, you had the fuel trucks, you had to do chicken sales, there is a lot that officers do there. There is a lot of responsibility they have. To put Robin in a position like that through the holidays it would have been a bad decision on the company's part.

So I said Robin, we'll find you something else. She said that was fine, she would wait until after the holiday because Christmas was going to be upon us, she had

1   What she had said from a racial
2   issue is we favored the black people at the
3   plant over the white people. But this all
4   happened after she had been terminated for not
5   coming to work one day. She called in sick and
6   for her three o'clock shift, we have a four-hour
7   minimum and she called in really close to the
8   time she was due to work. And some hour later
9   one of the security officers who was assigned to
10  work at the plant that day noticed her pull up
11  in a car and pick up one of her girlfriends.
12  And we terminated her as a basis of lying to the
13  company and not coming into work that day. And
14  I think that was the basis for her suit. But it
15  went unfounded.
16       Q.   Employees of Bennett, are they
17  considered at will?
18       A.   Absolutely. We have no contracts
19  with employees.
20       Q.   Would it have mattered to you who
21  started this altercation or were you just
22  following the instructions of Mr. Miller?
23       A.   Mr. Habicht had said earlier, we
24  don't transfer people, it's disruptive to the

1  company, you have to do new training, you lose
2  proficiency. Robin had been there a long time,
3  and we weren't going to move Mr. Whiteman. He
4  didn't ask to move Mr. Whiteman and neither one
5  of them had any type of criminal charges pressed
6  against them. And to the extent that I learned
7  afterwards I believe Robin told me that
8  Mr. Whiteman had called her later that night and
9  apologized and that was an issue that, you know,
10 she felt had been put to bed, but she doesn't
11 see in interaction between the company, she's
12 looking at it strictly at the personnel level
13 between her and Mr. Whiteman.
14     Q.   So you didn't necessarily want to
15 transfer her?
16     A.   Absolutely not. I told you, I
17 didn't have a position to put her in, but I
18 still had the responsibility to find her work or
19 she would draw unemployment. And I don't have a
20 problem with trying to find people work, but my
21 hands are tied to what I have available.
22     Q.   They're only limited positions?
23     A.   Exactly.
24          MR. GERBER: Thank you. I think