# TAB 4

1

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROBIN D. NICHOLS,                      )
        Plaintiff,                     )
                                       )
        v.                             )  C.A. No.
                                       )  05-555 (KAJ)          *t*
BENNETT DETECTIVE & PROTECTIVE         )
AGENCY, INC., a Delaware corporation,  )
and ALLEN'S FAMILY FOODS, INC., a      )
Delaware corporation,                  )
        Defendants.                    )

              Deposition of **ROBIN DENISE NICHOLS**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Schmittinger & Rodriguez, 414 South State
Street, Dover, Delaware, on Wednesday, December 7, 2005,
beginning at 11:30 a.m.

APPEARANCES:

        SCHMITTINGER & RODRIGUEZ
        BY:  WILLIAM D. FLETCHER, JR., ESQUIRE
        and ADAM C. GERBER, ESQUIRE
        414 South State Street
        Dover, Delaware  19901
        Attorneys for Plaintiff.

        MURPHY, SPADARO & LANDON
        BY:  ROGER D. LANDON, ESQUIRE
        300 South State Street
        Dover, Delaware  19901
        Attorney for Defendant
        Bennett Detective & Protective Agency, Inc.

                   (Appearances Cont'd...)


        **ORIGINAL RETAINED BY ARTHUR M. BREWER, ESQUIRE**

_____

                    **ANTHONY REPORTING**
                      **PO Box 234**
                **Dover, Delaware   19903**
                     **(302) 674-8884**

**5**

1  make myself clear to you.
2          Okay. Do you have any physical or mental
3  problems which would interfere with your ability to
4  answer any questions here this morning?
5     A.   No, sir.
6     Q.   Are you on any medications at all today?
7     A.   No, sir.
8     Q.   I'm going to ask you this question, ma'am.
9  Could you tell us, please, how you came to contact
10 Mr. Fletcher?
11    A.   I called the office.
12    Q.   Okay. How did you know which office to
13 call, I guess, is what I'm asking?
14    A.   My pastor referred me to Bill, to this
15 office.
16    Q.   All right. Did you do any preparation for
17 your deposition here today?
18    A.   No, sir.
19    Q.   Did you review any documents?
20    A.   Today?
21    Q.   In preparation for your deposition today?
22 Yesterday? The day before?
23    A.   I was given paperwork, questions to answer.
24 I'm not sure what you are saying.

**6**

1          MR. FLETCHER: I think she's talking about
2  interrogatories that you want her to answer.
3          MR. LANDON: All right.
4          THE WITNESS: Yes, that's it.
5  BY MR. BREWER:
6     Q.   When did you do that?
7     A.   Probably about almost a month ago.
8     Q.   All right. So then when your counsel
9  suggests what you are referring to is information that
10 was given to us in response to questions we had asked
11 you, that is what you are referring to?
12    A.   Yes, sir.
13    Q.   There would have been no other documents
14 that you reviewed?
15    A.   No.
16    Q.   All right. Since the case was filed, which
17 was in December of last year, have you discussed your
18 claims with anyone?
19    A.   No, sir.
20    Q.   Have you kept a journal? Have you ever kept
21 a journal at any time?
22    A.   Before the case, yes.
23    Q.   Okay. What kind of entries would you have
24 made in your journal?

**7**

1     A.   I kept a record since the day I was told not
2  to report back to Allen Foods, when I called in for work
3  to see if they had any work for me. They told me to
4  call on a daily basis.
5     Q.   Who is the they that you are referring to?
6     A.   Bennett Security.
7     Q.   What is the date that you were told --
8     A.   December --
9     Q.   I'm sorry. I didn't hear you.
10    A.   December 15, 2003, I believe, yeah, 2003.
11    Q.   That is when you began keeping this journal?
12    A.   Yes, sir.
13    Q.   And are you still maintaining it?
14    A.   No, sir.
15    Q.   When did you stop?
16    A.   December 19, 2004.
17    Q.   December 19th, did you say?
18    A.   Yes, sir.
19    Q.   Thank you. Can you tell me why you stopped,
20 please?
21    A.   Because I was no longer employed with
22 Bennett Security, and I had started working on a new
23 career.
24    Q.   By that answer, can I take it to mean that

**8**

1  you were employed with Bennett from the 15th of December
2  in 2003 up to December 19, 2004?
3     A.   Yeah, because that would have been the day
4  that -- the last day for the two weeks' notice.
5     Q.   By the way, Ms. Nichols, I should have
6  stated this before I started. If at any time you need a
7  break, just please let me know.
8     A.   Okay.
9     Q.   Can you tell me what kind of entries you
10 would make in your journal, please?
11    A.   I put the dates that I called in and whether
12 or not if they told me I had a job or whether or not if
13 I had work or no work. I talked to just -- I called in
14 their response. That was what my journal was basically
15 about.
16    Q.   Did you make these entries every day?
17    A.   Yes, every day that I called and their
18 response, except for the weekends.
19    Q.   Okay. So if we looked --
20    A.   Monday through Friday.
21    Q.   If we looked in your journal, we would not
22 see any entries for the weekends?
23    A.   No.
24    Q.   Okay. We would see entries on every day of

A 011

25

1    Q.   Oh, all right.  Tankala?
2    A.   T-A-N-K-A-L-A.
3    Q.   T-A-N-K-A-L-A.  Okay.
4    A.   He's just my family doctor.
5    Q.   Let's see.  Ms. Nichols, let me ask you this
6    question.  Were you ever employed at any time by Allen
7    Family Foods.
8    A.   No, sir.
9    Q.   Who did you receive your benefits from?
10   A.   Bennett Security.
11   Q.   Who was your supervisor at Bennett?
12   A.   Wayne Keller and Mark.  I can't remember
13   Mark's last name.
14   Q.   Were they employees of Allen's at all?
15   A.   I'm not sure how that works, sir.  I just
16   know that they hired us to work at Allen's.
17   Q.   They --
18   A.   Mark -- I mean Bennett Security.
19   Q.   They hired you to work at Allen's?
20   A.   Right.
21   Q.   But you don't know whether Mr. Keller is
22   employed by Allen's or employed by Bennett?
23   A.   No.  I know he works for Bennett.
24   Q.   But do you know if he works for Allen's at

26

1    all?
2    A.   What are you -- I don't understand.
3    Q.   That is fine.  Like I said, if you don't
4    understand the question, please ask me.
5         Mr. Wayne Keller, whom you have identified,
6    you know works for Bennett?
7    A.   Yes.
8    Q.   And you identified him as your supervisor?
9    A.   Yes.
10   Q.   My question is Mr. Keller doesn't work for
11   Allen Foods.  He works for Bennett, doesn't he?
12   A.   Yes.
13   Q.   And the same is true for Mark?  He works for
14   Bennett, also?
15   A.   Yes.
16        MR. BREWER:  May we have this marked as
17   Exhibit 1?
18        (Nichols Exhibit Number 1 was marked for
19   identification and attached to the record.)
20   BY MR. BREWER:
21   Q.   Ms. Nichols, I'm going to show you a
22   document which I have had marked as Exhibit 1 to this
23   deposition.
24   A.   Uh-huh.

27

1    Q.   Can you take a look at this, please?
2    A.   Uh-huh.
3    Q.   Can you tell me what this is?
4    A.   It says it's the Condition of Employment.
5    Q.   If you look to the second page, is that your
6    signature there?
7    A.   It looks like it.
8    Q.   Okay.  And the date, was that something that
9    you would have written in?  Is that your handwriting?
10   A.   Uh-huh.  It looks like it, yes.
11   Q.   And this document, which is entitled
12   Conditions of Employment, deals with Bennett Security
13   Services?
14   A.   Uh-huh.
15   Q.   And this relates then to your employment
16   with Bennett?
17   A.   Yes.
18        MR. BREWER:  Exhibit 2.
19        (Nichols Exhibit Number 2 was marked for
20   identification and attached to the record.)
21   BY MR. BREWER:
22   Q.   Ms. Nichols, would you take a look at the
23   document that I have had marked for identification as
24   Exhibit 2 to your deposition?

28

1    A.   Uh-huh.
2    Q.   Can you tell me what this is?
3    A.   It's a W-2 --
4    Q.   For what year?
5    A.   -- for Bennett Security.
6    Q.   And the employer's name is Bennett Security?
7    A.   Yes.
8    Q.   And this document was supplied, I believe,
9    to us by your attorney.  And this shows that you were
10   paid by Bennett.
11   A.   Yes.
12   Q.   Did you ever receive a W-2 form like this
13   from Allen Family Foods?
14   A.   No, sir.
15        MR. BREWER:  Exhibit 3, please.
16        (Nichols Exhibit Number 3 was marked for
17   identification and attached to the record.)
18   BY MR. BREWER:
19   Q.   Ms. Nichols, can I ask you to take a look at
20   the document that has been marked as Exhibit Number 3 to
21   your deposition?
22   A.   Yes.  It is my resume.
23   Q.   In this resume that appears to be
24   handwritten, on page two --

---

**29**

1    A.    Yes.
2    Q.    -- it says from August of '01 through it
3  looks like November.  And then that is scratched out,
4  and then there is January.  And the date is then '04?
5    A.    Correct.
6    Q.    That is the period of time that you were
7  working for Bennett?
8    A.    Yes, sir.
9    Q.    I would like you to clear up for me, if you
10  would --
11    A.    Uh-huh.
12    Q.    -- when we talked earlier about your
13  journal, you said that you stopped making entries in
14  that journal on December 19th of '04, which is --
15    A.    No.  I said January 19th of '04.
16    Q.    I'm sorry.  Maybe you did.  I wrote down
17  December 19, '04.  So then you kept your journal that we
18  were referring to earlier?  Do you remember the journal
19  we talked about earlier?
20    A.    Yes.
21    Q.    You started that on the 15th of December,
22  2003 and stopped --
23    A.    Correct.
24    Q.    -- on January 19, 2004?

---

**30**

1    A.    Yes.
2    Q.    Thank you.  I probably wrote that down
3  incorrectly.  That is 19 January '04.
4        The first job I am looking at is your
5  employment from September of '04 to April of '05 as a
6  school bus driver.
7    A.    Oh.
8    Q.    I'm sorry.  Go back to page one.  Thanks.
9  Okay.  That is the job you are going to be looking at.
10  Can you tell me why you left that job?
11    A.    Because they cut my hours without notice and
12  took away -- They went back two weeks and took my pay
13  with no notice.
14    Q.    I'm not sure I understand your answer.  They
15  cut your hours, I understand.
16    A.    Yes.
17    Q.    What hours were you working?
18    A.    I was getting like six hours, six to seven
19  hours a day driving a school bus.  And they took away an
20  hour.
21    Q.    They took away one hour?
22    A.    Uh-huh.  But the thing of it is, because
23  they cut the hour, that meant I couldn't get health
24  insurance because it made me part-time.

---

**31**

1    Q.    Okay.  I believe I understand that.  And
2  that is why you left?
3    A.    Yes.
4    Q.    And from April of '05 through today, are you
5  employed now?
6    A.    No, no, sir.
7    Q.    You are not.  So you still don't have health
8  insurance?
9    A.    Correct.
10    Q.    Does your husband have health insurance?
11    A.    No, sir.
12    Q.    He doesn't?
13    A.    No.
14    Q.    Would you explain to me how quitting helped
15  your situation with respect to health insurance?
16    A.    It didn't help me there.  It was just that
17  they took everything away, you know, with no notice or
18  nothing.  I mean I wasn't really working there for the
19  health insurance, but it was a big help.  Then they cut
20  my hours, and they took away the health insurance.  And
21  it just didn't seem worth it.
22    Q.    When that happened, were you --
23    A.    My husband is trying to get his health
24  insurance.

---

**32**

1    Q.    Okay.  That is fine.  But I guess my
2  question would be from that period of time in April of
3  '05 when you left, have you just been basically working
4  at home, taking care of the children and things of that
5  nature?
6    A.    Yes.  But I have been looking for work.
7    Q.    The CDL that you have is a class B?
8    A.    Uh-huh.
9    Q.    So you can't necessarily drive over-the-
10  road rigs, but you can drive other equipment.  But there
11  has been no --
12    A.    No, I guess not.
13    Q.    You haven't been able to find anything?
14    A.    No.
15    Q.    Prior to working as a school bus driver, you
16  left The Milford Center as a CNA?
17    A.    Yes.
18    Q.    You worked there for approximately five
19  months?
20    A.    Uh-huh.
21    Q.    Can you tell me why you left that position?
22    A.    I was having a staffing problem.  We were
23  like the new girls on the floor, and they were like
24  giving us the hardest jobs.  We were reporting it, but

---

**33**

1  nothing was being done. And so I got upset and I quit.
2      And then the next day I thought about what I
3  had done. And I talked to the director of nursing, and
4  she tried to get my job back. But the person over her
5  didn't want to make any exceptions because they never
6  did before, even though they understood. But I couldn't
7  get my job back.
8      Q.   So when you left Bennett, you went --
9      A.   Yes, to the nursing --
10     Q.   You went right from Bennett to the nursing
11  home?
12     A.   Right.
13     Q.   And then you explained that situation?
14     A.   Right.
15     Q.   What did you do from May of '04 to September
16  of '04, during that summer?
17     A.   Well, for some reason, it's not on here.
18  The lady that did my resume for me, I gave her the
19  information. Then I got a job -- from there I got a job
20  at -- the nursing assistant job came after Bennett, and
21  then the school bus driver job came.
22         When I left the school bus driving job, I
23  went to the Department of Labor, and I got a job at
24  Allied Security. And I was working at some place at the

**34**

1  Peninsula in Millsboro. And when I went to work there,
2  I couldn't come in on my day off. And they fired me.
3      Q.   Allied was the name of the company?
4      A.   Allied Security.
5      Q.   Allied Security. To the best of your
6  recollection, when did you start with them?
7      A.   May 2000 -- this year, 2005.
8      Q.   After you left the --
9      A.   Yes.
10     Q.   So May of '05?
11     A.   Uh-huh.
12     Q.   And when did they fire you?
13     A.   May 2005.
14     Q.   Oh, so you were there for a very short
15  period of time?
16     A.   Yes.
17     Q.   And the reason given is because you couldn't
18  come in on your day off?
19     A.   Right. And they didn't give me any notice.
20  I would have came in, but I had already made
21  obligations. He told me: Well, if you can't come in,
22  then bring in your uniform. And that is what I did.
23     Q.   Okay. When you worked for Allied, which
24  account of theirs were you assigned to?

**35**

1      A.   Peninsula.
2      Q.   Oh, The Peninsula?
3      A.   Uh-huh.
4      Q.   Oh, I thought you were referring to --
5      A.   It's like a resort or something, houses and
6  man-made swimming pools and everything in Millsboro.
7      Q.   I believe you mentioned to me that you were
8  still looking for employment.
9      A.   Yes.
10     Q.   Where are you looking?
11     A.   Let's see. I tried driving companies. I
12  have tried home assistance living and a little bit of
13  everywhere. But my husband just told me to take my
14  time, because I just really wasn't having any type of
15  luck keeping a job. He told me to take my time until I
16  got something that I really wanted and really liked.
17         And then I thought about going to school,
18  going to the Department of Labor. But the class that I
19  want doesn't start until I think 2006. And that class
20  was administrative office specialist, something like
21  that.
22     Q.   Where would you take that? At Del Tech?
23     A.   Yes, sir.
24     Q.   The reason I ask you that question,

**36**

1  Ms. Nichols, is my firm represents a lot of people down
2  on the Shore. And I know that nursing homes, like the
3  Millsboro Nursing Home and the one at Nanticoke in
4  Seaford, are always looking for CNAs. That is why I'm
5  wondering why you have had a difficult time.
6      A.   Well, another thing, not just the staffing,
7  but I was -- I just decided that that was not what I
8  really wanted to do. It is just too much on your body.
9  And every night just about, my back was going out. And
10  I just told my husband I don't think that is the field
11  for me.
12         Now, if the person was able to do much more
13  for themselves and I could just assist, that would be
14  fine. But I really -- a nursing home, I don't want to
15  work in a nursing home.
16     Q.   But that is why you are saying that you
17  wanted to go take this course as an administrative
18  office assistant --
19     A.   Yes, do something else.
20     Q.   --and get out of that field as a CNA?
21     A.   Right.
22         (Nichols Exhibit Number 4 was marked for
23  identification and attached to the record.)
24

37

1  BY MR. BREWER:
2      Q.  Ma'am, I will ask you to take a look at a
3  document which is being marked as Exhibit Number 4 to
4  your deposition.  And what this is is initial
5  disclosures that were made by your attorney, not only to
6  us but to counsel for Bennett Detective Agencies.  We
7  made similar disclosures.  Each of us made similar
8  disclosures to your attorneys.
9          What I would like to ask you is you have
10  identified people who have knowledge of the claims that
11  you have made in this case.
12      A.  Uh-huh.
13      Q.  The first one you have identified,
14  obviously, is yourself, which goes without saying.  The
15  second is Joseph Josh Whiteman.  Who is he, and what
16  knowledge does he have about the claims that you have
17  made in this case?
18      A.  I'm not sure.  What are you asking me?
19      Q.  I'm asking you, first of all, who is Joseph
20  Josh Whiteman?
21      A.  He was a co-worker.
22      Q.  A co-worker for --
23      A.  Bennett.
24      Q.  He worked for Bennett?

38

1      A.  Yes, sir.
2      Q.  He did not work for Allen's?
3      A.  No, sir.
4      Q.  What information does Mr. Whiteman have, as
5  far as you know, that would support --
6      A.  Well, I don't know that -- All I know is he
7  was part of the problem that day that the incident took
8  place at Allen's Foods on the job, at the job site.
9      Q.  Let me see if I can be a little more helpful
10  to you in answering my questions.  When I refer to
11  claims that you have made in this case, they are as far
12  as Allen's is concerned.
13      A.  Uh-huh.
14          MR. BREWER:  Off the record.
15          (Following a discussion off the record:)
16  MR. BREWER:
17      Q.  Are you ready, ma'am?
18      A.  Yes.
19      Q.  The Complaint that you filed in court
20  accuses Allen's of several things.  One, you accuse us
21  of discriminating against you on the basis of your race.
22      A.  Uh-huh.
23      Q.  You say that about Allen's.
24      A.  Uh-huh.

39

1      Q.  You say Allen's discriminated you based on
2  race?
3      A.  Yes.
4      Q.  But you were not employed by Allen's?
5      A.  No.
6      Q.  What would Mr. Whiteman have to do and how
7  could he support the claim that you have made that you
8  have been discriminated against on the basis of your
9  race by Allen's, since he was also employed by Bennett?
10      A.  Because he was the one that communicated
11  with Mr. Miller.
12      Q.  Mr. Whiteman communicated with Mr. Miller?
13      A.  Yes.
14      Q.  Do you know that for a fact?
15      A.  Well, I sent them down there.
16      Q.  What --
17      A.  To his office.  Do you want me to explain
18  the situation?
19      Q.  Yes, please do.  I need to explain what is
20  going on.
21      A.  Let's see, the 15th is Monday.  I would say
22  about the 11th of December 2003, a prior incident had
23  took place that Josh evidently was a witnesses of at the
24  job site.  And Mr. Miller called me, because I was the

40

1  supervisor at the time, to tell Josh to report to his
2  office for a meeting when he came in.
3          And I gave Josh the order.  Josh refused.
4  And I asked Josh to please go, because I needed to leave
5  on time to pick my daughter up from school.  And then he
6  just laid into me, you know, just started arguing with
7  me, that I'm the supervisor and it's my job to have my
8  hide there and -- well, he used other words.  And before
9  that, he had came in fussing about --
10      Q.  He being Mr. Whiteman?
11      A.  Yeah, Mr. Whiteman, about they stopped his
12  medication.  And he was shaking, going into withdrawals,
13  and he was really angry when he came in.  When I told
14  him what Mr. Miller said, you know, he was already
15  irritated.  So anyway --
16      Q.  Excuse me.  I want to be sure I have this.
17  This is all occurring on the 11th of December?
18      A.  Yes.
19      Q.  Okay.  That is all I wanted to know.
20      A.  And so a driver came up to the window, and I
21  was -- Josh was still fussing.  So I went to attend to
22  the driver, and Josh pushed me.  And I punched him back
23  and told him:  Don't push me anymore.  Don't put your
24  hands on me.

**41**

1    And then he pushed me again. And then I
2  pushed him again. And then he pushed me into the file
3  cabinet and the CB radio. And the windows were tinted,
4  and I asked the driver could he see, you know, him
5  pushing me. And the driver said, no, he didn't see
6  anything.
7    But anyway, I called the police and reported
8  what happened. Now, by the time the police got there,
9  Josh had went into the office with Mr. Miller. And when
10  the police got there, I came into the office and I asked
11  for Josh. I went down to Mr. Miller's office, which
12  before you get to his office, there's other offices.
13    And Ms. Eva, I told her what the problem
14  was, and she said: Well, you know, you have permission
15  to go in there and interrupt the meeting. The police
16  are here. Just go in there.
17    So I went and I knocked. I knocked, and I
18  went in and let Josh know that the police was here for
19  what had happened. And the police took a statement.
20  And of course, Josh lied and said he never touched me.
21  And I didn't have any witnesses to prove it or anything,
22  because nobody saw nothing.
23    And so I felt really bad about it, because
24  when something like that happens -- you know, we are

**42**

1  supposed to be like a team. Everybody is on the same
2  team, and it makes the whole team look bad.
3    So it bothered me all that night. And I
4  called Josh's partner, Brother Lonnie, who is spiritual.
5  And so I talked to him about it. And you know, I asked
6  him to maybe talk to Josh or, you know, I wanted to
7  apologize. But he had Josh call me. And Josh called me
8  that same night, and he apologized. And then after
9  that, I just remember -- and that was settled.
10    Then Mr. Miller had called a meeting with
11  Wayne and Mark on that Friday. And my work schedule
12  then was Tuesday through Saturday. And so they went in,
13  and they had their meeting. They came out, and I
14  informed Mark and Wayne that Josh and I had worked
15  everything out and everything was okay. And I didn't
16  press any charges further on him. Then I finished my
17  work week out.
18    On December 15th -- which I'm off on Sundays
19  and Mondays -- that is when I received a message on my
20  answering machine not to report back to Allen's. Do not
21  report back to that site. If there are any belongings
22  that you have there, we will retain them. But please do
23  not go back to that site.
24    Allen Foods was aware, you know, of this,

**43**

1  that I was not supposed to be on the property, like I
2  was some sort of plague or something, like I had really
3  done something wrong now.
4    So they had moved me, with nowhere to go.
5  But they didn't fire me. So that is how I knew it
6  wasn't their decision to move me.
7    Q.  You have covered a lot of territory, and I
8  have a number of questions. Let's start back on the
9  11th. You said that Mr. Miller called you and wanted
10  you to have Mr. Whiteman report to his office?
11    A.  Yes, sir.
12    Q.  Did he tell you why?
13    A.  Just for a meeting.
14    Q.  Okay. I'm sorry. I don't mean to interrupt
15  you. So you and Mr. Whiteman are in the security
16  trailer?
17    A.  The security office.
18    Q.  The security office. It's been a while
19  since I have been at the facilities. So the two of you
20  were at the security office. You and Mr. Whiteman are
21  both in the office?
22    A.  Yes.
23    Q.  Mr. Miller calls down and says: I would
24  like for you to send Mr. Whiteman up to see me?

**44**

1    A.  Mr. Whiteman hadn't gotten there yet.
2    Q.  He hadn't gotten there yet, so it is just
3  you?
4    A.  Me and my partner.
5    Q.  Who was that?
6    A.  I think it was -- golly day. I want to say
7  it was -- I don't think it was -- I can't remember his
8  name, because he had just came on. I can't remember
9  who -- or was it Joe Duncan? I'm not sure who my
10  partner was then. They switch off real quick.
11    Q.  Whoever it was, Mr. Miller is calling down
12  to you and your partner is in there with you, whoever
13  that might have been?
14    A.  Uh-huh.
15    Q.  And Mr. Miller is saying to you: Send
16  Mr. Whiteman to my office?
17    A.  Yes.
18    Q.  Did he say why?
19    A.  He said: I want to meet with him. So when
20  he comes in, send him into the office.
21    Q.  So Mr. Whiteman hadn't been in yet?
22    A.  Correct.
23    Q.  Mr. Whiteman worked for Bennett?
24    A.  Yes.

---

**45**

1    Q.    And Mr. Miller never told you why he wanted
2 to see Mr. Whiteman?
3    A.    I'm not sure if Mr. Miller told me what it
4 was for. But I just remember that -- I knew what was
5 going on, so he really didn't have to tell me.
6    Q.    You knew what was going on --
7    A.    Yeah.
8    Q.    -- when Mr. Miller first made the call down?
9    A.    Yes.
10    Q.    What was going on?
11    A.    Josh had witnessed an incident on the wash
12 pad with an Allen's Foods driver and an outside driver.
13 And they were arguing about the wash pad. And Josh
14 witnessed it. As a matter of fact, that day the outside
15 driver came in, too, for the meeting.
16    Q.    All right. So that is what you are saying
17 you knew it was about. You thought it was about this
18 incident with the two drivers?
19    A.    Right, right.
20    Q.    Okay. And Mr. Whiteman had not been at work
21 yet?
22    A.    No.
23    Q.    Now Mr. Whiteman comes to work?
24    A.    Uh-huh.

---

**46**

1    Q.    And you tell him to go to Mr. Miller's
2 office?
3    A.    Yes.
4    Q.    And that is when he says he's not going?
5    A.    Correct.
6    Q.    And after that occurred, is that when the
7 pushing and the shoving that you described started?
8    A.    Yes.
9    Q.    And when that started, tell me what you did.
10    A.    I called the police.
11    Q.    Which police?
12    A.    Lewes, Troop 4 in Lewes.
13    Q.    The state police?
14    A.    Yes.
15    Q.    Why did you call them?
16    A.    Because he put his hands on me.
17    Q.    So then you were pretty upset?
18    A.    Yes.
19    Q.    Did you let Mr. Miller know that you had
20 called the police?
21    A.    Yes.
22    Q.    When did you do that?
23    A.    Well, I was upset. And I called Mr. Miller,
24 and I told him what happened.

---

**47**

1    Q.    When did you do that? Before you called the
2 police or --
3    A.    After Josh, yeah, yeah.
4    Q.    Let me finish. Did you tell him before you
5 called the police that you were going to call the
6 police, or did you tell him after you had called the
7 police that you had called the police?
8    A.    Let me think.
9    Q.    Sure. Take your time.
10    A.    Everything was happening so fast.
11    Q.    Take your time.
12    A.    All I know was when Josh refused, I called
13 Mr. Miller and let him know. Mr. Miller sounded a
14 little upset by that, but he didn't come down to -- you
15 know, bother to come down to see what was going on
16 himself. And I'm not sure if -- I think I called my
17 boss for the police part. I called my bosses.
18    Q.    Which would be Wayne and Mark?
19    A.    Wayne and Mark, yes, yeah, I did. I called
20 them. I don't think I called Mr. Miller about the
21 police incident. I think it was my bosses that I
22 called, because I do remember the police talking to my
23 boss and telling him that he said he never touched her.
24    Q.    Just so I can understand what has occurred

---

**48**

1 now, when the pushing and shoving that you have
2 described between you and Mr. Whiteman starts --
3    A.    Uh-huh.
4    Q.    -- you call the police and then call Mark
5 and Wayne Keller?
6    A.    Yes.
7    Q.    And you then let them know that you called
8 the police and why?
9    A.    Yes.
10    Q.    Did you talk to them both or just one?
11    A.    It was always either one or the other. It
12 was never both.
13    Q.    Okay.
14    A.    I can't remember if it was Mark or Wayne.
15 Like I said, everything was just happening so fast. I
16 just know that I called them. I know I called the
17 police. I know the police talked to one of them, Mark
18 or Wayne, and told them about -- told them what Josh
19 told them.
20    Q.    I'm trying to get it narrowed down.
21 Regardless of who it was, regardless of whether it was
22 Mark or Wayne, when you called them and told them, I
23 have just called the police, did you tell them why you
24 had called the police?

---

49

1    A.    Yes.
2    Q.    What, if anything, did they say to you?
3    A.    Well, once I called the police, it was out
4  of their hands.
5    Q.    But you called the police. From what you
6  told me, you talked to them.
7    A.    Yes.
8    Q.    You talked to one of them?
9    A.    Yeah, yeah.
10   Q.    What did they say? What did he say, whoever
11  it was, whether it was Mark or Wayne?
12   A.    I can't remember exactly what he said. He
13  just said: Let the police handle it then.
14   Q.    Okay. You don't have to remember exactly
15  what they said.
16   A.    Okay.
17   Q.    But basically, the message was: Let the
18  police handle it?
19   A.    Yes.
20   Q.    Now, when the police came, where did they
21  come? To the security office?
22   A.    Yeah.
23   Q.    Then if I understand you, did Mr. Whiteman
24  go up to see Mr. Miller --

50

1    A.    Uh-huh.
2    Q.    -- before the police arrived?
3    A.    Yeah, before the police got there.
4    Q.    So Mr. Whiteman finally does go up to see
5  Mr. Miller?
6    A.    Yeah.
7    Q.    And then the police arrive?
8    A.    Right.
9    Q.    And then do you and the officer go up to
10  Mr. Miller's office?
11   A.    Yes, sir.
12   Q.    Is that what you have testified to?
13   A.    Yes, sir.
14   Q.    Did you spend any time in the security
15  office with the police officer before you went to
16  Mr. Miller's office?
17   A.    Yes.
18   Q.    How long?
19   A.    I don't know.
20   Q.    A few minutes? Five minutes or less?
21   A.    To give my statement, yes.
22   Q.    Did the police officer sit down and actually
23  take the statement from you in the security office?
24   A.    He stood up.

51

1    Q.    He stood up?
2    A.    Yes. And after I told him what happened, he
3  wanted to go and talk to Josh, Mr. Whiteman.
4    Q.    Let's go back just a second. He is talking
5  to you. Is he taking the statement down as he is
6  talking to you, or is he just listening to what you are
7  saying?
8    A.    I'm not sure. He wanted my name, my phone
9  number, and just basic information like that. And there
10  was a police report, so --
11   Q.    I understand there may have been. I'm just
12  trying to get the best of your recollection, if you can
13  remember, the officers and the security --
14   A.    He was writing it down.
15   Q.    He is writing down your statement?
16   A.    Yes.
17   Q.    So he may have been in with you in the
18  security office for five or ten minutes?
19   A.    Yes.
20   Q.    And Mr. Whiteman is not there?
21   A.    Right.
22   Q.    And then your recollection is that you and
23  the officer go up to Mr. Miller's office?
24   A.    Yes.

52

1    Q.    You both go in Mr. Miller's office?
2    A.    The policeman doesn't. He stands at the
3  door.
4    Q.    You are in Mr. Miller's office. Who else is
5  in there?
6    A.    Mr. Whiteman, Mr. Koster, Mr. Miller, and
7  me.
8    Q.    You were --
9    A.    I was just in the doorway.
10   Q.    You were in the doorway, so you weren't in?
11   A.    Right.
12   Q.    When you were in the doorway, what happened
13  then?
14   A.    I informed them that the police was here for
15  Josh Whiteman.
16   Q.    Okay. And that would have been the first
17  time that Mr. Miller knew that the police were there?
18   A.    I assume, yeah.
19   Q.    You didn't call him. You called Mark?
20   A.    I don't think I called Mr. Miller about it.
21   Q.    Okay. No, just stop from that point on.
22   A.    Uh-huh.
23   Q.    The knowledge that Mr. Whiteman would have
24  would be then what you have just testified to, that he

## 53

1  was told by you to go see Mr. Miller?
2     A.  Uh-huh.
3     Q.  That he refused?
4     A.  Uh-huh.
5     Q.  That there was pushing and shoving?
6     A.  Uh-huh.
7     Q.  And that he eventually did go to
8  Mr. Miller's office?
9     A.  Uh-huh.
10    Q.  And he was in Mr. Miller's office when you
11 were outside the door and the policeman was outside the
12 door?
13    A.  Correct.
14    Q.  That is what he would know?
15    A.  Correct.
16    Q.  Would he know anything else?
17    A.  No.
18    Q.  Okay. Because what you have also alleged is
19 that -- Well, before I ask you the question I was going
20 to ask, let me ask you this. Can you tell me, at least
21 from your point of view, how that relates to your claim
22 that Allen's discriminated against you on the basis of
23 your race?
24    A.  Well, because Josh is a white man who went

## 54

1  down and told his side of the story, and nobody ever
2  asked me nothing.
3     Q.  But you were not in the meeting that
4  Mr. Whiteman was having with Mr. Miller and Mr. Koster?
5     A.  Right.
6     Q.  So Mr. Miller did not know that the police
7  had been called?
8     A.  Correct.
9     Q.  So what you told me earlier is you assumed,
10 because of this incident with the two drivers, that is
11 why Mr. Whiteman was --
12    A.  That is why Mr. Koster was there.
13    Q.  So that meeting was probably then about the
14 incident with the driver?
15    A.  Right.
16    Q.  It had nothing to do with the pushing and
17 shoving?
18    A.  Right.
19    Q.  So when you say Mr. Koster gave Mr. Whiteman
20 an opportunity to explain --
21    A.  Right.
22    Q.  -- Mr. Whiteman was not employed by Allen's.
23    A.  Right.
24    Q.  Do you know for a fact that Mr. Koster asked

## 55

1  Mr. Whiteman what happened?
2     A.  No. I'm not going to say for a fact. I'm
3  not going to say for a fact. But it was an Allen
4  employee.
5     Q.  Who was an Allen employee?
6     A.  Ms. Valerie that works for Mr. Miller in his
7  office, she came down to the security office and
8  informed me that Mr. Miller and Mr. Whiteman had talked
9  about the incident. And Mr. Miller was in the office
10 making statements that everything was my fault.
11    Q.  Now, let's --
12    A.  Ms. Valerie --
13    Q.  Now, we are talking about the 11th?
14    A.  Yes. But no, that didn't happen on the 11th
15 when they said all of that.
16    Q.  We will get to all of this. What I am
17 interested in is the 11th and what you already testified
18 occurred.
19    A.  Uh-huh.
20    Q.  The meeting that Mr. Whiteman would have
21 been in with Mr. Koster and Mr. Miller was dealing with
22 the drivers and --
23    A.  Right.
24    Q.  -- not about the incident that happened in

## 56

1  the trailer?
2     A.  Right.
3     Q.  And you weren't in that meeting?
4     A.  Right.
5     Q.  So you don't know what was said by anybody?
6     A.  No.
7     Q.  Do you know for a fact that Mr. Miller or
8  anyone from Allen's asked Mr. Whiteman what went on
9  between you and him in the security office?
10    A.  I wouldn't know for a fact.
11    Q.  You wouldn't know for a fact. Okay. Were
12 you ever in a meeting where Mr. Whiteman was asked to
13 explain what happened?
14    A.  No, sir.
15    Q.  So then the basis for your claim that
16 Mr. Whiteman was given an opportunity to explain his
17 situation to Mr. Miller is based on this woman Valerie?
18    A.  Ms. Valerie Brittingham.
19    Q.  Valerie B. Okay. We will come back to her
20 in a second. So it's because of what Valerie said to
21 you that Mr. Whiteman was given an opportunity to
22 explain his situation to Mr. Miller?
23    A.  Yes.
24    Q.  And you were not afforded that opportunity?

**57**

1    A.   Correct.

2    Q.   That is what led you to say that Allen's

3 discriminated against you on the basis of race?

4    A.   She said that Mr. Miller is a racist.

5    Q.   She said Mr. Miller is a racist?

6    A.   Yes.

7    Q.   Is Valerie an African-American?

8    A.   Yes.

9    Q.   And she works for Mr. Miller?

10    A.   Yes.

11    Q.   What is her job, if you know?

12    A.   I'm not sure.  She works with Mr. Miller,

13 and it's the human resources department.

14    Q.   While we are on the subject -- so I don't

15 forget it -- when did Valerie tell you this?

16    A.   It had to be Friday.

17    Q.   Friday, which would have been --

18    A.   The 12th.

19    Q.   The 12th.  Okay.  And were you and Valerie

20 friends?

21    A.   I wouldn't say friends.  I just know her

22 from working there.

23    Q.   Tell me what happened, how she came to tell

24 you this.

**58**

1    A.   She just came to the office and said:  What

2 in the world happened?  Evidently, because the police

3 and everything was there, it got around quick about what

4 had happened.

5    Q.   Right.  I'm sure it would.

6    A.   So I explained what happened with me and

7 Josh.  And she said:  Well, he talked to Mr. Miller, and

8 Mr. Miller is down there telling everybody that

9 everything was your fault, and like, you know, I wasn't

10 capable of doing my job.  And I was:  Well, why in the

11 world would Mr. Miller say something like that about me?

12 And she was like:  Well, you know, he's a racist.

13    Q.   Does this occur in the morning or in the

14 afternoon?

15    A.   Probably in the -- it wasn't early in the

16 morning.  I got there at seven.  It was probably later

17 in the afternoon.

18    Q.   Okay.  So sometime after noon?

19    A.   Yeah, sometime between noon and three.

20    Q.   That is when you normally left the --

21    A.   Yeah, three.

22    Q.   Just let me see if I understand what you

23 have told me.  Sometime on the 12th of December, Friday,

24 Valerie, who works for Allen's, comes into the security

**59**

1 office --

2    A.   Yes.

3    Q.   -- and says to you:  What in the world

4 happened yesterday?

5    A.   Uh-huh.

6    Q.   Mr. Miller is telling them that you can't do

7 your job and so forth and so on?

8    A.   Yes.

9    Q.   Who was the them that he was telling?

10    A.   Them.

11    Q.   Them?

12    A.   Valerie, whoever was in the office, Valerie,

13 Ms. Eva, the other people in the office.

14    Q.   So Mr. Miller was telling Valerie?

15    A.   Yes.

16    Q.   Okay.  Who else?

17    A.   I'm not sure who else.  Valerie was the only

18 one who came back and told me what was being said.

19    Q.   And you mentioned an Eva?

20    A.   Well, Ms. Eva was there in the office.  She

21 works there.  But I don't know if she overheard anything

22 or not.  I never spoke with her.  I never questioned

23 anybody:  Did you hear if Mr. Miller said anything about

24 me?  I never even asked Valerie for the information.

**60**

1    Q.   Did you ever ask Mr. Keller whether

2 Mr. Miller said anything to him about your --

3    A.   No.  But I know he had a meeting on me

4 Friday.

5    Q.   My question is did you ever ask Mr. Keller?

6    A.   No.

7    Q.   Did you ever ask Mark?

8    A.   No.

9    Q.   Now, that covers that.  You have also made a

10 claim against Allen's that we have interfered -- and the

11 word is tortiously interfered -- with the employment

12 contract that you have with Bennett?

13    A.   Yes.

14    Q.   Do you have an employment contract with

15 Bennett?

16    MR. FLETCHER:  Well, that is a legal

17 question, isn't it?

18    MR. BREWER:  I want to know if she has a

19 contract, because if she does, I would like to see it.

20    MR. FLETCHER:  Well, do you mean does she

21 have a written contract?

22    MR. BREWER:  Oh, yes.  Well, it says

23 tortiously interfered with an employment contract.  That

24 is how the Complaint is phrased.

**61**

1    MR. FLETCHER: She was an employee. They
2 are the employer.
3    MR. BREWER: Right. And Delaware is an
4 employment at will state.
5    MR. FLETCHER: That doesn't mean that there
6 is a contract of employment.
7    MR. BREWER: Okay. Well, that's what we
8 will find out.
9    MR. FLETCHER: But see, these are legal
10 issues. She can't tell you that.
11    MR. BREWER: Well, the claim is made. I
12 would like to know: What is the basis for the claim.
13    MR. FLETCHER: You can certainly ask her,
14 but she is not competent to give a legal opinion.
15    MR. BREWER: That is fine.
16 BY MR. BREWER:
17    Q.  I don't expect a legal opinion from you,
18 ma'am. I understand you are not a lawyer.
19    Let me take it in two steps. Do you have a
20 written employment contract with Bennett Security?
21    A.  Do you mean like a contract like to say --
22    Q.  A document?
23    A.  -- that I am to stay with them for so many
24 years or something?

**62**

1    Q.  Just a document that says that you are
2 employed by them for a certain amount of money and
3 certain benefits and that you will have a certain amount
4 of vacation?
5    A.  No.
6    MR. FLETCHER: Will you exclude Exhibit 1
7 then from that category?
8    MR. BREWER: I would. I don't know if she
9 would, and that is what I am asking.
10 BY MR. BREWER:
11    Q.  So you don't believe you have a written
12 contract. Your answers are not legally binding. If
13 your lawyer wants to argue that Exhibit 1 is a written
14 contract, he can certainly do that.
15    But you don't have anything other than
16 Exhibit 1 in writing that talks about a contract of
17 employment, do you?
18    A.  Right.
19    Q.  Okay. Now, have your supervisors, either
20 Mr. Keller or Mark or both of them, suggested to you or
21 said to you anything orally which would give you reason
22 to believe that you have an oral contract of employment
23 with Bennett?
24    A.  I don't understand, because I mean --

**63**

1    MR. FLETCHER: I'm just going to interpose a
2 continuing objection.
3    MR. BREWER: That is fine.
4    MR. FLETCHER: These deal with legal issues.
5    MR. BREWER: Yes.
6    MR. FLETCHER: And I don't think she is
7 competent to give an opinion.
8    MR. BREWER: That is true, and I understand
9 your objection.
10 BY MR. BREWER:
11    Q.  I am just trying to find out. A claim has
12 been made on your behalf that we interfered with an
13 employment contract that you had with Bennett. I want
14 to know what is your factual basis for making that
15 claim. That's all.
16    THE WITNESS: Can I answer that?
17    MR. FLETCHER: Yes.
18    THE WITNESS: Okay. When Mr. Keller called
19 me and told me not to report back to Allen's after the
20 meeting took place on Friday, he removed me from the
21 site and told me not to go there after knowing that
22 everything was settled with me and Josh. And he had
23 nowhere for me to go.
24    And so you know, if Allen's -- this is what

**64**

1 I'm feeling. Allen's didn't want me there. To me, it
2 was obvious. Allen's didn't want me there anymore. It
3 was Mr. Miller's decision. Josh and -- I mean Wayne and
4 Mark wanted to keep their contract with Allen's, so they
5 would do what Allen's would tell them to do. So they
6 moved me. They didn't fire me. They wanted to keep me
7 evidently, because I was a good security officer. They
8 wanted to keep me, but they didn't have any place for me
9 to go. Why would they move me and not have any place
10 for me to go, unless they had to?
11 BY MR. BREWER:
12    Q.  That is what you are thinking?
13    A.  Yeah.
14    Q.  But my question is the claim here is that
15 we -- we, Allen's -- interfered with your employment
16 contract with the Defendant.
17    A.  Yes.
18    Q.  What I want to know is --
19    A.  Because I believe --
20    Q.  You have to let me ask the question.
21    A.  Okay.
22    Q.  What is the basis for your statement that
23 you have an employment contract with Bennett?
24    A.  They hired me.

A 021

**65**

1     Q.    They hired you. Okay. And that is your
2  basis for it?
3     A.    Bennett's hired me. And Allen Foods --
4  Bennett's hired me to work at Allen's Foods, and they
5  removed me because of Allen's Foods.
6     Q.    That is fine. Now, do you know whether
7  Mr. Miller would have had any knowledge that you had an
8  employment contract with Bennett?
9     A.    (The witness nodded head up and down.)
10    Q.    How would he know that?
11    A.    I'm not sure what you are asking me.
12  Mr. Miller knows I work for Bennett.
13    Q.    Well, he knows that you work for Bennett;
14  that is true.
15    A.    Yes.
16    Q.    But is there any reason that you can think
17  of that Mr. Miller would know that you have, as the
18  Complaint says, an employment contract with Bennett?
19  How would he know that?
20    A.    I don't understand. I mean a contract is
21  something that you would sign.
22    Q.    All right.
23    A.    I guess he wouldn't know, unless he told
24  them.

**66**

1     Q.    Unless they told them, there is no reason
2  for them to know?
3     A.    Right, because I wouldn't have told him.
4     Q.    Okay. Now, you have stated -- and this is
5  basically a defamation type claim -- that Mr. Miller
6  made false statements regarding yourself --
7     A.    Right.
8     Q.    -- to Bennett?
9     A.    To Bennett?
10    Q.    To agents of Bennett, yes. Okay. What
11  statements did Mr. Miller make that you are aware of to
12  Bennett that were false?
13    A.    I must have misunderstood the question.
14    Q.    Okay. Let me go back and rephrase it. The
15  Complaint that was filed on your behalf states in Count
16  IV, paragraph 33 that Mr. Miller, as an agent of
17  Defendant Allen's, made false oral statements regarding
18  you to agents of Defendant Bennett as set forth above.
19          My question is what false statements, false
20  oral statements, did Mr. Miller make to agents of
21  Bennett about you?
22    A.    I don't remember. I said that he made those
23  statements to Valerie, not to -- I don't know what he
24  said to Bennett's.

**67**

1     Q.    I'm sorry. You don't know what he said to
2  Bennett's?
3     A.    I don't know what he said to Mr. Bennett.
4     Q.    To Mr. Bennett?
5     A.    I mean to Mark and Wayne, my
6  bosses, with him. I wasn't at the meeting.
7          MR. BREWER: Okay. Let's take just a few
8  minutes.
9          (Following a brief recess:)
10  BY MR. BREWER:
11    Q.    Ms. Nichols, if I understand your prior
12  testimony, the statements that you said Mr. Miller made,
13  he made to Valerie?
14    A.    Yes, sir.
15    Q.    And you are not sure if he made them to
16  anybody else?
17    A.    No, sir.
18    Q.    Just to Valerie. And those statements were
19  to the effect that -- What were the statements that
20  Valerie said he made?
21    A.    Like everything that happened between me and
22  Josh was my fault, and I wasn't capable of doing my job.
23    Q.    Anything else?
24    A.    That's all I remember.

**68**

1     Q.    Now, Valerie is not listed on these initial
2  disclosures.
3     A.    Are you sure?
4          MR. FLETCHER: No, they are not. I mean
5  that is what it says.
6          MR. BREWER: No.
7  BY MR. BREWER:
8     Q.    We have already talked about Mr. Whiteman.
9  We have talked about yourself. Mr. Miller is
10  identified, but I would assume we have already pretty
11  much covered how Mr. Miller would support your claims.
12    A.    Uh-huh.
13    Q.    And we have Wayne, and it is Keller; is it
14  not?
15    A.    Yes.
16    Q.    What is Mr. Keller going to be able to --
17  how is he going to be able to show that Allen's
18  discriminated against you because of your race? What is
19  he going to have to say?
20    A.    I don't know what he's going to have to say.
21    Q.    Okay. How about your claim that Allen's
22  tortiously interfered with your employment contract?
23  What is he going to be able to say about that?
24    A.    I don't know, because I don't know what they

## 77

1  from Allen's, did you?
2      A.    I feel like I did.
3      Q.    And the reason you feel that is --
4      A.    Because I feel like they were the ones who
5  told Mark and Wayne to remove me.
6      Q.    Do you know that for a fact?  That Allen's
7  told them that?
8      A.    I don't know it for a fact, but I believe in
9  my heart that is what happened.
10     Q.    In fact, if I told you that people from
11 Bennett offered to have you removed and Allen's said,
12 maybe that is a good idea, would you have any reason to
13 disbelieve that?
14         MR. FLETCHER:  Well, I'm going to object to
15 the form of the question.  It is purely hypothetical.
16 BY MR. BREWER:
17     Q.    You can answer the question now.
18     A.    Oh, say it again.
19     Q.    Sure.  I said if I tell you that Bennett
20 offered to have you taken off the Allen's account and
21 Mr. Miller said, okay, I think that is probably a good
22 idea, would you have any reason to disbelieve that?
23         MR. FLETCHER:  I just don't think that she
24 can answer that question.

## 78

1          MR. BREWER:  She can answer it.
2          MR. FLETCHER:  Pardon me?
3          MR. BREWER:  She can answer it.
4          MR. FLETCHER:  You are asking her if she
5  believes something that you are --
6          MR. BREWER:  Is there any reason to
7  disbelieve it?
8          MR. FLETCHER:  Well, she has given you the
9  reason already.  She told you in her heart, what she
10 felt happened.
11         MR. BREWER:  And I am asking her:  If I tell
12 you that Bennett was the one that suggested removing you
13 and Allen's said it was okay, would you have any reason
14 to disbelieve that?
15         MR. FLETCHER:  I don't know how she can
16 answer a purely hypothetical question like that, that it
17 would in any way be relevant to this litigation.
18 BY MR. BREWER:
19     Q.    Can you provide me with any factual basis
20 for disbelieving that?
21     A.    For disbelieving it?
22         MR. FLETCHER:  Well, again, I have an
23 objection because you haven't provided a factual basis
24 stating that that is what happened.

## 79

1          MR. BREWER:  I know you have an objection,
2  Counselor.  She can answer the question.
3          MR. FLETCHER:  The problem is she can't
4  answer the question.
5          MR. BREWER:  The problem is that you keep
6  telling her she can't answer the question, which you
7  have now instructed her.
8  BY MR. BREWER:
9      Q.    Can you answer that, ma'am?
10     A.    What was the question again?
11     Q.    I will ask you one more time.  If I told you
12 that the people from Bennett offered to have you taken
13 off the Allen's account and that Mr. Miller then said
14 that is a good idea, is there any factual basis that you
15 would have to disbelieve that?
16     A.    I can believe that some would feel that way.
17     Q.    We have already discussed the meeting that
18 Whiteman and Miller and the guy from Allen's --
19     A.    Koster.
20     Q.    -- Koster, we have already discussed that.
21     A.    Right.
22     Q.    Now, the following day Mr. Miller met with
23 Mr. Keller and Mr. Habicht.  Are you aware of that?
24     A.    Yes.

## 80

1      Q.    How were you aware of that meeting?
2      A.    Because they checked in with me before they
3  went to the office, and they checked out with me before
4  they left.
5      Q.    When they checked in with you, did they tell
6  you who they were going to see?
7      A.    Yes.
8      Q.    Did they tell you why?
9      A.    No.
10     Q.    Okay.  When they checked out with you, did
11 they tell you what went on with the meeting they had
12 with Mr. Miller?
13     A.    No.
14     Q.    And you were not in the meeting?
15     A.    No.
16     Q.    Is there any reason for you to believe that
17 there was something wrong or inappropriate about the
18 meeting that Mr. Miller and Mr. Keller and Mark had?
19     A.    Well, I talked to Mr. Keller, I think,
20 Monday afternoon, the 15th.  And I asked him why.
21     Q.    Asked him why what?
22     A.    I asked him about my removal from Allen
23 Foods, did it have anything to do with the incident that
24 took place with me and Josh?  And his answer was: No,

**81**

1   but this just put the icing on the cake.
2        Q.   So you had that conversation with
3   Mr. Keller?
4        A.   Yes, I did.
5        Q.   Okay. All right. So this is Monday, the
6   15th?
7        A.   Yes.
8        Q.   And you asked him if your being removed from
9   Allen's had anything to do with the incident --
10       A.   Right.
11       Q.   -- on Friday, the 12th, that we went over?
12       A.   Exactly.
13       Q.   And he said: No, this is the icing on the
14  cake?
15       A.   Right. He said that because of the problems
16  with the other guards in the past -- not saying it was
17  with me and the other guards, but just the problems that
18  they had out of other guards and then this incident,
19  that now puts the icing on the cake, and that is why.
20            He said no at first, but then he turned
21  around and said yes.
22       Q.   To the best of your ability, I just want to
23  know what he said.
24       A.   Uh-huh.

**82**

1        Q.   He said no, but --
2        A.   But, and the but turned out to be no.
3        Q.   And the other guards that Mr. Keller was
4   referring to were also employees of Bennett?
5        A.   Yes.
6        Q.   They were not employees of Allen's?
7        A.   No.
8        Q.   You make an assertion in your Complaint that
9   Mr. Whiteman was not disciplined by Bennett. How do you
10  know that?
11       A.   Because he still had his job there.
12       Q.   All right. So he was still there?
13       A.   Correct.
14       Q.   You don't know whether he received any
15  disciplinary action?
16       A.   No.
17       Q.   Counseling? Warnings?
18       A.   No.
19       Q.   Anything?
20       A.   No.
21       Q.   And I believe you testified that you feel
22  you were disciplined because you were taken off the
23  Allen's account.
24       A.   Right, correct.

**83**

1        Q.   You also state in your Complaint that
2   Bennett's failure to reassign you was protectual. It
3   was, in fact, Bennett's role to reassign you; was it
4   not?
5        A.   Correct.
6        Q.   It wasn't Allen's. Allen's wouldn't have
7   anything to do with that?
8        A.   If they didn't want me there, Bennett's
9   would do whatever Allen's wanted them to do.
10       Q.   You said that. But I mean Allen's could not
11  say to you: I'm going to assign you someplace else?
12       A.   No.
13       Q.   Allen's cannot reassign you?
14       A.   Right.
15       Q.   That is Bennett.
16       A.   Correct.
17       Q.   And the failure to reassign you -- and these
18  are the words in your Complaint -- was a mask of
19  discrimination, in quotes. If Allen's couldn't reassign
20  you, how is that a mask of discrimination?
21       A.   I think they did it through my employee.
22  They did it through Bennett's.
23       Q.   But this is as to the reassignment.
24       A.   What do you mean?

**84**

1        Q.   Well, what you are saying is that Allen's
2   couldn't reassign you. They couldn't say: Don't work
3   at the Harbeson plant. Go down and work at Georgetown
4   at Family Court. Allen's couldn't do that, could they?
5        A.   Yes.
6        Q.   Bennett could do that?
7        A.   Right.
8        Q.   So if Allen's can't reassign you, then how
9   is the failure of you to be reassigned a mask of
10  discrimination by Allen's.
11       A.   I guess they wouldn't be.
12       Q.   Okay. Let's see. We have already covered
13  this. The Complaint alleges -- and you have covered
14  some of this -- that Mr. Miller made false statements
15  and other improper conduct. I think that is what it
16  says. I think that is paragraph 30.
17            I can give you a copy of the Complaint, if
18  you would like, if that would help you. Yes, it says:
19  Defendant Allen's, through the actions of its agent,
20  Mr. Miller, and specifically through false statements
21  and other improper conduct of Mr. Miller.
22            What other improper conduct are you
23  referring to? I believe you covered the statements made
24  to Valerie.

**85**

1  A.  Uh-huh.  All I can think of is it would be
2  like slander.  You mischaracterized me.  You attacked my
3  character.  You slandered me, you know.
4  Q.  And that was to Valerie?
5  A.  Yes.
6  Q.  Now, those were statements, any other
7  improper conduct.  Did Mr. Miller do anything else to
8  you?
9  A.  No.
10  Q.  So what we are talking about when we are
11  looking at the claims made here, what you have referred
12  to earlier, are the statements that Valerie said
13  Mr. Miller made to her?
14  A.  Uh-huh.
15  Q.  And Valerie works in Mr. Miller's office?
16  A.  Yes.
17  Q.  Just to be sure, the claims that were made
18  regarding you, as far as you know, were only made to
19  Valerie.  You don't know what was said to Mr. Keller or
20  to Mark?
21  A.  No, sir.
22  Q.  Okay.  That is what I thought.  Okay.  Let's
23  see.  Let me have a minute.  I think we may just about
24  be finished.

**86**

1  Let me ask you a few questions, Ms. Nichols,
2  about your employment history at Bennett.  You were
3  hired in 2001, as I recall --
4  A.  Uh-huh.
5  Q.  -- from your resume as a security officer.
6  A.  Yes.
7  Q.  Is it Bennett's practice to give you a
8  performance appraisal on any sort of a basis at all?
9  A.  No.
10  Q.  Did you receive any wage increases at all
11  while you are there?
12  A.  No, sir.
13  Q.  So if you do something that Bennett thinks
14  is not appropriate, do they discipline you?  Do they
15  discipline people, if you know?
16  A.  They usually talk to the guards, you know,
17  if they have a problem or if problems have been
18  reported.  They are pretty -- you know, when it comes to
19  something like that, they will talk to them.  Usually,
20  it takes something extreme for them to just fire
21  somebody, you right.
22  Q.  All right.  When you were promoted to a
23  supervisor, were you given any instructions by Bennett
24  that if one of the guards wasn't doing what they were

**87**

1  supposed to be doing, that you had a certain authority
2  to do certain things to that person?
3  A.  No.
4  Q.  You had no authority to do anything?
5  A.  No, just call them.
6  Q.  Just to call --
7  A.  Call Wayne or Mark.  I was to call them.
8  Q.  You would report that to them?
9  A.  Yes.
10  Q.  And did you ever have occasion to do that?
11  A.  Yes.
12  Q.  And when you did that, can you tell me what
13  happened?
14  A.  I would tell them what was going on.  And
15  then the matter was in their hands to talk to the person
16  or whatever they wanted to do.
17  Q.  All right.  Did you ever inquire as to what
18  they did, just so you knew?
19  A.  (The witness nodded head from side to side.)
20  Q.  No?
21  A.  Like if -- They might call back and say:
22  Well, I talked to such-and-such and that is it, you
23  know, about the problem.  You know, if it keeps up, call
24  back, or something like that.

**88**

1  Q.  Okay.  Now, I did ask you about raises.  I
2  just want to make sure I understood your answer.  When
3  you were first hired in 2001 by Bennett --
4  A.  Uh-huh.
5  Q.  -- until you were removed from Allen's --
6  let's put it that way -- until you were removed from
7  Allen's, you didn't receive any wage increases?
8  A.  Yes, one.
9  Q.  You received one?
10  A.  When I was given the supervisor position, I
11  was given a quarter raise.
12  Q.  And that was in 2003?
13  A.  Yes.
14  Q.  So for all of 2001 and 2002, you had the
15  same hourly rate?
16  A.  Yes.
17  Q.  And then in 2003 you were given that one
18  increase?
19  A.  Yes.
20  Q.  And if I understand, you did not receive any
21  performance evaluations or anything else --
22  A.  No.
23  Q.  -- as far as how you were doing your job?
24  A.  No.

## 89

1    Q.   And as far as you know, you were not given
2    any disciplinary action at all?
3    A.   Me?
4    Q.   Yes.
5    A.   No.
6    Q.   Were you ever talked to about some of the
7    problems that you mentioned earlier with Ms. Diane and
8    Ms. Linda?
9    A.   No.
10    Q.   Mark or Wayne never came to you and said --
11    A.   Nobody ever came to me and said anything
12    that I can remember about anybody complaining that I was
13    doing this or doing that wrong.
14    Q.   So as far as you are concerned then, you
15    never had any conversations with them where they were
16    saying that you weren't doing your job the way you were
17    supposed to?
18    A.   Oh, no, never that.
19    Q.   Okay.  If I read the record to date, you
20    were offered a position at Perdue's plant in Milford
21    when you stopped working at Allen's.  Do you remember
22    that?
23    A.   Yes.
24    Q.   Can you tell me why you didn't take that

## 90

1    job?
2    A.   I was going to take it.  But the day I
3    started, I called out sick.  And I was going to go in
4    the next workday.  But they called me and told me not
5    to -- Mark or Wayne called and told me not to report
6    there, that they were going to send me to the
7    courthouse.  They had a better position for me.  And
8    they sent me to the Georgetown Family Court.
9    Q.   When you were at Bennett, did you have
10    medical insurance benefits?
11    A.   I didn't have any benefits.
12    Q.   At Bennett?
13    A.   No.  But I didn't have to worry about
14    medical, because I qualified for the state Medicare or
15    Medicaid through the state.
16    Q.   Do you still qualify?
17    A.   No, because like after I got --
18    Q.   When did you stop being qualified?
19    A.   Like maybe a year after I got married.
20    Q.   A year after you got married.  You have been
21    married three years, so I guess that was two years ago?
22    A.   I guess.  All I know is after I got married,
23    I couldn't get it anymore.  I got married like three --
24    I have been married over three years.

## 91

1    Q.   You have to remember your anniversary date,
2    if not for this case, but for your husband's benefit.
3    A.   I got married July 26th.
4    Q.   Of --
5    A.   I would say 2002.
6    Q.   Okay.
7    A.   Maybe 2002, yeah.  I guess that's it, three
8    years.
9    Q.   That is fine.
10    A.   Yeah, 2002.  And then not long after that, I
11    didn't qualify for Medicare anymore.
12    Q.   Okay.  We asked in interrogatories for you
13    to identify every employee of Allen's who engaged in
14    actions which you believed to be untrue.  And you listed
15    Mr. Whiteman, who was employed by Bennett.
16    A.   Yes.
17    Q.   And Mr. Keller, who is also employed by
18    Bennett?
19    A.   Uh-huh.
20    Q.   Neither of them are employed by Allen's?
21    A.   Yes.
22    Q.   And then, of course, you did list
23    Mr. Miller.
24    A.   Uh-huh.

## 92

1    Q.   I think we have gone through that.  I think
2    we have established that you understand that Allen's was
3    not your employer, correct?
4    A.   Correct.
5    Q.   There is a reference about other non
6    African-Americans who have been given favorable
7    treatment.  We have identified Mr. Whiteman, I believe.
8    A.   Uh-huh.
9    Q.   Is there anybody else?
10    A.   That worked for Bennett and were given
11    favorable treatment?
12    Q.   Yes.
13    A.   By who?
14    Q.   By Bennett or by Allen's, but basically by
15    Bennett.
16    A.   I don't know of any.
17    Q.   How about Allen's, because it also pertains
18    to Allen's?
19    A.   Besides Mr. Whiteman -- What are you asking
20    me?
21    Q.   Well, you are basically saying, in Answer to
22    Interrogatory Number 5, which is here, what we asked is
23    for you to identify for each Defendant separately the
24    factual basis for your claims about discrimination under

## 101

1  let them handle everything. I gave them what documents
2  they requested, and that was it.
3      Q.   Now, this incident happened on the 11th. Do
4  you recall what day of the week that was? 12/11/03?
5      A.   A Thursday.
6      Q.   And you were scheduled to work the next day,
7  Friday, and the next day, Saturday?
8      A.   Yes.
9      Q.   And in fact, you did work at the Allen's
10 plant those two days?
11     A.   Yes.
12     Q.   And then you were scheduled to be off on
13 Sunday?
14     A.   And Monday, yes.
15     Q.   And it was Monday that you got the answering
16 machine message from Wayne Keller?
17     A.   Yes, sir.
18     Q.   And then as I understand your testimony,
19 later that day, after that message was left, you
20 actually had a phone conversation with Mr. Keller?
21     A.   Correct, correct.
22     Q.   All right. And what did he tell you about
23 alternative work arrangements at that time?
24     A.   He said: At this time we don't have

## 102

1  anything.
2      Q.   All right. And did you ask him if he could
3  look for something else for you at a different location?
4      A.   Did I ask? I don't think I asked. I think
5  he said at the time: Right now I don't have anything.
6  But I was to call him on a daily basis until something
7  came up. If something came up, he would definitely let
8  me know.
9      Q.   Having worked at Bennett for two and a half
10 years, you understand that from time to time security
11 guards were reassigned to different locations, correct?
12     A.   Yes.
13     Q.   And in fact, you had seen that happen?
14     A.   Yes.
15     Q.   Had you ever been reassigned in the two and
16 a half years?
17     A.   No, three years, never.
18     Q.   Were you hired July 30th of '01?
19     A.   Yes -- August, August 30th.
20     Q.   August 1st of '01?
21     A.   Yeah.
22     Q.   And this all happened in December of '03,
23 correct?
24     A.   Yeah.

## 103

1      Q.   So you were employed by Bennett throughout
2  that time frame, correct?
3      A.   Through 2004.
4      Q.   When in 2004 were you employed by Bennett?
5      A.   Well, I put my notice in, two weeks' notice.
6  So my two weeks' notice was -- I guess I would have had
7  to work for them a little bit in January. I'm not sure.
8      Q.   You don't really recall?
9      A.   I got a W-2 form. Or is that for 2003?
10 That can't be for 2003, because I worked longer than
11 that.
12     Q.   There is a W-2 form, Exhibit 2, for 2004,
13 showing $56 in wages, tips, and other compensation.
14     A.   And what year is that for? 2004? So that
15 meant that I had to work there the first week maybe.
16     Q.   Well, it means you were given a W-2 form for
17 wages apparently earned in 2004.
18     A.   Right, so maybe a job for one or two days or
19 something like that at the court, one day. I don't
20 know.
21     Q.   Do you recall whether you worked anywhere at
22 all for Bennett after the 15th of December of '03?
23     A.   Yes, Georgetown Family Court.
24     Q.   All right. Have you had a chance to look at

## 104

1  any of the information that Bennett provided to the
2  Department of Labor in connection with your claim?
3      A.   No, sir.
4      Q.   You have never looked at any of that?
5      A.   No, sir.
6      Q.   Now, at some point in December, Mr. Keller
7  did offer you a 32-hour a week job at the Perdue plant
8  in Milford; is that right?
9      A.   Yes.
10     Q.   And do you recall, by any chance, the day of
11 the week that he offered you that job?
12     A.   Well, he actually told me -- My social
13 worker called him for me to ask him when were they going
14 to send me back to work. At the time my husband and I
15 weren't together. And I was trying to get assistance
16 for me and my kids.
17         And the social worker, Ms. -- I'm not good
18 with last names. But anyway, the lady called him and
19 asked him when was he going to give me some work. How
20 soon would I be back to work?
21         And then all of a sudden, they had a job.
22 They never called me. But they told her: Well, we can
23 put her at Perdue for 32 hours a week. And that was
24 even a day short from my regular schedule. And so it

**105**

1    was Perdue in Milford.
2            And she asked him how soon would I start?
3    And he told her -- I'm not sure what they had told her.
4    But anyway, when I was -- Okay. So then I was assigned
5    that job, and I got sick. And I called out and I said:
6    I'm not going to be able to make it the first day, but I
7    should be all right to come in the next day.
8            But on the day I was sick, I think it was --
9    it might have been on a day I was sick. I got a call at
10   home. And Mark said: Robin, don't report to the job at
11   Perdue. We got a better job. We are going to send you
12   to Georgetown Family Court.
13       Q.   Do you recall whether the Perdue job, in
14   those conversations between Bennett and the social
15   worker -- if that is who spoke to them --
16       A.   Ms. Roseanne Eckels, that is her name.
17       Q.   Do you recall if they occurred during the
18   week of the 15th and, in fact, you were supposed to show
19   up for training on the 19th and 20th at the Perdue
20   plant?
21       A.   Okay. Possibly, I think it was a Thursday
22   or a Friday that she talked with him. I was in her
23   office.
24       Q.   And you got sick and couldn't report to work

**106**

1    before you got training?
2        A.   The -- yeah, the first day of the training.
3        Q.   And then do you recall that the following
4    Monday is when you were offered the job at Family Court?
5        A.   I think so.
6        Q.   And do you recall being asked to go in and
7    train at the Family Court position on December 23rd and
8    24th?
9        A.   That could be it.
10       Q.   And do you recall actually doing that?
11       A.   Yes.
12       Q.   So you worked there at Family Court the 23rd
13   and the 24th?
14       A.   Yes.
15       Q.   And then do you recall being off for five
16   days because the court was closed for the Christmas
17   holiday?
18       A.   Yes, yes.
19       Q.   Do you recall showing up on the 29th, and
20   the officer who you had been replacing had returned to
21   work because either he or she had been sick?
22       A.   Yes.
23       Q.   And that is why they were out, and now they
24   were back at the job on the 29th?

**107**

1        A.   Yes.
2        Q.   Do you recall talking to Mr. Keller at that
3    point and him telling you that he was going to try to
4    find you other work?
5        A.   I think so, yeah.
6        Q.   Do you recall him telling you that since it
7    was New Year's, a lot of sites were shut down and it may
8    take a few days before he could get you another position
9    at another location?
10       A.   I don't recall it. It's possible.
11       Q.   Do you recall any conversation along those
12   lines?
13       A.   All I was told was to call in every day to
14   see if there was any work.
15       Q.   Do you recall calling on Monday,
16   January 5th, and telling them that you were resigning
17   that day?
18       A.   Putting in my two weeks' notice, yeah.
19       Q.   Do you recall also being told that you could
20   apply for unemployment and be given unemployment
21   compensation?
22       A.   They never told me that.
23       Q.   They didn't tell you that?
24       A.   As a matter of fact, they tried to keep me

**108**

1    from having it.
2        Q.   Did you apply for unemployment benefits?
3        A.   Yes, I did.
4        Q.   When was that?
5        A.   I am not sure. But I did that somewhere in
6    between that time -- when I wasn't getting enough hours
7    and they didn't have enough work and before the 19th of
8    January. And they had to investigate to make sure I was
9    telling the truth about the reason why I wasn't there or
10   getting enough hours anymore. And then when the lady
11   found out that I was telling the truth and I had
12   everything documented, they went on and gave me my
13   unemployment.
14       Q.   How long did you collect unemployment?
15       A.   Not long, because I took a class for CNA.
16   And it was a class that paid you.
17       Q.   When did that CNA class start?
18       A.   January 19th.
19       Q.   So did you collect unemployment from Sunday
20   through the 19th?
21       A.   Well, once I started work, I didn't fill out
22   any more slips. So then I wouldn't get any more
23   unemployment.
24       Q.   I'm just trying to figure out over what

---

**109**

1  length of time you received that.
2      A.   Probably about two weeks maybe; that's it.
3  It wasn't long.
4      Q.   Then you started this CNA schooling, which
5  paid you to attend the course?
6      A.   Right.
7      Q.   And then you went into this job that is a
8  nurse's assistant --
9      A.   Right.
10     Q.   -- at The Milford Center?
11     A.   Yes, yes.
12     Q.   And that training would have started on the
13 19th or the 20th of January?
14     A.   Right, yes.
15     Q.   How much were you earning at that job?
16     A.   Well, I started out with the class, $7 and
17 maybe 13 is.  And then once I finished all of my
18 clinicals and stuff and was on the floor, I went up to
19 like $9.35, something like that.
20     Q.   And I wasn't real clear, just in terms of
21 your employment history.  Your resume, Exhibit 3, seems
22 to say you were at that job until sometime in May of
23 '04.
24     A.   Uh-huh.

---

**110**

1      Q.   And then the next job listed in
2  chronological order would be the school bus driver job.
3      A.   Uh-huh.
4      Q.   And that doesn't start up until September,
5  when school starts.
6      A.   Right, right.
7      Q.   Did you work anywhere between The Milford
8  Center, the nursing assistant job, in '04 and the school
9  bus driver job in September?
10     A.   No.
11     Q.   Did you collect unemployment during that
12 time frame?
13     A.   No.
14     Q.   Did you apply for unemployment during that
15 time frame?
16     A.   No.  Me and my husband reunited, and he took
17 care of everything.  I didn't even bother with
18 unemployment money.
19     Q.   Did you and your husband reunite before you
20 quit The Milford Center job?
21     A.   Yeah.
22     Q.   Did the reuniting have anything to do with
23 quitting that job?
24     A.   No, not at all.

---

**111**

1      Q.   And what was your reason for going back to
2  work in September?
3      A.   Because I just wanted my own money.  I
4  didn't want to be asking my husband for money all the
5  time.
6      Q.   Okay.  And you worked as a school bus
7  driver, according to this, from September '04 until
8  April of '05.  Is that accurate?
9      A.   Yes.
10     Q.   How much money were you earning?
11     A.   $10.16 an hour.
12     Q.   How many hours a week were you working?
13     A.   I think it totaled up to 30 something, 30
14 something a week.
15     Q.   And why did you leave that position?
16     A.   Because they cut my hours and they took away
17 all of my benefits, with no notice at all.  They just
18 done it.
19     Q.   Who was your supervisor at that job?
20     A.   Rudolph Drummond.
21     Q.   And then once you left that job, did you
22 apply for unemployment?
23     A.   Well, the same day I went to apply for
24 unemployment, I got a job.  I went directly to the

---

**112**

1  Department of Labor and got hired with Allied Security.
2      Q.   The same day?
3      A.   Yeah, the same day.  So that canceled it
4  out, so I didn't try to get unemployment.
5      Q.   How long did you work for Allied?
6      A.   For, I guess, about two weeks at the most,
7  two or three weeks.
8      Q.   And how much were you earning there?
9      A.   $10.
10     Q.   40 hours a week?
11     A.   Unh-unh.
12     Q.   No?
13     A.   No.
14     Q.   30?
15     A.   Well, it started out that I was working
16 maybe -- I don't know.  Their schedule is maybe two or
17 three days a week.  And then they gave me every other
18 week, every other weekend.
19     Q.   All right.  But you only worked there for
20 two weeks, right?
21     A.   Yeah.  They changed the schedule.  And after
22 that, I was supposed to be scheduled every other
23 weekend, but I got -- it might have been longer than two
24 weeks.  I'm not sure.

**113**

```
1    Q.    Why did you leave that job?
2    A.    Well, it was Memorial Day. The schedule was
3  made up Thursday. I was off Memorial Day. I wasn't
4  scheduled to come in until the weekend after Memorial
5  Day. No one called my supervisor, and no one called to
6  let me know that I was on the schedule to work Memorial
7  Day until Memorial Day.
8         I already had obligations. My family and
9  stuff was coming over. I told them I wouldn't be able
10 to make it. And nobody called me, left a message or
11 nothing.
12        And so he said: Well, if you can't come in,
13 then you bring in your uniform. And that is what I had
14 to do.
15   Q.    And have you been employed anywhere since
16 then?
17   A.    No.
18   Q.    Have you applied for unemployment?
19   A.    Yeah, I did.
20   Q.    When did you apply?
21   A.    Probably right after that, May, June 2005.
22   Q.    Did you get it?
23   A.    Well, I had to fight for that, too, because
24 they tried to say that I told them that I was resigning
```

**114**

```
1  because I wanted to find another job. And that wasn't
2  true. And then when they found out that I was telling
3  the truth, once again they went on and gave me my
4  unemployment.
5    Q.    So have you been receiving that unemployment
6  from Allied or unemployment from the Allied job since
7  that determination was made?
8    A.    Yeah.
9    Q.    How much do you get?
10   A.    $139 a week; well, it was actually -- the
11 gross is 154. But after taxes, it's 139.
12   Q.    Have you applied for any jobs since that?
13   A.    Yes, I have, yes.
14   Q.    Have you kept any records of your efforts to
15 do that?
16   A.    No. The unemployment, I just write some of
17 my slips there. They would have the records.
18   Q.    Is there somebody there that you deal with?
19   A.    No.
20   Q.    Nobody in particular?
21   A.    No.
22   Q.    When does your unemployment run out?
23   A.    I'm not sure, probably the end of this year.
24   Q.    Do you have any jobs lined up once that
```

**115**

```
1  happens?
2    A.    Do I have any jobs lined up?
3    Q.    Yes. Do you have any jobs lined up that you
4  can go to once your unemployment runs out?
5    A.    No.
6    Q.    Were you ever present when Mr. Whiteman was
7  giving anyone else any account of what he says happened
8  between you and he in the guard office?
9    A.    No, sir.
10   Q.    Have you heard from any third source, such
11 as Ms. Valerie or anyone else, what Mr. Whiteman claims
12 happened?
13   A.    No, sir.
14   Q.    Did anybody from Bennett Security discuss
15 with you at any time what Mr. Whiteman said had happened
16 between the two of you?
17   A.    No, sir, not that I recall.
18   Q.    Other than being reassigned from the Allen's
19 plant to another location from Bennett, did Bennett do
20 anything else to you that you feel was in the nature of
21 any type of employment discipline?
22   A.    Say that again?
23   Q.    Did the folks at Bennett do anything to you
24 in connection with this incident, other than reassign
```

**116**

```
1  you, that you believe was in the nature of a
2  disciplinary action?
3    A.    No, not that I know of, nothing that I can
4  recall.
5    Q.    Do you believe that Bennett's actions in
6  this matter against you were actions based on their
7  intent to discriminate you on the basis of your race?
8    A.    Do you mean Mark and Wayne or by --
9    Q.    I mean Bennett, the company.
10   A.    The company?
11   Q.    Yes.
12   A.    Other than Josh at the time -- I don't think
13 Mark and Wayne; but Josh, my coworker that I had the
14 incident from or with.
15   Q.    Why don't you explain what you mean by that?
16   A.    I feel like Josh had a problem with taking
17 orders from me because I was a young black woman. I
18 guess he felt he was old enough to be my father or
19 something, and he didn't do what I told him to do. And
20 I had made it clear to them that I didn't ask for the
21 supervisor's position. It was given to me, you know.
22 Any of you could have asked for it, you know.
23        And I don't talk to them disrespectfully. I
24 don't have the right to fire anybody or order anybody
```

**121**

1    Q.   You had called the police on another prior
2  occasion about something, hadn't you?  Another incident
3  with another coworker?
4    A.   That worked for Bennett's?
5    Q.   Yes.
6    A.   Are you talking about Ms. Linda?
7    Q.   I'm sorry?
8    A.   Who are you talking about?
9    Q.   I don't know.  I'm just asking you:  Have
10  you ever?
11    A.   I don't believe it was from the job site,
12  not that I can recall.
13    Q.   Had any other coworkers, security guards
14  that were also employed by Bennett and worked with you
15  at the Harbeson plant, ever quit because they couldn't
16  get along with you?
17    A.   Maybe one.
18    Q.   Who was that?
19    A.   I'm not going to say it was because of me,
20  because we talked.  And even after things were settled,
21  I asked her to come back and -- Ms. Diane Stokes.  And
22  she said she just thought it was best that she didn't
23  come back.  And that incident took place -- we just had
24  a disagreement one day, and then it was settled.  That

**122**

1  was not an ongoing thing.  I even let her sit at my
2  desk.  That is how fond of her I was.
3          MR. LANDON:  All right.  Thank you.
4          MR. FLETCHER:  I have no questions.
5  BY MR. BREWER:
6    Q.   I just have one question, ma'am.
7    A.   Uh-huh.
8    Q.   In December of '03, how much was your hourly
9  rate?
10    A.   For Bennett's?
11    Q.   Yes.
12    A.   $7.
13    Q.   $7?  That is when you were supervisor?
14    A.   Yes, sir.
15    Q.   $7 per hour?
16    A.   Uh-huh.
17    Q.   And after you were asked to go to some other
18  location other than Allen's, did your rate change?
19    A.   Yes, sir.
20    Q.   What was it then?
21    A.   Six something.
22    Q.   That was at Perdue?  Well, you never did
23  work at Perdue, did you?
24    A.   No, I never did.  It was at the Family

**123**

1  Court.
2    Q.   At the Family Court it was what?
3    A.   Six -- I'm not sure.  It was $6.75, $6.50,
4  something like that.
5    Q.   And I think you answered this.  When you
6  went to work at the nursing home shortly after that, you
7  were making seven something?
8    A.   Yeah.  And then it went up to nine
9  something.
10          MR. BREWER:  Thank you.  That is all I have.
11          MR. FLETCHER:  I have no questions.  As we
12  stated at the beginning, we waive reading and signing.
13
14
15
16
17
18
19
20
21
22
23
24

**124**

INDEX TO TESTIMONY

WITNESS                          PAGE
ROBIN D. NICHOLS
   Examination by Mr. Brewer        3
   Examination by Mr. Landon       98
   Further Examination by Mr. Brewer   122

INDEX TO EXHIBITS

NICHOLS EXHIBIT NO., FOR IDENTIFICATION    PAGE

1  Condition of Employment        26

2  2002, 2003, 2004 W-2 Statements    27

3  Resume                 28

4  Plaintiff's Initial Disclosures Made
   Pursuant to Federal Rules of Civil
   Procedure 26(a)(1)          36

A 031