# TAB 5



1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
ROBIN D. NICHOLS,                    )
     Plaintiff,                      )
                                     )
          v.                         ) C.A. No.
                                     ) 05-555 (KAJ)
BENNETT DETECTIVE & PROTECTIVE       )
AGENCY, INC., a Delaware corporation,)
and ALLEN'S FAMILY FOODS, INC., a    )
Delaware corporation,                )
     Defendants.                     )
```

        Deposition of **RAYMOND GREGORY MILLER**, taken before Cheryl A. Anthony, Court Reporter, in the law offices of Schmittinger & Rodriguez, 414 South State Street, Dover, Delaware, on Wednesday, December 7, 2005, beginning at 2:45 p.m.

APPEARANCES:

    SCHMITTINGER & RODRIGUEZ
    BY:  ADAM C. GERBER, ESQUIRE
    414 South State Street
    Dover, Delaware  19901
    Attorney for Plaintiff.

    MURPHY, SPADARO & LANDON
    BY:  ROGER D. LANDON, ESQUIRE
    1011 Centre Road
    Number 210
    Wilmington, Delaware  19805
    Attorney for Defendant
    Bennett Detective & Protective Agency, Inc.

                          (Appearances Cont'd...)

**ORIGINAL RETAINED BY ADAM C. GERBER, ESQUIRE**

---

**ANTHONY REPORTING**
PO Box 234
**Dover, Delaware  19903**
(302)674-8884

A 032

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROBIN D. NICHOLS,            )
    Plaintiff,               )
                             )
    v.                       ) C.A. No.
                             ) 05-555 (KAJ)
BENNETT DETECTIVE & PROTECTIVE )
AGENCY, INC., a Delaware corporation,)
and ALLEN'S FAMILY FOODS, INC., a    )
Delaware corporation,        )
    Defendants.              )

Deposition of **RAYMOND GREGORY MILLER**, taken before Cheryl A. Anthony, Court Reporter, in the law offices of Schmittinger & Rodriguez, 414 South State Street, Dover, Delaware, on Wednesday, December 7, 2005, beginning at 2:45 p.m.

APPEARANCES:

SCHMITTINGER & RODRIGUEZ
BY: ADAM C. GERBER, ESQUIRE
414 South State Street
Dover, Delaware 19901
Attorney for Plaintiff.

MURPHY, SPADARO & LANDON
BY: ROGER D. LANDON, ESQUIRE
1011 Centre Road
Number 210
Wilmington, Delaware 19805
Attorney for Defendant
Bennett Detective & Protective Agency, Inc.

(Appearances Cont'd...)

ORIGINAL RETAINED BY ADAM C. GERBER, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware 19903
(302)674-8884

**Page 2**

1  APPEARANCES (Cont'd):
2  SHAWE & ROSENTHAL
3  BY: ARTHUR M. BREWER, ESQUIRE
   and LAURA A. PIERSON SCHEINBERG, ESQUIRE
   20 South Charles Street
4  11th Floor
   Baltimore, Maryland 21201
5  Attorneys for Defendant
   Allen's Family Foods, Inc.
6
7  ALSO PRESENT:
8  MR. WAYNE KELLER,
   Bennett Detective & Protective Agency, Inc.

**Page 3**

1         RAYMOND GREGORY MILLER,
2  the witness herein, having first been
3  duly sworn on oath, was examined and
4  testified as follows:
5  BY MR. GERBER:
6      Q. Good afternoon, Mr. Miller.
7      A. Good afternoon.
8      Q. My name is Adam Gerber. I will be deposing
9  you this afternoon. I know you just sat in on the
10 previous deposition. Do you have any other experience
11 with depositions? Are you familiar with the format?
12     A. Yes, sir.
13     Q. Just as a reminder, please verbalize all of
14 your responses, yes and no, so the court reporter can
15 take it down. If I don't make things clear, just let me
16 know and I will rephrase my question.
17     A. Yes, sir.
18     Q. Could you, for the record, state your full
19 name, please?
20     A. Gregory Miller.
21     Q. What is your date of birth?
22     A.
23     Q. What is your current address?
24     A.                           , Maryland

**Page 4**

1  21804.
2      Q. Are you married?
3      A. Yes.
4      Q. Do you have children?
5      A. Yes.
6      Q. Now, if I could, let's go through some of
7  your educational background. What is the highest level
8  of education you have completed?
9      A. Undergraduate degree.
10     Q. Undergraduate?
11     A. Yes.
12     Q. Where was that?
13     A. East State Tennessee University.
14     Q. What was that degree in?
15     A. Business economics.
16     Q. Okay. Now, what is your current position?
17 I understand you are employed by Allen's Foods. What is
18 your current title?
19     A. Well, manager of human resources for the
20 Harbeson, Delaware plant.
21     Q. How long have you held that particular
22 position?
23     A. I have been in Harbeson nine years.
24     Q. Okay. Were you always, for those nine

**Page 5**

1  years, the manager of human resources?
2     A.  Yes.
3     Q.  Prior to that, where were you employed?
4     A.  With Allen's at the Hurlock, Maryland plant.
5     Q.  Okay. How long were you there?
6     A.  Three years.
7     Q.  Then prior to that, what other experience do
8  you have? Where were you employed?
9     A.  I was with a regional airline, Henson
10 Aviation in Salisbury.
11    Q.  And what was your title there? What role
12 did you fill there at Henson?
13    A.  Personnel director.
14    Q.  Okay. At the Allen's Hurlock plant, were
15 you also the human resources or personnel manager?
16    A.  Yes, sir.
17    Q.  Has most of your job experience been as
18 personnel manager?
19    A.  It has.
20    Q.  Now, prior to Henson, where were you
21 employed?
22    A.  Burroughs Corporation.
23    Q.  Where was that located?
24    A.  Headquartered in Detroit, Michigan.

**Page 6**

1     Q.  Okay. How long were you there?
2     A.  I was at the Rochester, New York facility
3  for a year and the Salisbury, Maryland facility for six
4  years.
5     Q.  Do you have any criminal record or
6  convictions?
7     A.  No, sir.
8     Q.  In any of those prior jobs or any others
9  that you didn't list, have you been involved in any
10 circumstances in which there were claims of
11 discrimination based on race? Not necessarily that you
12 were named as a party, but have you been involved in
13 some similar claims?
14    A.  Yes.
15    Q.  Where was that?
16    A.  At Allen Family Foods.
17    Q.  Okay. Was that at the Harbeson location
18 or --
19    A.  It was both at the Hurlock and Harbeson
20 plants.
21    Q.  Okay. How about any other prior jobs? Were
22 there any --
23    A.  Yes.
24    Q.  Okay. As far as these incidents go, have

**Page 7**

1  you been a party in any claims prior to this?
2     A.  No.
3     Q.  Now, Allen's, in particular, could you give
4  me an estimate as to how many claims of discrimination
5  you have been involved with based on either race or sex?
6        MR. BREWER: May I just pose a question?
7  When you say claims, are you talking about
8  administrative claims, as well as --
9        MR. GERBER: Yes, if that is possible. I'm
10 sorry. Yes, let me clarify.
11 BY MR. GERBER:
12    Q.  Administrative claims based on
13 discrimination for race or sex.
14    A.  I would say probably six to eight.
15    Q.  Okay. Now, as far as your position as
16 personnel manager for Allen's, could you give me a
17 description of what that job entails? What are your
18 duties, just generally?
19    A.  In general terms, staffing, employment,
20 labor agreements, administration, labor relations,
21 employer relations, activities.
22    Q.  Approximately how many people do you
23 oversee? How many do you oversee?
24    A.  Four.

**Page 8**

1     Q.  Four? What are their names?
2     A.  Elizabeth Abularach, Valerie Brittingham,
3  Salamone Ramos, Tina Marie Bravo, Robert Lowry.
4     Q.  So there are five. Okay. Are they also in
5  the human resources or personnel department, just under
6  you?
7     A.  Yes.
8     Q.  Okay. Now, what contact did you personally
9  have with the Plaintiff, Robin Nichols, on a day-to-day
10 basis?
11    A.  As necessary.
12    Q.  Okay. Did you come into contact with her
13 every day?
14    A.  Generally speaking, yes.
15    Q.  Okay. Were you involved in overseeing her
16 in any capacity?
17    A.  No.
18    Q.  What decisions did you make regarding Allen
19 Foods' decision to hire a particular security company?
20    A.  None.
21    Q.  None? You had no say over that?
22    A.  No.
23    Q.  What department would have made that
24 decision?

### 9

1  A.  That would have been the corporate level.
2  Q.  Corporate level? A higher level of the
3  human resources department?
4  A.  Yes, sir.
5  Q.  What was your understanding of the
6  relationship between Allen's Foods and Bennett
7  Detective & Protective Agency?
8  A.  It was a contract relationship.
9  Q.  There was a contract relationship. And
10 Bennett provided the security for Allen's?
11 A.  Correct.
12 Q.  Do you know how long that had been going on?
13 How long that contractual relationship had been going
14 on?
15 A.  Approximately four years.
16 Q.  Okay. What contact did you have with the
17 managers or anyone in a managerial position of Bennett?
18 A.  Just the location.
19 Q.  Just the location?
20 A.  Location and administration.
21 Q.  So in other words, you managed on a local
22 level for that plant?
23 A.  I approved bills, invoices.
24 Q.  Okay. I understand there was an altercation

### 10

1  that occurred between Plaintiff, Ms. Nichols, and a
2  Joshua Whiteman on December 11th. Is that correct, to
3  your understanding, as well?
4  A.  Yes.
5  Q.  How did you first learn of this incident?
6  A.  I was in my office, and I was made aware
7  that the state police were on the premises at security.
8  Q.  Do you remember who particularly made you
9  aware?
10 A.  I do not.
11 Q.  So that was your first knowledge of this
12 incident, after the state police had already arrived?
13 A.  That's right.
14 Q.  That is when you found out about it?
15 A.  That's right.
16 Q.  Do you remember who you were with whenever
17 you were informed of this in your office? Were you in
18 your office with anyone else?
19 A.  No.
20 Q.  After you were informed, did you have any
21 contact with the state police about the incident? Did
22 they ask you any questions?
23 A.  Yes.
24 Q.  They did. So did you make a statement to

### 11

1  them about the incident?
2  A.  Did I make a statement?
3  Q.  Yes.
4  A.  No.
5  Q.  After hearing about this altercation, how
6  long were the police there once you heard about their
7  arrival or their presence on site?
8  A.  They were there for approximately a total
9  of -- from when I arrived at the scene, ten minutes.
10 Q.  Okay. After the police were there, what was
11 the next step you took to find out what happened in this
12 altercation?
13 A.  I left my office and headed for the security
14 post.
15 Q.  And that is where the altercation occurred
16 between the Plaintiff and Mr. Whiteman?
17 A.  That is my understanding.
18 Q.  Okay. Who was the first person you spoke to
19 about the incident once you were informed? Do you
20 remember?
21 A.  I greeted the state trooper.
22 Q.  So the state trooper was first. Who was the
23 first person from Allen's or Bennett that you spoke to
24 about the incident?

### 12

1  A.  Robin Nichols.
2  Q.  So you spoke to Ms. Nichols immediately
3  after. What did you find out from Ms. Nichols at that
4  point about the altercation?
5  A.  My first question to Ms. Nichols was: What
6  is going on? And she provided a summary of what we
7  heard this morning.
8  Q.  Okay. Then after Ms. Nichols, who did you
9  speak to?
10 A.  Well, there was an exchange with the state
11 trooper briefly, just cordially thanking him for coming
12 out. And he assured me that everything was handled, and
13 we both left concurrently.
14 Q.  What was your understanding from Ms. Nichols
15 of what happened exactly?
16 A.  There was a pushing, shoving incident
17 between Mr. Whiteman and Ms. Nichols, and that is the
18 extent of it.
19 Q.  That is the extent of your knowledge of the
20 incident?
21 A.  Yes.
22 Q.  Did you speak later to Mr. Whiteman about
23 the incident at some point?
24 A.  No, I did not.

## 13

1  Q. Did you make any sort of report, any
2  documentation of your conversations or of the
3  altercation?
4  A. No. I created no documents.
5  Q. Do you know if anyone created a document?
6  A. Ms. Nichols created a document.
7  Q. Okay. Did she give that to someone?
8  A. She gave me a copy.
9  Q. She gave you a copy of it?
10 A. Yes.
11 Q. An incident report, would you call it?
12 A. I would call it that.
13 Q. Do you know when she gave that to you?
14 A. Probably the day after the incident.
15 Q. It would have been Friday?
16 A. The 12th.
17 Q. Okay. Now, who from the Bennett Agency did
18 you have the most closest contact with? Generally, who
19 was your contact with the Bennett Agency?
20 A. My only contact had been with Wayne Keller
21 and Mark Habicht.
22 Q. Can you spell Mark's last name, if you know?
23 A. H-A-B-I-C-H-T. Close?
24    MR. KELLER: Good job.

## 14

1 BY MR. GERBER:
2  Q. Now, at some point after this incident, did
3  you meet with Mr. Keller and Mr. Habicht --
4  A. Yes.
5  Q. -- concerning the incident?
6  A. Yes.
7  Q. Now, between the incident and that meeting,
8  had you spoken to Mr. Whiteman?
9  A. No.
10 Q. Just for the record, Mr. Whiteman is a white
11 male, and Robin Nichols is an African-American female,
12 correct?
13 A. That's correct.
14 Q. When was this meeting with Mr. Keller and
15 Mr. Habicht about the incident? When was that meeting
16 held?
17 A. The following day.
18 Q. On that Friday?
19 A. Yes.
20 Q. And at that meeting did you discuss the
21 roles of Plaintiff and Ms. Nichols and Mr. Whiteman in
22 the altercation?
23 A. We discussed the incident.
24 Q. Okay. Do you remember telling them the

## 15

1  details of who started the incident, how it may have
2  escalated, what exactly happened?
3  A. I believe at that point they were aware of
4  the incident and the details. My concern was the fact
5  that the state police were called. That created kind of
6  a disruptive environment. And when you hear about these
7  things out of the blue, you don't know if some act of
8  violence may have taken place or just exactly what, if
9  somebody got hurt on the job. You just don't know. And
10 so that was my concern.
11 Q. Sure. Do you mean whenever the state police
12 was called, that was your concern?
13 A. Right.
14 Q. And did you discuss these concerns, also, at
15 the meeting with the two individuals with Bennett?
16 A. I did.
17 Q. Do you happen to know how they were made
18 aware of the incident?
19 A. I called them, from my perspective, the
20 evening of the incident or the afternoon of the incident
21 and made them aware.
22 Q. In that conversation on the evening after
23 the incident, what did you tell them? What did you tell
24 them then?

## 16

1  A. Just what I reiterated earlier, that the
2  event was disruptive. It was an internal conflict
3  between their staff, and it needed to -- they needed to
4  be aware of it and deal with it.
5  Q. And then you set up to meet with them the
6  next day?
7  A. Yes.
8  Q. Was that your idea or theirs to meet?
9  A. It was theirs.
10 Q. Okay. Now, at the meeting you described to
11 them the details of the incident from your
12 understanding? Correct?
13 A. Correct.
14 Q. And that understanding was based on your
15 conversation with Ms. Nichols only?
16 A. That's correct.
17 Q. At that point she was the only person you
18 had discussed the incident with? She was the only
19 individual who had told you what happened in the
20 incident?
21 A. That's correct.
22 Q. And as far as you know, there are no other
23 witnesses besides Mr. Whiteman and Ms. Nichols to this
24 incident?

## Page 17

1  A.  That's correct.
2  Q.  Now, at the meeting did the two individuals
3  from Bennett's discuss with you, as far as what should
4  be done in response to this incident, this altercation?
5  A.  Essentially, we reviewed what had occurred,
6  and I thanked them for coming out and visiting this
7  morning. And basically, the conversation, you know,
8  just continued. And at some point in the conversation,
9  either Mark or Wayne or both asked the question: Would
10  I feel more comfortable if we made a change?
11  Q.  Okay. What did you respond to that?
12  A.  Yes.
13  Q.  Do you remember who made that suggestion?
14  A.  Mark and Wayne always are in pairs, and I
15  don't think I have ever met with one of them alone. So
16  I can't tell you which one or both.
17  Q.  And prior to that, had you made any similar
18  suggestion about anything that could be done in response
19  to the situation?
20  A.  No.
21  Q.  Whenever Mark or Wayne asked you whether it
22  would be a good idea to make a change, what was your
23  understanding of what they meant by that?
24  A.  A change in supervision.

## Page 18

1  Q.  In supervision?
2  A.  Yes.
3  Q.  Okay. Does that mean supervision within
4  their staff at Allen's?
5  A.  A change within the contract, their employee
6  staffing.
7  Q.  And at that time who was the supervisor?
8  A.  Ms. Nichols.
9  Q.  Ms. Nichols. So that was your understanding
10  immediately? That they were suggesting that she be
11  transferred or that her position be changed?
12  A.  I'm not sure what they meant, but a change.
13  Q.  So you weren't sure. Okay. Did they ever
14  discuss Mr. Whiteman? Did he ever come up in a meeting,
15  as far as a change concerning him?
16  A.  No.
17  Q.  As far as Mr. Whiteman goes, had you had any
18  problems with him before, or do you know if Bennett's
19  staff had any problems with him prior to this incident?
20  MR. BREWER: I'm going to object to the form
21  of the question. It is two-fold as to Allen's and as to
22  Bennett.
23  MR. GERBER: I'm sorry. I will rephrase it.
24

## Page 19

1  BY MR. GERBER:
2  Q.  Had you, in particular, had to take any
3  action against Mr. Whiteman prior to this incident?
4  A.  That would not be my role. He's not our
5  employee.
6  Q.  Okay. Do you know if Bennett's had to?
7  A.  I do not.
8  Q.  Was he involved in an incident in which he
9  witnessed a confrontation between two drivers in the
10  time frame of this incident?
11  A.  He was involved in witnessing a
12  confrontation between two drivers. I can't confirm if
13  the time frame was -- if it coincided with this or not.
14  Q.  Okay. And as far as the Plaintiff, had you
15  ever had to take any action or had any action against
16  her prior to this? Any disciplinary action?
17  A.  Once again, that would not be my role. She
18  was not an employee of Allen Family Foods.
19  Q.  Okay. Did you have to report any of her
20  actions to anyone at Bennett's?
21  A.  No.
22  Q.  So prior to this, you never had any problems
23  with her or had to report anything she had done?
24  A.  No.

## Page 20

1  Q.  Now, when Mark and Wayne suggested that
2  something be changed as far as the supervisory position,
3  did you discuss in detail what would happen? Did they
4  suggest what in particular would happen then?
5  A.  No.
6  Q.  So all they said to you was that there would
7  be a change?
8  A.  No. The only thing they said to me was:
9  Would you feel more comfortable if a change was made?
10  And my response was yes.
11  Q.  Did that end that line of discussion in this
12  meeting?
13  A.  Yes, it did.
14  Q.  Now, were you made aware that Ms. Nichols
15  was to be transferred?
16  A.  No.
17  Q.  When she was actually transferred was the
18  first time you knew that she had been --
19  A.  I did not know what had happened to her,
20  transfer or otherwise.
21  Q.  Okay. What is your recollection of what
22  happened to Mr. Whiteman after this incident?
23  A.  Once again, that is only something that I
24  would have not have dealt with, because he is not an

## Page 25

1 do that?
2   A.   That's correct.
3   Q.   Prior to December 11th of 2003, did you have
4 any knowledge of any employment issue involving Robin
5 Nichols and Diane Stokes, who was also a Bennett
6 Security employee at the Harbeson plant?
7   A.   No, sir, I didn't.
8   Q.   And that would have occurred, I will
9 represent to you, during the calendar year 2002?
10   A.   No, sir, I didn't.
11   Q.   Did you have any knowledge, prior to
12 December 12th of 2003, about an incident between Robin
13 Nichols and an Allen's truck driver who was a Hispanic
14 male, where there was a problem between the two of them
15 that occurred at the Harbeson plant?
16   A.   Yes, sir, I am.
17   Q.   What were you aware of because of that
18 incident? What did you know about that incident?
19   A.   The incident was between an Allen's
20 interplant truck driver and Ms. Nichols. It involved
21 unwanted touching and to the extent that, apparently,
22 the truck driver forced affection toward Ms. Nichols.
23   Q.   Were the state police involved in that
24 incident?

## Page 26

1   A.   I have no idea.
2   Q.   You don't know that Ms. Nichols called the
3 state police and they came to your plant to investigate
4 that incident?
5   A.   No, sir, I don't.
6   Q.   As the human resource director at the plant,
7 if the state police are on site investigating some sort
8 of Complaint by anyone that is working there at the
9 site, would you expect, as the human resource director,
10 to be informed about that?
11   A.   I would.
12   Q.   Did you yourself perform any investigation
13 into the truth or falsity of the complaint made by
14 Ms. Nichols?
15   A.   Ms. Nichols was -- I believe I asked her to
16 reduce her concerns to writing. The interplant truck
17 driver was not based out of the Harbeson facility,
18 however, Hurlock. And I referred the document to our
19 Hurlock human resources individual, and they in turn got
20 his transportation or his supervisor involved. That was
21 the extent of my involvement.
22   Q.   Were you aware, before December 11, 2003, of
23 an incident that occurred at your plant between Robin
24 Nichols and a Linda Fooks, who was also a Bennett

## Page 27

1 Security officer?
2   A.   No, sir, I was not.
3   Q.   Are you saying that after becoming aware
4 that something had happened between Officer Whiteman and
5 Robin Nichols, that you never asked Officer Whiteman for
6 his version of what occurred?
7   A.   Once again, neither of those two individuals
8 are Allen's Family Foods employees, and it was best
9 handled the way I handled it, by contacting Bennett
10 Security.
11   Q.   What did Robin Nichols tell you had
12 occurred?
13   A.   In the presence of the state trooper, she
14 just indicated there was a pushing and shoving incident
15 that took place inside the security post.
16   Q.   Is that as much detail as you can remember
17 about it?
18   A.   That is as much detail as I can remember.
19   Q.   Do you believe that she gave the officer
20 more detail than you have just related, but you just
21 can't remember the extra details?
22   A.   He was in the -- he was either in the midst
23 or had concluded his conversation or his investigation
24 or interrogation of her when I arrived.

## Page 28

1   Q.   Are you saying you kind of walked in in the
2 middle of it or toward the end of it?
3   A.   That's correct.
4   Q.   Where was Mr. Whiteman at that time?
5   A.   I have no idea.
6   Q.   Well, you had just been talking to him in
7 your office, hadn't you?
8   A.   I had not.
9   Q.   Did you ever talk to him on the 11th about
10 anything?
11   A.   No, sir.
12   Q.   On the 11th you heard Robin Nichols testify
13 under oath that you phoned her in the security office to
14 ask her to have Officer Whiteman report to you when he
15 came in. Did you hear her testify to that today?
16   A.   Yes.
17   Q.   Did you do that?
18   A.   No. The only -- Again, this has to do with
19 another incident involving the witnessing or where
20 Whiteman witnessed two other truck drivers in an
21 altercation. And I cannot recall if the incidents,
22 plural, coincided with one another. That is the only
23 time I talked or spoke with Whiteman.
24   Q.   Fair enough. So you did talk with Whiteman

**Page 29**

1  about that incident that he witnessed between the two
2  truck drivers. You just don't recall whether you talked
3  to him on 12/11/03 or on some other day?
4     A.  That's correct.
5     Q.  Whenever it was, whether it was 12/11 or
6  some other day, did that meeting with Whiteman -- is it
7  Whitman or Whiteman?
8     A.  I'm not certain.
9     Q.  Did that process start with a phone call
10 from you to Robin Nichols saying: Tell Whiteman I want
11 to talk to him when he comes in. Send him down here?
12    A.  Well, that whole incident involved an
13 Allen's employee and a contract trucking company. And
14 my understanding was that Whiteman witnessed the events
15 that took place during that incident.
16    Q.  And you met with Whiteman and talked with
17 him about that incident?
18    A.  Yes.
19    Q.  And that occurred in your office?
20    A.  Yes.
21    Q.  How did he get from wherever he was to your
22 office? Did you call down to the security office and
23 talk to Robin Nichols and say: I want to talk to
24 Whiteman?

**Page 30**

1     A.  I don't have any ideas whether or not I
2  talked to Robin about that or not.
3     Q.  Well, do you remember what you were doing
4  for the hour before you became aware that there had been
5  an incident and the state police were at the plant on
6  12/11/03?
7     A.  I'm not sure now.
8     Q.  Did you ever see Mr. Whiteman at the
9  Harbeson plant on 12/11/03?
10    A.  No, to the best of my knowledge.
11    Q.  You heard the statement that Ms. Nichols
12 made today that Ms. Valerie -- is it Brittingham?
13    A.  That is correct.
14    Q.  -- allegedly told her that you are a racist?
15    A.  That is what I heard.
16    Q.  Now, have you had any kind of a difficult
17 work relationship with Valerie Brittingham?
18    A.  None whatsoever.
19    Q.  Have you ever had any problems with her at
20 all at work?
21    A.  No.
22    Q.  Is she black or white?
23    A.  She's black.
24    Q.  How old is she?

**Page 31**

1     A.  I would say late 30's. I hired her.
2     Q.  When did you hire her?
3     A.  About three years ago.
4     Q.  Has she ever, to your knowledge, ever made
5  any comment like that to anyone else?
6     A.  To my knowledge, no.
7     Q.  Obviously, you haven't spoken to her today
8  on the phone, by any chance, have you?
9     A.  I saw her this morning before I came in.
10    Q.  Did you tell her where you were going?
11    A.  Yes.
12    Q.  Did you have any conversation with her today
13 about the nature of the case or the nature of the
14 complaints being made by Robin Nichols?
15    A.  Absolutely not.
16    Q.  Does she know Robin Nichols is suing Allen's
17 Family Foods for race discrimination?
18    A.  I have no idea.
19    Q.  Have you ever had a discussion with Valerie
20 Brittingham about the Robin Nichols lawsuit?
21    A.  I have not.
22    Q.  Do you know whether anyone else employed by
23 Allen's has had any conversations with her about the
24 claims being made by Robin Nichols?

**Page 32**

1     A.  No.
2     Q.  Is it hard for you to believe that Valerie
3  Brittingham would have made the statement that Robin
4  Nichols alleges she made about you being a racist?
5     A.  Yes, it is.
6     Q.  Are you a racist?
7     A.  No, I'm not.
8     Q.  Do you have any recollection of talking to
9  Valerie Brittingham about Robin Nichols or the Robin
10 Nichols/Josh Whiteman incident on 12/11/03 or the next
11 few days following that date?
12    A.  In my role that is one thing you do not do,
13 is visit regarding matters that are no one else's
14 business. They are personal.
15    Q.  When you met with Wayne Keller and Mark
16 Habicht and spoke to them on the 11th and you met with
17 them on the 12th, the only version that you had of
18 whatever happened between Robin Nichols and Josh
19 Whiteman was what you overheard Nichols telling the
20 state police at the end of the state police interview of
21 Nichols, correct?
22    A.  The purpose of my call to Bennett was to
23 make them aware of the situation that occurred when the
24 state police were there that seemingly created a

### 33

1  disruptive environment. It was an internal thing, and
2  they should be aware of it and they should address it.
3      Q.   In your own mind, did you make a
4  determination, before you spoke to Bennett, about who
5  was responsible for creating that disruption?
6      A.   No.
7      Q.   Well, there were two possibilities. Either
8  it was Josh Whiteman or it was Robin Nichols, or it was
9  a combination of both of them. So there are three
10 possibilities.
11     A.   Well, you have to understand that my impetus
12 to contact Bennett Security was simply from the
13 standpoint that they need to address with their
14 employees the behavior of the security persons.
15     Q.   As a human resources director or manager, as
16 you have been in the business for your whole working
17 life, you have a situation between two people that are
18 there on your premises. You don't know really what
19 happened, because all you have done is overheard the
20 tail end of a conversation between one of them and the
21 police.
22          Don't you go through the thought processes
23 at that point of what is going on here and who is
24 responsible for causing this disruption at my plant?

### 34

1  And it's either got to be the guy, the girl, or both of
2  them. Does any of that go through your mind at all?
3      A.   It's not my role. They are not my
4  employees.
5      Q.   Well, you were worried about the disruption.
6      A.   That's right.
7      Q.   You wanted to make sure the disruption
8  didn't happen again.
9      A.   That's right.
10     Q.   You would want to make sure, I would think,
11 that as a matter of logic, if you didn't want the
12 disruption to happen again, you wanted to get to the
13 root of the disruption to get it fixed. Whether it was
14 your responsibility to fix it or not, you wanted it
15 fixed?
16     A.   That's right.
17     Q.   These people, the Bennett people, it was
18 their responsibility to get it fixed; is that right?
19     A.   That's correct.
20     Q.   It never crossed your mind about what the
21 root cause of the problem was so that it could be
22 addressed properly by the Bennett people?
23     A.   No. That is their role.
24     Q.   And what was your understanding of what they

### 35

1  found out? Did they communicate to you what they found
2  out about what had happened between Whiteman --
3      A.   No, sir.
4      Q.   -- and Nichols?
5      A.   No, sir.
6      Q.   So when they offered to make a supervisory
7  change -- in other words, get rid of Nichols and move
8  her somewhere else, move her from your plant -- that was
9  just fine with you?
10     A.   That was fine.
11     Q.   Even though it may have completely been
12 Whiteman's fault, as far as you knew?
13     A.   That was fine with me.
14     Q.   And even though Whiteman may have been the
15 one that, as far as you knew, physically attacked
16 Nichols, he was going to remain at the plant and Nichols
17 was going to be removed from the plant, and that was all
18 right with you?
19     A.   They made an offer, and I accepted it.
20     Q.   And you would, I guess, deny that in the
21 phone conversation you had on the 11th with the folks
22 from Bennett, you told them you wanted Nichols out of
23 there? You didn't say that?
24     A.   I believe you are correct.

### 36

1      Q.   Well, am I or am I not?
2      A.   Yes, you are.
3      Q.   At the meeting with the Bennett folks on the
4  12th, did you tell them that although you liked the
5  Bennett Security company, you could no longer support
6  having Officer Nichols at the company as the supervisor?
7      A.   No, I did not.
8      Q.   Did you tell the Bennett people that you
9  were concerned about the number of times that she had
10 gotten into arguments with either your employees --
11 meaning Allen's employees -- or Bennett employees?
12     A.   No.
13     Q.   Did you tell the Bennett folks that you were
14 concerned about the two times that she had called the
15 state police to show up and cause, as you have termed in
16 other testimony, a disruption at the plant?
17     A.   I'm only aware of one time that she called
18 the police.
19     Q.   And did the Bennett folks tell you that
20 after the decision was made to remove her from the
21 plant, that they were going to let her finish out her
22 shift that week and work that day, the 12th? To
23 continue to work her shift that day and on the 13th?
24     A.   I believe they said there was a window