# TAB 6

*Robin D. Nichols v.*
*Bennett Detective & Protective Agency, et al.*

*Mark Habicht*
*January 6, 2006*

*Hawkins Reporting Service*
*715 N King Street*
*Suite 3*
*Wilmington, DE   United States of America   19801*
*(302) 658-6697*

*Original File MARKHA~1.TXT, 45 Pages*
*Min-U-Script® File ID: 2544627107*

**Word Index included with this Min-U-Script®**

Page 5

[1] A: Wilmington College.
[2] Q: And you're one degree away from the MBA?
[3] A: One more class.
[5] Q: Where is that?
[6] A: Wilmington College.
[7] Q: Okay. How about undergrad, where did you go?
[9] A: Wilmington College.
[10] Q: Okay.
[11] A: Business management.
[12] Q: All right. Business management. Okay.
[14] A: I keep a lot of people employed there.
[16] Q: And you are currently employed at Bennett Protective Agency?
[18] A: That's correct.
[19] Q: How long have you been there?
[20] A: Since June of '98.
[21] Q: June '98. What's your position, your title?
[23] A: My title is vice-president of operations.

Page 6

[1] Q: And just generally, what does that position entail, if you give me a brief description?
[4] A: Just to oversee pretty much anything that comes up, problems, you know, put down fires. I do the payroll for the company, the invoicing, scheduling, whatever comes up on a day-to-day basis, you know, customer complaint, you know, I get involved in that.
[10] Q: Okay. How are your duties related to the human resources, the personnel?
[12] A: There is three people in our corporate office, myself, Mr. Keller and Mr. Bennett. And Mr. Keller and I pretty much handle — we don't have a human resources section, it's not a big enough company to have specialized management, so all of our positions are entry level, all our security officers are entry level, so the hiring process is essentially the same for everyone that wants to apply with our company.
[22] Q: I see. I'll try not to interrupt you.
[24] There is no separate human

Page 7

[1] resources department?
[2] A: No, we don't have a human resources manager or director so to speak.
[4] Q: Okay. How many people currently approximately are employed by Bennett?
[6] A: I would say around 140.
[7] Q: 140?
[8] A: Yeah, approximately. Just — I could get you the exact number if you needed it, but it just depends on how many contracts we have at the time.
[12] Q: As regards to that, approximately how many different contracts are there generally, or —
[15] A: A rough estimate based on the amount of invoices we send out I would say between fifty and fifty-five.
[18] Q: Mr. Bennett, is he the president?
[19] A: President and owner.
[20] Q: Okay. If we could backtrack a little bit, what's your prior work experience before June of 1998?
[23] A: I spent six months working for the State of Delaware as an investigator for the

Page 8

[1] Welfare Fraud Unit and the Division of Child Support Enforcement. Prior to that I spent twenty years in the United States Air Force.
[4] Q: Twenty years?
[5] A: Yes.
[6] Q: What rank did you obtain?
[7] A: I retired as an E-6.
[8] Q: And when did you get your masters at Wilmington College?
[10] A: May of I think it was 2003.
[11] Q: Okay.
[12] A: It was either 2002 or 2003.
[13] Q: And what about your degree from Wilmington College, when was that?
[15] A: The bachelors?
[16] Q: Yeah, the bachelors.
[17] A: Either May 2001 or 2002. 2002 I think, so the masters was 2003.
[19] Q: Okay.
[20] A: That would be right.
[21] Q: Now, you don't have any criminal record or convictions?
[23] A: No.
[24] Q: Have you ever been involved in any

Page 9

[1] circumstances, any incidents involving claims of
[2] discrimination based on race such as in this
[3] case?
[4]   A: Me personally?
[5]   Q: Yes.
[6]   A: No.
[7]   Q: As either a witness or in your
[8] role now as vice-president?
[9]   A: We have one other case that I
[10] recollect.
[11]   Q: At Bennett?
[12]   A: Yes.
[13]   Q: And what was that case?
[14]   A: Can I defer to Wayne to verify?
[15] Christina Melvin.
[16]   MR. KELLER: Yes.
[17]   A: Sorry.
[18]   Q: And that case has been resolved?
[19]   A: It no longer — we're no longer
[20] doing anything on it. They never contacted her,
[21] she never followed up with her complaint is what
[22] I understood happened.
[23]   Q: Did she resign?
[24]   A: I would have to go back and look

Page 10

[1] at the case file.
[2]   Q: Okay. And that was the only other
[3] incident — the only other case you can remember
[4] involving discrimination at Bennett?
[5]   A: That's the only one that I
[6] remember.
[7]   Q: Okay. How do your duties overlap
[8] with Mr. Keller's at Bennett?
[9]   A: They overlap quite a bit. I defer
[10] to him as the senior manager in the company,
[11] however, if he is off, it's not like I can't
[12] assume his duties and if I'm off, it's not like
[13] he can't assume my duties.
[14]   Q: Okay. So he has perhaps some
[15] other responsibilities as a senior manager that
[16] you wouldn't?
[17]   A: I can't be specific about that.
[18]   Q: Okay.
[19]   A: But there may be an occasion where
[20] Mr. Bennett may go to Wayne instead of me
[21] because he's been there longer than I have.
[22]   Q: How long has Mr. Keller been
[23] there, do you know?
[24]   A: Ten years.

Page 11

[1]   Q: Just talking a little bit more
[2] about the structure of the company, do you
[3] oversee certain individuals directly underneath
[4] you?
[5]   A: There would be I would consider it
[6] another layer of supervision underneath me
[7] between myself and our actual security officers,
[8] our New Castle supervisor and our supervisor who
[9] runs our Salisbury, Maryland operation.
[10]   Q: What are their names?
[11]   A: Ron Getry in New Castle and Jim
[12] Harrington in Salisbury.
[13]   Q: Turning now to this specific
[14] arrangement between Allen's Family Foods and
[15] Bennett Security, what type of arrangement is
[16] that? Is there a contract?
[17]   A: There is a contract, yes.
[18]   Q: I have a copy that I would like
[19] you to look at.
[20]      (Habicht Deposition Exhibit No. 1
[21] was marked for identification.)
[22]              BY MR. GERBER:
[23]   Q: Does this two-page document, is
[24] this an accurate representation of the contract,

Page 12

[1] a copy of the contract?
[2]   A: Yes, it appears to be.
[3]   Q: The current contract?
[4]   A: Yes, it appears to be, yeah.
[5]   Q: This is a contract signed on
[6] February 11, 2003?
[7]   A: (Witness nodded.)
[8]   Q: Who signed this contract?
[9]   A: It was signed by E. Bradford
[10] Bennett, the president, witnessed by Mr. Keller.
[11]   Q: That's Mr. Bennett?
[12]   A: Yes.
[13]   Q: Now, I just want to look at one
[14] paragraph essentially in this contract. It's
[15] paragraph number one, which states that,
[16] "Bennett shall furnish unarmed, uniformed
[17] security officers in numbers as may from time to
[18] time be designated by AFF." That's Allen's
[19] Family Foods; correct?
[20]   A: Yes.
[21]   Q: And that's what the contract says
[22] in paragraph one, just to clarify that for the
[23] record?
[24]   A: Sure.

Page 13

[1]  Q: Now, does Allen's have any say —
it says here they have say as to numbers, but in
our experience does Allen's have any say as to
specific employees, specific individual
[5] employees?
[6]  A: As far as if they knew somebody
[7] that they wanted us to hire?
[8]  Q: Yes, just in your practice?
[9]  A: In the practice of our business,
[10] if they identified an individual that they would
[11] like us to hire, more than likely we would
[12] accommodate them.
[13]  Q: Okay. That's all I wanted to look
[14] at that, that contract. Thanks.
[15]     Generally who do you deal with
[16] primarily at Allen's Foods?
[17]  A: At the Harbeson facility?
[18]  Q: Yes, there are two facilities;
[19] correct?
[20]  A: Yes. Originally there was three.
[21]  Q: We're talking about the
[22] Harbeson's.
[23]  A: Yes.
[24]  Q: Who do you deal with directly?

Page 14

[1]  A: As our point of contact at the
[2] plant?
[3]  Q: Yes.
[4]  A: Most of the time it was Greg
[5] Miller.
[6]  Q: Mr. Miller?
[7]  A: Yes.
[8]  Q: Okay. Do you personally have any
[9] idea who made the decision to retain Bennett as
[10] the security company, who at Allen's made that
[11] decision?
[12]  A: I personally don't know who made
[13] that decision, no.
[14]  Q: Who at Bennett makes the ultimate
[15] decision to hire and fire individuals?
[16]  A: Each one is made on a case by case
[17] basis, but it's normally not a decision that's
[18] made unless it's discussed between myself,
[19] Mr. Keller and Mr. Bennett.
[20]  Q: Okay. So all three of you
[21] generally sit down and discuss it?
[22]  A: I would say not so much on the
[23] hiring process, but if there is a disciplinary
[24] action that needs to be taken, then, I mean, we

Page 15

[1] can all normally make those decisions
[2] unilaterally, but normally we don't.
[3]  Q: And you mentioned that would take
[4] place with most disciplinary actions, too.
[5] Would that apply to transfer of someone to a
[6] different position?
[7]  A: Could you clarify that, please?
[8]  Q: Yes. Sorry.
[9] Does someone generally make a
[10] unilateral decision whether to transfer someone
[11] to a different assignment?
[12]  A: From job site to job site?
[13]  Q: Yes.
[14]  A: Not normally from our end in my
[15] experience, my experience has been that if we
[16] move employees around, it's disruptive for our
[17] company, it's disruptive for our customer, it
[18] cost us more money in training, it cost us money
[19] in overtime because we have to backfill the
[20] position when we move the person out of there,
[21] so therefore, the only time that I know that we
[22] move somebody that I'm aware of is when our
[23] customer request it.
[24]  Q: Okay. I want to turn now

Page 16

[1] specifically to the plaintiff in this case,
[2] Robin Nichols. Do you know when she was hired
[3] at Bennett?
[4]  A: Not without looking —
[5]  MR. KELLER: I have —
[6]  MR. LANDON: That's all right.
[7]  Q: Just what you know.
[8]  A: Not without going to the file.
[9]  Q: Does around the beginning of
[10] August 2001 sound right?
[11]  A: Yes, it does. Yeah.
[12]  Q: Do you have any idea who made the
[13] decision to hire her specifically?
[14]  A: I remember meeting her when she
[15] came into the office and I can't recollect if
[16] Mr. Keller was there or not, but we explained to
[17] her we had that position down in Harbeson and
[18] she accepted the offer.
[19]  Q: You were there, you helped
[20] interview her?
[21]  A: Sure, I helped her complete her
[22] employment paperwork and the application and the
[23] licensing paperwork and so forth.
[24]  Q: Okay. Now, in your recollection,

Page 17

[1] how was Ms. Nichols' performance at work?
[2] A: I mean —
[3] Q: Did you have any problems with her
[4] specifically? That's of course prior to this
[5] incident.
[6] A: I didn't, no.
[7] Q: Just what you know. So you never
[8] had to discipline her?
[9] A: No.
[10] Q: And you don't know that anyone
[11] else did?
[12] A: No.
[13] Q: Did she receive evaluations
[14] periodically?
[15] A: No.
[16] Q: No evaluations?
[17] A: No.
[18] Q: Was she ever promoted within
[19] Bennett's?
[20] A: She originally started off at the
[21] Harbeson facility as a security officer. When
[22] our supervisor at that facility left, we
[23] promoted her into that position.
[24] Q: So she was promoted up to

Page 18

[1] supervisor?
[2] A: Right. And she had asked that we
[3] — she was normally working Sunday through
[4] Thursday, if I remember correctly, and she
[5] wanted to work Tuesday through Saturday because
[6] she wanted to go to church, so we accommodated
[7] her with that because, you know, we wanted her
[8] to be the supervisor.
[9] Q: Okay. You may have already seen
[10] this, but I want to show you a copy of a police
[11] report, crime report. It's dated December 11th,
[12] 2003.
[13] (Habicht Deposition Exhibit No. 2
[14] was marked for identification.)
[15] BY MR. GERBER:
[16] Q: I now just want to talk about the
[17] incident that resulted — that's the need for
[18] this crime report. Have you seen a copy of this
[19] before?
[20] A: I don't recall seeing this before,
[21] no.
[22] Q: This incident involves the
[23] plaintiff, and it is an altercation with another
[24] employee. Do you remember how you first heard

Page 19

[1] about this incident involving Ms. Nichols and
[2] this incident in December?
[3] A: I remember having a telephone
[4] conversation with Greg Miller regarding the
[5] incident.
[6] Q: Okay. When was that, do you know?
[7] A: On the day of the incident,
[8] December 11th, 2003.
[9] Q: Was that in the evening or in the
[10] afternoon?
[11] A: It was in the afternoon.
[12] Q: And who was the other employee
[13] involved?
[14] A: Joseph Whiteman.
[15] Q: That's on the police report. Is
[16] that your recollection?
[17] A: Yes, his name just slipped my mind
[18] for a minute.
[19] Q: That's fine.
[20] Now, before this conversation, you
[21] knew Mr. Miller as the point of contact at
[22] Allen's?
[23] A: Yes, I have spoken to Mr. Miller
[24] several times.

Page 20

[1] Q: Okay. During that conversation,
[2] what specifically to the best of your
[3] recollection did Mr. Miller tell you that
[4] happened?
[5] A: This is to the best of my
[6] recollection because it's been a while, but I
[7] remember having the phone conversation with
[8] Mr. Miller and he says, "You know, I called out
[9] to the guardhouse a couple of times and Robin
[10] answered the phone and there was yelling in the
[11] background and then she slammed the phone down.
[12] And I called back and she did the same thing."
[13] And he says, "I can't have that
[14] out there." He says, "Enough is enough, she's
[15] got to go."
[16] Q: So he told you she's got to go?
[17] A: That was my understanding.
[18] Q: Your understanding, or did he say
[19] it in so many words?
[20] A: Like I said, it's not verbatim,
[21] but that's the best of my recollection of what
[22] was said.
[23] So I said well, can I make an
[24] appointment to come and see you tomorrow, the

Page 21

[1] next day. So we set up a time, I believe it was
[2] ten o'clock the next day. I would have gone
[3] down there that day but there were no more
[4] company vehicles available to take down to
[5] Harbeson, so I set it up for the next day.
[6]    I knew Wayne was out of the area,
[7] out of the office. Wayne came back, we talked,
[8] I said we have an appointment at Harbeson
[9] tomorrow. I told him what I knew and then we
[10] went down there the next day.
[11]   Q: So you were the only one there in
[12] the office to receive that phone call?
[13]   A: Mr. Bennett was in the office, but
[14] he wasn't on the other line. I mean, he was in
[15] the building with me.
[16]   Q: Was Mr. Bennett informed of this
[17] at any point?
[18]   A: Sure. I briefed him as soon as I
[19] got off the phone what I knew had happened.
[20]   Q: Okay. Mr. Keller was out of the
[21] area at that point, you told him later that
[22] evening?
[23]   A: I told him, but after I got off
[24] the phone I talked to Mr. Bennett and I think I

Page 22

[1] called Mr. Keller on his cell phone and
[2] explained to him, you know, we need to talk
[3] about something when you get back here, so I
[4] want to make sure we hooked up and I briefed him
[5] on what was going on.
[6]   Q: Okay. And then you set up the
[7] appointment for the next morning, that would be
[8] December 12th?
[9]   A: Yes.
[10]   Q: And you went down to Harbeson?
[11]   A: Yes.
[12]   Q: With anyone, with Mr. Keller?
[13]   A: Mr. Keller and I both went to
[14] Harbeson the next day.
[15]   Q: And you met with Mr. Miller?
[16]   A: That's correct.
[17]   Q: Just the three of you?
[18]   A: Yes.
[19]   Q: Did you make a record of any of
[20] your conversations on December 11th, that
[21] afternoon, evening of the incident?
[22]   A: You mean a written record?
[23]   Q: Yes.
[24]   A: No.

Page 23

[1]   Q: Did you make any record of the
[2] meeting, then, on the morning of the 12th?
[3]   A: No.
[4]   Q: Do you know if there is any
[5] written record?
[6]   A: Not that I'm aware of.
[7]   Q: Okay. What happened at that
[8] meeting, what was discussed?
[9]   A: Basically went over what had
[10] happened and, you know, I know that Mr. Miller
[11] was upset about what had happened, the fact that
[12] the state police had responded to the plant and
[13] apparently he didn't know about it and this is
[14] the second time it happened.
[15]   And, you know, my recollection is
[16] that, you know, he reiterated the fact that she
[17] had to go, that he couldn't have that kind of
[18] activity going on in his plant, it was too
[19] disruptive.
[20]   So we had asked if it would be
[21] possible to have Robin work out her shift which
[22] ended on Saturday and then Mr. Keller would call
[23] Robin on one of her days off, probably on Monday
[24] to let her know that she couldn't go back. We

Page 24

[1] didn't want to exacerbate the situation by
[2] telling her right then and there that she
[3] couldn't come back, and we figured we would just
[4] let things go as they were. We would try to
[5] keep Mr. Whiteman away from her by asking him
[6] just to wait in his car until Robin left because
[7] he was the relief at three o'clock.
[8]   And so she finished out her week
[9] up through Saturday without incident, and then
[10] she took her days off Sunday and Monday.
[11]   Q: Okay. I want to come back to that
[12] in just a minute. I first want to ask you,
[13] whenever you talked to Mr. Miller on the phone
[14] right after the incident, did he tell you who
[15] was responsible for this altercation, who
[16] started it?
[17]   A: No.
[18]   Q: All he really said at that point
[19] was something to the effect of she's got to go?
[20]   A: Well, I mean, there was some
[21] discussion about the incident, he just didn't
[22] call up and say, you know, out of the clear blue
[23] skies. I mean, there was talk about, you know,
[24] an incident between Whiteman and Robin and the

Page 25

[1] fact that he called out there and like I said,
[2] you know, she picked up the phone, they kept
[3] slamming it down and he could hear yelling in
[4] the background and he wasn't happy about that,
[5] apparently.
[6] Q: Then at the meeting the next
[7] morning, did you further discuss who might have
[8] been responsible for this altercation?
[9] A: I don't remember discussing
[10] assigning blame to anyone.
[11] Q: Okay. So then if you weren't
[12] really assigning blame to anyone, how did you
[13] come to the decision to remove Ms. Nichols from
[14] the situation?
[15] A: I wouldn't say that it was my
[16] decision or Bennett Security's decision, we were
[17] asked to remove her from the site.
[18] Q: You were specifically asked to
[19] remove Ms. Nichols?
[20] A: If it was okay for her to stay
[21] there, she may still work there up until the end
[22] of the contract. Like I said earlier, we're not
[23] in the habit of removing people from a job site
[24] just to move them.

Page 26

[1] Q: But if someone, if a company with
[2] whom you have a contract ask you to remove
[3] someone, you try —
[4] A: Absolutely, not only in the case
[5] of Allen Harbeson, but other locations routinely
[6] throughout our company when a customer ask us to
[7] replace someone, we do it, but we don't do that
[8] on our own or unilaterally.
[9] Q: Did you conduct any investigation
[10] on your own, anymore investigation into the
[11] incident?
[12] A: No.
[13] Q: You didn't talk to Ms. Nichols
[14] about it?
[15] A: I didn't.
[16] Q: Did anyone from Bennett's?
[17] A: I don't know. I know I didn't.
[18] Q: Okay. Did anyone talk to
[19] Mr. Whiteman?
[20] A: I don't know. I didn't talk to
[21] Mr. Whiteman.
[22] Q: You're basically just relying on
[23] Mr. Miller's request to remove Ms. Nichols?
[24] A: Yes. I mean, at other job sites

Page 27

[1] we have had customers ask us to remove people
[2] for nonperformance, bad performance. You know,
[3] it's their property and if they don't want
[4] someone there, they want someone removed or
[5] replaced, we accommodate them, or else we don't
[6] keep the business, we lose the contract.
[7] Q: Now, this meeting on the 12th, did
[8] you discuss with Mr. Miller any other possible
[9] options as far as assigning Ms. Nichols
[10] somewhere else, or even somewhere within
[11] Allen's?
[12] A: Well, first of all, I don't think
[13] we would ever suggest reassigning her within
[14] Allen's. I don't know if we discussed with him
[15] what our future plans were for Robin, but I
[16] would say in most cases, our goal is to — I
[17] mean, sometimes in some places it's not a good
[18] fit for our employee and our customer, and since
[19] we do have numerous work locations, it is easier
[20] to relocate people when our customer ask us to.
[21] And I think that was our goal, I know that was
[22] our goal with Ms. Nichols.
[23] Q: Okay. Do you know when
[24] Mr. Whiteman was hired?

Page 28

[1] A: No, I don't, without looking at
[2] his file.
[3] Q: Generally do you have an idea?
[4] A: No, not even generally, to be
[5] honest with you.
[6] Q: Do you remember ever having any
[7] disciplinary, any discipline problems with him?
[8] A: I don't remember any, no.
[9] Q: What was his position at the time
[10] of this altercation?
[11] A: Security officer.
[12] Q: So he was not a supervisor?
[13] A: No.
[14] Q: Is he still with Bennett?
[15] A: No.
[16] Q: Why did he leave?
[17] A: Without looking at his personnel
[18] file, I can't be specific.
[19] Q: Do you know about when he left?
[20] A: No.
[21] Q: Do you remember if he was
[22] terminated, if his employment was terminated or
[23] did he resign?
[24] A: Without looking at his termination

Page 29

[1] paperwork, I can't answer that.
[2]   Q: Did this incident with Ms. Nichols
affect his employment status in any way that you
know of?
[5]   A: No.
[6]   Q: No?
[7] Did you conduct any further
[8] investigation into this incident?
[9]   A: No.
[10]   Q: There were no other witnesses to
[11] speak to?
[12]   A: No.
[13]   Q: Who in your opinion was
[14] responsible for starting that altercation?
[15]   A: I don't have enough information to
[16] answer that.
[17]   Q: The only information you have is
[18] from Mr. Miller?
[19]      What was the official, if there
[20] was an official course of action taken against
[21] Ms. Nichols?
[22]   MR. LANDON: Object to the form of
[23] the question.
[24]   Q: Was there a specific disciplinary

Page 30

[1] action taken against —
[2]   A: There was no disciplinary action
[3] taken that I'm aware of.
[4]   Q: But she was reassigned to a
[5] different position?
[6]   A: Yes, we attempted to reassign her.
[7]   Q: You attempted. Where did you
[8] attempt to reassign her?
[9]   A: The Milford Perdue plant. I think
[10] we had her working at Family Court in Sussex
[11] County for a few days, a couple of shifts,
[12] maybe.
[13]   Q: Did those not work out for
[14] Ms. Nichols?
[15]   A: I believe what I remember is is
[16] that we offered her a full-time position in
[17] Milford Perdue which was similar to the type of
[18] work she was doing at Harbeson, it was similar I
[19] think to the hours of work were the same, and
[20] her rate of pay was the same. And without
[21] discussing it with Mr. Keller or looking in the
[22] record, I believe she decided not to take the
[23] position and chose to resign.
[24]   Q: Approximately how many other

Page 31

[1] positions had you offered her then before she
[2] resigned?
[3]   A: There may have been more. I
[4] remember two.
[5]   Q: Approximately when did she resign?
[6]   A: Approximately the end of December.
[7]   Q: Just two to three weeks after this
[8] incident?
[9]   A: Correct.
[10]   Q: Did you ever speak to anyone else
[11] at Allen's about this incident?
[12]   A: No.
[13]   Q: Just Mr. Miller?
[14]   A: That's correct, yes.
[15]   Q: Have you in conversation hear any
[16] discussions within Bennett's of transferring
[17] Mr. Whiteman to another assignment?
[18]   A: No.
[19]   MR. GERBER: I think that's all I
[20] have for right now. I may have a couple of
[21] questions later.
[22]      Thank you.
[23]   MR. BREWER: Do you want to go?
[24]   MR. LANDON: No.

Page 32

[1]   MR. BREWER: Okay.
[2]           BY MR. BREWER:
[3]   Q: Mr. Habicht, I have a few
[4] questions for you. Exhibit 1, that's this, the
[5] agreement between Allen's, you were asked some
[6] questions about that. Go to page two on that
[7] exhibit, paragraph five, please. And this
[8] paragraph says that it's mutually understood
[9] that Bennett, meaning your company; correct?
[10]   A: Yes.
[11]   Q: Is an independent contractor, and
[12] that's what you are, an independent contractor?
[13]   A: That's correct.
[14]   Q: And that all the guards employed
[15] by Bennett to perform services are and shall be
[16] employees of Bennett and not employees of
[17] Allen's Family Foods; is that correct?
[18]   A: That's correct.
[19]   Q: So Ms. Nichols was an employee of
[20] Bennett?
[21]   A: That's correct.
[22]   Q: And not Allen's?
[23]   A: That's correct.
[24]   Q: In fact, the last sentence talks

Robin D. Nichols v.
Bennett Detective & Protective Agency, et al.

Case 1:05-cv-00055-KAJ   Document 47-7   Filed 01/27/2006   Page 10 of 12

Mark Habicht
January 6, 2006

Page 33

[1] about if Allen's were to hire any one of those
[2] employees within a six-month period, they would
[3] be charged a fee of $2,000. Is that what the
[4] agreement says?
[5] A: Yes.
[6] Q: Is this a standard agreement that
[7] you had with all of your —
[8] A: At that time it was, yes.
[9] Q: It's since been changed now?
[10] A: We have a different agreement that
[11] we use.
[12] Q: You are the vice-president of
[13] operations. How long have you been the
[14] vice-president of operations?
[15] A: Probably since around June of
[16] 2000.
[17] Q: Okay. So 6/2000. And your
[18] dealings at the plant was with Mr. Miller?
[19] A: Yes.
[20] Q: Okay. Let's go back to the — I
[21] think you said that you hired Ms. Nichols?
[22] A: Yes, I was there when she came to
[23] our office and applied and I offered the
[24] position and she accepted.

Page 34

[1] Q: You offered her the position?
[2] A: Yes.
[3] Q: And she signed it?
[4] A: Yes.
[5] Q: Okay. And she signed that?
[6] MR. BREWER: Let me have this
[7] marked as I guess Habicht Number 3.
[8] (Habicht Deposition Exhibit No. 3
[9] was marked for identification.)
[10]         BY MR. BREWER:
[11] Q: Would you take a look at the
[12] exhibit that is in front of you. It's entitled
[13] Conditions of Employment. Can you tell me what
[14] this is?
[15] A: That was a document that we used
[16] that basically laid out our rules and
[17] regulations for employment with our company.
[18] Q: And this is signed by Robin
[19] Harris?
[20] A: Yes.
[21] Q: That is also Ms. Nichols, is it
[22] not?
[23] A: Yes.
[24] Q: It is signed on July 30th, 2001.

Page 35

[1] Is that about the time that you would have hired
[2] her?
[3] A: Yes.
[4] Q: This is not a contract of
[5] employment, is it?
[6] A: No.
[7] Q: Okay. Now, let's go to the — so
[8] you hired her, did you, and by you, I mean you
[9] Bennett promote Ms. Nichols to supervisory
[10] position?
[11] A: Bennett Security did, yes.
[12] Q: Bennett Security did?
[13] A: Yes.
[14] Q: Did you do it yourself?
[15] A: I don't remember who specifically
[16] asked her if she would like to be the supervisor
[17] or not.
[18] Q: Did Allen's have any input into
[19] that decision to promote Ms. Nichols?
[20] A: I don't believe so.
[21] Q: You also mentioned that sometimes
[22] companies will request you, being Bennett, to
[23] hire somebody they know as a security officer?
[24] A: Yes.

Page 36

[1] Q: And you will generally accommodate
[2] that?
[3] A: Right, if there is not a conflict.
[4] Q: Did Allen's ever ask you to hire
[5] anybody specifically at the Harbeson plant as a
[6] security guard?
[7] A: I don't remember.
[8] Q: Okay. I used the term you and I
[9] meant you personally, and you don't remember?
[10] A: Sure.
[11] Q: Do you know if they asked anyone
[12] from Bennett to hire anybody?
[13] A: I don't know.
[14] Q: You don't know?
[15] A: Right.
[16] Q: I believe you testified that on
[17] December 11th of 2003, you had a conversation
[18] with Mr. Miller regarding the Mr. Whiteman
[19] incident?
[20] A: Yes.
[21] Q: And I believe if my notes are
[22] correct, in that phone conversation — let me
[23] withdraw that question and ask the question this
[24] way.

Page 37

[1] Did Mr. Miller during this phone
[2] conversation give you details of the incident
[3] which occurred between Mr. Whiteman and
[4] Ms. Nichols?
[5]   A: He just gave me an overview of
[6] what was going on down there. He was mainly
[7] upset like I said about the phone being answered
[8] and yelling in the background and her hanging up
[9] the phone.
[10]   Q: And it's your testimony that that
[11] happened during the conversation on the 11th of
[12] December?
[13]   A: That's what I remember.
[14]   Q: That's fine.
[15] Did you have that similar
[16] conversation with Mr. Miller on the 12th when
[17] you met?
[18]   A: Yes.
[19]   Q: So that was said again for the
[20] second time?
[21]   A: Yes, that was the whole reason we
[22] were there.
[23]   Q: I understand he called you?
[24]   A: Yes.

Page 38

[ ]   Q: I understand that he had an
[ ] incident there.
[ ]     Let me show you this document
[ ] here, make this Number 4.
[ ]     (Habicht Deposition Exhibit No. 4
[ ] was marked for identification.)
[ ]                 BY MR. BREWER:
[ ]   Q: I'm going to ask you if you don't
[ ] mind to go to page three of this document, which
[ ] bears the Ben number of 062, and first full
[ ] paragraph. Are you with me?
[ ]   A: Okay.
[ ]   Q: Yes, that's it. 062, does that
[ ] say 062 at the bottom?
[ ]   A: Yes.
[ ]   Q: The first paragraph, full
[ ] paragraph at the top says, "On December 15,
[ ] 2003, I called officer Nichols at her residence
[ ] to inform her we were removing her from the
[ ] site."
[ ]     Is that you who called
[ ] Ms. Nichols?
[ ]   A: No.
[ ]   Q: Do you know who the "I" is

Page 39

[1] referring to?
[2]   A: I believe it's Mr. Keller.
[3]   Q: Do you know, in fact, that
[4] Mr. Keller did call Ms. Nichols at her home?
[5]   A: I don't know.
[6]   Q: You don't know.
[7] And let me go further. I
[8] understand I, being Mr. Keller, now explained to
[9] her that it was a decision made by our company.
[10]   A: You would have to ask Mr. Keller.
[11]   Q: So you had no role in making the
[12] decision as to whether or not Ms. Nichols should
[13] be removed?
[14]   A: No, I can't answer what Mr. Keller
[15] said to the "I" part of this in the paragraph
[16] here.
[17]   Q: Well, I understood your testimony,
[18] you, Mr. Keller and Mr. Bennett are generally
[19] involved in the discipline and discharging of
[20] employees. Are you telling me that you had no
[21] role then in deciding whether or not Ms. Nichols
[22] should be reassigned?
[23]   A: I'm just saying when you ask me
[24] about the I, I told her and I, being Wayne

Page 40

[1] Keller, I wasn't around when Wayne Keller as I
[2] talked to Robin Nichols.
[3]   Q: If there were phone conversations,
[4] you were not there to hear it?
[5]   A: No.
[6]   Q: Let me ask you this, did you have
[7] any role in having Ms. Nichols removed from
[8] Allen's to some other place?
[9]   A: A role?
[10]   Q: You, yes, did you have any input
[11] into it?
[12]   A: Just agreeing to accommodate
[13] Mr. Miller's request.
[14]   Q: I'm not sure if I understand what
[15] that means.
[16]   A: When he asked us to remove her
[17] from the job site.
[18]   Q: You didn't have to do that?
[19]   A: If we wanted to keep the contract
[20] we would have.
[21]   Q: Did Mr. Miller say if you don't
[22] remove her, you're going to lose the contract?
[23]   A: No, he didn't say that.
[24]   MR. BREWER: I don't have any

Robin D. Nichols v.  
Bennett Detective & Protective Agency, et al.
Case 1:05-cv-00055-KAJ   Document 47-7   Filed 01/27/2006   Page 12 of 12
Mark Habicht
January 6, 2006

Page 41

[1] further questions.
[2] BY MR. LANDON:
[3] Q: Did Mr. Miller prior to this
[4] incident involving Robin Nichols ever ask
[5] Bennett to remove or transfer any other security
[6] guards from the Harbeson plant?
[7] A: Yes, there was a couple of other
[8] individuals that I remember, one by the name of
[9] David Leggins and the other by the name of
[10] Daniel Steele.
[11] Q: Do you remember when those
[12] requests were made?
[13] A: I don't remember. I could find
[14] out those dates.
[15] Q: They were before the Nichols
[16] incident?
[17] A: I believe they were, yes.
[18] Q: And David Leggins, was he white or
[19] black?
[20] A: He was a black male.
[21] Q: What about the other person,
[22] Daniel —
[23] A: Daniel.
[24] Q: Daniel?

Page 42

[1] A: Daniel, male, D-A-N-I-E-L.
[2] Q: Steele?
[3] A: Yeah, I think it's S-T-E-E-L-E.
[4] Q: White or black?
[5] A: White male.
[6] Q: What were the circumstances that
[7] led to those requests?
[8] A: I just remember that they had some
[9] disagreements with the truck drivers down there,
[10] and they were asked to be removed or replaced.
[11] Q: And how did those requests come
[12] about, were they phone calls?
[13] A: Just a phone call.
[14] Q: From Mr. Miller to you?
[15] A: Yes.
[16] Q: To you?
[17] A: I don't remember. I don't
[18] remember if I talked to him and discussed it
[19] with Wayne and Wayne took it and discussed it
[20] with me.
[21] Q: On both of those instances, did
[22] Bennett remove those individuals from the
[23] Harbeson plant and reassign them?
[24] A: Yes. Yes, we did.

Page 43

[1] Q: Do you recall any instances where
[2] Mr. Miller requested that a guard be reassigned
[3] and Bennett refused to reassign the guard?
[4] A: No, I don't remember that ever
[5] happening at Harbeson or anywhere since I have
[6] been working at Bennett Security.
[7] Q: Was Robin Nichols replaced, was
[8] there a guard that replaced her at the Harbeson
[9] plant after you removed her?
[10] A: When she left Harbeson, that
[11] created a forty-hour position which was
[12] backfilled by not a supervisor, but another
[13] security officer, an employee by the name of Amy
[14] Stein.
[15] Q: Was she white or black?
[16] A: She was a white female.
[17] Q: Okay.
[18] A: But she was not the supervisor.
[19] Q: Was there a supervisor at that
[20] point?
[21] A: At that time when Robin left, no,
[22] there was not.
[23] Q: At some point was there a new
[24] supervisor named?

Page 44

[1] A: Yes.
[2] Q: Who was that?
[3] A: Linda Fooks.
[4] Q: Was she black or white?
[5] A: She was a black female.
[6] Q: How long after Robin left was
[7] Linda Fooks involved as the supervisor at the
[8] Harbeson plant?
[9] A: I would say not being exact,
[10] approximately four to six weeks.
[11] MR. LANDON: I have nothing
[12] further.
[13] MR. BREWER: I just have two quick
[14] questions, if I may.
[15] BY MR. BREWER:
[16] Q: I just want to be sure.
[17] Mr. Miller didn't ask you in this meeting on the
[18] 12th of December of 2003 to terminate
[19] Ms. Nichols, did he?
[20] A: No.
[21] Q: And I believe I understood your
[22] testimony to be that Ms. Nichols ultimately
[23] resigned sometime the beginning of January,
[24] latter part of December '03, beginning of