# TAB 7

*Robin D. Nichols v.*
*Bennett Detective & Protective Agency, et al.*

*Wayne A. Keller*
*January 6, 2006*

*Hawkins Reporting Service*
*715 N King Street*
*Suite 3*
*Wilmington, DE United States of America 19801*
*(302) 658-6697*

*Original File WAYNEK~1.TXT, 64 Pages*
*Min-U-Script® File ID: 2163268143*

**Word Index included with this Min-U-Script®**

Case 1:05-cv-00055-KAJ   Document 47-8   Filed 01/27/2006   Page 3 of 14

Robin D. Nichols v.
Bennett Detective & Protective Agency, et al.

Wayne A. Keller
January 6, 2006

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROBIN D. NICHOLS,                )
         Plaintiff,              )
                                 ) Civil Action
v.                               ) No. 05-555
BENNETT DETECTIVE & PROTECTIVE   )
  AGENCY, INC., a Delaware corporation, )
and ALLEN'S FAMILY FOODS, INC.,  )
a Delaware corporation,          )
         Defendants.             )

Deposition of WAYNE A. KELLER, taken pursuant to notice at the law offices of Schmittinger & Rodriguez, 414 South State Street, Dover, Delaware, beginning at 12:06 p.m., on Friday, January 6, 2006, before Dale C. Hawkins, Registered Merit Reporter and Notary Public.

APPEARANCES:
   ADAM C. GERBER, ESQ.
   SCHMITTINGER & RODRIGUEZ, P.A.
   414 South State Street
   Dover, Delaware   19903
     for the Plaintiff
   ROGER D. LANDON, ESQ.
   MURPHY, SPADARO & LANDON
   1011 Centre Road, Suite 210
   Wilmington, Delaware   19805
     for the Defendant
     Bennett Detective & Protective Agency

**2**

APPEARANCES (Cont'd):
   ARTHUR M. BREWER, ESQ.
   LAURA A. PIERSON SCHEINBERG, ESQ.
   SHAWE & ROSENTHAL, LLP
   20 South Charles Street, 11th Floor
   Baltimore, Maryland   21201
     for the Defendant
     Allen's Family Foods, Inc.
ALSO PRESENT:
   Mr. Greg Miller
   Ms. Valerie Brittingham
   Mr. Mark Habicht

**3**

[1] WAYNE A. KELLER,
[2] the deponent herein, having first
[3] been duly sworn on oath, was
[4] examined and testified as follows:
[5]            BY MR. GERBER:
[6]   Q: Good afternoon, Mr. Keller.
[7]   A: Good afternoon.
[8]   Q: I am assuming you heard, because
[9] you have been sitting in, the instructions for
[10] the depositions?
[11]   A: I understand them.
[12]   Q: Okay. And I just want to clarify
[13] that you were here sitting and you listened to
[14] Mr. Habicht's testimony?
[15]   A: Yes, I did.
[16]   Q: What is your age?
[17]   A: I'm forty-nine.
[18]   Q: And your current address?
[19]   A:                           Dover,
[20] 19904.
[21]   Q: Are you married?
[22]   A: Yes, I am.
[23]   Q: Do you have children?
[24]   A: I do.

Page 4

[1]   Q: What's the highest level of
[2] education you have completed?
[3]   A: I have a bachelor's degree in
[4] business management from Wilmington College.
[5] Now I'm halfway through my masters degree right
[6] now in human resources.
[7]   Q: When did you receive that
[8] bachelor's degree?
[9]   A: Last year, '05.
[10]   Q: Okay. And you're currently
[11] employed at Bennett?
[12]   A: I am.
[13]   Q: Your position?
[14]   A: Vice-president.
[15]   Q: And how long have you been there?
[16]   A: Ten years.
[17]   Q: Ten years.
[18] How long have you been
[19] vice-president?
[20]   A: Seven, maybe. Seven or eight,
[21] somewhere in that general range.
[22]   Q: Prior to Bennett, where were you
[23] employed?
[24]   A: United States Air Force, Office of

Case 1:05-cv-00055-KAJ    Document 47-8    Filed 01/27/2006    Page 4 of 14

Wayne A. Keller
January 6, 2006

Robin D. Nichols  v.
Bennett Detective & Protective Agency, et al.

Page 5

[1] Special Investigations.
[2]  Q: How long were you in the Air
     orce?
[4]  A: Twenty years.
[5]  Q: Okay. What rank?
[6]  A: I was a tech sergeant, E-6.
[7]  Q: And you don't have any criminal
[8] record or convictions?
[9]  A: I do not.
[10] Q: We just spoke to Mr. Habicht, but
[11] I wanted to clarify with you, what are your work
[12] duties at Bennett?
[13] A: Having spoken with Mr. Habicht,
[14] they're similar to Mr. Habicht. I do some
[15] different things over and above what he does.
[16] We're licensed in two states, so in Maryland I
[17] fingerprint and do the applications for our
[18] security officers that are applying for us over
[19] and above in Delaware you send them down to the
[20] state police to have the criminal background
[21] check done. In Maryland we do the paperwork and
[22] mail it into the Maryland State Police, a little
[23] bit different. So I spend time doing that.
[24] Pretty much other than that what Mr. Habicht

Page 6

[1] said. We all function in the capacity of hiring
[2] people, the HR function.
[3]  Q: All meaning you, Mr. Habicht and
[4] Mr. Bennett?
[5]  A: Mr. Bennett if he actually had to.
[6] He normally doesn't get involved with the hiring
[7] of people. I mean, I guess if all of us, or
[8] Mr. Habicht and I were out of the office, if
[9] someone came in, having them fill out the
[10] paperwork would be called hiring them, then
[11] yeah, you can say that, but other than that he
[12] leaves most of that to Mr. Habicht and myself.
[13] Q: And just to clarify, there is no
[14] official human resources department?
[15] A: No, there isn't.
[16] Q: And do you know specifically about
[17] how many people are employed at Bennett's?
[18] A: Last time I looked at the bottom
[19] of the list it was 137.
[20] Q: Do you directly oversee — who do
[21] you directly oversee within Bennett's?
[22] A: The way the company is split up,
[23] and Mr. Habicht alluded to that, we have a
[24] northern supervisor and a southern supervisor

Page 7

[1] and they both manage human assets, forty at one,
[2] twenty at another that they supervise on a daily
[3] basis. Mr. Habicht and I have the rest of them
[4] in the company that we're responsible for for
[5] personnel issues, scheduling, days off,
[6] vacations, that type of thing.
[7]  Q: Okay. I'm sorry to have to repeat
[8] some of this, but I want to ask you your
[9] understanding, your knowledge of the arrangement
[10] between Bennett Security and Allen's Food?
[11] A: We had a contract to provide them
[12] with security officers to provide a security
[13] function at their facilities, three of them
[14] initially, and then they dropped down to two
[15] when the Hurlock plant went away, or they got
[16] another agency. And up until a few months ago,
[17] we worked for Mr. Miller at the Harbeson plant.
[18] Q: And we've already introduced this,
[19] this would be Exhibit 1, we introduced this with
[20] Mr. Habicht. Is this an accurate representation
[21] of the contract you believe to be in force?
[22] A: It appears to be, yes.
[23] Q: And in paragraph one, it states
[24] that Bennett, or pardon me, that Allen's Foods

Page 8

[1] sets the number of security guards to be
[2] employed at their sites?
[3]  A: That's correct.
[4]  Q: And in your experience in the
[5] practice with Allen's, do you agree with
[6] Mr. Habicht that you would try to accommodate
[7] within certain limits, at least try to
[8] accommodate a request by someone such as Allen's
[9] to hire certain individuals if they asked?
[10] A: Absolutely, we would do that for
[11] any client as long as they could pass the
[12] background check. If they had someone they
[13] recommended and we ran them to the state police
[14] in Delaware or in Maryland and they failed the
[15] background check, we wouldn't do that.
[16] Q: Certainly, obviously there are
[17] limits.
[18]     Now, does that also apply to
[19] requests by a client to transfer someone?
[20] A: Absolutely.
[21] Q: Okay. Is this contract we're
[22] looking at, is it terminable by your clients?
[23] A: I don't know when this contract —
[24] normally we have a thirty day — I don't know if

Case 1:05-cv-00055-KAJ   Document 47-8   Filed 01/27/2006   Page 5 of 14

Robin D. Nichols   v.
Bennett Detective & Protective Agency, et al.

Wayne A. Keller
January 6, 2006

Page 9

[1] it's in here. Yes, contract may be terminated
[2] following thirty days written notice by either
[3] party of the other party's intention to
[4] terminate paragraph eight. Yes, I think that's
[5] what it says.
[6]   Q: Now, I just want to turn directly
[7] to Ms. Nichols specifically. Do you remember
[8] approximately when she was hired?
[9]   A: 7/30/01.
[10]   Q: So you remember specifically.
[11] Did you play a role in her hiring?
[12]   A: One of us, we were both probably
[13] in the office that day because I don't know who
[14] signed. We have obviously employment forms, and
[15] they have been in the disclosure packet, I
[16] believe. I don't know which one of us, but I
[17] think I recall Robin had been in and out of our
[18] office on different occasions picking up forms,
[19] if she was in Dover she would stop by, so it
[20] could have been either both of us, but yes, I
[21] remember when she came on board.
[22]   Q: Where is your office?
[23]   A: In Dover, it's the Sorentino's
[24] Restaurant now, there is a brick house in the

Page 10

[1] back parking lot, that's where we're located.
[2]   Q: Do you remember whether there were
[3] any reservations or concerns in hiring
[4] Ms. Nichols or was she hired promptly?
[5]   A: She applied, and when people apply
[6] they fill out the application, we look at the
[7] application, we sent her up to the Delaware
[8] State Police, she returned with the security
[9] guard license which meant she had no criminal
[10] history, and I don't believe she disclosed any
[11] on the front, so that would not have precluded
[12] her from going up there. She came back and we
[13] completed the paperwork.
[14]   Q: Did anyone from Allen's have any
[15] input in that decision to hire her?
[16]   A: No, I don't believe so, no.
[17]   Q: Who was your — I'm sorry to
[18] reiterate, who was your point of contact at
[19] Allen's Foods?
[20]   A: Mr. Habicht or myself, we kind of
[21] split responsibilities. Mr. Habicht may have
[22] had a little bit more contact with Mr. Miller
[23] than I do. I represent some other businesses.
[24] Structurally within the company at one time they

Page 11

[1] were broken up in a utopian effort to say
[2] Mr. Habicht is in charge of these, Mr. Keller,
[3] you're in charge of those, but we each know each
[4] others because if he's away or I'm away and
[5] there is an issue with the client or we stop by
[6] to see them, we want to be able to interface
[7] with our contacts.
[8]   Q: And your duties overlap?
[9]   A: Yes, they do.
[10]   Q: But you did know Mr. Miller?
[11]   A: Absolutely.
[12]   Q: We've also talked about
[13] Ms. Nichols' performance. Do you remember
[14] having any disciplinary problems with her?
[15]   A: I don't know if you would call
[16] them disciplinary problems. There were issues,
[17] she had had. She had had an issue with a driver
[18] from one of the Allen's plants at the Harbeson
[19] site one other time. I remember, I don't know
[20] if you would — because I wasn't there.
[21]   Q: Okay.
[22]   A: And I don't know if it was an
[23] offensive touching. I believe someone, one of
[24] their drivers had come in the guardhouse and

Page 12

[1] touched her, possibly even kissed her. She
[2] called the state police, they responded, they
[3] took a report on the matter.
[4]   She had a run in — I won't say a
[5] run in, she had a difference with Linda Fooks,
[6] one of our security officers there. Robin was a
[7] very religious person as were many of our people
[8] that were there and I don't know what the
[9] difference was involving that, but we — she had
[10] an issue there with an employee.
[11]   She had a Diane Stokes I believe
[12] her name was, both were black females. She had
[13] an issue with them that ultimately led to us —
[14] Robin was not reassigned, Robin stayed, one girl
[15] just terminated her service and Ms. Fooks said
[16] she wasn't going to work with Robin and she said
[17] transfer me or, you know, I'll go — I'm just
[18] not going to work with her, so do what you want.
[19]   Q: And Ms. Fooks said that?
[20]   A: Yes.
[21]   Q: Do you remember approximately when
[22] you said that Robin may have called the police
[23] before?
[24]   A: No.

Case 1:05-cv-00055-KAJ    Document 47-8    Filed 01/27/2006    Page 6 of 14

Wayne A. Keller
January 6, 2006

Robin D. Nichols   v.
Bennett Detective & Protective Agency, et al.

**Page 13**

[1] Q: Okay.
[2] A: It's in the notes.
[3] Q: Was there any, ever any disciplinary action taken —
[5] A: Robin was a victim, so there was
[6] no action taken against Robin. No, she was a
[7] victim.
[8] Q: And at some point was Robin
[9] promoted in Bennett's?
[10] A: Yes, she started out — she might
[11] have been one of the original security officers
[12] when we received the Allen's contract, and when
[13] I believe she replaced our original supervisor,
[14] Kenny Cresage.
[15] Q: When was she promoted, do you
[16] remember?
[17] A: No, I don't remember that.
[18] Q: So she had up until December 2003,
[19] she had been there for —
[20] A: From 7/30/01 when she was hired,
[21] that was the only site she worked at until such
[22] time of the incident.
[23] Q: You said that was almost the
[24] duration of the contract with that site with

**Page 14**

[1] Allen's?
[2] A: No, it went on for longer after
[3] Ms. Nichols left.
[4] Q: That was the near the beginning of
[5] the contract?
[6] A: Yes.
[7] Q: Okay. We've also discussed the
[8] altercation between Ms. Nichols and
[9] Mr. Whiteman.
[10] A: Yes.
[11] Q: How did you find out about that
[12] altercation?
[13] A: I was in Maryland either visiting
[14] clients, fingerprinting security officers, and
[15] Mr. Habicht called me on the company cell phone
[16] and related that there had been an incident and
[17] made an — that he had made an appointment to
[18] see Mr. Miller and that he wanted Robin
[19] replaced.
[20] Q: And that was the afternoon right
[21] after the incident?
[22] A: I don't know when the incident
[23] happened. I was on the road like I said, but
[24] Mr. Habicht probably would have called me

**Page 15**

[1] shortly after talking with Mr. Bennett.
[2] Q: So you just stated Mr. Habicht
[3] told you that Mr. Miller wanted Ms. Nichols —
[4] A: Absolutely.
[5] Q: — to be —
[6] A: Mr. Habicht said he was
[7] displeased.
[8] Q: Wanted her transferred. Okay?
[9] A: I don't think he cared whether she
[10] was transferred or not, he just didn't want her
[11] on his property.
[12] Q: Okay. Did you ever learn, or did
[13] Mr. Habicht tell you who might have been
[14] responsible for the incident, give you any
[15] specifics?
[16] A: Not at that time. Maybe when I
[17] came back later that afternoon.
[18] Q: Did Mr. Habicht tell you that
[19] Mr. Miller said something to the effect of she's
[20] got to go?
[21] A: Yes, exactly.
[22] Q: Did you also learn — when did you
[23] learn that the police had been called?
[24] A: Probably when I got back to the

**Page 16**

[1] office that night, because I'm not sure — I
[2] know the police had responded and I don't
[3] remember if they called our office. Somebody
[4] from down there called the office and was —
[5] said that the police had responded but that they
[6] weren't going to charge anybody.
[7] Q: Okay. And then you did meet the
[8] next morning with Mr. Miller?
[9] A: Yes, I did.
[10] Q: That was you and Mr. Habicht and
[11] Mr. Miller?
[12] A: That's correct, the three of us.
[13] Q: Where did you meet?
[14] A: In Mr. Miller's office, Harbeson
[15] plant.
[16] Q: What did Mr. Miller tell you in
[17] that meeting specifically about the incident?
[18] A: I remember very clearly we got
[19] there and you have to basically be signed in, so
[20] we went to the guardhouse, they called in, we
[21] walked down to Mr. Miller's office, waited
[22] outside in the foyer for a little while and then
[23] he came and got us, we walked in. We sat down
[24] and he looked at us and he said I like you guys,

Case 1:05-cv-00055-KAJ    Document 47-8    Filed 01/27/2006    Page 7 of 14

Robin D. Nichols  v.
Bennett Detective & Protective Agency, et al.

Wayne A. Keller
January 6, 2006

Page 17

[1] she's got to go. And that was the opening of
[2] the meeting.
[3]   Q: That was the first thing he said?
[4]   A: How you doing, you know,
[5] pleasantries like that, but I remember that
[6] specifically because you have to understand, in
[7] our company, obviously Robin had been there a
[8] long while. She had done at least an adequate
[9] job in our opinion.
[10]    Now, granted, she reports to
[11] Mr. Miller for her daily issues. If they wanted
[12] to change how they did business, he wouldn't
[13] necessarily call us, he would talk to the site
[14] supervisor, which Robin was. If they were
[15] changing procedures or those types of things,
[16] visitors coming, those types of things, they
[17] interfaced more with her than we did obviously
[18] on a daily basis.
[19]    And I lost track of where I was
[20] with our question. I'm sorry.
[21]   Q: That's fine.
[22]    After he asked, started out by
[23] asking that she be removed, did he give you more
[24] details about the incident, for example, who was

Page 18

[1] responsible, who started the incident?
[2]   A: I remember him saying that the
[3] phone had been picked up and put down a couple
[4] of times and that he had explained that I think
[5] the day on the 11th what he wanted was
[6] Mr. Whiteman actually to come down to his office
[7] because there was an issue that Mr. Whiteman had
[8] seen involving a couple of the truck drivers, to
[9] the best of my knowledge, and that — but never
[10] really did he say who started the fight, I don't
[11] think, that I remember, just that he was unhappy
[12] that Robin had slammed the phone down a couple
[13] of times, and he said she had to go.
[14]   Q: Do you know how long Mr. Whiteman
[15] had been with Bennett at that point?
[16]   A: He was hired I believe in
[17] November, mid November, maybe, of '03. So he
[18] had been there at that time maybe a month.
[19]   Q: Maybe only a month?
[20]   A: Roughly. I mean, that could be
[21] three weeks to six weeks, but I would shoot the
[22] middle and say maybe a month.
[23]   Q: So he was relatively new, he had
[24] not been promoted —

Page 19

[1]   A: No.
[2]   Q: And —
[3]   A: At our sites where they're bigger
[4] like that, you have one supervisor and the rest
[5] are security officers.
[6]   Q: Those are the only two positions?
[7]   A: Yeah, right.
[8]   Q: Does Bennett's conduct any sort of
[9] internal evaluations of its employees?
[10]   A: I would say that job performance,
[11] reliability, comes to work, does the job is what
[12] we use to apply, to make a point of contact.
[13] When we say they're supervisors, they're
[14] supervised to the extent that they interface
[15] with the client on a daily basis where we would
[16] not interface with Mr. Miller on a daily basis,
[17] Robin did.
[18]    If it involved hiring people or,
[19] hiring people or needing positions transferred
[20] as far as making decisions, well we want to put
[21] the officer here, there, at the plant, stuff
[22] like that, that normally came back to
[23] Mr. Habicht or myself. She really acted as an
[24] interface with Mr. Miller for just specifics on

Page 20

[1] site job requirements.
[2]   Q: Okay.
[3]   A: As far as personnel actions,
[4] hirings, terminations, that's done by our
[5] office, she didn't have that authority.
[6]   Q: So you're saying that she
[7] interacted fairly closely on a daily basis with
[8] Mr. Miller?
[9]   A: Right. As far as — and in
[10] Robin's position, if our employees needed a day
[11] off, if she had the ability to talk to one of
[12] the other employees and say hey, would you trade
[13] with this person for a day off or something, she
[14] would do that. If she couldn't do it, she would
[15] call Mr. Habicht or myself and ask us to take
[16] care of it.
[17]   Q: Okay. And then in the
[18] approximately month or six weeks, had there been
[19] any previous problems with Mr. Whiteman?
[20]   A: No, not that I was aware of.
[21]   Q: Okay. Going back to the meeting,
[22] so Mr. Miller explained to you at least in some
[23] detail what had happened at the incident and
[24] then did he again ask you to remove —

Case 1:05-cv-00055-KAJ    Document 47-8    Filed 01/27/2006    Page 8 of 14

Wayne A. Keller  
January 6, 2006

Robin D. Nichols v.  
Bennett Detective & Protective Agency, et al.

Page 21

[1] A: He had asked at the beginning and
[2] we didn't have to go over it. It's not an
[3] njoyable situation to go to a client because
[4] one of your employees has gotten involved in
[5] some type of an incident.
[6]     So I like Greg Miller, but I don't
[7] want to be in his office anymore than I have to.
[8] You tell me that there is a situation, my job
[9] then is to handle it.
[10]    Q: Did you discuss any other options
[11] with Mr. Miller as to possibly transferring
[12] Ms. Nichols?
[13]    A: No, because as long as she wasn't
[14] working at his plant, I don't think he really
[15] cared.
[16]    Q: Did you personally investigate the
[17] facts of this altercation anymore?
[18]    A: Not really. I had probably talked
[19] to Joe because we had agreed with Mr. Miller,
[20] that was the other part of the meeting, so it
[21] was less disruptive to the Allen's because we
[22] value their contract, we had a contract with
[23] them, we valued their business and it wasn't
[24] just there, we also worked at the Cordova plant

Page 22

[1] which was a couple hundred hours of business a
[2] week as well, so we're looking at them as a
[3] company, not necessarily as an entity there,
[4] that we would leave Robin there and she would
[5] work two more days, which was the rest of her
[6] normal schedule, Friday and Saturday, and she
[7] would not return to work security there, that
[8] way it was probably less disruptive because we
[9] didn't want Robin to possibly go back to the
[10] plant still if she was in an upset situation, to
[11] go down there and raise any cane or anything
[12] like that, since there had already been one
[13] incident.
[14]     And we had instructed
[15] Mr. Whiteman, and that might have been myself, I
[16] don't remember, we told him that he would sit in
[17] his car, because I think there was only one more
[18] day until Ms. Nichols left so that there was no
[19] interface, because at the plant there was also I
[20] believe at the time, but I'm not sure, I think
[21] there was another three o'clock guard who would
[22] be coming on, so it wasn't like Robin would
[23] drive away and there would be a lapse of thirty
[24] seconds for the other officer to run into the

Page 23

[1] guardhouse, I think we had two people working
[2] the 3:00 to 11:00 shift.
[3]     Q: So there were no subsequent
[4] altercations between, or problems between
[5] Ms. Nichols and Mr. Whiteman?
[6]     A: None that were brought to my
[7] attention, no. And I don't think there was any
[8] at all.
[9]     Q: But you still tried to keep them
[10] separated to some extent, is that what you're
[11] referring to?
[12]    A: Yes, exactly. We didn't want it
[13] to flare up. I don't think — I don't think the
[14] incident — if there was no — that is my
[15] understanding, there were no criminal charges
[16] pressed, it wasn't an offensive touching that
[17] I'm aware of filed, so there is no criminal
[18] problem here, what we had was two officers who
[19] apparently got in a disagreement.
[20]    Q: So it's your understanding that
[21] nothing was actually filed, no criminal charges
[22] actually filed?
[23]    A: That is correct. Had they been
[24] filed, we probably would have lost an officer

Page 24

[1] because they would have been arrested for some
[2] type of offensive touching or assault and that
[3] precludes you from working in the security
[4] field.
[5]     Q: Your understanding there wasn't at
[6] least charges made that day?
[7]     A: Robin filed a complaint from what
[8] I understood.
[9]     Q: Yes, a complaint. So as to the
[10] facts of the altercation, you and Bennett's —
[11]    A: Bennett, no S.
[12]    Q: Pardon me.
[13]    A: That's okay.
[14]    Q: You and Bennett accepted the
[15] version of the facts from Mr. Miller?
[16]    A: Yes, we did.
[17]    Q: Did you ever discuss this
[18] situation with Ms. Nichols with anyone else at
[19] Allen's?
[20]    A: No. No.
[21]    Q: You mentioned you talked to Joe or
[22] Mr. Whiteman at some point. Was that discussion
[23] just about what was going to happen or did it
[24] involve the incident at all?

Case 1:05-cv-00055-KAJ    Document 47-8    Filed 01/27/2006    Page 9 of 14

Robin D. Nichols   v.
Bennett Detective & Protective Agency, et al.

Wayne A. Keller
January 6, 2006

Page 25

[1]   A: It would have been on that
[2] afternoon of the 11th because like I said, I
[3] believe it was me that told him, you know, to
[4] sit in his car. I'm not a hundred percent sure,
[5] but I believe I did talk to him and, you know,
[6] he would have gone over what — you know, I
[7] can't remember that day if it was Robin who told
[8] me and Joe, I probably talked to both of them at
[9] some point that afternoon when I got back
[10] because the stories were remarkably similar, you
[11] know, you pushed me, get out of my way, that
[12] type of situation. And then I know I talked to
[13] Joe to tell him please just sit in your car
[14] until such time that Robin leaves.
[15]   Q: And that was the afternoon of the
[16] incident when you got back?
[17]   A: December 11th.
[18]   Q: You said their stories were fairly
[19] similar when you spoke to them?
[20]   A: Yeah. You know, I have been an
[21] investigator for a number of years, and people
[22] pushing each other, I don't agree that that
[23] should ever happen, but that was the extent of
[24] what I could understand what actually happened

Page 26

[1] down there.
[2]   Q: You weren't able to gather from
[3] speaking to either of them who might have pushed
[4] who?
[5]   A: You know, one would have had to
[6] have started, but what was that that started it,
[7] I can't tell you.
[8]   Q: Did Mr. Miller ever tell you that,
[9] did he —
[10]   A: I don't know if he ever knew, I
[11] don't know. He just knew that the police wound
[12] up on his property and he wasn't real happy
[13] about that.
[14]   Q: Did you find out from Mr. Whiteman
[15] what had started — before any pushing happened,
[16] what had sparked this altercation?
[17]   A: I don't remember if it was from
[18] Robin, but it dealt with I believe him having to
[19] go in to see Mr. Miller. Shift changes at 3:00,
[20] sometimes people don't want to start until 3:00,
[21] I don't remember what it was over, exactly what
[22] it was over.
[23]   Q: These conversations were over the
[24] phone?

Page 27

[1]   A: Yes. I didn't have personal
[2] contact with them.
[3]   Q: What did Ms. Nichols tell you
[4] happened?
[5]   A: That's what I'm saying, I'm not
[6] sure that Whiteman wouldn't go in to see
[7] Mr. Miller when she wanted him to. And whether
[8] she were going outside, or she had to go outside
[9] to see a truck and she couldn't get by him going
[10] out of the guardhouse, the guardhouse was set up
[11] with two desks in there, it's close quarters,
[12] you could bump into somebody walking into the
[13] guardhouse. I don't think you would have to
[14] make an effort to push me to bump into me, you
[15] know what I'm saying, or vice versa, it's close
[16] quarters in there. And I guess one bumped into
[17] one and then it went from there.
[18]   Q: That might have been around the
[19] time of the shift change?
[20]   A: That's the only reason why Joe
[21] Whiteman would have been there because his shift
[22] was 3:00 to 11:00 and Robin was 7:00 to 3:00, so
[23] it had to have been a shift change.
[24]   Q: Because they wouldn't otherwise

Page 28

[1] have been in the same —
[2]   A: Together.
[3]   Q: Now, did you make any written
[4] record of any of these conversations?
[5]   A: I think the only written is the
[6] typed information I provided to the Department
[7] of Labor or the EEOC people, that's the only
[8] typed record I have.
[9]   Q: You're referring to the position
[10] statement?
[11]   A: Exactly, that we responded to.
[12]   Q: We have identified that as Exhibit
[13] 4 earlier.
[14]    Now, in your position statement,
[15] you give a fairly detailed description of the
[16] facts. Where else did you find out some of
[17] these facts?
[18]   A: Mr. — well, we're responding to
[19] an allegation made against our company and since
[20] Mr. Habicht, Mr. Bennett, and myself all may
[21] have had some little bit of the pie, we sat down
[22] and I just happened to be the one who typed it.
[23]   Q: Okay.
[24]   A: So all of us had input into what

Wayne A. Keller
January 6, 2006

Robin D. Nichols v.
Bennett Detective & Protective Agency, et al.

Page 29

[1] occurred.
[2] Q: So after this meeting, what action
[3] id you take in regards to Ms. Nichols?
[4] A: Sure. The meeting was over on the
[5] 12th, Robin worked the 12th and the 13th which
[6] would have been a Friday and Saturday. She was
[7] off Sunday and Monday. On December 15th at some
[8] point I called her and asked her not to report
[9] back in and at that point I believe it was an
[10] answering machine, because I had conversation
[11] with her, it had to be later that day, I'm sure
[12] she called me back.
[13] And I left a message saying
[14] listen, it has nothing to do with Allen's, it's
[15] just we need to have change because what I don't
[16] want to have happen is for her to find out and
[17] we had already had this meeting with Mr. Miller
[18] saying we'll do it this way so that we don't
[19] have Robin come back and make a scene at your
[20] property because that has happened before to our
[21] customers.
[22] So I left a message saying Robin,
[23] just time to move on, we have had some hiccups
[24] down there and that was whether it was with

Page 30

[1] other personnel or the other incident where she
[2] had called the police, it was just time to move
[3] her and that I would offer her a position
[4] elsewhere.
[5] Q: So you asked Mr. Miller if you
[6] could let her complete her shift just so you
[7] wouldn't have any problems when she —
[8] A: You have to understand, we have
[9] business with Allen's like I said at two
[10] locations, a lot of work, and you know, if Robin
[11] had flared up because of whatever between her
[12] and Joe, I didn't want her to return to that
[13] again. I valued Allen's business, I left her a
[14] message, it's Bennett, because Greg wasn't going
[15] to ask her to be transferred himself, so it was
[16] my responsibility or Mr. Habicht's
[17] responsibility to do that.
[18] Q: Right. Ultimately it would be
[19] your responsibility.
[20] You also mentioned a couple of
[21] other incidents at the Harbeson site.
[22] A: Uh-huh.
[23] Q: What were those incidents?
[24] A: She had gotten in shouting

Page 31

[1] incidents with our other employees, other than
[2] the one incident that involved the Allen's
[3] employee, the truck driver —
[4] Q: You had mentioned that.
[5] A: — who had touched her
[6] inappropriately.
[7] Q: What was Ms. Nichols' response to
[8] your phone call? I assume you spoke to her?
[9] A: She called me back, I believe.
[10] She was upset, you know, she had been there a
[11] while, you know, and we don't have any
[12] counseling forms on Robin. And she had not been
[13] previously disciplined.
[14] So with that in mind, I'm sure —
[15] and I tried to explain to her that I didn't have
[16] any full-time job — you have to understand the
[17] security business, Mr. Habicht may have said
[18] before we might have fifty-five, sixty accounts,
[19] that doesn't mean you have fifty or sixty,
[20] seventy to a hundred openings, we have people
[21] that are filling those openings.
[22] I didn't have at that second a
[23] full-time position for her. Actually I didn't
[24] have a position on Monday that day that I

Page 32

[1] thought I could fill right away for her for
[2] forty hours, we only have limited positions, you
[3] can't create customers, you only have so many
[4] customers and there is only so many positions.
[5] And I explained to her that I would look to get
[6] her a position as soon as I could.
[7] Q: So how long was it until you were
[8] able to provide a position for her?
[9] A: A couple of days went by, and you
[10] know, it was maybe two days, I talked to her on
[11] the 15th, maybe on the 18th I got a call from
[12] someone, I want to say it was Social Services,
[13] I'm not sure, I talked to a lady, I think Robin
[14] was probably there, and she was trying to help
[15] Robin. And I believe I talked to Robin at that
[16] location, or later in the day I had talked to
[17] her, but I had a person who was either going to
[18] leave us, wasn't sure, but an opening came at
[19] the Milford Perdue facility.
[20] Q: And —
[21] A: We had offered her thirty-two
[22] hours, and I offered her thirty-two hours there
[23] to start training, maybe the 19th and the 20th,
[24] somewhere in that general area, of December.

Case 1:05-cv-00055-KAJ   Document 47-8   Filed 01/27/2006   Page 11 of 14

Robin D. Nichols v.
Bennett Detective & Protective Agency, et al.

Wayne A. Keller
January 6, 2006

Page 33

[1] Q: And her position at Bennett was
[2] full-time?
[3] A: Yes, it was, she was working forty
[4] hours. And this was thirty-two, but I told her
[5] I would try to get her eight more hours because
[6] that's not unusual. We may have workers who are
[7] twenty-four hours at site A and sixteen hours at
[8] site B to get them at forty hours. That was my
[9] attempt to at least get her back into a position
[10] where she was getting the bulk of her normal
[11] forty hours.
[12] Q: Were you able to find her a
[13] position with forty hours?
[14] A: No, never, ultimately I was not.
[15] Q: And then how long was it until
[16] Ms. Nichols resigned?
[17] A: She — initially she didn't want
[18] to go to Milford Perdue, and then she said she
[19] would. And the first day she was supposed to go
[20] in for training she called in sick and she was
[21] really ill. And I said well, you know what, I
[22] can't have her — she was working through the
[23] Christmas holidays, the way her shift would have
[24] taken her through there. I said Robin, if you

Page 34

[1] can't go in, I understand that, people get sick,
[2] but I can't hold a position. I have to have a
[3] trained officer in there because you just can't
[4] throw a person into a customer's position.
[5]     If you owned a car lot and you're
[6] my client and you tell me make sure there is no
[7] dealer plates and all four doors are locked on a
[8] car, I don't have to give you a lot of training
[9] other than take you out there, show you it's a
[10] car lot, identify that four wheels and a body is
[11] a car, you can do that.
[12]     At the facilities she worked at to
[13] include Allen's and Milford Perdue, you had to
[14] lock trucks in, you had to lock trucks out, you
[15] had the fuel trucks, you had to do chicken
[16] sales, there is a lot that officers do there.
[17] There is a lot of responsibility they have. To
[18] put Robin in a position like that through the
[19] holidays it would have been a bad decision on
[20] the company's part.
[21]     So I said Robin, we'll find you
[22] something else. She said that was fine, she
[23] would wait until after the holiday because
[24] Christmas was going to be upon us, she had

Page 35

[1] children, a family, I'm sure at that point she
[2] wasn't looking to work through the holidays.
[3]     She trained on the 23rd and 24th
[4] at another site which I believe was Family
[5] Court, Sussex County Family Court. We had a
[6] person who had gotten pneumonia, at least that's
[7] what he informed me. He had pneumonia, and as
[8] miracles happened, the one time I had pneumonia
[9] I was out for a couple of weeks. This
[10] individual was out for a week.
[11]     And Robin worked the 23rd, 24th,
[12] she was off for Christmas, she came back to work
[13] maybe on the 29th, because that was a forty-hour
[14] position, 2:00 to 10:00, and that's where I
[15] thought Robin was going to wind up working was
[16] at Sussex Family Court, but the officer,
[17] Mr. Wilmouth returned, he had been out a week
[18] with pneumonia, that's unheard of. But maybe he
[19] didn't have pneumonia, I don't know, but Robin
[20] worked her last day I believe it was December
[21] 29th, and then she resigned her position shortly
[22] thereafter.
[23] Q: Sometime in early 2004?
[24] A: Yeah, she said — I told her, I

Page 36

[1] said Robin, it takes a while, I only have finite
[2] positions, I'm sure she understood it, but she
[3] was also looking for employment.
[4] Q: So the action by Bennett
[5] transferring her, was that considered a
[6] disciplinary action?
[7] A: No, by no means. In our
[8] conditions of employment we have there, and I
[9] know we've been out previously, that we can move
[10] a sup — move a supervisor, move an employee
[11] from one site to another, because these type of
[12] positions do come up, people lose transportation
[13] and probably the best way I can show any of this
[14] is that perfect example, we wind up completing a
[15] job at Mr. Miller's plant in the end of November
[16] of last year, if I don't transfer all those ten
[17] people that worked at Allen's, they don't have a
[18] job.
[19]     So you have to be able to transfer
[20] your people because jobs come and go. So if you
[21] can't do that, you can't be a business. If
[22] you're a builder and you build a development and
[23] you work for X builders, when they're done
[24] building that development, if you don't move

Wayne A. Keller
January 6, 2006

Robin D. Nichols  v.
Bennett Detective & Protective Agency, et al.

Page 37

[1] over to where they're building development B,
[2] you don't have a job, and that's Bennett
  ecurity in a nutshell.
    We have so many positions, we take
[5] them on and we lose them and we have to transfer
[6] people, there is no other way we can keep them
[7] employed on a regular basis.
[8]    Q: You just mentioned the conditions
[9] of the employment, this was earlier identified
[10] as Exhibit 3. Can you just point out to me the
[11] provision —
[12]   A: Sure, give me a second to find it
[13] here.
[14]   Underneath the word paychecks, the
[15] third sentence starts, "Bennett's Security has
[16] the right to remove any security officer to
[17] another job site at any time."
[18]   Q: Okay. Thanks.
[19]   A: You're welcome.
[20]   Q: Now, your testimony is that
[21] Mr. Miller requested, or almost demanded that
[22] you transfer Ms. Nichols?
[23]   A: That's correct.
[24]   Q: Had he done that on previous

Page 38

[1] occasions with other employees?
[2]   A: Mr. Habicht inferred that there
[3] were two others, yes.
[4]   Q: There were two others. Who were
[5] they?
[6]   A: Daniel Steele and David Leggins.
[7]   Q: And had you at Bennett ever dealt
[8] with another claim of race discrimination?
[9]   A: Yes, on one other occasion.
[10]   Q: Who was that, do you remember the
[11] name?
[12]   A: Mr. Habicht mentioned her name.
[13]   Q: I believe Christine Miller?
[14]   A: Christine Miller.
[15]   Q: Do you know what happened?
[16]   A: It went unfounded.
[17]   Q: Unfounded?
[18]   A: Yes. And the uniqueness of that
[19] situation there was that she had actually made a
[20] complaint of sexual harassment against our
[21] company, but the person who sexually harassed
[22] her was a Perdue employee, so that was a problem
[23] with Perdue, but we got caught in that
[24] allegation.

Page 39

[1]   What she had said from a racial
[2] issue is we favored the black people at the
[3] plant over the white people. But this all
[4] happened after she had been terminated for not
[5] coming to work one day. She called in sick and
[6] for her three o'clock shift, we have a four-hour
[7] minimum and she called in really close to the
[8] time she was due to work. And some hour later
[9] one of the security officers who was assigned to
[10] work at the plant that day noticed her pull up
[11] in a car and pick up one of her girlfriends.
[12] And we terminated her as a basis of lying to the
[13] company and not coming into work that day. And
[14] I think that was the basis for her suit. But it
[15] went unfounded.
[16]   Q: Employees of Bennett, are they
[17] considered at will?
[18]   A: Absolutely. We have no contracts
[19] with employees.
[20]   Q: Would it have mattered to you who
[21] started this altercation or were you just
[22] following the instructions of Mr. Miller?
[23]   A: Mr. Habicht had said earlier, we
[24] don't transfer people, it's disruptive to the

Page 40

[1] company, you have to do new training, you lose
[2] proficiency. Robin had been there a long time,
[3] and we weren't going to move Mr. Whiteman. He
[4] didn't ask to move Mr. Whiteman and neither one
[5] of them had any type of criminal charges pressed
[6] against them. And to the extent that I learned
[7] afterwards I believe Robin told me that
[8] Mr. Whiteman had called her later that night and
[9] apologized and that was an issue that, you know,
[10] she felt had been put to bed, but she doesn't
[11] see in interaction between the company, she's
[12] looking at it strictly at the personnel level
[13] between her and Mr. Whiteman.
[14]   Q: So you didn't necessarily want to
[15] transfer her?
[16]   A: Absolutely not. I told you, I
[17] didn't have a position to put her in, but I
[18] still had the responsibility to find her work or
[19] she would draw unemployment. And I don't have a
[20] problem with trying to find people work, but my
[21] hands are tied to what I have available.
[22]   Q: They're only limited positions?
[23]   A: Exactly.
[24]   MR. GERBER: Thank you. I think

A 062

Robin D. Nichols v.
Bennett Detective & Protective Agency, et al.

Wayne A. Keller
January 6, 2006

### Page 41

[1] that's all I have for right now.
[2]         BY MR. BREWER:
[3]   Q: Mr. Keller, I have a couple of
[4] questions for you. Take the — it's already
[5] exhibit I think three to the Mr. Habicht
[6] deposition which is your contract with Allen's.
[7] Do you have that in front of you? That's it, I
[8] believe. Go to Page 2, please, paragraph five.
[9]   A: Paragraph what, sir?
[10]   Q: Paragraph five.
[11]   A: Okay.
[12]   Q: And this makes it clear, does it
[13] not, that Bennett is an independent contractor?
[14]   A: Yes. It states that.
[15]   Q: And that all the guards that are
[16] employed by Bennett are employees of Bennett and
[17] not of Allen's Family Foods?
[18]   A: That's correct.
[19]   Q: Pursuant to this contract, you are
[20] responsible for providing the staffing, if
[21] Allen's tells you we need ten, you provide the
[22] ten?
[23]   A: That's correct.
[24]   Q: You mentioned that I guess it's a

### Page 42

[1] practice of your company that if some of your
[2] contractors ask that a specific person be
[3] employed, that you would try the accommodate
[4] that as long as they pass whatever
[5] qualifications are required?
[6]   A: That's correct.
[7]   Q: Did Allen's ever ask you to employ
[8] Ms. Nichols?
[9]   A: No, I don't believe so.
[10]   Q: Ms. Nichols was never an employee
[11] of Allen's, was she?
[12]   A: That I don't know. I don't think
[13] so, I don't think she was.
[14]   Q: Well, while she was acting in her
[15] capacity as a guard for Bennett's, she wasn't
[16] employed by Allen's, she was employed by
[17] Bennett's?
[18]   A: That's correct.
[19]   Q: She was paid by Bennett's?
[20]   A: Yes.
[21]   Q: And she was supervised by people
[22] from Bennett?
[23]   A: Correct.
[24]   Q: The document that I believe you

### Page 43

[1] just looked at recently which is conditions of
[2] employment?
[3]   A: Yes, sir.
[4]   Q: You can have it in front of you if
[5] you need it. I believe you told me, you said in
[6] response to a question from plaintiff's attorney
[7] that this is not a contract of employment, is
[8] it?
[9]   A: No.
[10]   Q: This is —
[11]   A: This is just what dictates their
[12] working for us.
[13]   Q: That's what I thought.
[14] Now, going back to Allen's, in
[15] their working with you, they don't have any role
[16] in firing people, do they, they can't fire
[17] somebody, can they?
[18]   A: They can ask us to re-replace
[19] them.
[20]   Q: But they can't fire anybody?
[21]   A: Not that I'm aware of.
[22]   Q: And they request you to replace
[23] them?
[24]   A: We would.

### Page 44

[1]   Q: You would. But they don't say to
[2] you you need to fire this person?
[3]   A: No.
[4]   Q: And they didn't do that in
[5] Ms. Nichols case?
[6]   A: They could ask that, whether we
[7] did it or not would remain up to us.
[8]   Q: Because they're employed by you,
[9] not by Allen's. Disciplining employees they
[10] can't tell you to give somebody three days off,
[11] can they?
[12]   A: No.
[13]   Q: The decision to promote
[14] Ms. Nichols, as Mr. Habicht testified, that was
[15] a Bennett decision, was it not?
[16]   A: I have had customers ask could we
[17] promote someone, give them pay rates and pay
[18] increases. And Mr. Miller subsequent to the
[19] Robin Nichols incident, Mr. Habicht and I were
[20] looking to find a — they had a situation where
[21] there was that break I think that Mr. Habicht
[22] alluded to as far as that young lady that we
[23] hired to take Robin's hours on a day shift. We
[24] didn't have a supervisor down there and they

Case 1:05-cv-00055-KAJ    Document 47-8    Filed 01/27/2006    Page 14 of 14

Robin D. Nichols v.                                                Wayne A. Kelle
Bennett Detective & Protective Agency, et al.                      January 6, 200(

Page 49

[1] the vice-president for seven years?
[2]  A: Maybe a little longer, yes.
[3]  Q: So my question is: In those seven
[4] years, I'm assuming you have promoted people to
[5] supervisors at various contracts that you have
[6] had?
[7]  A: A few. Not many, a few. We don't
[8] have a lot of supervisors in our company and
[9] maybe Mr. Habicht when he was explaining the
[10] structure of the company, we have a northern
[11] supervisor who takes care of Wilmington, a
[12] southern supervisor who handles our Salisbury
[13] and that general area accounts, and then very
[14] few site supervisors.
[15]     Where Mr. Miller's office required
[16] 336 hours a week, we try to appoint someone to
[17] be a contract point.
[18]  Q: So Ms. Nichols was a site
[19] supervisor?
[20]  A: That's correct.
[21]  Q: How many site supervisors do you
[22] have at Bennett?
[23]  A: We had one there, one at Perdue,
[24] and one at Allen's Harbeson.

Page 50

[1]  Q: That's Allen's Harbeson.
[2]  A: I'm sorry, Allen's Cordova.
[3] That's three. Maybe one more.
[4]  Q: Throughout the company?
[5]  A: Throughout the company, out of 140
[6] people, or at the time that Robin was with us,
[7] we probably had two to 300 people. So we're
[8] talking very few.
[9]  Q: Very few.
[10] And then my question is now that
[11] before, if I understand your testimony, before
[12] you would promote somebody from security officer
[13] to a site supervisor, you would contact the
[14] client and say this is what we have in mind, do
[15] you have any objection?
[16]  A: Yes.
[17]  Q: That's what you do?
[18]  A: Yes.
[19]  Q: That's what I wanted to get. Now,
[20] let's see, Mr. Miller said okay, when you came
[21] to him and said promote Ms. Nichols, he said
[22] okay?
[23]  A: Like I said, I believe we had that
[24] conversation because that would be a lot of

Page 51

[1] hours to work.
[2]  Q: Okay. Now, you do — I believe
[3] you testified you do transfer employees at the
[4] request of a client?
[5]  A: That's correct.
[6]  Q: Okay. And is that just for
[7] Allen's or for any client?
[8]  A: Any client, sir.
[9]  Q: All right. You talked about some,
[10] I think you classified them as difficulties that
[11] Ms. Nichols had with a Linda Fooks?
[12]  A: Yes.
[13]  Q: Is Linda Fooks an employee of
[14] Bennett?
[15]  A: Yes.
[16]  Q: So that was an internal Bennett
[17] problem?
[18]  A: Yes, sir.
[19]  Q: It didn't involve Allen's?
[20]  A: Right.
[21]  Q: Was Ms. Fooks at the Allen's
[22] location in Harbeson?
[23]  A: Was she there? Yes, that's where
[24] the incident happened.

Page 52

[1]  Q: And then there was a Ms. Stokes?
[2]  A: Yes.
[3]  Q: Was Ms. Stokes also an employee of
[4] Bennett's?
[5]  A: Yes.
[6]  Q: And was that also at the Harbeson
[7] facility?
[8]  A: Yes.
[9]  Q: And then of course we have the
[10] incident that occurred on the 11th with
[11] Mr. Whiteman.
[12]  A: Yes.
[13]  Q: That's another incident with
[14] Ms. Bennett?
[15]  A: With Ms. Bennett?
[16]  Q: I'm sorry, excuse me, with
[17] Ms. Nichols?
[18]  A: Yes.
[19]  Q: And Bennett?
[20]  A: And Bennett.
[21]  Q: And the time frame I think, it's
[22] in your position statement, give me a second
[23] here while I find it.
[24]  A: Certainly.

A 064