# Tab 1



Not Reported in A.2d                                                                                                          Page 1
Not Reported in A.2d, 2000 WL 303342 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
Robert E. BLOSS, Plaintiff,
v.
Vance V. KERSHNER and Labware, Inc., a Delaware Corporation, Defendants.
**No. 93C-04-282 CHT.**

March 9, 2000.

Melanie Sharp, Esq. of Young, Conaway, Stargatt & Taylor, LLP, Wilmington, for Plaintiff.
Richard Wier, Jr., Esq. of Richard R. Wier, Jr., Wilmington, for Defendants.

ALFORD, J.
**\*1** This is an action for damages arising out of the February 12, 1993 termination of Plaintiff Robert E. Bloss ("Bloss") by Vance V. Kershner ("Kershner") and LabWare, Inc. ("LabWare"). Bloss is seeking damages for wrongful termination, intentional infliction of emotional distress, defamation and equal participation in the profits of LabWare based upon alleged promises made by Kershner. A trial on this matter was held on March 29, 30, 31, April 1 and April 5, 1999. The following constitutes the Court's findings of fact and conclusions of law.

I. Findings of Fact

Bloss and Kershner met while Kershner was employed by the DuPont Company circa March 1988. At the time, Bloss was an independent contractor, a principal of Brandywine Software, Inc. ("BSI"). Despite the fact that the terms of the offer of employment, along with almost every other detail including the initial date of employment, are disputed by the parties, the Court finds that Bloss was offered employment with LabWare, Inc. in October, 1988.

Kershner while still employed by DuPont, developed instrument interfacing technology which he called LabStation. DuPont was involved in the exploration of systems that would automate its laboratories. Dr. Dale Crouse ("Crouse"), then an employee of DuPont, had the responsibility for implementing instrument interfacing software initially at DuPont's Chamberworks plant.

Crouse hired Bloss as an independent contractor in connection with the implementation project at the Chamberworks plant. Apparently, Crouse and Bloss looked at numerous laboratory instrument interfacing modalities including LabStation. Although there initially was a question about the ownership of LabStation since Kershner was a DuPont employee, it was established that Kershner had developed the technology on his own time.

Crouse and Bloss recommended LabStation to DuPont for implementation at Chamberworks, and DuPont adopted that recommendation in mid-1989. Kershner remained a DuPont employee until late 1991. BSI, since 1987 was an approved vendor and an approved independent contractor for DuPont. Apparently, getting such approved status was not an easy task. Sometime in October 1988, Kershner offered Bloss employment with LabWare and asked that LabStation be marketed to DuPont through BSI. It should be noted that LabStation at that time had no documentation, i.e., operator's manuals, development manuals or sales materials. Bloss was also hired by LabWare to develop documentation and sales materials.

Both Kershner and Bloss were excited by the potential of LabWare to be highly successful. Despite claims by Bloss that Kershner offered Bloss a 50% equity interest in LabWare, there is no evidence to support such claim. LabWare has never been other than wholly owned by Kershner. Bloss testified that he was promised an equal share of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 2
Not Reported in A.2d, 2000 WL 303342 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

profits. According to Bloss, Kershner, as an inducement for Bloss to work for LabWare and to use BSI as the vendor for LabStation, made representations that Bloss would equally share in the profits. Bloss testified that Kershner said if he made a million, I would make a million. [FN1] Even before formally becoming a LabWare employee, Bloss was given the title of Vice President and had business cards which reflected this position. At the time Bloss accepted employment with LabWare, he was employed by DuPont to do instrument interfacing worldwide. [FN2] Bloss was not asked to give up working for DuPont and work exclusively for LabWare until February 1990. However, Bloss worked in the evenings and on weekends for LabWare from October 1988 until February 1990. [FN3] Bloss estimates that he spent 3,000 hours; and that if he were paid his customary hourly rate, it would be $58.00. [FN4]

> FN1. Bloss Trial Tr. Vol. 1 at 18-19.
>
> FN2. Bloss Trial Tr. Vol. 1 at 19.
>
> FN3. Bloss Trial Tr. Vol. 2 at 9.
>
> FN4. Bloss Trial Tr. Vol. 1 at 33.

*2 Bloss stated that he worked 6-7 nights a week until 11 p.m. or 12 midnight. He testified that he created sales literature, demonstrated LabStation, made sales presentations, purchased equipment and created documentation materials including operator's manuals and a 500 page developer's manual. While still a DuPont employee, Bloss sold LabStation software and hardware necessary for its implementation to DuPont through BSI at Kershner's request. BSI invoiced DuPont which then paid BSI. BSI in turn passed the money through to LabWare without charging a fee.

Bloss has testified that in February 1990 he was promised a salary of $75,000 per year, of which $60,000 was for development work and $15,000 was for his executive position, plus benefits; this was, according to Bloss, in addition to the promise of profit sharing. [FN5] Although Bloss alleges that he and Kershner held themselves out as partners and that Kershner promised him lifetime employment, there is no evidence that Kershner ever offered an equity interest in LabWare to Bloss or any other employee. At times, Bloss apparently interpreted Kershner's alleged representations to mean that an equity interest was being offered. However, Bloss has presented no evidence to support this claim. To the contrary, under cross examination, Bloss admitted that Kershner never offered an equity interest in LabWare. [FN6]

> FN5. *Id.* at 45-47.
>
> FN6. Bloss Trial Tr. Vol. 2 at 8, 33-34.

Bloss, in addition to his claim to 50% of LabWare's profits, also asserts that he is due monetary compensation for the "sweat equity" he put into LabWare prior to being placed on the payroll. He makes claim to $174,000 he alleges to have invested in LabWare by way of sweat equity. [FN7]

> FN7. Estimated 3,000 hours @ $58.00 per hour.

The Court finds that Kershner admits Bloss worked on developing documentation for a period of one year on LabStation without pay prior to being officially hired as a LabWare employee. [FN8] Further, Kershner and Bloss met to discuss Bloss' uncompensated labors prior to being formally employed by LabWare and came to an agreement that $65,000 was fair compensation for the hours put in by Bloss on LabStation documentation up until the time he was formally employed by LabWare. [FN9]

> FN8. *Id.* at 64.
>
> FN9. Kershner Trial Tr. at 80-81.

Bloss further claims that Kershner breached an oral employment contract for employment for life when he fired him. Bloss testified that in October 1988, Kershner told him that "together [they] would promote and develop LabWare and his product

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                             Page 3
Not Reported in A.2d, 2000 WL 303342 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

LabStation [and][i]n return, [he] would have a job for life." [FN10] It was Bloss' understanding that he and Kershner would equally share in the profits due to Kershner's comment that Bloss would make a million if he made a million. [FN11] Apparently, Bloss took this to mean that they were to be partners. Bloss acknowledges that this October 1988 conversation took place between him and Kershner alone. The October 1988 conversation was the only "offer or representation as to employment with LabWare." [FN12] Bloss claims that after being fired he was depressed and he had high blood pressure, which he stated he never had before, but was now taking medication for it. [FN13] Bloss testified that subsequent to termination he was not treated by a physician for any new problems and that the medication he takes for anxiety had been prescribed before he was terminated. [FN14] Bloss contends that he still suffers from anxiety, sleeplessness, and nightmares. [FN15]

>FN10. Bloss Trial Tr. Vol. 1 at 19.
>
>FN11. *Id.*
>
>FN12. Bloss Trial Tr. Vol. 2 at 4-5 (quoting the question asked by opposing counsel on cross-examination to which Bloss's first answer "no." Upon further inquiry by opposing counsel, Bloss responded "I was his right-hand man. I had a job for life. I had equal share of the profits. There was nothing else.").
>
>FN13. Bloss Trial Tr. Vol. 1 at 103-04.
>
>FN14. Bloss Trial Tr. Vol. 2 at 76.
>
>FN15. Bloss Trial Tr. Vol. 1 at 104.

**\*3** Kershner denies that he ever extended an offer of lifetime employment to Bloss. [FN16] Kershner answered "[n]o" when asked if any term or duration of employment was ever discussed with Bloss. [FN17] There exists no evidence, other than Bloss' subjective interpretation of Kershner's alleged statements regarding employment, to support his claim that Kershner extended an offer of lifetime employment or 50% of LabWare's profits. The Court finds that Bloss has failed to sustain his burden of proof on these claims. [FN18]

>FN16. Kershner Trial Tr. at 73.
>
>FN17. *Id.*
>
>FN18. Even had Bloss proved his contention regarding 50% of the profits, LabWare was not very profitable between October 1988 and his termination date of February 12, 1993.

From October 1988 until July 1989 Bloss was the only person other than Kershner working for Kershner. In July 1989, LabWare sought to hire employee, Sandy Allem ("Allem") through BSI. From July 1, 1989 through November 15, 1991, at Kershner's request, Allem's work at DuPont was billed at $75.00 per hour by BSI. Bloss remitted to LabWare all monies received from DuPont for Allem's work. [FN19] Allem worked under the supervision of Kershner as he was still employed by DuPont at the time.

>FN19. Bloss Trial Tr. Vol. 1 at 42.

Bloss states that BSI was not paid the industry standard of 25% of the billings. Bloss further testified that he turned over to LabWare BSI's billings for his time beginning in March 1990 and continuing through November 1991. Beginning March 1990, Bloss went on LabWare's payroll and began receiving a salary from LabWare payable to BSI. [FN20]

>FN20. *Id.* at 49-50 (Referencing Plaintiff's Ex. 1).

Bloss also claims compensation is due for his pass through of Brandywine Software billings to LabWare on a dollar for dollar basis without charging a standard industry fee of approximately 25% Bloss claims that as a result of his not having

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                        Page 4
Not Reported in A.2d, 2000 WL 303342 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

charged a commission fee for selling LabStation, other equipment and services through BSI he actually made a capital investment in LabWare; amounting to $418,770 which includes $174,000 sweat equity. [FN21] He stated that when Kershner reneged on his part of the "bargain" he felt it necessary to raise these items. [FN22]

> FN21. Bloss Trial Tr. Vol. 1 at 54-55 (Referencing Plaintiff's Ex. 2).
>
> FN22. Bloss Trial Tr. Vol. 2 at 57-58.

Bloss asserted that he relied on Kershner's promises of lifetime employment and to share equally in LabWare's profits to his detriment by working over an extended period of time without pay and by directly passing through sales and services from BSI to LabWare without charging the industry standard fee of 25% of billings; and by forsaking business opportunities available to BSI in order to develop LabWare along with Kershner.

The Court finds that Bloss failed to prove that he is entitled to be reimbursed for what he alleges is the standard industry fee of 25% of billings passed through BSI to LabWare for 25 LabStations and Sandy Allem's employment compensation. [FN23] As previously mentioned, Bloss testified that he believes that he is owed these monies because Kershner allegedly reneged on his promises of lifetime employment and 50% of LabWare's profits. Therefore, Bloss, having failed to prove those claims, has also failed to prove any entitlement to a fee of 25% of BSI's billings.

> FN23. Bloss acknowledges that Kershner paid him $15,000 which could be attributed to equipment purchased by BSI for LabWare. See Bloss Trial Tr. Vol 1 at 64-65, 74.

Bloss further claims that even if his employment at LabWare is deemed at-will, Kershner breached an implied covenant of good faith and fair dealing. Bloss claims that Kershner used his superior bargaining power to deprive him of compensation for past services rendered in implementing LabWare's business. [FN24] Bloss asserts that such implied covenant was also breached when Kershner fired him for not relinquishing his right to pursue a legal remedy. [FN25] Bloss testified that he would only be allowed to continue employment if he gave up his legal claim of monies owed. [FN26] Kershner claims Bloss was fired for cause and that at no time was Bloss' continued employment conditional upon his dropping any legal claims he might have had. [FN27] Bloss also claims a breach of a covenant of good faith and fair dealing as it relates to his assertion of lifetime employment and his entitlement to 50% of LabWare's profits.

> FN24. Bloss Trial Tr. Vol. 1 at 20.
>
> FN25. *See Id.* at 84-87.
>
> FN26. *See Id.*
>
> FN27. Kershner Trial Tr. at 15-18, 121-124.

*4 Next, Bloss argues that Kershner defamed him by making false statements concerning his competence, work performance, and mental health. According to Bloss, Kershner on February 11, 1993 stated at a meeting at Gallucio's restaurant Bloss was going to be fired from his job at DuPont. [FN28] Only Bloss and Kershner were present at the February 11, 1993 meeting. [FN29] However, Bloss claims Kershner made the same comments to others. [FN30] Bloss testified that, according to Sandy Allem, Kershner called a meeting on January 26, 1993 with all of the employees and told them the following:

> FN28. Bloss Trial Tr. Vol. 1 at 83, 97.
>
> FN29. *Id.* at 83; Bloss Trial Tr. Vol. 2 at 63.
>
> FN30. Bloss Trial Tr. Vol. 1 at 97.

[Kershner] told them at DuPont he had-that DuPont had wanted to fire me, and that [Kershner] went to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                            Page 5
Not Reported in A.2d, 2000 WL 303342 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

DuPont and said 'Bob is my main man. You have to keep Bob,' and he told the employees that he saved my butt for that. He also told them that I owed all my success at Dupont to [Kershner]. He also told them that I thought I was better than anyone else in LabWare and that I was above any of the other employees in LabWare, and then they also told them that I was paid $292,000 in the last three years, compared to his $172,000. [FN31]

FN31. *Id.* at 99.

Bloss testified that none of the alleged statements Kershner made about him were true. [FN32] Bloss further testified that Sandy Allem told him that Kershner at the same meeting also told the team that Bloss' work was poor and Kershner thought he was mentally ill. [FN33]

FN32. *Id.*

FN33. *Id.* at 102-03.

Kershner denies that he told Bloss that DuPont was going to fire him from his job at DuPont and that Kershner had "saved his butt." [FN34] Kershner also denies making such statements to any of the employees. [FN35] Kershner testified that though he thought Bloss was out of step with the team he never expressed those thoughts to the team. [FN36] Kershner denies telling the team that Bloss "saw himself above the team," but felt that Bloss saw himself "separate from the team somehow or other." [FN37] Kershner further testified that he never told the team that Bloss was mentally ill; his performance was not good; he was incompetent; nor that he had problems completing tasks at DuPont. [FN38] Kershner also testified that he did not say to the group that Bloss thought his worth was greater than his (Kershner). [FN39]

FN34. Kershner Trial Tr. at 110.

FN35. *Id.* at 112.

FN36. *Id.*

FN37. *Id.* (for clarification the quotation "saw himself above the team" is the question asked by the attorney to which Kershner responded "no," whereas the second quotation was Kershner's direct statement).

FN38. *Id.* at 113, 115.

FN39. *Id.* at 114.

However, Kershner admits that he told the group he had paid Bloss $75,000 and that overall he had paid Bloss $292,000 versus $172,000 he had paid himself. [FN40] Kershner maintains that he did in fact pay those monies to Bloss. [FN41] The only other testimony in the record that could possibly support or refute Bloss' defamation claim is that of Sandy Allem. However, Sandy Allem testified via deposition and it is unclear as to what specifically she agreed with or disagreed with. [FN42]

FN40. *Id.*

FN41. *Id.*

FN42. *See* Sandy Allem Dep. Tr. at 89-102 (May 25, 1994); Sandy Allem Dep. Tr. at 62-68 (Nov. 20, 1998).

Finally, Bloss seeks damages for his claim of intentional infliction of emotional distress. Bloss testified that his reaction to the various things Ms. Allem told him Kershner said about him to the team was his tension was heightened. [FN43]

FN43. Bloss Trial Tr. Vol. 1 at 103.

II. Conclusions of Law

**\*5** The Statute of Frauds is inapplicable because the instant employment agreement was for an indefinite duration, and therefore may have been performed within one year. [FN44]

FN44. *Brandner v. Delaware State*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                Page 6
Not Reported in A.2d, 2000 WL 303342 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

*Housing Authority,* Del. Ch. 605 A.2d 1, 1 (1991) (citing *Haveg Corp. v. Guyer,* Del.Supr., 211 A.2d 910 (1965)); *Peterson v. Beebe Medical Center, Inc.,* Del.Super., C.A. No. 91C-07-147, Del Pesco, J. (Nov. 13, 1992) (ORDER).

In determining the nature of an employment contract, Delaware law "provides a heavy presumption that a contract for employment, unless otherwise expressly stated, is at-will in nature, with duration indefinite." [FN45] An at-will employee is subject to termination with or without cause. [FN46] An exception to the at-will doctrine is that the employer's statements and conduct can alter the at-will status of the employment relationship but only if such change is stated with " 'a reasonable degree of specificity.' " [FN47] Other exceptions to the at-will doctrine are those addressing the implied covenant of good faith and fair dealing . [FN48] The exceptions falling under the implied covenant of good faith are limited to (1) the public policy exception in which the termination was a violation of a public interest; (2) "the employer misrepresented an an important fact and the employee relied 'thereon either to accept a new position or remain in a present one' "; (3) where an employee was deprived of clearly identifiable compensation related to past service due to the employer's use of superior bargaining power; or (4) "the employer falsified or manipulated a record to create fictitious grounds to terminate the employee." [FN49]

   FN45. *Merrill v. Crothall-American, Inc.,* Del.Supr., 606 A.2d 96, 102 (1992) (citing *Heideck v. Kent General Hospital, Inc.,* Del.Supr., 446 A.2d 1095, 1096 (1982)).

   FN46. *Heideck,* 446 A.2d at 1096; *Peterson* at 3.

   FN47. *Lord v. Souder,* Del.Super., C.A. No. 97C-10-012, Graves, Jr. (Feb. 1, 1999) (Mem. Op. at 3) (quoting *Ayers v. Jacobs & Crumpler, P.A.,* Del.Super., C.A. No. 96C-07-258, Quillen, J. (Dec. 31, 1996) (Let. Op. at 25-26) (citations omitted)).

   FN48. *See E.I. duPont de Nemours and Co., v. Pressman,* Del. Supr ., 679 A.2d 436 (1996); *Ayers* at 11; *Layfield v. Beebe Medical Center., Inc.,* Del.Super., C.A. No. 95C-12-007, Graves, J. (Jul. 18, 1997) (Mem. Op. at 3); *Lord* at 3.

   FN49. *Lord* at 3 (quoting *Layfield* at 7-8); *See also Pressman,* 679 A.2d at 442-44.

The Court concludes that Bloss has failed to prove, by clear and convincing evidence that Kershner offered him lifetime employment. Rather, the employment relationship was at-will. There exists no evidence other than Bloss' subjective interpretation of Kershner's alleged statements regarding employment to support his claim that Kershner extended an offer of lifetime employment. Such statements, without any objective or tangible proofs that such a contract existed between Bloss and Kershner, are simply not enough. Such statements are not enough to alter the presumed at-will relationship . [FN50]

   FN50. *See Peterson v. Beebe Medical Center,* supra (holding that the words "we trust you will be here until you retire" spoken to an employee when originally hired did not alter the at-will relationship).

Further, the Court concludes that Kershner did not breach an implied covenant of good faith and fair dealing when Bloss was terminated. Although the Supreme Court has found an employer to have breached such a covenant when the employer promised indefinite employment and its intent was to employ on a temporary basis, [FN51] this Court finds that Bloss has made no such showing. Neither has Bloss met his burden of proof with respect to a breach of a covenant of good faith and fair dealing as it might relate to relinquishing a legal claim nor on the basis of a superior bargaining power on Kershner's part. Bloss put forward no evidence which indicates that he was any less knowledgeable in business than was Kershner.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                                         Page 7
Not Reported in A.2d, 2000 WL 303342 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

> FN51. *Merrill v. Crothall-American, Inc.,* 606 A.2d 96 at 102.

The Court concludes that there can be no recovery based upon a breach of the covenant of good faith and fair dealing as it relates to Kershner's failure to fulfill his promise to share 50% of LabWare's profits with Bloss. Bloss has not shown that Kershner's conduct was in any way fraudulent or deceitful. [FN52]

> FN52. See *Id.* at 101; *Peterson* at 5.

*6 An employer acts in bad faith when it induces another to enter into an employment contract through actions, words, or the withholding of information, which is intentionally deceptive in some way material to the contract. [FN53]

> FN53. *Merrill,* 606 A.2d at 101.

There was no evidence produced indicating that Kershner's intent was to deceive Bloss.

Generally, the elements of defamation are: (1) defamatory communication; (2) publication; (3) the communication refers to the plaintiff; (4) a third party's understanding of the communication's defamatory character; and (5) injury. [FN54] Generally, defamation is not actionable without special damages. [FN55] However, slander per se does not require proof of special damages. [FN56] Delaware recognizes four categories of slander that does not require special damages and they are statements that: (1) malign a person in that person's trade, business, or profession; (2) impute a crime; (3) imply that one has a loathsome disease, or (4) impute unchastity to a woman. [FN57] Delaware also recognizes a qualified privilege of employers to make communications regarding the character, qualifications, or job performance of an employee or former employee to those who have a legitimate interest in such information. [FN58] "The privilege will not be forfeited unless there is excessive publication, use of the occasion for a purpose not embraced within the privilege, or by making a statement which the speaker knows is false." [FN59]

> FN54. *Read v. Carpenter,* Del.Super., C.A. No. 95C-03-171, Quillen, J. (Jun. 8, 1995) (Let. Op. at 2) (citations omitted).

> FN55. *Q-Tone Broadcasting, Co. v. Musicradio of Maryland, Inc.,* Del.Super., C.A. No. 93C-09-021, Silverman, J. (Aug. 22, 1994) (Mem. Op. at 5).

> FN56. *Id.* at 7.

> FN57. *Id.;* Restatement (Second) Torts § 570.

> FN58. *See Stafford v. Air Products and Chemicals, Inc.,* Del.Super., C.A. No. 84C-JL-85, O'Hara, J. (Sept. 5, 1985) (ORDER); *Burr v. Atlantic Aviation Co.,* Del.Super., 332 A.2d 154, 155 (1974), *rev'd* on other grounds, Del.Supr., 348 A.2d 179 (1975).

> FN59. *Stafford* at 3 (citations omitted).

The Court concludes that Bloss has failed to sustain a claim for defamation. The evidence produced at trial fails to establish a defamatory statement that was made by Kershner to any third party. The alleged defamatory statements, if they had been proven, would amount to slander per se. [FN60] Kershner denies ever making any defamatory statements to anyone concerning Bloss' competency or work performance. The Court has indicated that Sandy Allem's deposition testimony is at best unclear. The Court does not find anywhere in Ms. Allem's testimony where she comes close to stating she was told by Kershner that Bloss was going to be terminated from his employment at DuPont and Kershner "saved his butt;" or that Bloss was incompetent; or any of the other statements alleged by Bloss. Without testimony from a third party, the whole basis of a defamation claim, Bloss is not entitled to recover for his defamation.

> FN60. The statements allegedly made are those which would be considered to malign Bloss' business or profession and he would not have had to prove special damages.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                              Page 8
Not Reported in A.2d, 2000 WL 303342 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

In order to recover a claim for intentional infliction of emotional distress, a plaintiff must prove that he suffered severe emotional distress as a result of some extreme and outrageous conduct by a defendant. [FN61] Moreover, the plaintiff does not have to prove there is any accompanying bodily harm to succeed on intentional infliction of emotional distress claim. [FN62] However, the Supreme Court in *Barker v. Huang* [FN63] held that "an independent action for intentional infliction of emotional distress does not lie where ... the gravamen of the complaint sounds in defamation." [FN64]

> FN61. Restatement (Second Torts) § 46; *Cummings v. Pinder,* Del.Supr., 574 A.2d 843, 845 (1990); *Brett v. Berkowitz,* Del.Super., C.A. No. 91C-12-251, Lee, J. (Apr. 13, 1995) (Mem.Op.); *Drainer v. O'Donnell,* Del.Super., C.A. No. 94C-08-062, Alford, J. (May 30, 1995) (Mem.Op.).
>
> FN62. *Cummings,* 574 A.2d at 845.
>
> FN63. *Barker v. Huang,* Del.Supr., 610 A.2d 1341 (1992).
>
> FN64. *See Barker,* 610 A.2d at 1351 (1992).

In the case sub judice, the intentional infliction of emotional distress claim is based upon the same statements allegedly made by Kershner to Bloss and other employees. Bloss was specifically asked by his attorney "[w]hat was your [Bloss'] reaction to these various things that you were told Mr. Kershner had said about you." [FN65] Those " various things" are the same defamatory statements Bloss alleges Sandy Allem told him (Bloss) that Kershner made to the team. [FN66] Therefore, pursuant to *Barker v. Huang,* [FN67] the Court concludes this claim cannot survive since it is based on the same set of facts as the defamation claim.

> FN65. *See* Bloss Trial Tr. Vol. 1 at 103.
>
> FN66. *See Id.* at 97-103.
>
> FN67. *Barker,* 610 A.2d at 1351.

**\*7** Based on the foregoing, Bloss is entitled to a judgment in the amount of sixty-five thousand dollars ($65,000) for services rendered in connection with documentation for LabStation prior to his being formally hired by LabWare in February, 1990.

IT IS SO ORDERED.

Del.Super.,2000.
Bloss v. Kershner
Not Reported in A.2d, 2000 WL 303342 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.