# Tab 5



Not Reported in A.2d                                                                                                                              Page 1
Not Reported in A.2d, 1994 WL 555391 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
  Superior Court of Delaware, New Castle County.
  Q-TONE BROADCASTING, CO., a Delaware corporation, and Anthony J. Quartarone, Plaintiff,
v.
MUSICRADIO OF MARYLAND, INC., a Maryland corporation, Donald Duckman, and Donald O'Brian, Defendants.
**No. CIV. A. 93C-09-021.**

Submitted: Aug. 1, 1994.
Decided: Aug. 22, 1994.

Upon Defendant's Motion to Dismiss-GRANTED in Part DENIED in Part.

David L. Finger, Biggs & Battaglia, Wilmington, for plaintiffs.
Daniel F. Wolcott, Jr., Gayle P. Lafferty, Potter, Anderson & Corroon, Wilmington, for defendants.

OPINION

SILVERMAN, Judge.
**\*1** This is a case of defamation. The parties compete in the field of radio broadcasting. Plaintiffs say Defendants went too far in Defendants' disparagement of Plaintiffs, some of which occurred on the air. Defendants have moved to dismiss. The Court must now consider whether Defendants' alleged statements are defamatory. If they are, the Court must consider whether they are libel or slander. If they are slander, the Court must further consider whether they are slander *per se* and if they are not, whether Plaintiffs have pleaded sufficient special damages.

I.

On September 3, 1993, Plaintiffs filed their initial complaint alleging libel, slander, and false light invasion of privacy. On January 6, 1994, Defendants filed this Motion to Dismiss for failure to state a claim. After reviewing the motion, the Court ordered briefs. In the meantime, on February 8, 1994, Plaintiffs filed a Motion to Amend their complaint in order to plead special damages. The Court granted Plaintiffs' Motion to Amend on February 18, 1994. On July 8, 1994, after the parties briefed the instant motion, Plaintiffs submitted the recently decided *Ward v. Zelikovsky,* N.J.Supr., No. A-48, 1994 WL 275341, Garibaldi, J. (June 20, 1994). With the Court's permission, Defendants responded by letter on August 1, 1994. This is the Court's decision on Defendants' Motion to Dismiss.

II.

In determining, under Super.Ct.Civ.R. 12(b)(6), whether to grant a motion to dismiss for failure to state a claim, the Court must accept all well-pleaded allegations as true. *Spence v. Funk,* Del.Supr., 396 A.2d 967 (1978). If plaintiff can recover "under any reasonably conceivable set of circumstances susceptible of proof under the complaint," the motion must be denied. *Id.* The Court is mindful that Plaintiffs have yet to develop the facts fully through discovery and that dismissal forecloses any possibility of Plaintiffs' establishing a claim.

III.

Viewing the facts in the light most favorable to Plaintiffs, it appears that Plaintiffs are owners of WRKE, a 3,000 watt radio station broadcasting over Sussex County in Delaware, several adjacent counties in Maryland and a portion of the coast of Virginia. Defendant, MusicRadio of Maryland, Inc., owns and operates WOCQ, another 3,000 watt station broadcasting over an area almost identical to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                    Page 2
Not Reported in A.2d, 1994 WL 555391 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

WRKE. Planitiff Quartarone is a WRKE on-air personality, "Tony Q." Defendant Duckman is program director and an on-air personality for WOCQ. Defendant O'Brian is an on-air personality for WOCQ. WRKE and WOCQ are " urban contemporary" stations. They compete for the same demographic audience and for advertisers in the same radio market.

Apparently, this case started in the summer of 1993 when WOCQ agreed to act as a sponsor of a contemporary musical concert at the Wicomico Youth and Civic Center in Salisbury, Maryland. WRKE made a deal with the Civic Center for free tickets in exchange for free radio advertising for the concert. According to WRKE, when WOCQ learned that WRKE was giving away tickets to the concert WOCQ was sponsoring, WOCQ went ballistic. Specifically, WRKE alleges that:

**\*2** WOCQ engaged in an on-air campaign of false and defamatory statements aimed at WRKE and Quartarone, designed to injure the reputation and standing of WRKE and Quartarone among listeners, advertisers and others in the community.

According to Plaintiffs' Second Amended Complaint, Defendants disparaged Plaintiffs in two, general ways. Defendants allegedly made defamatory comments about Plaintiffs over the air. Defendants also allegedly made disparaging remarks about Plaintiffs to advertisers and other individuals with whom Plaintiffs did business.

A. On-Air Remarks

The Plaintiffs allege:
On more than one occasion, Duckman stated on the air that WRKE was "the biggest liar in town" for stating that it had concert tickets to offer to its listeners, thereby suggesting that WRKE was intentionally deceiving its listeners. Duckman also stated on at least one occasion that WRKE had lied to personnel at the Civic Center to obtain the concert tickets, thereby suggesting that WRKE obtained property under false pretenses.
On or about June 22, 1993, O'Brian, while on the air, placed a telephone call to Duckman at his home, to inquire about WRKE's advertising that they had concert tickets to give away. Duckman asked O'Brian "Are we on the air?", to which O'Brian replied "Yes, we are." Duckman then went on to say "they are saying that they are the station with the [concert] tickets, when we are the ones bringing them down here in the first place and the tickets say OC-104, ahh, they are just a bunch of homosexuals over at that station anyway." After a moment, O'Brian added, "Tony Q, I wonder what the 'Q' stands for, Queen?" In making those statements, Duckman and O'Brian intended to, and did, suggest that the staff and management of WRKE in general, and Quartarone in particular, were homosexuals.
Thereafter, Duckman continued his defamatory on-air attacks on the staff of WRKE, continuing to suggest that they are homosexuals by stating that they want to "touch [Duckman's] butt," they "wear lace on their drawers," and by speaking in an effeminate voice and then stating that that voice sounds like the announcers at WRKE.
On August 26, 1993, Duckman, after discussing on the air the popular artist Michael Jackson was being accused of child abuse, said, on the air, "you can't do that at this station, so go see the man at the other baby station." Duckman and O'Brian have, in the past, repeatedly used the phrase "baby station" to refer to WRKE. In that context, and in light of Duckman's and O'Brian's previous accusations regarding Quartarone, Duckman's comment intended to, and did, suggest that Quartarone sexually abused children.

B. Remarks to Business Associates

Plaintiffs allege that, in addition to the on-air comments presented above, Defendants made the following actionable statements to business associates and potential advertisers of WRKE:
In late July or early August, 1993, in a meeting with [representatives of] of RCA Records, Duckman falsely stated that (i) WRKE did so poorly in the last ratings that it did not show up on the charts, (ii) WRKE does not play RCA Records, and (iii) WRKE does not play the advertising spots contracted for with RCA Records. In so stating, Duckman intended to, and did, cause undue

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 3

Not Reported in A.2d, 1994 WL 555391 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

embarrassment to WRKE and suggest that WRKE was deceiving its client, RCA, was intentionally breaching its contractual obligations to RCA, and was generally not competent in its business.

**\*3** [The representatives of RCA] subsequently contacted Quartarone and informed him of Duckman's statements, and expressed their concern about the validity of those statements. To satisfy their concern and to prove the falsity of Duckman's statements, Quartarone was obliged to provide a complete list of the records on its play list, the latest rating reports and the log of advertisements.

Quartarone also received a telephone call from [the] Co-National Director of Motown Records stating that Duckman told him that WRKE was not playing Motown Records. That statement is false, and was intended by Duckman to deter Motown Records from doing business with WRKE.

On or about August 20, 1993, ... the owner of Roundtable Management, an advertising agency that places advertisements for their clients on WRKE, visited the offices of WOCQ, where he met Duckman. Duckman asked [the owner of the advertising agency] why he was placing his client's adverting on WRKE. When [the owner of the agency] explained he was pleased with the results, Duckman said, "Don't you know he's a little 'funny' ?" [The owner of the adverting agency] asked, " Who?" "Tony," Duckman replied, holding up his hand and making his wrist limp. When [the owner of the advertising agency] told Duckman that he had seen Quartarone recently, Duckman asked, "and he didn't put the move on you?" In making these statements and gestures Duckman intended to, and did, suggest that Quartarone was a homosexual who had a sexual interest in [the owner of the advertising agency].

As mentioned above, on February 8, 1994, Plaintiffs amended their complaint to add allegations of special damages totaling $19,336.84. Those allegations are:

As a result of defendant's pattern of libelous and slanderous attacks, Quartarone was subject to tremendous mental anguish and stress over potential damage of his economic investment in WRKE resulting from defendant's actions. This stress contributed to Quartarone suffering heart problems resulting in an episode of atrial fibrillation which required hospitalization on November 3, 1993. Hospital and related medical bills total $5,644.84.

To minimize the mental anguish and stress caused by defendants' pattern of libelous and slanderous attacks, Quartarone engaged a psychiatrist for treatment. The psychiatrist bills to date total $600.00.

In early January, 1994, Arbitron issued its latest ratings report, covering the period during and following defendants' on-air onslaught of false and defamatory accusations, Arbitron reported that WRKE suffered a loss of 0.8, with its rating dropping from 2.18 to 2.0. For the same period, WOCQ experienced a gain of 0.8 with its rating from 7.9 to 8.7.

To mitigate the harm, WRKE has signed contracts for additional promotional billboard and mass mailing advertising, at a cost of $13,092.00. WRKE would not have incurred this additional expense but for the ratings drop.

IV.

**\*4** According to the generally accepted definition of "defamation" in Delaware:

A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

Restatement (Second) of Torts § 559 (1977); *quoted in Spence,* 396 A.2d at 969. Stated slightly differently, defamation is:That which tends to injure the reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him.

W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts,* § 111 (1971); *quoted in Spence,* 396 A.2d at 969. It is not enough that a plaintiff is merely annoyed or embarrassed; plaintiff's standing in the community must be "grievously fractured." *Guyer v. Greer,* Del.Super., C.A. No. 82C-DE-84, Bifferato, J. (Sept. 8, 1983), Mem.Op. at 2 (citations omitted). A statement is not defamatory

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                          Page 4
Not Reported in A.2d, 1994 WL 555391 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

if it offends but a single person. The plaintiffs' reputation in the entire community must be affected. *Id.* Finally, a defamed corporate plaintiff must show that the defamatory statements tend to prejudice the corporation in its business or to deter others from dealing with it. Restatement (Second) of Torts § 561.

Although *Ward* is not on point factually, it is a timely, comprehensive consideration of the modern law of defamation. *Ward* serves as a companion to Delaware's defamation law fountainhead, *Spence.* The Court adopts here the Supreme Court of New Jersey's general analysis of the defamatory nature of challenged statements, along with the Restatement (Second) of Torts §§ 558-576.

In determining whether a statement is defamatory, the Court must consider at least three factors: the content, verifiability, and context of the statement. *Ward,* No. A-48 at *4. With respect to the first *Ward* factor, content, *Ward* points out that no matter how vulgar or offensive certain statements may be, name calling, ephitats, and abusive language are not actionable as defamation since those statements do not have a defamatory content so that harm to the reputation can be shown. *Id.* at *5. *Ward* explains that "[n]o matter how obnoxious, insulting or tasteless such name-calling, it is regarded as a part of life for which the law of defamation affords no remedy." *Id. quoting* Rodney A. Smolla, *Law of Defamation,* § 4.03 at 4.11 (1986).

The Restatement also distinguishes actionable defamation from non-actionable name-calling:
There are some statements that are in form statements of opinion, or even of fact, which cannot reasonably be understood to be meant literally and seriously and are obviously mere vituperation and abuse. A certain amount of vulgar name-calling is frequently resorted to by angry people without any real intent to make a defamatory assertion, and it is properly understood by reasonable listeners to amount to nothing more.

**\*5** Restatement (Second) of Torts § 566 cmt. e. In its analysis of the content of an allegedly defamatory statement, the Court must look to the "fair and natural meaning which will be given it by reasonable persons of ordinary intelligence." *Ward,* No. A-48 at *4; *Riley v. Moyed,* Del.Supr., 529 A.2d 248, 253 (1987).

As listed above, the second factor in determining whether a statement is defamatory is its verifiability. Factual statements are uniquely capable of objective proof of truth or falsity while opinion statements generally are not since they reflect the maker's state of mind. *Ward,* No. A-48 at *5. Expressions of opinion are given broad protection under the First Amendment. *Id.* By requiring that a statement be verifiable in order to be defamatory, courts can ensure that defendants are not punished for exercising their First Amendment right to free speech. Therefore, unless a statement explicitly or impliedly rests on false facts that damage a person's reputation, the statement will not be actionable as defamation. *Id.*

Finally, the third *Ward* factor the Court must consider is the context in which the speaker made the allegedly defamatory statement. The listener's reasonable interpretation of the statement will be based, in part, on the context in which the speaker made the statement. *Id.* at *7; Restatement (Second) of Torts § 563, cmt. e.

The law has not treated defamation as a monolith. Courts have broken defamation into two parts: the torts of libel and slander. As set out in *Spence,* the history and pleading requirements for the two torts differ. In general, the scope of liability is greater, and the pleading requirements are less strict, for libel. *Spence,* 396 A.2d at 970. Libel is actionable *per se,* that is, it is not necessary to plead special damages in order to recover nominal or compensatory damages. *Id.* Slander, on the other hand, generally is not actionable without proof of special damages. *Id.* The exception is where the defamation is found to be slander *per se,* in which case proof of special damages is not necessary. As discussed below, in the past, Delaware has recognized four categories of slander *per se. Id.*

V.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                                   Page 5
Not Reported in A.2d, 1994 WL 555391 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

a.

Count I of Plaintiffs' complaint alleges libel as a result of the statements Defendants made during radio broadcasts at WOCQ. Specifically, as quoted above, Duckman and O'Brian allegedly suggested or implied that Quartarone is a homosexual and a child molester. Defendants also accused WRKE of lying to obtain concert tickets to give away to listeners and of lying to its listeners about the availability of the concert tickets.

Defendants argue that Count I must be dismissed because the statements are not defamatory. The comments Defendants allegedly made on the air were spontaneous and made to a limited audience in response to a specific event and were not of the type to "permanently blot" Defendants' reputation. Alternatively, Count I must be dismissed because it fails to allege libel; the statements Defendants made during their radio broadcasts, at most, are slander because they were spoken. Moreover, Plaintiffs fail to make out a *prima facie* case for slander because they do not plead special damages.

**\*6** Plaintiffs respond that defamatory radio broadcasts are libel because of the wide dissemination of radio broadcasts to listening audiences. Therefore, the complaint sets forth a *prima facie* case for libel, and it does not matter whether Plaintiffs pleaded special damages. The statements made by Duckman over the radio that Plaintiffs lied to their listeners and obtained concert tickets by false pretenses are libelous because Duckman and O'Brian maligned Plaintiffs' professional conduct and suggested the commission of the crime of obtaining property under false pretenses. Duckman's and O'Brian's allegations over the air that Quartarone is a homosexual and a child molester damaged Quartarone's reputation because homosexuality, according to Plaintiffs, is widely condemned by society. The comments also suggest criminal conduct with respect to child molestation.

Without addressing the libel/slander distinction, the Court finds that, after applying the factors set out in *Ward* and the Restatement, Defendants' comments over the air that arguably imply that Quartarone is a homosexual or a child molester do not amount to actionable defamation. Although the Court recognizes that a jury could conclude that a listener might reasonably interpret O'Brian's references to "queen" and "wearing lace on their drawers" as derogatory references to transvestitism or homosexuality, and that Duckman's reference to Michael Jackson was intended to refer to child molestation, a reasonable listener would take those comments as name-calling and no more. Duckman suggested no specific facts to support his accusations about Quartarone, much less that the entire staff of WRKE was composed of homosexuals. No reasonable listener could interpret the statements as to impute underlying facts to support them so as to believe the statements literally. This finding is supported by the context in which these statements were made, namely, of one radio station dissing a rival station and its announcer over the air.

As discussed below, the Court recognizes that not all accusations of homosexuality are non-defamatory automatically, since there are instances when such an accusation may be made in a harmful context as an assertion of fact intended to cause harm. *See Schomer v. Smidt,* Cal.Ct.App., 170 Cal.Rptr. 662 (1980). The statements made by Duckman, however, do not amount to such an accusation. Because these statements are non-actionable, the claims in Count I referring to these statements must be dismissed.

Defendants' on-air comments that Plaintiffs lied to their listeners about the availability of concert tickets and that Plaintiffs obtained the tickets by false pretenses, on the other hand, are actionable. The content of these statements could be interpreted by a reasonable listener as true, even when viewed in the same context as the comments set forth above, and a reasonable listener could be deterred from associating with the station and participating in its promotions if the listener believed the statements were true. These are statements of fact and not of opinion and they are susceptible to proof or disproof by Plaintiffs. Since these statements are actionable, the issue becomes whether Plaintiffs must meet the less stringent pleading requirements

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                        Page 6

Not Reported in A.2d, 1994 WL 555391 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

of libel or the stricter standards for slander, which invokes consideration of the sufficiency of Plaintiffs' special damages.

**\*7** While distinguishing libel from slander in 1978, *Spence* did not consider "the relatively new methods of communication such as radio and television broadcasts." *Id.* at 970 n. 2. Although the distinction between libel and slander as it applies to radio or television broadcasts has not been addressed in Delaware, the Restatement (Second) of Torts § 568A states that " [b]roadcasting of defamatory matter by means of radio or television is libel, whether or not it is read from a script." Defendants observe that the rationale of the Restatement has not been accepted universally. Nevertheless, a string of authorities has developed along the lines of the Restatement. *See Camp v. Yeager,* Ala.Supr., 601 So.2d 924, 927, n. 1 (1992), *cert. denied,* 113 S.Ct. 967 (1993) ; *Brown v. K.N.D. Corp.,* Conn.App., 509 A.2d 533, 534 n. 1 (1986), *rev'd on other grounds,* Conn.Supr., 529 A.2d 1292 (1987); and *Matherson v. Marchello,* N.Y.App.Div., 473 N.Y.S.2d 998, 1004 (1984). As discussed above, because of its inherent reasoning, and consistency with the spirit of *Spence,* the Court accepts the Restatement (Second) of Torts § 568A as the law of Delaware. Therefore, the Court finds that the comments made by Defendants that Plaintiffs lied to their listeners and lied to the Civic Center to obtain tickets support a *prima facie* case of libel. Accordingly, the Court need not reach the issue of Plaintiffs' special damages.

b.

Count II of Plaintiffs' complaint alleges that Duckman's statements, quoted above, to the record companies' representatives are slander *per se.* Count II further alleges that Duckman's statements to the owner of the advertising agency, also quoted above, are slander *per se.*

As mentioned above, there are four categories of slander that, historically, have been held actionable without proof of special damages, that is, as slanderous *per se.* These categories are statements that (1) malign a person in that person's business, trade, or profession, (2) impute a crime, (3) imply that one has a loathsome disease, or (4) impute unchastity to a woman. *Id.;* Restatement (Second) of Torts § 570. The common characteristic of these categories of slander is the tendency to isolate the object of the defamation from society so that the person defamed might never know the reason for, and the extent to which, the person has been shunned. Nor would the person have the chance to rebut the defamation. *Spence,* 396 A.2d at 970.

Defendants argue that Count II of Plaintiffs' complaint fails to state a claim upon which relief can be granted because the alleged comments do not constitute slander *per se* and because Plaintiffs failed to plead sufficient special damages. Plaintiffs respond that Duckman's remarks are slander *per se;* Duckman's comments to the record companies that WRKE does not play their records and the remaining comments made to RCA malign Defendants in their business and profession. The allegations made to the owner of the advertising agency are slanderous *per se* because they not only suggest that Quartarone is a homosexual but that he propositions his male clients. Plaintiffs argue that allegations of homosexuality are slander *per se* because such allegations can have a severe stigmatizing effect. In addition, Plaintiffs argue that the statements are slander *per se* because they malign Quartarone in his professional conduct. Alternatively, Plaintiffs argue that their amended complaint sets out sufficient special damages.

**\*8** Continuing to apply the *Ward* factors, the Court finds that the statements allegedly made by Duckman to the record companies' representatives amount to actionable defamation because a reasonable juror could conclude that the representatives might believe Duckman had specific facts to support his accusations and thus, be deterred from associating with Plaintiffs. Duckman allegedly made the statements during a presumably serious conversation with the record companies' representatives so that the representatives reasonably could have believed the statements.

The Court finds that Duckman's alleged comments to the owner of the advertising agency are also

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                Page 7
Not Reported in A.2d, 1994 WL 555391 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

actionable. Both the content and context of these comments differ from Duckman's on-air name-calling. In this case, Duckman's comments, viewed in the context of a presumably serious conversation with a business associate of Quartarone's, could have been construed by the advertising executive as based on fact and the advertising executive could infer from the comments that Quartarone was a homosexual who had designs on him. The comments went further than mere name calling. Although not every person hearing these comments would be deterred from associating with Quartarone, a significant number might choose to disassociate themselves. Moreover, the comments may well have been intended to harm Quartarone, who is Duckman's business competitor. Since the comments made by Duckman are slander, the Court must determine whether they are slander *per se* or whether the Court must consider the sufficiency of Plaintiffs' special damages.

Duckman's statements to the record companies' representatives support a *prima facie* case of slander *per se* because they malign Plaintiffs in their business of operating a radio station. The statements suggest that Plaintiffs breached their contracts with the record companies [FN1] and that Plaintiffs' small audience made Plaintiffs' station unattractive to the record companies. As these statements are slanderous *per se,* there is no need to reach the issue of whether the special damages alleged in the complaint are sufficient.

> FN1. The complaint is somewhat vague as to the exact nature of Plaintiffs' contractual relationship with the record companies. The Court assumes, subject to a future dispositive motion, that Plaintiffs will clarify their claim as the case proceeds.

As for Duckman's comments to the owner of the advertising agency, the Court will not find that the comments support a case for slander *per se* simply because they suggest that Quartarone is a homosexual. The modern trend of tort law is to focus on the injury resulting from a wrong and the traditional categories of slander *per se* have come under criticism. *Ward,* No. A-48, 1994 at *12; Keeton, § 112 at 793. In 1994, the Court will not expand the categories of slander *per se*. This includes now adding to the longstanding categories the imputation of homosexuality.

However, as stated above, Duckman's comments to the owner of the advertising agency not only imply that Quartarone is a homosexual, but that he propositions his male clients. Therefore, these comments support a *prima facie* case of slander *per se* because they malign Quartarone in his professional conduct.

c.

*9 Count III of Plaintiffs' complaint alleges false light invasion of privacy as a result of Duckman's and O'Brian's false accusations, discussed above, that Quartarone was a homosexual and a child molester. False light invasion of privacy is giving publicity to something that places plaintiff in a false light before the public where the false light is highly offensive to a reasonable person, and knowing of or acting "in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Wyshock v. Malekzadeh,* Del.Super., C.A. No. 91C-09-22, Taylor, J. (June 10, 1992), Mem.Op. at 5; *quoting* Restatement (Second) of Torts § 652E. Where statements are actionable under either tort, the same restrictions that apply to defamation also apply to false light invasion of privacy. Therefore, plaintiffs must plead and prove special damages when alleging false light invasion of privacy in any case where the defamatory words are not actionable *per se*. Id.

Defendants argue that Count III must be dismissed because the alleged statements are not slander *per se* and Plaintiffs failed to plead special damages. Plaintiffs respond that, as argued in support of their claim for slander, allegations of homosexuality and child molestation are slander *per se,* and so pleading special damages is not required.

Consistent with its holdings above, the Court finds that the statements made by Defendants that do not make out an actionable cause of action for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 8

Not Reported in A.2d, 1994 WL 555391 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

defamation also do not support a *prima facie* case of false light invasion of privacy. Although a jury could find that a listener hearing the comments would find them highly offensive, a reasonable listener would interpret them as name-calling and no more; no reasonable listener would interpret the comments as the truth. Thus, Defendants did not place Quartarone in a false light so that damages could have resulted. Therefore, Count III of Plaintiffs' complaint must be dismissed.

V.

In closing, the Court strongly emphasizes the fact that this ruling comes at the case's threshold. The Court has given Plaintiffs the benefit of every reasonable doubt. Whether the Complaint can survive future dispositive motions or support an award of damages after trial remains to be seen.
The Court requests that the parties confer and submit a form of Order consistent with this decision. The Court further requests that the parties advise the Court as to whether they agree to submit this case to mediation in October.

Del.Super.,1994.
Q-Tone Broadcasting, Co. v. Musicradio of Maryland, Inc.
Not Reported in A.2d, 1994 WL 555391 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.