## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ROBIN D. NICHOLS,                     *
                                      *
    Plaintiff,                     *          CIVIL ACTION
                                      *          NO. 05-055(KAJ)
v.                                    *
                                      *
BENNETT DETECTIVE &                   *
PROTECTIVE AGENCY, INC.,              *
A Delaware corporation, and           *
ALLEN'S FAMILY FOODS, INC.,           *
A Delaware corporation,               *
                                      *
    Defendants.                    *

---

### PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT ALLEN'S FAMILY FOODS INC.'S MOTION FOR SUMMARY JUDGMENT

---

SCHMITTINGER AND RODRIGUEZ, P.A
BY:  WILLIAM D. FLETCHER, JR.
      Bar I.D. #362
BY:  NOEL E. PRIMOS, ESQUIRE
      Bar I.D. #3124
      414 South State Street
      P.O. Box 497
      Dover, Delaware 19903-0497
      (302) 674-0140
      Attorneys for Plaintiff

Dated: 2|9|06

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES.......................................... ii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS........... 1

SUMMARY OF ARGUMENT........................................... 2

STATEMENT OF FACTS............................................ 3

ARGUMENT..................................................... 7

    I.    SUMMARY JUDGMENT STANDARD........................... 7

    II.   PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF
         RACE DISCRIMINATION UNDER 42 U.S.C.
         § 1981 AND THE DELAWARE DISCRIMINATION ACT........... 7
         A.   Allen's and Bennett Acted In Concert In
             Discriminating Against Plaintiff................ 8
         B.   Plaintiff Has Established a Prima Facie
             Case of Discrimination........................ 11

    III.  SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S
         REMAINING CLAIMS OF GENDER DISCRIMINATION UNDER
         THE DDA............................................ 13

    IV.   PLAINTIFF HAS STATED A LEGITIMATE CLAIM FOR
         TORTIOUS INTERFERENCE WITH HER EMPLOYMENT
         WITH BENNETT....................................... 14

    V.    PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF
         SLANDER PER SE..................................... 18

CONCLUSION................................................... 20

## TABLE OF AUTHORITIES

PAGE

**CASES**

Bishop v. Wood,
    426 U.S. 341 (1976).................................... 7

Boire v. Greyhound Corp.,
    376 U.S. 473 (1964)..................................... 9

Brown v. Philip Morris, Inc.,
    250 F.3d 789 (3d Cir. 2001)........................... 11

Cantor v. Fitzgerald, L.P. v. Cantor,
    724 A.2d 571 (Del. Ch. 1998).......................... 15

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)................................... 7

Choe-Rively v. Vietnam Veterans of America Chapter 83,
    135 F.Supp.2d 462 (D.Del. 2001)....................... 8

Cifarelli v. Village of Babylon,
    93 F.3d 47 (2d Cir. 1996)............................. 7

E.I. Dupont de Nemours & Co. v. Pressman,
    679 A.2d 436 (Del. 1996).............................. 17

Graves v. Lowery,
    117 F.3d 723 (3d Cir. 1997)........................... 8

Irwin & Leighton Inc. v. W.M. Anderson Co.,
    532 A.2d 983 (Del. Ch. 1987).......................... 15

Jones v. School District of Philadelphia,
    198 F.3d 403 (3d Cir. 1999)........................ 13-14

Nelson v. Fleet Nat'l Bank,
    949 F.Supp. 254 (D.Del. 1996)...................... 14-16

NLRB v. Browning-Ferris Industries, Inc.,
    691 F.2d 1117 (3d Cir. 1982).......................... 9

Schuster v. Derocili,
    775 A.2d 1029 (Del. 2001)............................. 17

Spence v. Funk,
    396 A.2d 967 (Del. 1978)........................... 18,19

ii

United States v. Diebold,
    369 U.S. 654 (1962) ....................................... 7


**STATUTES**

19 Del. C. § 710, <u>et</u>. <u>seq</u>. ........................ 1,7,8,12,13

42 U.S.C. § 1981............................. 1,7,8,11,12,17,18

**RULES**

Fed. R. Civ. P. 56(c)........................................ 7

**OTHER SOURCES**

The Restatement of Torts § 559................................ 19

Restatement (Second) of Torts § 766 (1979).................... 16

Restatement (Second) of Torts § 767 (1979)................. 15-16

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

On December 28, 2004, Plaintiff, Robin Nichols, sued Bennett Detective & Protective Agency, Inc. (hereinafter Bennett) and co-defendant Allen's Family Foods, Inc. (hereinafter Allen's) after she was removed from her job as a supervisor of security officers at Allen's Harbeson, Delaware plant. In her complaint, Plaintiff alleges that Defendants discriminated against her on the basis of her race and sex in violation of the Delaware Discrimination Act (19 Del. C. § 710 et. seq.) and 42 U.S.C. § 1981. Plaintiff also alleges that Allen's tortiously interfered with her employment with Bennett and defamed her by making false oral statements about her.

The matter was removed to the United States District Court for the District of Delaware on February 2, 2005. Defendants Bennett and Allen's filed separate Motions for Summary Judgment on January 27, 2006. Plaintiff files this brief in opposition to Allen's Motion for Summary Judgment because genuine issues of material fact exist in this case.

## SUMMARY OF ARGUMENT

Summary judgment should be denied because there are genuine issues of material fact with regard to Plaintiff's claims, and those claims should be submitted to a jury.

1.    Allen's and Bennett acted in concert in Plaintiff's discriminatory transfer from the Allen's plant.

2.    Summary Judgment should be denied on Plaintiff's claims of race discrimination because Plaintiff has established a <u>prima facie</u> case of such discrimination.

3.    Summary Judgment should be denied on Plaintiff's claims of gender discrimination because she has established a <u>prima facie</u> case of such discrimination.

4.    Plaintiff has stated a legitimate claim for tortious interference by Allen's with her employment with Bennett.

5.    Plaintiff has established a <u>prima facie</u> case of slander <u>per se</u> based on Greg Miller's statements to other employees at Allen's.

2

## STATEMENT OF FACTS

Plaintiff is an African-American female. (Deposition of Greg Miller, at 14)(B35). Bennett is a security agency that provides security guards to a number of different customers at various locations. (Deposition of Mark Habicht, at 6-7)(B42-43). Bennett has a contract with Allen's under which Bennett provides uniformed security officers to two Allen's plants. (Habicht Dep., at 11-12)(B44-45).

Plaintiff began her employment with Bennett as a security guard on July 30, 2001. (Deposition of Wayne Keller, at 9)(B58). Plaintiff worked at the Allen's Harbeson, Delaware plant from the beginning of her employment at the end of July 2001 until December 2003 when Bennett removed her from the Harbeson plant. (Keller Dep., at 13)(B59).

During her employment at the Allen's plant Plaintiff was a good worker and, prior to her removal from the Harbeson plant, had never been disciplined. (Keller Dep., at 31)(B77). Plaintiff's performance was so outstanding that she was promoted by Bennett to the position of supervisor. (Keller Dep., at 13)(B59). As supervisor, Plaintiff was responsible for the security procedures at Allen's plant. (Keller Dep., at 17)(B63). Plaintiff interacted with Allen's Human Resources Manager, Greg Miller on a daily basis and responded to his requests to change specific security procedures at Allen's. (Keller Dep., at 17-19)(B63-65). Plaintiff also oversaw the other Bennett employees at the Harbeson

3

plant, including Joseph Joshua Whiteman. (Nichols Dep., at 39-40)(B4-5). Whiteman is a white male. (Miller Dep., at 14)(B35).

On December 11, 2003, Mr. Whiteman attacked Plaintiff in the guardhouse at the Harbeson plant. (Nichols Dep., at 39-50)(B4-15). According to Plaintiff, Whiteman pushed Plaintiff three times during this incident, including pushing her into the file cabinet and the CB radio. (Nichols Dep., at 40-41)(B5-6). Plaintiff then called the police who came to the Harbeson plant to investigate this altercation. (Nichols Dep., at 39-42)(B4-7). No official charges were filed in the matter. (Nichols Dep., at 42)(B7).

Greg Miller is Manager of Human Resources at the Allen's Harbeson Plant. (Miller Dep., at 4)(B34). Soon after the altercation between Plaintiff and Whiteman, Miller contacted Mark Habicht, who was a vice president at Bennett. (Habicht Dep., at 18-19)(B46-47). Habicht recalled that Miller told him over the phone that "she [Plaintiff] had to go, that he [Miller] couldn't have that kind of activity going on in his plant, it was too disruptive." (Habicht Dep., 23)(B49). Habicht then called Wayne Keller (also a vice president at Bennett) to inform Keller of the incident. (Keller Dep., at 54)(B87). According to Miller, either Keller or Habicht suggested that Miller, Habicht and Keller meet the next morning. (Miller Dep., at 16)(B37).

According to Plaintiff, Miller interviewed Whiteman about the incident but did not get Plaintiff's side of the story. (Nichols Dep., at 53-54)(B18-19). At some point on the evening of December

4

11, Keller spoke to Whiteman concerning the incident. (Keller Dep., at 24-25)(B70-71). The next morning, December 12, 2003, Miller, Habicht and Keller met at the Harbeson plant to discuss the altercation. (Habicht Dep., at 22-23)(B48-49). The defendants' versions of what was discussed at that meeting conflict dramatically. Miller argues that at that meeting Keller and Habicht, on behalf of Bennett, offered to remove Plaintiff from her position at Allen's and he "accepted" their offer. (Miller Dep., at 40)(B39). Keller and Habicht, however, state that Miller told them at the meeting that "I like you guys, but she's [referring to Plaintiff] got to go." (Keller Dep., at 16-17)(B62-63); (Habicht Dep., at 23-24)(B49-50). Keller further stated that Miller "didn't ask to move Mr. Whiteman." (Keller Dep., at 40)(B86).

Also on December 12, 2003, Valerie Brittingham, an employee of Allen's approached Plaintiff and told Plaintiff that Miller was "telling everybody" that everything was Plaintiff's fault and that Plaintiff was not capable of doing her job. (Nichols Dep., at 57-59)(B22-24). Plaintiff testified that, during that conversation, Ms. Brittingham told Plaintiff that Miller was a racist. (Nichols Dep., at 58)(B23).

On December 15, 2003, Keller called Plaintiff to inform her that she was being removed from the Allen's plant. (Keller Dep., at 21-22, 29)(B67-68,75). Keller claimed that, at that time, Bennett did not have any other position available for Plaintiff. (Nichols Dep., at 102)(B26). Keller did not call Plaintiff until

5

a few days later to inform Plaintiff that another position was available. (Keller Dep., at 32-33)(B78-79). The new position Keller offered Plaintiff was only a part-time position at a Perdue plant in Milford. (Keller Dep., at 33)(B79). Plaintiff became ill the night before she was to report to the Perdue plant. (Nichols Dep., at 105)(B29). A few days later, Keller informed Plaintiff that she was to be transferred to another part-time position at the Sussex County Family Court. (Nichols Dep., at 106)(B30).

Plaintiff reported to work for a few days at the Sussex County Family Court. (Keller Dep., at 34-35)(B80-81). However, the guard at the Family Court who Plaintiff had been replacing returned to work December 29th. (Nichols Dep., at 106)(B30); (Keller Dep., at 35)(B81). Keller claimed that he was never able to find Plaintiff a full-time position after she was removed from the Allen's plant. (Keller Dep., at 33)(B79). Because Bennett claimed it was not able to provide her a full-time position with comparable pay to her job at Allen's, Plaintiff was forced to resign her position at Bennett on January 5, 2004. (Nichols Dep., at 29)(B3).

Whiteman, who had only been employed at Bennett approximately one month at the time of the altercation with Plaintiff, was not disciplined in any way for his role in the altercation with Plaintiff. (Habicht Dep., at 28-29)(B54-55).

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate only where there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c). The party moving for summary judgment has the burden of identifying evidence it believes demonstrates the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). For purposes of a summary judgment motion, the Court must view the facts in the light most favorable to the non-moving party. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962). The non-moving party's version of the facts must be accepted, and all disputed facts resolved in her favor. <u>Bishop v. Wood</u>, 426 U.S. 341, 348 n.11 (1976). The Court must resolve all ambiguities and draw all reasonable inferences against the moving party. <u>Cifarelli v. Village of Babylon</u>, 93 F.3d 47, 51 (2d Cir. 1996).

Plaintiff has raised several genuine issues of material fact that remain unresolved at this stage of the case.

### II.    PLAINTIFF HAS ESTABLISHED A <u>PRIMA FACIE</u> CASE OF RACE DISCRIMINATION UNDER 42 U.S.C. § 1981 AND THE DELAWARE DISCRIMINATION ACT.

The strong factual dispute between Miller and Bennett's vice presidents, Keller and Habicht, as to who decided to remove Plaintiff from Allen's plant is a significant issue of material fact still in dispute in this case. Defendants disagree as to

whether Miller demanded that Plaintiff be removed from Allen's or whether Plaintiff's transfer was suggested by Keller or Habicht. This factual dispute, itself, is sufficient to preclude summary judgment.

In the event the Court does not determine that this dispute is a genuine issue of material fact, however, summary judgment on Plaintiff's claims of discrimination should nonetheless be denied because she has established a _prima facie_ case of race discrimination under both 42 U.S.C. § 1981 and the Delaware Discrimination Act.

**A.    Allen's and Bennett Acted In Concert In Discriminating Against Plaintiff.**

Bennett and Allen's have a unique, symbiotic business relationship in which Bennett supplies security services to Allen's. While Bennett's security guards are not officially employees of Allen's, nonetheless, Allen's exercises a significant amount of control over the Bennett employees--including the power to tell Bennett when to transfer employees. (See Keller Dep., at 37-38)(B83-84). Such unique power over the Bennett employees indicates that Allen's and Bennett were, at the least, acting in concert in the discriminatory transfer of Plaintiff from the Allen's plant.

An employee may be simultaneously employed by joint employers. See Choe-Rively v. Vietnam Veterans of America Chapter 83, 135 F.Supp.2d 462 (D.Del. 2001); Graves v. Lowery, 117 F.3d

723 (3d Cir. 1997); <u>NLRB v. Browning-Ferris Industries, Inc.</u>, 691
F.2d 1117 (3d Cir. 1982). <u>See also</u> <u>Boire v. Greyhound Corp</u>. 376
U.S. 473 (1964). The highly factual question of "joint employer"
status "requires an examination into whether an employer who is
claimed to be a 'joint employer' possessed sufficient control over
the work of the employees to qualify as a 'joint employer' with
[the actual employer]." <u>NLRB v. Browning-Ferris</u>, 691 F.2d 1117 at
1121 (quoting <u>Boire</u>, 376 U.S. at 481). The concept of joint
employers "recognizes the business entities involved are in fact
separate but that they share or co-determine those matters
governing the essential terms and conditions of employment." <u>NLRB
v. Browning-Ferris</u>, 691 F.2d 1117 at 1123.

In the present case, Allen's controlled certain significant
aspects of Plaintiff's employment. As a matter of logic, it is
apparent that Allen's had a right to control the location and
hours of Plaintiff's work because, under the Bennett-Allen's
contract, Allen's had the right to request a particular number of
guards for particular locations. (See Bennett Security
Agreement)(B89-90). These guards would not be needed except when
Allen's required them at its plant.

Further, Plaintiff interacted on a daily basis with Miller
and accommodated Miller's specific requests concerning the
security procedures at the Allen's plant. (Keller Dep., at
17)(B63). Keller described the amount of control Miller exercised
over the Bennett security guards in great detail:

Now, granted, she [Plaintiff] reports to Mr. Miller for her

9

daily issues.  If they wanted to change how they did business, he wouldn't necessarily call us, he would talk to the site supervisor,  which Robin was.   If they were changing procedures or those  types  of things,  visitors coming, those types of things, they interfaced more with her than we did obviously on a daily basis.
(Keller Dep., at 17)(B63).

Allen's, through its Human Resources Manager, Miller, also had the right to request that certain guards be terminated or transferred. Keller stated that, in addition to requesting Plaintiff's transfer, Miller had previously requested the transfer of two other employees.   (Keller Dep., at 37-38)(B83-84).

The foregoing facts about Bennett and Allen's unique working relationship indicate that, Allen's and Bennett were joint employers then, at the least, they were acting in concert.   The business arrangement between Bennett and Allen's essentially made Bennett an intermediary between Allen's and the security officers: Allen paid Bennett, who then paid the security guards.   Allen's enjoyed a significant level of control over the security officers given its position as Bennett's employer.   As Keller admitted, Bennett was essentially required to do whatever Allen's asked because "we had a contract with them, we valued their business." (Keller Dep., at 21)(B67).   Bennett had essentially forfeited the right to transfer its own employees because it was so subservient to its client, Allen's.   Because of its unique relationship with Allen's, Bennett could not refuse to transfer Plaintiff, for fear of  losing  its  contract  with  Allen's.    Knowing  of  this relationship, Allen's demanded that Bennett transfer Plaintiff, thereby effectively terminating Plaintiff.   Bennett and Allen's,

10

therefore, acted in concert in transferring Plaintiff from the Allen's plant and should both be held responsible for the discrimination against Plaintiff.

### B.  Plaintiff Has Established a <u>Prima Facie</u> Case of Discrimination.

Allen's contends, very generally, that Plaintiff has not established a case of discrimination under 42 U.S.C. § 1981 because she "is unable to present any evidence that Allen's intended to discriminate against her on the basis of her race." (Allen's Opening Brief, at 14). Allen's does not, however, argue that Plaintiff's claims under the Delaware Discrimination Act should fail.

The test for discrimination under 42 U.S.C. § 1981, as set out by Allen's (Allen's Opening Brief, at 12), requires that Plaintiff show: (1) that she is a member of a racial minority; (2) an intent to discriminate on the basis of race by Allen's; and (3) discrimination concerning one or more of the activities enumerated in the statute.  <u>Brown v. Philip Morris, Inc.</u>, 250 F.3d 789, 797 (3d Cir. 2001).  Section 1981(a) specifically provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

Section 1981(b) defines the phrase" make and enforce

11

contracts" under subsection (a), providing:

> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981(b).

Allen's does not dispute that Plaintiff is a member of a racial minority. Rather, Allen's contends that Plaintiff has not presented evidence that Allen's intended to discriminate against her on the basis of her race. Miller's actions, however, raise an inference of discriminatory intent. As Plaintiff stated, Miller only interviewed Whiteman about the altercation. (Nichols Dep., at 53-54)(B18-19). Miller's failure to interview Plaintiff about the altercation raises an inference of discrimination, particularly in light of the fact that Plaintiff called the police in the first place to investigate the altercation. (Nichols Dep., at 41)(B6). Further, Miller's demands to Keller and Habicht that Plaintiff be transferred, without any suggestion that Whiteman, a white citizen, be transferred, give rise to an inference of discrimination.

As Keller noted, Plaintiff was "one of the original security officers when [Bennett] received the Allen's contract." (Keller Dep., at 13)(B59). Plaintiff had been at the Allen's plant for more than two years and had been promoted to supervisor. Whiteman had only been at Allen's approximately one month. Yet, as Habicht and Keller testified, Miller demanded that Plaintiff (a black female) be removed from the plant when, at best, it was unclear

12

who initiated the altercation between Plaintiff and Whiteman.

There is further evidence of discrimination in Miller's statements to Valerie Brittingham on the afternoon of December 12, 2003.  Plaintiff testified that Brittingham told her that Miller was "telling everybody that everything was your fault" and also telling everyone that she wasn't "capable of doing [her] job." (Nichols Dep., at 58)(B23).  When Plaintiff asked Brittingham why Miller would say something like that, Brittingham responded, "Well, you know, he's a racist." (Nichols Dep., at 58)(B23).

When paired with Miller's negative comments about Plaintiff to Valerie Brittingham, these actions give rise to an inference of discrimination.  As will be shown infra, Miller's actions directly interfered with Plaintiff's right to contract under Section 1981.

## III. SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S REMAINING CLAIMS OF GENDER DISCRIMINATION UNDER THE DDA.

Allen's does not appear to contend that Plaintiff has not established a case for gender discrimination under the Delaware Discrimination Act.  In an abundance of caution, however, Plaintiff will reiterate the basis for her claims of gender discrimination.

The test for a prima facie case of gender discrimination is: 1) membership in a protected class; 2) qualification for the position in question; 3) adverse employment action; and 4) circumstances surrounding the action which give rise to an inference of unlawful discrimination.  Jones v. School District of

Philadelphia, 198 F.3d 403, 410-411 (3d Cir. 1999).

Allen's actions were discriminatory because, as Plaintiff testified, Miller never spoke to her to get her side of the story. Further, Miller never suggested that Whiteman, who had been employed only a month as a security guard, be removed. (Keller Dep., at 40)(B86). Logically, it would have been much easier to remove Whiteman from the Allen's plant rather than Plaintiff because Whiteman was not a supervisor and had only been at the plant approximately one month. Yet, as Keller stated, Miller "didn't ask to move Mr. Whiteman." (Keller Dep., at 40)(B86). Miller's determination to have Plaintiff, a black female, removed from the plant instead of a newer employee who was a white male, permits an inference of race and gender discrimination.

## IV.  PLAINTIFF HAS STATED A LEGITIMATE CLAIM FOR TORTIOUS INTERFERENCE WITH HER EMPLOYMENT WITH BENNETT.

Summary judgment should be denied on Plaintiff's claims of tortious interference with her employment with Bennett. Allen's argues that Plaintiff cannot sustain a claim of tortious interference with contract because Plaintiff was only an "at-will" employee with Bennett.

While the Delaware Superior Court has ruled that a plaintiff cannot sustain a claim for tortious interference based on at-will employment, the Delaware Supreme Court has not examined the issue. See Nelson v. Fleet Nat'l Bank, 949 F.Supp. 254, 261 (D.Del. 1996). The Delaware District Court, however, has examined the

issue and predicted that the Delaware Supreme Court "would hold an action for tortious interference with contract may be maintained in conjunction with an at-will employment contract." Nelson, 949 F.Supp. 254 at 261.    The Court, in Nelson, also held that "as a matter of logic, at-will status should not bar suits for tortious interference with contract." Id. at 264.    Therefore, under this Court's holding in Nelson, Plaintiff should be allowed to sustain her claim for tortious interference with contract based on Miller's demand to Bennett that Plaintiff be transferred.

The elements of a claim of tortious interference with contract are: (1) existence of a contract; (2) defendant's knowledge of the contract; (3) an intentional act that is a significant factor in causing the breach of the contract; (4) lack of justification in causing the breach; and (5) injury.    See Cantor v. Fitzgerald, L.P. v. Cantor, 724 A.2d 571, 584 (Del. Ch. 1998); Irwin & Leighton Inc. v. W.M. Anderson Co., 532 A.2d 983, 992 (Del. Ch. 1987).    In order to determine whether a party's interference with contract may be justified, the Delaware courts rely on the test set forth in the Restatement (Second) of Torts § 767 (1979).    The Restatement (Second) test requires an inquiry into: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the societal interests in protecting the freedom of action of the actor and the contractual interests of the other; (6) the proximity or remoteness of the actor's conduct to the

interference; and (7) the relations between the parties.  See Irwin & Leighton Inc., 532 A.2d at 992-93 (quoting Restatement (Second) of Torts § 767).

Nothing in the generally accepted test for tortious interference with a contract nor in the Restatement test prohibits an at-will employee from asserting a cause of action based on tortious interference.  Moreover, comment g. to Restatement (Second), § 766, states that "Until . . . terminated . . the [at-will] contract is valid and subsisting, and the defendant may not properly interfere with it."  As the Court noted in Nelson, this portion of the Restatement "indicates a cause of action for tortious interference with contract may lie for breach of an at-will contract." Nelson, 949 F.Supp. 254 at 261.

In addition, an examination of the Restatement factors indicates that Allen's actions were not justified because they were motivated by discriminatory animus.  Plaintiff's interests with which Allen's interfered were not only Plaintiff's right to continue her healthy and long-term relationship with Bennett, but also Plaintiff's right to be free of race and sex discrimination in the workplace.  At the time of her transfer, Plaintiff had been working for Bennett for more than two years and had risen to the level of supervisor.  Miller's demands that Plaintiff be transferred directly interfered with the otherwise healthy relationship between Bennett and Plaintiff.  Further, Miller's actions were motivated by a discriminatory animus, as can be inferred from the fact that Miller never even suggested that

Whiteman, Plaintiff's white, male co-worker, be transferred. (Keller Dep., at 40)(B86). The interests Miller was attempting to advance were merely his own, unlawful, discriminatory purposes based on Plaintiff's race and sex. There is no "societal interest" in promoting unlawful race and sex discrimination. Rather, there is a strong public policy against unlawful race and sex discrimination in the workplace. Miller took advantage of his superior position over Bennett and directly caused Plaintiff's termination. Under the Restatement test, it is clear that Miller's actions were not justified.

Further, while it has not ruled directly on the issue of whether a tortious interference claim may be based on an at-will employment contract, the Delaware Supreme Court has held that even an at-will employee has a right to the protection of good faith and fair dealing in her employment relationships. E.I. Dupont de Nemours & Co. v. Pressman, 679 A.2d 436 (Del. 1996). An employee's legal right to continue an at-will employment relationship without unlawful hinderance was also reinforced recently in the Delaware Supreme Court case of Schuster v. Derocili, 775 A.2d 1029 (Del. 2001). Therefore, while Plaintiff was an at-will employee, she had the right to protection under the basic principles of good faith and fair dealing in her employment relationships. Miller's demand that Bennett remove Plaintiff was not made in good faith. As Plaintiff testified, Miller did not allow her to tell her side of the story concerning the altercation with Whiteman. (Nichols Dep., at 53-54)(B18-19). Because Miller

17

did not discuss the incident with Plaintiff, Miller's demand that
Plaintiff be removed from his plant was made without a good faith
investigation into the actual facts.

Plaintiff's claim of tortious interference with contract may
also be sustainable under 42 U.S.C. § 1981.   Section 1981(a)
provides, in part, that, "All persons within the jurisdiction of
the United States shall have the same right in every State and
Territory to make and enforce contracts . . . .   42 U.S.C. §
1981(a).   Section 1981(b) defines the term "make and enforce
contracts" to include "the making, performance, modification, and
termination of contracts, and the enjoyment of all benefits,
privileges,   terms,   and   conditions   of   the   contractual
relationship." 42 U.S.C. § 1981(b).   By forcing Bennett to remove
Plaintiff from her position at the Harbeson plant due to her race,
Allen's interfered with Plaintiff's right to contract with
Bennett.   Although there is no physical contract, Plaintiff's
right to work without discriminatory interference, even under an
at-will employment agreement, is a right to make and enforce
contracts to which she is entitled under Section 1981.   The right
of a plaintiff to protect her employment agreement should fall
under the broad scope of Section 1981's protection.

## V.    PLAINTIFF HAS ESTABLISHED A <u>PRIMA FACIE</u> CASE OF SLANDER <u>PER SE</u>.

Plaintiff has stated a claim for defamation.  A defamatory
statement is one which "tends so to harm the reputation of another

as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Spence v. Funk, 396 A.2d 967, 969 (Del. 1978)(quoting The Restatement of Torts § 559). Plaintiff testified at her deposition that, on December 12, 2003, Valerie Brittingham, an employee in the Human Resources Department at Allen's, told Plaintiff that Miller was "telling everybody" that the altercation with Whiteman was Plaintiff's fault and that Plaintiff was not capable of doing her job. (Nichols Dep., at 57-59)(B22-24). These statements by Miller were directly critical of Plaintiff's work performance and ability. Miller communicated these defamatory statements about Plaintiff to Valerie Brittingham and other employees at Allen's, who understood the defamatory nature of Miller's statements. Injury to Plaintiff may be presumed because Miller's statements maligned Plaintiff in her "trade, business or profession" and as such are considered slander per se. See Spence, 396 A.2d at 970. Because Plaintiff has established a case for slander per se, summary judgment cannot be granted on Plaintiff's claims of defamation.

19

**CONCLUSION**

For the reasons stated above, Defendant's Motion for Summary Judgment should be denied.

SCHMITTINGER & RODRIGUEZ, P.A.

BY: _____
WILLIAM D. FLETCHER, JR.
Bar I.D. #362
NOEL E. PRIMOS
Bar I.D. #3124
414 S. State Street
P.O. Box 497
Dover, DE    19901
(302) 674-0140
Attorneys for Plaintiff

DATED: 2\9\06
WDF:NEP:ACG

20