## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ROBIN D. NICHOLS,                    *
                                     *
    Plaintiff,                   *          CIVIL ACTION
                                     *          NO. 05-055(KAJ)
v.                                   *
                                     *
BENNETT DETECTIVE &                  *
PROTECTIVE AGENCY, INC.,             *
A Delaware corporation, and          *
ALLEN'S FAMILY FOODS, INC.,          *
A Delaware corporation,              *
                                     *
    Defendants.                  *

---

### APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION
### TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

SCHMITTINGER AND RODRIGUEZ, P.A
BY:   WILLIAM D. FLETCHER, JR.
      Bar I.D. #362
BY:   NOEL E. PRIMOS, ESQUIRE
      Bar I.D. #3124
      414 South State Street
      P.O. Box 497
      Dover, Delaware 19903-0497
      (302) 674-0140
      Attorneys for Plaintiff

Dated: 2|9|06

## TABLE OF CONTENTS

PAGE

PORTIONS OF DEPOSITION OF ROBIN NICHOLS,
      DATED DECEMBER 7, 2005.............................    B1

PORTIONS OF DEPOSITION OF GREG MILLER,
      DATED DECEMBER 7, 2005.............................    B32

PORTIONS OF DEPOSITION OF MARK HABICHT,
      DATED JANUARY 6, 2006..............................    B40

PORTIONS OF DEPOSITION OF WAYNE KELLER,
      DATED JANUARY 6, 2006..............................    B56

BENNETT SECURITY AGREEMENT WITH ALLEN'S FOODS,
      DATED FEBRUARY 11, 2003............................    B89



1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROBIN D. NICHOLS,                      )
     Plaintiff,                       )
                             )
            v.                         ) C.A. No.
                             ) 05-555 (KAJ)
BENNETT DETECTIVE & PROTECTIVE          )
AGENCY, INC., a Delaware corporation,)
and ALLEN'S FAMILY FOODS, INC., a       )
Delaware corporation,                   )
     Defendants.                      )

              Deposition of **ROBIN DENISE NICHOLS**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Schmittinger & Rodriguez, 414 South State
Street, Dover, Delaware, on Wednesday, December 7, 2005,
beginning at 11:30 a.m.

APPEARANCES:

     SCHMITTINGER & RODRIGUEZ
     BY:  WILLIAM D. FLETCHER, JR., ESQUIRE
     and ADAM C. GERBER, ESQUIRE
     414 South State Street
     Dover, Delaware  19901
     Attorneys for Plaintiff.

     MURPHY, SPADARO & LANDON
     BY:  ROGER D. LANDON, ESQUIRE
     300 South State Street
     Dover, Delaware  19901
     Attorney for Defendant
     Bennett Detective & Protective Agency, Inc.

                (Appearances Cont'd...)

     **ORIGINAL RETAINED BY ARTHUR M. BREWER, ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

2

```
 1    APPEARANCES (Cont'd):

 2          SHAWE & ROSENTHAL
            BY:  ARTHUR M. BREWER, ESQUIRE
 3          and LAURA A. PIERSON SCHEINBERG, ESQUIRE
            20 South Charles Street
 4          11th Floor
            Baltimore, Maryland  21201
 5          Attorneys for Defendant
            Allen's Family Foods, Inc.
 6
      ALSO PRESENT:
 7
            MR. WAYNE KELLER,
 8          Bennett Detective & Protective Agency, Inc.

 9          MR. GREGORY MILLER,
            Allen's Family Foods, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

B2

1      A.    Yes.

2      Q.    -- it says from August of '01 through it

3  looks like November.  And then that is scratched out,

4  and then there is January.  And the date is then '04?

5      A.    Correct.

6      Q.    That is the period of time that you were

7  working for Bennett?

8      A.    Yes, sir.

9      Q.    I would like you to clear up for me, if you

10  would --

11      A.    Uh-huh.

12      Q.    -- when we talked earlier about your

13  journal, you said that you stopped making entries in

14  that journal on December 19th of '04, which is --

15      A.    No.  I said January 19th of '04.

16      Q.    I'm sorry.  Maybe you did.  I wrote down

17  December 19, '04.  So then you kept your journal that we

18  were referring to earlier?  Do you remember the journal

19  we talked about earlier?

20      A.    Yes.

21      Q.    You started that on the 15th of December,

22  2003 and stopped --

23      A.    Correct.

24      Q.    -- on January 19, 2004?

B3

39

1          Q.     You say Allen's discriminated you based on

2     race?

3          A.     Yes.

4          Q.     But you were not employed by Allen's?

5          A.     No.

6          Q.     What would Mr. Whiteman have to do and how

7     could he support the claim that you have made that you

8     have been discriminated against on the basis of your

9     race by Allen's, since he was also employed by Bennett?

10         A.     Because he was the one that communicated

11    with Mr. Miller.

12         Q.     Mr. Whiteman communicated with Mr. Miller?

13         A.     Yes.

14         Q.     Do you know that for a fact?

15         A.     Well, I sent them down there.

16         Q.     What --

17         A.     To his office.  Do you want me to explain

18    the situation?

19         Q.     Yes, please do.  I need to explain what is

20    going on.

21         A.     Let's see, the 15th is Monday.  I would say

22    about the 11th of December 2003, a prior incident had

23    took place that Josh evidently was a witnesses of at the

24    job site.  And Mr. Miller called me, because I was the

B4

1    supervisor at the time, to tell Josh to report to his

2    office for a meeting when he came in.

3              And I gave Josh the order.  Josh refused.

4    And I asked Josh to please go, because I needed to leave

5    on time to pick my daughter up from school.  And then he

6    just laid into me, you know, just started arguing with

7    me, that I'm the supervisor and it's my job to have my

8    hide there and -- well, he used other words.  And before

9    that, he had came in fussing about --

10             Q.    He being Mr. Whiteman?

11             A.    Yeah, Mr. Whiteman, about they stopped his

12   medication.  And he was shaking, going into withdrawals,

13   and he was really angry when he came in.  When I told

14   him what Mr. Miller said, you know, he was already

15   irritated.  So anyway --

16             Q.    Excuse me.  I want to be sure I have this.

17   This is all occurring on the 11th of December?

18             A.    Yes.

19             Q.    Okay.  That is all I wanted to know.

20             A.    And so a driver came up to the window, and I

21   was -- Josh was still fussing.  So I went to attend to

22   the driver, and Josh pushed me.  And I punched him back

23   and told him:  Don't push me anymore.  Don't put your

24   hands on me.

1          And then he pushed me again.  And then I

2    pushed him again.  And then he pushed me into the file

3    cabinet and the CB radio.  And the windows were tinted,

4    and I asked the driver could he see, you know, him

5    pushing me.  And the driver said, no, he didn't see

6    anything.

7          But anyway, I called the police and reported

8    what happened.  Now, by the time the police got there,

9    Josh had went into the office with Mr. Miller.  And when

10   the police got there, I came into the office and I asked

11   for Josh.  I went down to Mr. Miller's office, which

12   before you get to his office, there's other offices.

13          And Ms. Eva, I told her what the problem

14   was, and she said:  Well, you know, you have permission

15   to go in there and interrupt the meeting.  The police

16   are here.  Just go in there.

17          So I went and I knocked.  I knocked, and I

18   went in and let Josh know that the police was here for

19   what had happened.  And the police took a statement.

20   And of course, Josh lied and said he never touched me.

21   And I didn't have any witnesses to prove it or anything,

22   because nobody saw nothing.

23          And so I felt really bad about it, because

24   when something like that happens -- you know, we are

42

1    supposed to be like a team.    Everybody is on the same

2    team, and it makes the whole team look bad.

3            So it bothered me all that night.    And I

4    called Josh's partner, Brother Lonnie, who is spiritual.

5    And so I talked to him about it.    And you know, I asked

6    him to maybe talk to Josh or, you know, I wanted him to

7    apologize.    But he had Josh call me.    And Josh called me

8    that same night, and he apologized.    And then after

9    that, I just remember -- and that was settled.

10            Then Mr. Miller had called a meeting with

11    Wayne and Mark on that Friday.    And my work schedule

12    then was Tuesday through Saturday.    And so they went in,

13    and they had their meeting.    They came out, and I

14    informed Mark and Wayne that Josh and I had worked

15    everything out and everything was okay.    And I didn't

16    press any charges further on him.    Then I finished my

17    work week out.

18            On December 15th -- which I'm off on Sundays

19    and Mondays -- that is when I received a message on my

20    answering machine not to report back to Allen's.    Do not

21    report back to that site.    If there are any belongings

22    that you have there, we will retain them.    But please do

23    not go back to that site.

24            Allen Foods was aware, you know, of this,

43

1    that I was not supposed to be on the property, like I

2    was some sort of plague or something, like I had really

3    done something wrong now.

4             So they had moved me, with nowhere to go.

5    But they didn't fire me.  So that is how I knew it

6    wasn't their decision to move me.

7         Q.    You have covered a lot of territory, and I

8    have a number of questions.  Let's start back on the

9    11th.  You said that Mr. Miller called you and wanted

10   you to have Mr. Whiteman report to his office?

11        A.    Yes, sir.

12        Q.    Did he tell you why?

13        A.    Just for a meeting.

14        Q.    Okay.  I'm sorry.  I don't mean to interrupt

15   you.  So you and Mr. Whiteman are in the security

16   trailer?

17        A.    The security office.

18        Q.    The security office.  It's been a while

19   since I have been at the facilities.  So the two of you

20   were at the security office.  You and Mr. Whiteman are

21   both in the office?

22        A.    Yes.

23        Q.    Mr. Miller calls down and says:  I would

24   like for you to send Mr. Whiteman up to see me?

44

1      A.    Mr. Whiteman hadn't gotten there yet.

2      Q.    He hadn't gotten there yet, so it is just

3  you?

4      A.    Me and my partner.

5      Q.    Who was that?

6      A.    I think it was -- golly day.  I want to say

7  it was -- I don't think it was -- I can't remember his

8  name, because he had just came on.  I can't remember

9  who -- or was it Joe Duncan?  I'm not sure who my

10  partner was then.  They switch off real quick.

11      Q.    Whoever it was, Mr. Miller is calling down

12  to you and your partner is in there with you, whoever

13  that might have been?

14      A.    Uh-huh.

15      Q.    And Mr. Miller is saying to you:  Send

16  Mr. Whiteman to my office?

17      A.    Yes.

18      Q.    Did he say why?

19      A.    He said:  I want to meet with him.  So when

20  he comes in, send him into the office.

21      Q.    So Mr. Whiteman hadn't been in yet?

22      A.    Correct.

23      Q.    Mr. Whiteman worked for Bennett?

24      A.    Yes.

45

1        Q.    And Mr. Miller never told you why he wanted

2    to see Mr. Whiteman?

3        A.    I'm not sure if Mr. Miller told me what it

4    was for.  But I just remember that -- I knew what was

5    going on, so he really didn't have to tell me.

6        Q.    You knew what was going on --

7        A.    Yeah.

8        Q.    -- when Mr. Miller first made the call down?

9        A.    Yes.

10        Q.    What was going on?

11        A.    Josh had witnessed an incident on the wash

12    pad with an Allen's Foods driver and an outside driver.

13    And they were arguing about the wash pad.  And Josh

14    witnessed it.  As a matter of fact, that day the outside

15    driver came in, too, for the meeting.

16        Q.    All right.  So that is what you are saying

17    you knew it was about.  You thought it was about this

18    incident with the two drivers?

19        A.    Right, right.

20        Q.    Okay.  And Mr. Whiteman had not been at work

21    yet?

22        A.    No.

23        Q.    Now Mr. Whiteman comes to work?

24        A.    Uh-huh.

B10

46

1          Q.    And you tell him to go to Mr. Miller's

2    office?

3          A.    Yes.

4          Q.    And that is when he says he's not going?

5          A.    Correct.

6          Q.    And after that occurred, is that when the

7    pushing and the shoving that you described started?

8          A.    Yes.

9          Q.    And when that started, tell me what you did.

10         A.    I called the police.

11         Q.    Which police?

12         A.    Lewes, Troop 4 in Lewes.

13         Q.    The state police?

14         A.    Yes.

15         Q.    Why did you call them?

16         A.    Because he put his hands on me.

17         Q.    So then you were pretty upset?

18         A.    Yes.

19         Q.    Did you let Mr. Miller know that you had

20    called the police?

21         A.    Yes.

22         Q.    When did you do that?

23         A.    Well, I was upset.  And I called Mr. Miller,

24    and I told him what happened.

47

1      Q.    When did you do that?  Before you called the

2    police or --

3      A.    After Josh, yeah, yeah.

4      Q.    Let me finish.  Did you tell him before you

5    called the police that you were going to call the

6    police, or did you tell him after you had called the

7    police that you had called the police?

8      A.    Let me think.

9      Q.    Sure.  Take your time.

10     A.    Everything was happening so fast.

11     Q.    Take your time.

12     A.    All I know was when Josh refused, I called

13   Mr. Miller and let him know.  Mr. Miller sounded a

14   little upset by that, but he didn't come down to -- you

15   know, bother to come down to see what was going on

16   himself.  And I'm not sure if -- I think I called my

17   boss for the police part.  I called my bosses.

18     Q.    Which would be Wayne and Mark?

19     A.    Wayne and Mark, yes, yeah, I did.  I called

20   them.  I don't think I called Mr. Miller about the

21   police incident.  I think it was my bosses that I

22   called, because I do remember the police talking to my

23   boss and telling him that he said he never touched her.

24     Q.    Just so I can understand what has occurred

48

1    now, when the pushing and shoving that you have

2    described between you and Mr. Whiteman starts --

3        A.    Uh-huh.

4        Q.    -- you call the police and then call Mark

5    and Wayne Keller?

6        A.    Yes.

7        Q.    And you then let them know that you called

8    the police and why?

9        A.    Yes.

10       Q.    Did you talk to them both or just one?

11       A.    It was always either one or the other.  It

12   was never both.

13       Q.    Okay.

14       A.    I can't remember if it was Mark or Wayne.

15   Like I said, everything was just happening so fast.  I

16   just know that I called them.  I know I called the

17   police.  I know the police talked to one of them, Mark

18   or Wayne, and told them about -- told them what Josh

19   told them.

20       Q.    I'm trying to get it narrowed down.

21   Regardless of who it was, regardless of whether it was

22   Mark or Wayne, when you called them and told them, I

23   have just called the police, did you tell them why you

24   had called the police?

49

1          A.    Yes.

2          Q.    What, if anything, did they say to you?

3          A.    Well, once I called the police, it was out

4     of their hands.

5          Q.    But you called the police.  From what you

6     told me, you talked to them.

7          A.    Yes.

8          Q.    You talked to one of them?

9          A.    Yeah, yeah.

10          Q.    What did they say?  What did he say, whoever

11     it was, whether it was Mark or Wayne?

12          A.    I can't remember exactly what he said.  He

13     just said:  Let the police handle it then.

14          Q.    Okay.  You don't have to remember exactly

15     what they said.

16          A.    Okay.

17          Q.    But basically, the message was:  Let the

18     police handle it?

19          A.    Yes.

20          Q.    Now, when the police came, where did they

21     come?  To the security office?

22          A.    Yeah.

23          Q.    Then if I understand you, did Mr. Whiteman

24     go up to see Mr. Miller --

50

1       A.      Uh-huh.

2       Q.      -- before the police arrived?

3       A.      Yeah, before the police got there.

4       Q.      So Mr. Whiteman finally does go up to see

5   Mr. Miller?

6       A.      Yeah.

7       Q.      And then the police arrive?

8       A.      Right.

9       Q.      And then do you and the officer go up to

10  Mr. Miller's office?

11      A.      Yes, sir.

12      Q.      Is that what you have testified to?

13      A.      Yes, sir.

14      Q.      Did you spend any time in the security

15  office with the police officer before you went to

16  Mr. Miller's office?

17      A.      Yes.

18      Q.      How long?

19      A.      I don't know.

20      Q.      A few minutes?  Five minutes or less?

21      A.      To give my statement, yes.

22      Q.      Did the police officer sit down and actually

23  take the statement from you in the security office?

24      A.      He stood up.

51

1       Q.    He stood up?

2       A.    Yes.  And after I told him what happened, he

3  wanted to go and talk to Josh, Mr. Whiteman.

4       Q.    Let's go back just a second.  He is talking

5  to you.  Is he taking the statement down as he is

6  talking to you, or is he just listening to what you are

7  saying?

8       A.    I'm not sure.  He wanted my name, my phone

9  number, and just basic information like that.  And there

10  was a police report, so --

11       Q.    I understand there may have been.  I'm just

12  trying to get the best of your recollection, if you can

13  remember, the officers and the security --

14       A.    He was writing it down.

15       Q.    He is writing down your statement?

16       A.    Yes.

17       Q.    So he may have been in with you in the

18  security office for five or ten minutes?

19       A.    Yes.

20       Q.    And Mr. Whiteman is not there?

21       A.    Right.

22       Q.    And then your recollection is that you and

23  the officer go up to Mr. Miller's office?

24       A.    Yes.

52

1      Q.    You both go in Mr. Miller's office?

2      A.    The policeman doesn't.  He stands at the

3    door.

4      Q.    You are in Mr. Miller's office.  Who else is

5    in there?

6      A.    Mr. Whiteman, Mr. Koster, Mr. Miller, and

7    me.

8      Q.    You were --

9      A.    I was just in the doorway.

10     Q.    You were in the doorway, so you weren't in?

11     A.    Right.

12     Q.    When you were in the doorway, what happened

13   then?

14     A.    I informed them that the police was here for

15   Josh Whiteman.

16     Q.    Okay.  And that would have been the first

17   time that Mr. Miller knew that the police were there?

18     A.    I assume, yeah.

19     Q.    You didn't call him.  You called Mark?

20     A.    I don't think I called Mr. Miller about it.

21     Q.    Okay.  No, just stop from that point on.

22     A.    Uh-huh.

23     Q.    The knowledge that Mr. Whiteman would have

24   would be then what you have just testified to, that he

53

1    was told by you to go see Mr. Miller?

2         A.    Uh-huh.

3         Q.    That he refused?

4         A.    Uh-huh.

5         Q.    That there was pushing and shoving?

6         A.    Uh-huh.

7         Q.    And that he eventually did go to

8    Mr. Miller's office?

9         A.    Uh-huh.

10        Q.    And he was in Mr. Miller's office when you

11   were outside the door and the policeman was outside the

12   door?

13        A.    Correct.

14        Q.    That is what he would know?

15        A.    Correct.

16        Q.    Would he know anything else?

17        A.    No.

18        Q.    Okay.  Because what you have also alleged is

19   that -- Well, before I ask you the question I was going

20   to ask, let me ask you this.  Can you tell me, at least

21   from your point of view, how that relates to your claim

22   that Allen's discriminated against you on the basis of

23   your race?

24        A.    Well, because Josh is a white man who went

54

1    down and told his side of the story, and nobody ever

2    asked me nothing.

3         Q.    But you were not in the meeting that

4    Mr. Whiteman was having with Mr. Miller and Mr. Koster?

5         A.    Right.

6         Q.    So Mr. Miller did not know that the police

7    had been called?

8         A.    Correct.

9         Q.    So what you told me earlier is you assumed,

10   because of this incident with the two drivers, that is

11   why Mr. Whiteman was --

12        A.    That is why Mr. Koster was there.

13        Q.    So that meeting was probably then about the

14   incident with the driver?

15        A.    Right.

16        Q.    It had nothing to do with the pushing and

17   shoving?

18        A.    Right.

19        Q.    So when you say Mr. Koster gave Mr. Whiteman

20   an opportunity to explain --

21        A.    Right.

22        Q.    -- Mr. Whiteman was not employed by Allen's.

23        A.    Right.

24        Q.    Do you know for a fact that Mr. Koster asked

55

1    Mr. Whiteman what happened?

2         A.    No.  I'm not going to say for a fact.  I'm

3    not going to say for a fact.  But it was an Allen

4    employee.

5         Q.    Who was an Allen employee?

6         A.    Ms. Valerie that works for Mr. Miller in his

7    office, she came down to the security office and

8    informed me that Mr. Miller and Mr. Whiteman had talked

9    about the incident.  And Mr. Miller was in the office

10   making statements that everything was my fault.

11        Q.    Now, let's --

12        A.    Ms. Valerie --

13        Q.    Now, we are talking about the 11th?

14        A.    Yes.  But no, that didn't happen on the 11th

15   when they said all of that.

16        Q.    We will get to all of this.  What I am

17   interested in is the 11th and what you already testified

18   occurred.

19        A.    Uh-huh.

20        Q.    The meeting that Mr. Whiteman would have

21   been in with Mr. Koster and Mr. Miller was dealing with

22   the drivers and --

23        A.    Right.

24        Q.    -- not about the incident that happened in

56

1    the trailer?

2         A.    Right.

3         Q.    And you weren't in that meeting?

4         A.    Right.

5         Q.    So you don't know what was said by anybody?

6         A.    No.

7         Q.    Do you know for a fact that Mr. Miller or

8    anyone from Allen's asked Mr. Whiteman what went on

9    between you and him in the security office?

10        A.    I wouldn't know for a fact.

11        Q.    You wouldn't know for a fact.  Okay.  Were

12   you ever in a meeting where Mr. Whiteman was asked to

13   explain what happened?

14        A.    No, sir.

15        Q.    So then the basis for your claim that

16   Mr. Whiteman was given an opportunity to explain his

17   situation to Mr. Miller is based on this woman Valerie?

18        A.    Ms. Valerie Brittingham.

19        Q.    Valerie B.  Okay.  We will come back to her

20   in a second.  So it's because of what Valerie said to

21   you that Mr. Whiteman was given an opportunity to

22   explain his situation to Mr. Miller?

23        A.    Yes.

24        Q.    And you were not afforded that opportunity?

57

1    A.    Correct.

2    Q.    That is what led you to say that Allen's

3    discriminated against you on the basis of race?

4    A.    She said that Mr. Miller is a racist.

5    Q.    She said Mr. Miller is a racist?

6    A.    Yes.

7    Q.    Is Valerie an African-American?

8    A.    Yes.

9    Q.    And she works for Mr. Miller?

10    A.    Yes.

11    Q.    What is her job, if you know?

12    A.    I'm not sure.  She works with Mr. Miller,

13    and it's the human resources department.

14    Q.    While we are on the subject -- so I don't

15    forget it -- when did Valerie tell you this?

16    A.    It had to be Friday.

17    Q.    Friday, which would have been --

18    A.    The 12th.

19    Q.    The 12th.  Okay.  And were you and Valerie

20    friends?

21    A.    I wouldn't say friends.  I just know her

22    from working there.

23    Q.    Tell me what happened, how she came to tell

24    you this.

1      A.    She just came to the office and said:  What

2   in the world happened?  Evidently, because the police

3   and everything was there, it got around quick about what

4   had happened.

5      Q.    Right.  I'm sure it would.

6      A.    So I explained what happened with me and

7   Josh.  And she said:  Well, he talked to Mr. Miller, and

8   Mr. Miller is down there telling everybody that

9   everything was your fault, and like, you know, I wasn't

10  capable of doing my job.  And I was:  Well, why in the

11  world would Mr. Miller say something like that about me?

12  And she was like:  Well, you know, he's a racist.

13     Q.    Does this occur in the morning or in the

14  afternoon?

15     A.    Probably in the -- it wasn't early in the

16  morning.  I got there at seven.  It was probably later

17  in the afternoon.

18     Q.    Okay.  So sometime after noon?

19     A.    Yeah, sometime between noon and three.

20     Q.    That is when you normally left the --

21     A.    Yeah, three.

22     Q.    Just let me see if I understand what you

23  have told me.  Sometime on the 12th of December, Friday,

24  Valerie, who works for Allen's, comes into the security

59

1    office --

2            A.      Yes.

3            Q.      -- and says to you:   What in the world

4    happened yesterday?

5            A.      Uh-huh.

6            Q.      Mr. Miller is telling them that you can't do

7    your job and so forth and so on?

8            A.      Yes.

9            Q.      Who was the them that he was telling?

10           A.      Them.

11           Q.      Them?

12           A.      Valerie, whoever was in the office, Valerie,

13   Ms. Eva, the other people in the office.

14           Q.      So Mr. Miller was telling Valerie?

15           A.      Yes.

16           Q.      Okay.   Who else?

17           A.      I'm not sure who else.   Valerie was the only

18   one who came back and told me what was being said.

19           Q.      And you mentioned an Eva?

20           A.      Well, Ms. Eva was there in the office.   She

21   works there.   But I don't know if she overheard anything

22   or not.   I never spoke with her.   I never questioned

23   anybody:   Did you hear if Mr. Miller said anything about

24   me?   I never even asked Valerie for the information.

60

1          Q.    Did you ever ask Mr. Keller whether

2     Mr. Miller said anything to him about your --

3          A.    No. But I know he had a meeting on me

4     Friday.

5          Q.    My question is did you ever ask Mr. Keller?

6          A.    No.

7          Q.    Did you ever ask Mark?

8          A.    No.

9          Q.    Now, that covers that. You have also made a

10    claim against Allen's that we have interfered -- and the

11    word is tortiously interfered -- with the employment

12    contract that you have with Bennett?

13         A.    Yes.

14         Q.    Do you have an employment contract with

15    Bennett?

16              MR. FLETCHER:  Well, that is a legal

17    question, isn't it?

18              MR. BREWER:  I want to know if she has a

19    contract, because if she does, I would like to see it.

20              MR. FLETCHER:  Well, do you mean does she

21    have a written contract?

22              MR. BREWER:  Oh, yes.  Well, it says

23    tortiously interfered with an employment contract.  That

24    is how the Complaint is phrased.

102

1   anything.

2        Q.    All right.  And did you ask him if he could

3   look for something else for you at a different location?

4        A.    Did I ask?  I don't think I asked.  I think

5   he said at the time:  Right now I don't have anything.

6   But I was to call him on a daily basis until something

7   came up.  If something came up, he would definitely let

8   me know.

9        Q.    Having worked at Bennett for two and a half

10  years, you understand that from time to time security

11  guards were reassigned to different locations, correct?

12       A.    Yes.

13       Q.    And in fact, you had seen that happen?

14       A.    Yes.

15       Q.    Had you ever been reassigned in the two and

16  a half years?

17       A.    No, three years, never.

18       Q.    Were you hired July 30th of '01?

19       A.    Yes -- August, August 30th.

20       Q.    August 1st of '01?

21       A.    Yeah.

22       Q.    And this all happened in December of '03,

23  correct?

24       A.    Yeah.

1          Q.     So you were employed by Bennett throughout

2     that time frame, correct?

3          A.     Through 2004.

4          Q.     When in 2004 were you employed by Bennett?

5          A.     Well, I put my notice in, two weeks' notice.

6     So my two weeks' notice was -- I guess I would have had

7     to work for them a little bit in January.  I'm not sure.

8          Q.     You don't really recall?

9          A.     I got a W-2 form.  Or is that for 2003?

10    That can't be for 2003, because I worked longer than

11    that.

12         Q.     There is a W-2 form, Exhibit 2, for 2004,

13    showing $56 in wages, tips, and other compensation.

14         A.     And what year is that for?  2004?  So that

15    meant that I had to work there the first week maybe.

16         Q.     Well, it means you were given a W-2 form for

17    wages apparently earned in 2004.

18         A.     Right, so maybe a job for one or two days or

19    something like that at the court, one day.  I don't

20    know.

21         Q.     Do you recall whether you worked anywhere at

22    all for Bennett after the 15th of December of '03?

23         A.     Yes, Georgetown Family Court.

24         Q.     All right.  Have you had a chance to look at

104

1    any of the information that Bennett provided to the

2    Department of Labor in connection with your claim?

3          A.    No, sir.

4          Q.    You have never looked at any of that?

5          A.    No, sir.

6          Q.    Now, at some point in December, Mr. Keller

7    did offer you a 32-hour a week job at the Perdue plant

8    in Milford; is that right?

9          A.    Yes.

10         Q.    And do you recall, by any chance, the day of

11   the week that he offered you that job?

12         A.    Well, he actually told me -- My social

13   worker called him for me to ask him when were they going

14   to send me back to work.  At the time my husband and I

15   weren't together.  And I was trying to get assistance

16   for me and my kids.

17                And the social worker, Ms. -- I'm not good

18   with last names.  But anyway, the lady called him and

19   asked him when was he going to give me some work.  How

20   soon would I be back to work?

21                And then all of a sudden, they had a job.

22   They never called me.  But they told her:  Well, we can

23   put her at Perdue for 32 hours a week.  And that was

24   even a day short from my regular schedule.  And so it

1    was Perdue in Milford.

2              And she asked him how soon would I start?

3    And he told her -- I'm not sure what they had told her.

4    But anyway, when I was -- Okay.  So then I was assigned

5    that job, and I got sick.  And I called out and I said:

6    I'm not going to be able to make it the first day, but I

7    should be all right to come in the next day.

8              But on the day I was sick, I think it was --

9    it might have been on a day I was sick.  I got a call at

10   home.  And Mark said:  Robin, don't report to the job at

11   Perdue.  We got a better job.  We are going to send you

12   to Georgetown Family Court.

13        Q.    Do you recall whether the Perdue job, in

14   those conversations between Bennett and the social

15   worker -- if that is who spoke to them --

16        A.    Ms. Roseanne Eckels, that is her name.

17        Q.    Do you recall if they occurred during the

18   week of the 15th and, in fact, you were supposed to show

19   up for training on the 19th and 20th at the Perdue

20   plant?

21        A.    Okay.  Possibly, I think it was a Thursday

22   or a Friday that she talked with him.  I was in her

23   office.

24        Q.    And you got sick and couldn't report to work

106

1    before you got training?

2         A.    The -- yeah, the first day of the training.

3         Q.    And then do you recall that the following

4    Monday is when you were offered the job at Family Court?

5         A.    I think so.

6         Q.    And do you recall being asked to go in and

7    train at the Family Court position on December 23rd and

8    24th?

9         A.    That could be it.

10        Q.    And do you recall actually doing that?

11        A.    Yes.

12        Q.    So you worked there at Family Court the 23rd

13   and the 24th?

14        A.    Yes.

15        Q.    And then do you recall being off for five

16   days because the court was closed for the Christmas

17   holiday?

18        A.    Yes, yes.

19        Q.    Do you recall showing up on the 29th, and

20   the officer who you had been replacing had returned to

21   work because either he or she had been sick?

22        A.    Yes.

23        Q.    And that is why they were out, and now they

24   were back at the job on the 29th?

107

1          A.     Yes.

2          Q.     Do you recall talking to Mr. Keller at that

3    point and him telling you that he was going to try to

4    find you other work?

5          A.     I think so, yeah.

6          Q.     Do you recall him telling you that since it

7    was New Year's, a lot of sites were shut down and it may

8    take a few days before he could get you another position

9    at another location?

10         A.     I don't recall it.  It's possible.

11         Q.     Do you recall any conversation along those

12   lines?

13         A.     All I was told was to call in every day to

14   see if there was any work.

15         Q.     Do you recall calling on Monday,

16   January 5th, and telling them that you were resigning

17   that day?

18         A.     Putting in my two weeks' notice, yeah.

19         Q.     Do you recall also being told that you could

20   apply for unemployment and be given unemployment

21   compensation?

22         A.     They never told me that.

23         Q.     They didn't tell you that?

24         A.     As a matter of fact, they tried to keep me



1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROBIN D. NICHOLS,                          )
     Plaintiff,                          )
                                 )
          v.                          ) C.A. No.
                                 ) 05-555 (KAJ)
BENNETT DETECTIVE & PROTECTIVE     )
AGENCY, INC., a Delaware corporation,)
and ALLEN'S FAMILY FOODS, INC., a     )
Delaware corporation,                      )
     Defendants.                          )

          Deposition of **RAYMOND GREGORY MILLER**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Schmittinger & Rodriguez, 414 South State
Street, Dover, Delaware, on Wednesday, December 7, 2005,
beginning at 2:45 p.m.

APPEARANCES:

     SCHMITTINGER & RODRIGUEZ
     BY:  ADAM C. GERBER, ESQUIRE
     414 South State Street
     Dover, Delaware  19901
     Attorney for Plaintiff.

     MURPHY, SPADARO & LANDON
     BY:  ROGER D. LANDON, ESQUIRE
     1011 Centre Road
     Number 210
     Wilmington, Delaware  19805
     Attorney for Defendant
     Bennett Detective & Protective Agency, Inc.

                (Appearances Cont'd...)

**ORIGINAL RETAINED BY ADAM C. GERBER, ESQUIRE**

_____

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

B32

2

```
 1      APPEARANCES (Cont'd):

 2          SHAWE & ROSENTHAL
            BY:  ARTHUR M. BREWER, ESQUIRE
 3          and LAURA A. PIERSON SCHEINBERG, ESQUIRE
            20 South Charles Street
 4          11th Floor
            Baltimore, Maryland  21201
 5          Attorneys for Defendant
            Allen's Family Foods, Inc.
 6
        ALSO PRESENT:
 7
            MR. WAYNE KELLER,
 8          Bennett Detective & Protective Agency, Inc.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

4

1   21804.

2        Q.    Are you married?

3        A.    Yes.

4        Q.    Do you have children?

5        A.    Yes.

6        Q.    Now, if I could, let's go through some of

7   your educational background.  What is the highest level

8   of education you have completed?

9        A.    Undergraduate degree.

10       Q.    Undergraduate?

11       A.    Yes.

12       Q.    Where was that?

13       A.    East State Tennessee University.

14       Q.    What was that degree in?

15       A.    Business economics.

16       Q.    Okay.  Now, what is your current position?

17  I understand you are employed by Allen's Foods.  What is

18  your current title?

19       A.    Well, manager of human resources for the

20  Harbeson, Delaware plant.

21       Q.    How long have you held that particular

22  position?

23       A.    I have been in Harbeson nine years.

24       Q.    Okay.  Were you always, for those nine

14

1    BY MR. GERBER:

2          Q.    Now, at some point after this incident, did

3    you meet with Mr. Keller and Mr. Habicht --

4          A.    Yes.

5          Q.    -- concerning the incident?

6          A.    Yes.

7          Q.    Now, between the incident and that meeting,

8    had you spoken to Mr. Whiteman?

9          A.    No.

10         Q.    Just for the record, Mr. Whiteman is a white

11   male, and Robin Nichols is an African-American female,

12   correct?

13         A.    That's correct.

14         Q.    When was this meeting with Mr. Keller and

15   Mr. Habicht about the incident?  When was that meeting

16   held?

17         A.    The following day.

18         Q.    On that Friday?

19         A.    Yes.

20         Q.    And at that meeting did you discuss the

21   roles of Plaintiff and Ms. Nichols and Mr. Whiteman in

22   the altercation?

23         A.    We discussed the incident.

24         Q.    Okay.  Do you remember telling them the

15

1    details of who started the incident, how it may have

2    escalated, what exactly happened?

3         A.    I believe at that point they were aware of

4    the incident and the details.  My concern was the fact

5    that the state police were called.  That created kind of

6    a disruptive environment.  And when you hear about these

7    things out of the blue, you don't know if some act of

8    violence may have taken place or just exactly what, if

9    somebody got hurt on the job.  You just don't know.  And

10   so that was my concern.

11        Q.    Sure.  Do you mean whenever the state police

12   was called, that was your concern?

13        A.    Right.

14        Q.    And did you discuss these concerns, also, at

15   the meeting with the two individuals with Bennett?

16        A.    I did.

17        Q.    Do you happen to know how they were made

18   aware of the incident?

19        A.    I called them, from my perspective, the

20   evening of the incident or the afternoon of the incident

21   and made them aware.

22        Q.    In that conversation on the evening after

23   the incident, what did you tell them?  What did you tell

24   them then?

16

1        A.      Just what I reiterated earlier, that the

2   event was disruptive.   It was an internal conflict

3   between their staff, and it needed to -- they needed to

4   be aware of it and deal with it.

5        Q.      And then you set up to meet with them the

6   next day?

7        A.      Yes.

8        Q.      Was that your idea or theirs to meet?

9        A.      It was theirs.

10       Q.      Okay.  Now, at the meeting you described to

11  them the details of the incident from your

12  understanding?  Correct?

13       A.      Correct.

14       Q.      And that understanding was based on your

15  conversation with Ms. Nichols only?

16       A.      That's correct.

17       Q.      At that point she was the only person you

18  had discussed the incident with?  She was the only

19  individual who had told you what happened in the

20  incident?

21       A.      That's correct.

22       Q.      And as far as you know, there are no other

23  witnesses besides Mr. Whiteman and Ms. Nichols to this

24  incident?

39

1    vice president of human resources.

2         Q.    Who was that in December of '03?

3         A.    Her name is Tracy Morris.

4         Q.    Is she still there?

5         A.    Yes, she is.

6               MR. LANDON:   Can I take a moment?

7               (Following a brief recess:)

8               MR. LANDON:   I have no further questions.

9    BY MR. BREWER:

10        Q.    Mr. Miller, I just have one question.   I

11   want to make sure I understood your testimony.   Did you

12   request that Ms. Nichols be removed from Harbeson?

13        A.    No, sir.

14              MR. BREWER:   That is all I have.   We will

15   waive read and signing.

16   BY MR. GERBER:

17        Q.    Mr. Miller, I just want to ask you, Tracy

18   Morris, is she your supervisor or directly above you?

19   Is that correct?

20        A.    That's correct.

21        Q.    Did you ever make a report to her about this

22   incident at all?   Was she made aware of it?

23        A.    No, she was not.

24        Q.    And at the point where Wayne and Mark

40

1    suggested to you that they could make a change, did you

2    feel at that point that you had the power to make the

3    decision as to whether or not Ms. Nichols was to be

4    transferred?  That was essentially in your hands?

5         A.    No.

6         Q.    You felt that they were going to do that no

7    matter what you said?

8         A.    Well, they made the offer, and I accepted

9    it.

10              MR. GERBER:  Okay.  That is all.

11              (Presentation, reading, and signature to the

12   deposition were waived.)

13

14                    INDEX TO TESTIMONY

15   WITNESS                                          PAGE
     GREGORY MILLER
16        Examination by Mr. Gerber                    3
          Examination by Mr. Landon                    23
17        Examination by Mr. Brewer                    39
          Further Examination by Mr. Gerber            39

18

19

20

21

22

23

24

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROBIN D. NICHOLS,                        )
                                         )
            Plaintiff,                   )
                                         ) Civil Action
v.                                       ) No. 05-555
                                         )
BENNETT DETECTIVE & PROTECTIVE           )
AGENCY, INC., a Delaware corporation,    )
and ALLEN'S FAMILY FOODS, INC.,          )
a Delaware corporation,                  )
                                         )
            Defendants.                  )


            Deposition of MARK HABICHT, taken
pursuant to notice at the law offices of
Schmittinger & Rodriguez, 414 South State Street,
Dover, Delaware, beginning at 11:05 a.m., on Friday,
January 6, 2006, before Dale C. Hawkins, Registered
Merit Reporter and Notary Public.


APPEARANCES:

            ADAM C. GERBER, ESQ.
            SCHMITTINGER & RODRIGUEZ, P.A.
             414 South State Street
             Dover, Delaware   19903
             for the Plaintiff


            ROGER D. LANDON, ESQ.
            MURPHY, SPADARO & LANDON
             1011 Centre Road, Suite 210
             Wilmington, Delaware   19805
             for the Defendant
             Bennett Detective & Protective Agency

2

APPEARANCES (Cont'd):


            ARTHUR M. BREWER, ESQ.
            LAURA A. PIERSON SCHEINBERG, ESQ.
            SHAWE & ROSENTHAL, LLP
             20 South Charles Street, 11th Floor
             Baltimore, Maryland  21201
             for the Defendant
             Allen's Family Foods, Inc.




ALSO PRESENT:
            Mr. Greg Miller
            Ms. Valerie Brittingham
            Mr. Wayne Keller

1          Q.   And just generally, what does that

2     position entail, if you give me a brief

3     description?

4          A.   Just to oversee pretty much

5     anything that comes up, problems, you know, put

6     down fires.  I do the payroll for the company,

7     the invoicing, scheduling, whatever comes up on

8     a day-to-day basis, you know, customer

9     complaint, you know, I get involved in that.

10         Q.   Okay.  How are your duties related

11    to the human resources, the personnel?

12         A.   There is three people in our

13    corporate office, myself, Mr. Keller and

14    Mr. Bennett.  And Mr. Keller and I pretty much

15    handle -- we don't have a human resources

16    section, it's not a big enough company to have

17    specialized management, so all of our positions

18    are entry level, all our security officers are

19    entry level, so the hiring process is

20    essentially the same for everyone that wants to

21    apply with our company.

22         Q.   I see.  I'll try not to interrupt

23    you.

24              There is no separate human

1    resources department?

2            A.    No, we don't have a human

3    resources manager or director so to speak.

4            Q.    Okay.    How many people currently

5    approximately are employed by Bennett?

6            A.    I would say around 140.

7            Q.    140?

8            A.    Yeah, approximately.    Just -- I

9    could get you the exact number if you needed it,

10   but it just depends on how many contracts we

11   have at the time.

12           Q.    As regards to that, approximately

13   how many different contracts are there

14   generally, or --

15           A.    A rough estimate based on the

16   amount of invoices we send out I would say

17   between fifty and fifty-five.

18           Q.    Mr. Bennett, is he the president?

19           A.    President and owner.

20           Q.    Okay.    If we could backtrack a

21   little bit, what's your prior work experience

22   before June of 1998?

23           A.    I spent six months working for the

24   State of Delaware as an investigator for the

1          Q.    Just talking a little bit more

2     about the structure of the company, do you

3     oversee certain individuals directly underneath

4     you?

5          A.    There would be I would consider it

6     another layer of supervision underneath me

7     between myself and our actual security officers,

8     our New Castle supervisor and our supervisor who

9     runs our Salisbury, Maryland operation.

10         Q.    What are their names?

11         A.    Ron Getry in New Castle and Jim

12    Harrington in Salisbury.

13         Q.    Turning now to this specific

14    arrangement between Allen's Family Foods and

15    Bennett Security, what type of arrangement is

16    that?  Is there a contract?

17         A.    There is a contract, yes.

18         Q.    I have a copy that I would like

19    you to look at.

20              (Habicht Deposition Exhibit No. 1

21    was marked for identification.)

22    BY MR. GERBER:

23         Q.    Does this two-page document, is

24    this an accurate representation of the contract,