1    a copy of the contract?

2              A.    Yes, it appears to be.

3              Q.    The current contract?

4              A.    Yes, it appears to be, yeah.

5              Q.    This is a contract signed on

6    February 11, 2003?

7              A.    (Witness nodded.)

8              Q.    Who signed this contract?

9              A.    It was signed by E. Bradford

10   Bennett, the president, witnessed by Mr. Keller.

11             Q.    That's Mr. Bennett?

12             A.    Yes.

13             Q.    Now, I just want to look at one

14   paragraph essentially in this contract.  It's

15   paragraph number one, which states that,

16   "Bennett shall furnish unarmed, uniformed

17   security officers in numbers as may from time to

18   time be designated by AFF."  That's Allen's

19   Family Foods; correct?

20             A.    Yes.

21             Q.    And that's what the contract says

22   in paragraph one, just to clarify that for the

23   record?

24             A.    Sure.

B45

1    supervisor?

2         A.    Right.   And she had asked that we

3    -- she was normally working Sunday through

4    Thursday, if I remember correctly, and she

5    wanted to work Tuesday through Saturday because

6    she wanted to go to church, so we accommodated

7    her with that because, you know, we wanted her

8    to be the supervisor.

9         Q.    Okay.   You may have already seen

10   this, but I want to show you a copy of a police

11   report, crime report.   It's dated December 11th,

12   2003.

13              (Habicht Deposition Exhibit No. 2

14   was marked for identification.)

15   BY MR. GERBER:

16        Q.    I now just want to talk about the

17   incident that resulted -- that's the need for

18   this crime report.   Have you seen a copy of this

19   before?

20        A.    I don't recall seeing this before,

21   no.

22        Q.    This incident involves the

23   plaintiff, and it is an altercation with another

24   employee.   Do you remember how you first heard

B46

1     about this incident involving Ms. Nichols and

2     this incident in December?

3          A.   I remember having a telephone

4     conversation with Greg Miller regarding the

5     incident.

6          Q.   Okay.  When was that, do you know?

7          A.   On the day of the incident,

8     December 11th, 2003.

9          Q.   Was that in the evening or in the

10    afternoon?

11         A.   It was in the afternoon.

12         Q.   And who was the other employee

13    involved?

14         A.   Joseph Whiteman.

15         Q.   That's on the police report.  Is

16    that your recollection?

17         A.   Yes, his name just slipped my mind

18    for a minute.

19         Q.   That's fine.

20              Now, before this conversation, you

21    knew Mr. Miller as the point of contact at

22    Allen's?

23         A.   Yes, I have spoken to Mr. Miller

24    several times.

1    called Mr. Keller on his cell phone and

2    explained to him, you know, we need to talk

3    about something when you get back here, so I

4    want to make sure we hooked up and I briefed him

5    on what was going on.

6         Q.   Okay.  And then you set up the

7    appointment for the next morning, that would be

8    December 12th?

9         A.   Yes.

10        Q.   And you went down to Harbeson?

11        A.   Yes.

12        Q.   With anyone, with Mr. Keller?

13        A.   Mr. Keller and I both went to

14   Harbeson the next day.

15        Q.   And you met with Mr. Miller?

16        A.   That's correct.

17        Q.   Just the three of you?

18        A.   Yes.

19        Q.   Did you make a record of any of

20   your conversations on December 11th, that

21   afternoon, evening of the incident?

22        A.   You mean a written record?

23        Q.   Yes.

24        A.   No.

1          Q.    Did you make any record of the

2    meeting, then, on the morning of the 12th?

3          A.    No.

4          Q.    Do you know if there is any

5    written record?

6          A.    Not that I'm aware of.

7          Q.    Okay.  What happened at that

8    meeting, what was discussed?

9          A.    Basically went over what had

10   happened and, you know, I know that Mr. Miller

11   was upset about what had happened, the fact that

12   the state police had responded to the plant and

13   apparently he didn't know about it and this is

14   the second time it happened.

15              And, you know, my recollection is

16   that, you know, he reiterated the fact that she

17   had to go, that he couldn't have that kind of

18   activity going on in his plant, it was too

19   disruptive.

20              So we had asked if it would be

21   possible to have Robin work out her shift which

22   ended on Saturday and then Mr. Keller would call

23   Robin on one of her days off, probably on Monday

24   to let her know that she couldn't go back.  We

```
1     didn't want to exacerbate the situation by

2     telling her right then and there that she

3     couldn't come back, and we figured we would just

4     let things go as they were.  We would try to

5     keep Mr. Whiteman away from her by asking him

6     just to wait in his car until Robin left because

7     he was the relief at three o'clock.

8              And so she finished out her week

9     up through Saturday without incident, and then

10    she took her days off Sunday and Monday.

11         Q.   Okay.  I want to come back to that

12    in just a minute.  I first want to ask you,

13    whenever you talked to Mr. Miller on the phone

14    right after the incident, did he tell you who

15    was responsible for this altercation, who

16    started it?

17         A.   No.

18         Q.   All he really said at that point

19    was something to the effect of she's got to go?

20         A.    Well, I mean, there was some

21    discussion about the incident, he just didn't

22    call up and say, you know, out of the clear blue

23    skies.  I mean, there was talk about, you know,

24    an incident between Whiteman and Robin and the
```

1    fact that he called out there and like I said,

2    you know, she picked up the phone, they kept

3    slamming it down and he could hear yelling in

4    the background and he wasn't happy about that,

5    apparently.

6          Q.   Then at the meeting the next

7    morning, did you further discuss who might have

8    been responsible for this altercation?

9          A.   I don't remember discussing

10   assigning blame to anyone.

11         Q.   Okay.  So then if you weren't

12   really assigning blame to anyone, how did you

13   come to the decision to remove Ms. Nichols from

14   the situation?

15         A.   I wouldn't say that it was my

16   decision or Bennett Security's decision, we were

17   asked to remove her from the site.

18         Q.   You were specifically asked to

19   remove Ms. Nichols?

20         A.   If it was okay for her to stay

21   there, she may still work there up until the end

22   of the contract.  Like I said earlier, we're not

23   in the habit of removing people from a job site

24   just to move them.

1          Q.   But if someone, if a company with

2    whom you have a contract ask you to remove

3    someone, you try --

4          A.   Absolutely, not only in the case

5    of Allen Harbeson, but other locations routinely

6    throughout our company when a customer ask us to

7    replace someone, we do it, but we don't do that

8    on our own or unilaterally.

9          Q.   Did you conduct any investigation

10   on your own, anymore investigation into the

11   incident?

12         A.   No.

13         Q.   You didn't talk to Ms. Nichols

14   about it?

15         A.   I didn't.

16         Q.   Did anyone from Bennett's?

17         A.   I don't know.  I know I didn't.

18         Q.   Okay.  Did anyone talk to

19   Mr. Whiteman?

20         A.   I don't know.  I didn't talk to

21   Mr. Whiteman.

22         Q.   You're basically just relying on

23   Mr. Miller's request to remove Ms. Nichols?

24         A.   Yes.  I mean, at other job sites

1    we have had customers ask us to remove people

2    for nonperformance, bad performance.  You know,

3    it's their property and if they don't want

4    someone there, they want someone removed or

5    replaced, we accommodate them, or else we don't

6    keep the business, we lose the contract.

7             Q.   Now, this meeting on the 12th, did

8    you discuss with Mr. Miller any other possible

9    options as far as assigning Ms. Nichols

10   somewhere else, or even somewhere within

11   Allen's?

12            A.   Well, first of all, I don't think

13   we would ever suggest reassigning her within

14   Allen's.  I don't know if we discussed with him

15   what our future plans were for Robin, but I

16   would say in most cases, our goal is to -- I

17   mean, sometimes in some places it's not a good

18   fit for our employee and our customer, and since

19   we do have numerous work locations, it is easier

20   to relocate people when our customer ask us to.

21   And I think that was our goal, I know that was

22   our goal with Ms. Nichols.

23            Q.   Okay.  Do you know when

24   Mr. Whiteman was hired?

```
 1              A.   No, I don't, without looking at

 2      his file.

 3              Q.   Generally do you have an idea?

 4              A.   No, not even generally, to be

 5      honest with you.

 6              Q.   Do you remember ever having any

 7      disciplinary, any discipline problems with him?

 8              A.   I don't remember any, no.

 9              Q.   What was his position at the time

10      of this altercation?

11              A.   Security officer.

12              Q.   So he was not a supervisor?

13              A.   No.

14              Q.   Is he still with Bennett?

15              A.   No.

16              Q.   Why did he leave?

17              A.   Without looking at his personnel

18      file, I can't be specific.

19              Q.   Do you know about when he left?

20              A.   No.

21              Q.   Do you remember if he was

22      terminated, if his employment was terminated or

23      did he resign?

24              A.   Without looking at his termination
```

```
 1    paperwork, I can't answer that.

 2              Q.   Did this incident with Ms. Nichols

 3    affect his employment status in any way that you

 4    know of?

 5              A.   No.

 6              Q.   No?

 7                   Did you conduct any further

 8    investigation into this incident?

 9              A.   No.

10              Q.   There were no other witnesses to

11    speak to?

12              A.   No.

13              Q.   Who in your opinion was

14    responsible for starting that altercation?

15              A.   I don't have enough information to

16    answer that.

17              Q.   The only information you have is

18    from Mr. Miller?

19                   What was the official, if there

20    was an official course of action taken against

21    Ms. Nichols?

22                   MR. LANDON:  Object to the form of

23    the question.

24              Q.   Was there a specific disciplinary
```

B 55

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


ROBIN D. NICHOLS,                    )
                                     )
            Plaintiff,               )
                                     ) Civil Action
v.                                   ) No. 05-555
                                     )
BENNETT DETECTIVE & PROTECTIVE       )
AGENCY, INC., a Delaware corporation, )
and ALLEN'S FAMILY FOODS, INC.,      )
a Delaware corporation,              )
                                     )
            Defendants.              )



          Deposition of WAYNE A. KELLER, taken
pursuant to notice at the law offices of
Schmittinger & Rodriguez, 414 South State Street,
Dover, Delaware, beginning at 12:06 p.m., on Friday,
January 6, 2006, before Dale C. Hawkins, Registered
Merit Reporter and Notary Public.


APPEARANCES:


          ADAM C. GERBER, ESQ.
          SCHMITTINGER & RODRIGUEZ, P.A.
          414 South State Street
          Dover, Delaware    19903
          for the Plaintiff


          ROGER D. LANDON, ESQ.
          MURPHY, SPADARO & LANDON
          1011 Centre Road, Suite 210
          Wilmington, Delaware    19805
          for the Defendant
          Bennett Detective & Protective Agency

APPEARANCES (Cont'd):

        ARTHUR M. BREWER, ESQ.
        LAURA A. PIERSON SCHEINBERG, ESQ.
        SHAWE & ROSENTHAL, LLP
         20 South Charles Street, 11th Floor
         Baltimore, Maryland  21201
         for the Defendant
         Allen's Family Foods, Inc.

ALSO PRESENT:
        Mr. Greg Miller
        Ms. Valerie Brittingham
        Mr. Mark Habicht

```
 1    it's in here.  Yes, contract may be terminated

 2    following thirty days written notice by either

 3    party of the other party's intention to

 4    terminate paragraph eight.  Yes, I think that's

 5    what it says.

 6          Q.   Now, I just want to turn directly

 7    to Ms. Nichols specifically.  Do you remember

 8    approximately when she was hired?

 9          A.   7/30/01.

10          Q.   So you remember specifically.

11               Did you play a role in her hiring?

12          A.   One of us, we were both probably

13    in the office that day because I don't know who

14    signed.  We have obviously employment forms, and

15    they have been in the disclosure packet, I

16    believe.  I don't know which one of us, but I

17    think I recall Robin had been in and out of our

18    office on different occasions picking up forms,

19    if she was in Dover she would stop by, so it

20    could have been either both of us, but yes, I

21    remember when she came on board.

22          Q.   Where is your office?

23          A.   In Dover, it's the Sorentino's

24    Restaurant now, there is a brick house in the
```

1     Q.    Okay.

2     A.    It's in the notes.

3     Q.    Was there any, ever any

4  disciplinary action taken --

5     A.    Robin was a victim, so there was

6  no action taken against Robin.  No, she was a

7  victim.

8     Q.    And at some point was Robin

9  promoted in Bennett's?

10    A.    Yes, she started out -- she might

11 have been one of the original security officers

12 when we received the Allen's contract, and when

13 I believe she replaced our original supervisor,

14 Kenny Cresage.

15    Q.    When was she promoted, do you

16 remember?

17    A.    No, I don't remember that.

18    Q.    So she had up until December 2003,

19 she had been there for --

20    A.    From 7/30/01 when she was hired,

21 that was the only site she worked at until such

22 time of the incident.

23    Q.    You said that was almost the

24 duration of the contract with that site with

1   Allen's?

2          A.   No, it went on for longer after

3   Ms. Nichols left.

4          Q.   That was the near the beginning of

5   the contract?

6          A.   Yes.

7          Q.   Okay.   We've also discussed the

8   altercation between Ms. Nichols and

9   Mr. Whiteman.

10          A.   Yes.

11          Q.   How did you find out about that

12   altercation?

13          A.   I was in Maryland either visiting

14   clients, fingerprinting security officers, and

15   Mr. Habicht called me on the company cell phone

16   and related that there had been an incident and

17   made an -- that he had made an appointment to

18   see Mr. Miller and that he wanted Robin

19   replaced.

20          Q.   And that was the afternoon right

21   after the incident?

22          A.   I don't know when the incident

23   happened.   I was on the road like I said, but

24   Mr. Habicht probably would have called me

1    shortly after talking with Mr. Bennett.

2              Q.    So you just stated Mr. Habicht

3    told you that Mr. Miller wanted Ms. Nichols --

4              A.    Absolutely.

5              Q.    -- to be --

6              A.    Mr. Habicht said he was

7    displeased.

8              Q.    Wanted her transferred.  Okay?

9              A.    I don't think he cared whether she

10   was transferred or not, he just didn't want her

11   on his property.

12             Q.    Okay.  Did you ever learn, or did

13   Mr. Habicht tell you who might have been

14   responsible for the incident, give you any

15   specifics?

16             A.    Not at that time.  Maybe when I

17   came back later that afternoon.

18             Q.    Did Mr. Habicht tell you that

19   Mr. Miller said something to the effect of she's

20   got to go?

21             A.    Yes, exactly.

22             Q.    Did you also learn -- when did you

23   learn that the police had been called?

24             A.    Probably when I got back to the

1    office that night, because I'm not sure -- I

2    know the police had responded and I don't

3    remember if they called our office.  Somebody

4    from down there called the office and was --

5    said that the police had responded but that they

6    weren't going to charge anybody.

7            Q.   Okay.  And then you did meet the

8    next morning with Mr. Miller?

9            A.   Yes, I did.

10           Q.   That was you and Mr. Habicht and

11   Mr. Miller?

12           A.   That's correct, the three of us.

13           Q.   Where did you meet?

14           A.   In Mr. Miller's office, Harbeson

15   plant.

16           Q.   What did Mr. Miller tell you in

17   that meeting specifically about the incident?

18           A.   I remember very clearly we got

19   there and you have to basically be signed in, so

20   we went to the guardhouse, they called in, we

21   walked down to Mr. Miller's office, waited

22   outside in the foyer for a little while and then

23   he came and got us, we walked in.  We sat down

24   and he looked at us and he said I like you guys,

 1    she's got to go.  And that was the opening of

 2    the meeting.

 3          Q.   That was the first thing he said?

 4          A.   How you doing, you know,

 5    pleasantries like that, but I remember that

 6    specifically because you have to understand, in

 7    our company, obviously Robin had been there a

 8    long while.  She had done at least an adequate

 9    job in our opinion.

10          Now, granted, she reports to

11    Mr. Miller for her daily issues.  If they wanted

12    to change how they did business, he wouldn't

13    necessarily call us, he would talk to the site

14    supervisor, which Robin was.  If they were

15    changing procedures or those types of things,

16    visitors coming, those types of things, they

17    interfaced more with her than we did obviously

18    on a daily basis.

19          And I lost track of where I was

20    with our question.  I'm sorry.

21          Q.   That's fine.

22          After he asked, started out by

23    asking that she be removed, did he give you more

24    details about the incident, for example, who was

1    responsible, who started the incident?

2              A.    I remember him saying that the

3    phone had been picked up and put down a couple

4    of times and that he had explained that I think

5    the day on the 11th what he wanted was

6    Mr. Whiteman actually to come down to his office

7    because there was an issue that Mr. Whiteman had

8    seen involving a couple of the truck drivers, to

9    the best of my knowledge, and that -- but never

10   really did he say who started the fight, I don't

11   think, that I remember, just that he was unhappy

12   that Robin had slammed the phone down a couple

13   of times, and he said she had to go.

14             Q.    Do you know how long Mr. Whiteman

15   had been with Bennett at that point?

16             A.    He was hired I believe in

17   November, mid November, maybe, of '03.  So he

18   had been there at that time maybe a month.

19             Q.    Maybe only a month?

20             A.    Roughly.  I mean, that could be

21   three weeks to six weeks, but I would shoot the

22   middle and say maybe a month.

23             Q.    So he was relatively new, he had

24   not been promoted --

1     A.    No.

2     Q.    And --

3     A.    At our sites where they're bigger

4    like that, you have one supervisor and the rest

5    are security officers.

6     Q.    Those are the only two positions?

7     A.    Yeah, right.

8     Q.    Does Bennett's conduct any sort of

9    internal evaluations of its employees?

10     A.    I would say that job performance,

11    reliability, comes to work, does the job is what

12    we use to apply, to make a point of contact.

13    When we say they're supervisors, they're

14    supervised to the extent that they interface

15    with the client on a daily basis where we would

16    not interface with Mr. Miller on a daily basis,

17    Robin did.

18          If it involved hiring people or,

19    hiring people or needing positions transferred

20    as far as making decisions, well we want to put

21    the officer here, there, at the plant, stuff

22    like that, that normally came back to

23    Mr. Habicht or myself.  She really acted as an

24    interface with Mr. Miller for just specifics on

1   site job requirements.

2           Q.   Okay.

3           A.   As far as personnel actions,

4   hirings, terminations, that's done by our

5   office, she didn't have that authority.

6           Q.   So you're saying that she

7   interacted fairly closely on a daily basis with

8   Mr. Miller?

9           A.   Right.  As far as -- and in

10  Robin's position, if our employees needed a day

11  off, if she had the ability to talk to one of

12  the other employees and say hey, would you trade

13  with this person for a day off or something, she

14  would do that.  If she couldn't do it, she would

15  call Mr. Habicht or myself and ask us to take

16  care of it.

17          Q.   Okay.  And then in the

18  approximately month or six weeks, had there been

19  any previous problems with Mr. Whiteman?

20          A.   No, not that I was aware of.

21          Q.   Okay.  Going back to the meeting,

22  so Mr. Miller explained to you at least in some

23  detail what had happened at the incident and

24  then did he again ask you to remove --

1      A.   He had asked at the beginning and

2   we didn't have to go over it.  It's not an

3   enjoyable situation to go to a client because

4   one of your employees has gotten involved in

5   some type of an incident.

6           So I like Greg Miller, but I don't

7   want to be in his office anymore than I have to.

8   You tell me that there is a situation, my job

9   then is to handle it.

10     Q.   Did you discuss any other options

11  with Mr. Miller as to possibly transferring

12  Ms. Nichols?

13     A.   No, because as long as she wasn't

14  working at his plant, I don't think he really

15  cared.

16     Q.   Did you personally investigate the

17  facts of this altercation anymore?

18     A.   Not really.  I had probably talked

19  to Joe because we had agreed with Mr. Miller,

20  that was the other part of the meeting, so it

21  was less disruptive to the Allen's because we

22  value their contract, we had a contract with

23  them, we valued their business and it wasn't

24  just there, we also worked at the Cordova plant

```
 1      which was a couple hundred hours of business a
 2      week as well, so we're looking at them as a
 3      company, not necessarily as an entity there,
 4      that we would leave Robin there and she would
 5      work two more days, which was the rest of her
 6      normal schedule, Friday and Saturday, and she
 7      would not return to work security there, that
 8      way it was probably less disruptive because we
 9      didn't want Robin to possibly go back to the
10      plant still if she was in an upset situation, to
11      go down there and raise any cane or anything
12      like that, since there had already been one
13      incident.
14                  And we had instructed
15      Mr. Whiteman, and that might have been myself, I
16      don't remember, we told him that he would sit in
17      his car, because I think there was only one more
18      day until Ms. Nichols left so that there was no
19      interface, because at the plant there was also I
20      believe at the time, but I'm not sure, I think
21      there was another three o'clock guard who would
22      be coming on, so it wasn't like Robin would
23      drive away and there would be a lapse of thirty
24      seconds for the other officer to run into the
```

1    guardhouse, I think we had two people working

2    the 3:00 to 11:00 shift.

3            Q.   So there were no subsequent

4    altercations between, or problems between

5    Ms. Nichols and Mr. Whiteman?

6            A.   None that were brought to my

7    attention, no.  And I don't think there was any

8    at all.

9            Q.   But you still tried to keep them

10   separated to some extent, is that what you're

11   referring to?

12           A.   Yes, exactly.  We didn't want it

13   to flare up.  I don't think -- I don't think the

14   incident -- if there was no -- that is my

15   understanding, there were no criminal charges

16   pressed, it wasn't an offensive touching that

17   I'm aware of filed, so there is no criminal

18   problem here, what we had was two officers who

19   apparently got in a disagreement.

20           Q.   So it's your understanding that

21   nothing was actually filed, no criminal charges

22   actually filed?

23           A.   That is correct.  Had they been

24   filed, we probably would have lost an officer

1    because they would have been arrested for some

2    type of offensive touching or assault and that

3    precludes you from working in the security

4    field.

5            Q.    Your understanding there wasn't at

6    least charges made that day?

7            A.    Robin filed a complaint from what

8    I understood.

9            Q.    Yes, a complaint.  So as to the

10    facts of the altercation, you and Bennett's --

11            A.    Bennett, no S.

12            Q.    Pardon me.

13            A.    That's okay.

14            Q.    You and Bennett accepted the

15    version of the facts from Mr. Miller?

16            A.    Yes, we did.

17            Q.    Did you ever discuss this

18    situation with Ms. Nichols with anyone else at

19    Allen's?

20            A.    No.   No.

21            Q.    You mentioned you talked to Joe or

22    Mr. Whiteman at some point.  Was that discussion

23    just about what was going to happen or did it

24    involve the incident at all?

1          A.    It would have been on that

2     afternoon of the 11th because like I said, I

3     believe it was me that told him, you know, to

4     sit in his car.  I'm not a hundred percent sure,

5     but I believe I did talk to him and, you know,

6     he would have gone over what -- you know, I

7     can't remember that day if it was Robin who told

8     me and Joe, I probably talked to both of them at

9     some point that afternoon when I got back

10    because the stories were remarkably similar, you

11    know, you pushed me, get out of my way, that

12    type of situation.  And then I know I talked to

13    Joe to tell him please just sit in your car

14    until such time that Robin leaves.

15         Q.    And that was the afternoon of the

16    incident when you got back?

17         A.    December 11th.

18         Q.    You said their stories were fairly

19    similar when you spoke to them?

20         A.    Yeah.  You know, I have been an

21    investigator for a number of years, and people

22    pushing each other, I don't agree that that

23    should ever happen, but that was the extent of

24    what I could understand what actually happened

1    down there.

2             Q.    You weren't able to gather from

3    speaking to either of them who might have pushed

4    who?

5             A.    You know, one would have had to

6    have started, but what was that that started it,

7    I can't tell you.

8             Q.    Did Mr. Miller ever tell you that,

9    did he --

10            A.    I don't know if he ever knew, I

11   don't know.  He just knew that the police wound

12   up on his property and he wasn't real happy

13   about that.

14            Q.    Did you find out from Mr. Whiteman

15   what had started -- before any pushing happened,

16   what had sparked this altercation?

17            A.    I don't remember if it was from

18   Robin, but it dealt with I believe him having to

19   go in to see Mr. Miller.  Shift changes at 3:00,

20   sometimes people don't want to start until 3:00,

21   I don't remember what it was over, exactly what

22   it was over.

23            Q.    These conversations were over the

24   phone?

```
 1              A.   Yes.  I didn't have personal

 2    contact with them.

 3              Q.   What did Ms. Nichols tell you

 4    happened?

 5              A.   That's what I'm saying, I'm not

 6    sure that Whiteman wouldn't go in to see

 7    Mr. Miller when she wanted him to.  And whether

 8    she were going outside, or she had to go outside

 9    to see a truck and she couldn't get by him going

10    out of the guardhouse, the guardhouse was set up

11    with two desks in there, it's close quarters,

12    you could bump into somebody walking into the

13    guardhouse.  I don't think you would have to

14    make an effort to push me to bump into me, you

15    know what I'm saying, or vice versa, it's close

16    quarters in there.  And I guess one bumped into

17    one and then it went from there.

18              Q.   That might have been around the

19    time of the shift change?

20              A.   That's the only reason why Joe

21    Whiteman would have been there because his shift

22    was 3:00 to 11:00 and Robin was 7:00 to 3:00, so

23    it had to have been a shift change.

24              Q.   Because they wouldn't otherwise
```

1    have been in the same --

2            A.    Together.

3            Q.    Now, did you make any written

4    record of any of these conversations?

5            A.    I think the only written is the

6    typed information I provided to the Department

7    of Labor or the EEOC people, that's the only

8    typed record I have.

9            Q.    You're referring to the position

10    statement?

11            A.    Exactly, that we responded to.

12            Q.    We have identified that as Exhibit

13    4 earlier.

14            Now, in your position statement,

15    you give a fairly detailed description of the

16    facts.  Where else did you find out some of

17    these facts?

18            A.    Mr. -- well, we're responding to

19    an allegation made against our company and since

20    Mr. Habicht, Mr. Bennett, and myself all may

21    have had some little bit of the pie, we sat down

22    and I just happened to be the one who typed it.

23            Q.    Okay.

24            A.    So all of us had input into what

```
 1    occurred.
 2            Q.   So after this meeting, what action
 3    did you take in regards to Ms. Nichols?
 4            A.   Sure.  The meeting was over on the
 5    12th, Robin worked the 12th and the 13th which
 6    would have been a Friday and Saturday.  She was
 7    off Sunday and Monday.  On December 15th at some
 8    point I called her and asked her not to report
 9    back in and at that point I believe it was an
10    answering machine, because I had conversation
11    with her, it had to be later that day, I'm sure
12    she called me back.
13            And I left a message saying
14    listen, it has nothing to do with Allen's, it's
15    just we need to have change because what I don't
16    want to have happen is for her to find out and
17    we had already had this meeting with Mr. Miller
18    saying we'll do it this way so that we don't
19    have Robin come back and make a scene at your
20    property because that has happened before to our
21    customers.
22            So I left a message saying Robin,
23    just time to move on, we have had some hiccups
24    down there and that was whether it was with
```

1    other personnel or the other incident where she

2    had called the police, it was just time to move

3    her and that I would offer her a position

4    elsewhere.

5         Q.   So you asked Mr. Miller if you

6    could let her complete her shift just so you

7    wouldn't have any problems when she --

8         A.   You have to understand, we have

9    business with Allen's like I said at two

10    locations, a lot of work, and you know, if Robin

11    had flared up because of whatever between her

12    and Joe, I didn't want her to return to that

13    again.  I valued Allen's business, I left her a

14    message, it's Bennett, because Greg wasn't going

15    to ask her to be transferred himself, so it was

16    my responsibility or Mr. Habicht's

17    responsibility to do that.

18         Q.   Right.  Ultimately it would be

19    your responsibility.

20              You also mentioned a couple of

21    other incidents at the Harbeson site.

22         A.   Uh-huh.

23         Q.   What were those incidents?

24         A.   She had gotten in shouting

1    incidents with our other employees, other than

2    the one incident that involved the Allen's

3    employee, the truck driver --

4              Q.    You had mentioned that.

5              A.    -- who had touched her

6    inappropriately.

7              Q.    What was Ms. Nichols' response to

8    your phone call?  I assume you spoke to her?

9              A.    She called me back, I believe.

10   She was upset, you know, she had been there a

11   while, you know, and we don't have any

12   counseling forms on Robin.  And she had not been

13   previously disciplined.

14             So with that in mind, I'm sure --

15   and I tried to explain to her that I didn't have

16   any full-time job -- you have to understand the

17   security business, Mr. Habicht may have said

18   before we might have fifty-five, sixty accounts,

19   that doesn't mean you have fifty or sixty,

20   seventy to a hundred openings, we have people

21   that are filling those openings.

22             I didn't have at that second a

23   full-time position for her.  Actually I didn't

24   have a position on Monday that day that I

1    thought I could fill right away for her for

2    forty hours, we only have limited positions, you

3    can't create customers, you only have so many

4    customers and there is only so many positions.

5    And I explained to her that I would look to get

6    her a position as soon as I could.

7              Q.   So how long was it until you were

8    able to provide a position for her?

9              A.   A couple of days went by, and you

10   know, it was maybe two days, I talked to her on

11   the 15th, maybe on the 18th I got a call from

12   someone, I want to say it was Social Services,

13   I'm not sure, I talked to a lady, I think Robin

14   was probably there, and she was trying to help

15   Robin.  And I believe I talked to Robin at that

16   location, or later in the day I had talked to

17   her, but I had a person who was either going to

18   leave us, wasn't sure, but an opening came at

19   the Milford Perdue facility.

20             Q.   And --

21             A.   We had offered her thirty-two

22   hours, and I offered her thirty-two hours there

23   to start training, maybe the 19th and the 20th,

24   somewhere in that general area, of December.

1      Q.   And her position at Bennett was

2   full-time?

3      A.   Yes, it was, she was working forty

4   hours.  And this was thirty-two, but I told her

5   I would try to get her eight more hours because

6   that's not unusual.  We may have workers who are

7   twenty-four hours at site A and sixteen hours at

8   site B to get them at forty hours.  That was my

9   attempt to at least get her back into a position

10  where she was getting the bulk of her normal

11  forty hours.

12     Q.   Were you able to find her a

13  position with forty hours?

14     A.   No, never, ultimately I was not.

15     Q.   And then how long was it until

16  Ms. Nichols resigned?

17     A.   She -- initially she didn't want

18  to go to Milford Perdue, and then she said she

19  would.  And the first day she was supposed to go

20  in for training she called in sick and she was

21  really ill.  And I said well, you know what, I

22  can't have her -- she was working through the

23  Christmas holidays, the way her shift would have

24  taken her through there.  I said Robin, if you

1   can't go in, I understand that, people get sick,

2   but I can't hold a position.  I have to have a

3   trained officer in there because you just can't

4   throw a person into a customer's position.

5          If you owned a car lot and you're

6   my client and you tell me make sure there is no

7   dealer plates and all four doors are locked on a

8   car, I don't have to give you a lot of training

9   other than take you out there, show you it's a

10  car lot, identify that four wheels and a body is

11  a car, you can do that.

12         At the facilities she worked at to

13  include Allen's and Milford Perdue, you had to

14  lock trucks in, you had to lock trucks out, you

15  had the fuel trucks, you had to do chicken

16  sales, there is a lot that officers do there.

17  There is a lot of responsibility they have.  To

18  put Robin in a position like that through the

19  holidays it would have been a bad decision on

20  the company's part.

21         So I said Robin, we'll find you

22  something else.  She said that was fine, she

23  would wait until after the holiday because

24  Christmas was going to be upon us, she had

```
 1    children, a family, I'm sure at that point she

 2    wasn't looking to work through the holidays.

 3                 She trained on the 23rd and 24th

 4    at another site which I believe was Family

 5    Court, Sussex County Family Court.  We had a

 6    person who had gotten pneumonia, at least that's

 7    what he informed me.  He had pneumonia, and as

 8    miracles happened, the one time I had pneumonia

 9    I was out for a couple of weeks.  This

10    individual was out for a week.

11                 And Robin worked the 23rd, 24th,

12    she was off for Christmas, she came back to work

13    maybe on the 29th, because that was a forty-hour

14    position, 2:00 to 10:00, and that's where I

15    thought Robin was going to wind up working was

16    at Sussex Family Court, but the officer,

17    Mr. Wilmouth returned, he had been out a week

18    with pneumonia, that's unheard of.  But maybe he

19    didn't have pneumonia, I don't know, but Robin

20    worked her last day I believe it was December

21    29th, and then she resigned her position shortly

22    thereafter.

23         Q.   Sometime in early 2004?

24         A.   Yeah, she said -- I told her, I
```

1    said Robin, it takes a while, I only have finite

2    positions, I'm sure she understood it, but she

3    was also looking for employment.

4         Q.    So the action by Bennett

5    transferring her, was that considered a

6    disciplinary action?

7         A.    No, by no means.  In our

8    conditions of employment we have there, and I

9    know we've been out previously, that we can move

10   a sup -- move a supervisor, move an employee

11   from one site to another, because these type of

12   positions do come up, people lose transportation

13   and probably the best way I can show any of this

14   is that perfect example, we wind up completing a

15   job at Mr. Miller's plant in the end of November

16   of last year, if I don't transfer all those ten

17   people that worked at Allen's, they don't have a

18   job.

19              So you have to be able to transfer

20   your people because jobs come and go.  So if you

21   can't do that, you can't be a business.  If

22   you're a builder and you build a development and

23   you work for X builders, when they're done

24   building that development, if you don't move

1    over to where they're building development B,

2    you don't have a job, and that's Bennett

3    Security in a nutshell.

4              We have so many positions, we take

5    them on and we lose them and we have to transfer

6    people, there is no other way we can keep them

7    employed on a regular basis.

8              Q.  You just mentioned the conditions

9    of the employment, this was earlier identified

10   as Exhibit 3.  Can you just point out to me the

11   provision --

12             A.  Sure, give me a second to find it

13   here.

14             Underneath the word paychecks, the

15   third sentence starts, "Bennett's Security has

16   the right to remove any security officer to

17   another job site at any time."

18             Q.  Okay.  Thanks.

19             A.  You're welcome.

20             Q.  Now, your testimony is that

21   Mr. Miller requested, or almost demanded that

22   you transfer Ms. Nichols?

23             A.  That's correct.

24             Q.  Had he done that on previous

1  occasions with other employees?

2           A.   Mr. Habicht inferred that there

3  were two others, yes.

4           Q.   There were two others.  Who were

5  they?

6           A.   Daniel Steele and David Leggins.

7           Q.   And had you at Bennett ever dealt

8  with another claim of race discrimination?

9           A.   Yes, on one other occasion.

10          Q.   Who was that, do you remember the

11  name?

12          A.   Mr. Habicht mentioned her name.

13          Q.   I believe Christine Miller?

14          A.   Christine Miller.

15          Q.   Do you know what happened?

16          A.   It went unfounded.

17          Q.   Unfounded?

18          A.   Yes.  And the uniqueness of that

19  situation there was that she had actually made a

20  complaint of sexual harassment against our

21  company, but the person who sexually harassed

22  her was a Perdue employee, so that was a problem

23  with Perdue, but we got caught in that

24  allegation.

1    What she had said from a racial

2    issue is we favored the black people at the

3    plant over the white people.  But this all

4    happened after she had been terminated for not

5    coming to work one day.  She called in sick and

6    for her three o'clock shift, we have a four-hour

7    minimum and she called in really close to the

8    time she was due to work.  And some hour later

9    one of the security officers who was assigned to

10   work at the plant that day noticed her pull up

11   in a car and pick up one of her girlfriends.

12   And we terminated her as a basis of lying to the

13   company and not coming into work that day.  And

14   I think that was the basis for her suit.  But it

15   went unfounded.

16        Q.   Employees of Bennett, are they

17   considered at will?

18        A.   Absolutely.  We have no contracts

19   with employees.

20        Q.   Would it have mattered to you who

21   started this altercation or were you just

22   following the instructions of Mr. Miller?

23        A.   Mr. Habicht had said earlier, we

24   don't transfer people, it's disruptive to the

1    company, you have to do new training, you lose

2    proficiency.  Robin had been there a long time,

3    and we weren't going to move Mr. Whiteman.  He

4    didn't ask to move Mr. Whiteman and neither one

5    of them had any type of criminal charges pressed

6    against them.  And to the extent that I learned

7    afterwards I believe Robin told me that

8    Mr. Whiteman had called her later that night and

9    apologized and that was an issue that, you know,

10    she felt had been put to bed, but she doesn't

11    see in interaction between the company, she's

12    looking at it strictly at the personnel level

13    between her and Mr. Whiteman.

14         Q.   So you didn't necessarily want to

15    transfer her?

16         A.   Absolutely not.  I told you, I

17    didn't have a position to put her in, but I

18    still had the responsibility to find her work or

19    she would draw unemployment.  And I don't have a

20    problem with trying to find people work, but my

21    hands are tied to what I have available.

22         Q.   They're only limited positions?

23         A.   Exactly.

24         MR. GERBER:   Thank you.  I think

1   is November of '02 is the Stokes incident.

2   April of '03 is the Nichols incident.  And then

3   we have December 11th, '03 being the Whiteman

4   incident.  That's three incidents in a little

5   over a year.  Is that accurate?

6           A.   I think the Stokes was in 6/02,

7   and the other one -- so a year-and-a-half, yes.

8           Q.   I was looking at 11/02, maybe --

9           A.   Diane Stokes was there, and I'm

10  not sure -- yeah.

11          Q.   The document is what it is.

12          A.   I'll read --

13          Q.   It says what it says.

14          A.   Right.

15          Q.   Now, let's see.  If I understand

16  your testimony, Mr. Habicht calls you because

17  you're in Maryland and tells you about the

18  incident with Ms. Nichols and Ms. Whiteman on

19  December 11th?

20          A.   He doesn't go into great detail.

21  Right, Mr. Miller was very unhappy, we got to

22  move Robin.

23          Q.   But you do remember him saying --

24  Mr. Miller said she's got to go?

1       A.    Yes.

2       Q.    No other details were provided to

3  you?

4       A.    Limited, limited because I'm out,

5  I'm coming back to the office.

6       Q.    Okay.  Now, you, if I understood

7  your testimony correctly, and I want to be sure

8  I do.

9       A.    Certainly.

10      Q.    You came back on the afternoon of

11 the 11th?

12      A.    That's correct.

13      Q.    And you called Mr. Whiteman on the

14 telephone?

15      A.    I either did or -- I had

16 conversation with him that afternoon.  There

17 were calls --

18      Q.    Because you told him not to get

19 out of his car?

20      A.    Right.  Because she had to -- that

21 was going to be on the 12th that I talked, I

22 think I said that, because on the 11th the

23 incident happened, I met with Mr. Miller on the

24 12th.



BENNETT
SECURITY

QUALITY SECURITY SERVICES SINCE 1960
LICENSED IN DELAWARE AND MARYLAND

BENNETT DETECTIVE
&
PROTECTIVE AGENCY, INC.
P.O. Box 344 • Dover, Delaware 19903-0344
Telephone (302) 734-2480
FAX: (302) 734-3415
E Mail: bbennett@dmv.com
TOLL FREE: DE 800-339-6553
MD 800-801-0334

## AGREEMENT

AGREEMENT by and between ALLENS FAMILY FOODS (AFF) bearing its office at 274 Nealson Street, P.O. Box 1030, Hurlock, MD 21643 hereinafter called AFF and the BENNETT DETECTIVE AND PROTECTIVE AGENCY, INC., Federal Tax ID #51-0095254 a corporation of the State of Delaware, hereinafter called BENNETT.

WITNESSETH:

1. BENNETT shall furnish unarmed, uniformed security officers in numbers as may from time to time be designated by AFF with it's job sites located in Cordova, MD and Harbeson, DE.

2. At its own expense and responsibility, BENNETT shall comply with all Federal, State, and local rules, regulations and requirements with respect to its services to be rendered under this AGREEMENT.

3. BENNETT shall employ security officers and shall abide by all rules, regulations, and requirements relating to private detectives within the states of Delaware and Maryland.

4. BENNETT shall at its own expense furnish and keep in full force the following insurance during the term of this contract.

   a. Workman's Compensation Insurance covering all persons employed by BENNETT that are or will be engaged in the rendering of services as provided herein.

   b. Personal Injury Liability Insurance covering bodily injuries or death of any person arising out of the performance of this AGREEMENT in the stated amount of one million dollars ($1,000,000) for each occurrence and three million dollars ($3,000,000) aggregate.

   c. Property Damage Liability Insurance covering property damage arising out of the performance of this AGREEMENT in the stated amount of one million dollars ($1,000,000).

   d. Personal Injury Liability Insurance covering against loss or claims for false arrest or imprisonment, malicious prosecution and defamation of character in the amount of one million dollars ($1,000,000) for each occurrence and three million dollars ($3,000,000) aggregate.

BRANCH OFFICES: WILMINGTON, DELAWARE (302) 658-8241 • SALISBURY, MARYLAND (410) 742-0334
GEORGETOWN, DELAWARE (302) 856-3133

B89

D00001

9

5.  It is mutually understood that BENNETT is an independent contractor and that all guards employed by BENNETT to perform the services as herein provided are and shall be employees of BENNETT and not employees of AFF. Employees of BENNETT may not be employed by AFF, for any position, within six months of the termination of this AGREEMENT. If a BENNETT employee is hired within the six month period, you will be charged by BENNETT a fee of Two Thousand Dollars per employee hired.

6.  BENNETT will pay all wages and expenses of its employees including unemployment insurance, FICA, Federal and State withholding taxes.

7.  The charges for service performed hereunder by BENNETT shall be NINE DOLLARS AND FIFTY CENTS($9.50) per hour for each unarmed officer furnished from February 11th to February 28th, 2003 based on the hours requested.  On March 1st 2003, the hourly rate shall increase to NINE DOLLAR AND NINETY CENTS ($9.90) per hour. As a result AFF shall pay to BENNETT the sum, due and owing upon receipt of invoice. This rate shall cover all costs and expenses in their entirety regardless of whether such guard services are performed on Saturdays or Sundays and no other compensation is considered in this agreement. Five holidays (Memorial Day, 4th of July, Labor Day, Christmas & Thanksgiving) will be billed at one and a half times the hourly rate. All sales are subject to 5% Maryland sales tax if the job site BENNETT is working at is located in Maryland. Any incident which would require a Bennett employee to appear in court will be billed at the regular hourly rate.

8.  This contract may be terminated following 30 days written notice from either party to the other of its intention to terminate.

9.  This AGREEMENT shall become effective as of the 11TH DAY of FEBRUARY 2003, and shall remain in effect unless terminated as provided for in paragraph 8.

IN WITNESS WHEREOF, the parties hereto have caused this AGREEMENT to be executed by their duly authorized officers, representatives this 11TH DAY of FEBRUARY 2003.

ATTEST: _Wayne A Keller_     BY: _E. Bradford Bennett_

TITLE: _President_

Bennett Detective & Protective Agency, Inc.

ATTEST: _Mary O Nelson_     BY _Tracy J. Morris_

TITLE: _Corporate HR Director_

B90

D00002