IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROBIN D. NICHOLS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 05-55-KAJ |
| | ) |
| BENNETT DETECTIVE & PROTECTIVE | ) |
| AGENCY, INC., a Delaware corporation, | ) |
| and ALLEN'S FAMILY FOODS, INC., a | ) |
| Delaware corporation, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

William D. Fletcher, Jr., Esq., Noel E. Primos, Esq., Schmittinger and Rodriguez, P.A., 414 South State Street, P.O. Box 497, Dover, Delaware, 19903; Counsel for Plaintiff.

Roger D. Landon, Esq., Philip T. Edwards, Esq., Murphy Spadaro & Landon, 1011 Centre Road, Suite 210, Wilmington, Delaware 19805; Counsel for Defendant Bennett Detective & Protective Agency, Inc.

Matthew F. Boyer, Esq., Connolly Bove Lodge & Hutz, 1007 North Orange St., P.O. Box 2207, Wilmington, Delaware 19899; Counsel for Defendant Allen's Family Foods, Inc.
    Of Counsel: Arthur M. Brewer, Esq., Laura A. Pierson Scheinberg, Esq., Shawe & Rosenthal, LLP, 20 S. Charles Street, 11th Floor, Baltimore, Maryland, 21201.

Wilmington, Delaware
May 31, 2006



JORDAN, District Judge

## I.    INTRODUCTION

Before me are two Motions for Summary Judgment, one filed by defendant Bennett Detective & Protective Agency, Inc. ("Bennett") (Docket Item ["D.I."] 43), and the other filed by defendant Allen's Family Foods, Inc. ("Allen") (D.I. 45).[1]  The complaint, filed by plaintiff Robin D. Nichols, alleges that Bennett discriminated against her on the basis of her race and sex, in violation of the Delaware Discrimination Act ("DDA"), 19 *Del. C.* § 710, et seq. (D.I. 1, Ex. A at ¶¶ 24-25), and that both Defendants discriminated against her on the basis of her race, in violation of 42 U.S.C. § 1981 (*id.* at ¶¶ 27-28). Nichols also alleges that Allen tortiously interfered with her contract with Bennett (*id.* at ¶¶ 30-31), and that an agent of Allen, Raymond Miller, made false statements about her that constitute slander per se (*id.* at ¶¶ 33-38).

Nichols initially filed her complaint in the Delaware Superior Court, but the case was removed to this court pursuant to 28 U.S.C. § 1441.[2]  Jurisdiction over the § 1981 claim is appropriate under 28 U.S.C. § 1331.  Supplemental jurisdiction over all other claims is proper under 28 U.S.C. § 1367.  For the reasons that follow, the Motions for Summary Judgment will be granted.

_____

[1] Bennett and Allen will be referred to collectively herein as "Defendants."

[2] The Notice of Removal was filed only by Bennett, a failing because all defendants must join a petition for removal. *Hanrick v. Hanrick*, 153 U.S. 192, 196 (1894) ("the suit could not be removed by one of several plaintiffs or defendants"). However, "a motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the motion of removal." 28 U.S.C. § 1447(c); *see also Roe v. O'Donohue*, 38 F.3d 298, 301-02 (7th Cir. 1994), overruled on other grounds by *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999) (finding that where only one defendant filed a notice of removal, removal was improper, but where plaintiff did not move to remand within 30 days, remand was improper). Thus, jurisdiction can properly be exercised in this case.

## II.    BACKGROUND[3]

Bennett is a security business that contracts with various companies, including Allen, to provide security guards and related services. (Deposition of Wayne Keller,[4] D.I. 47, Ex. 7 at 7:11-17.) Bennett's contract with Allen provides that Bennett will supply security officers at Allen's plants in Harbeson, Delaware, and Cordova, Maryland. (D.I. 47, Ex. 2 at A003.) The contract further provides that "[i]t is mutually understood that Bennett is an independent contractor and that all guards employed by Bennett to perform the services as herein provided are and shall be employees of Bennett and not employees of [Allen]." (*Id*. at A004.)

Nichols, an African-American female, worked as a Bennett security guard at Allen's Harbeson plant from July 30, 2001 until December 13, 2003. (Keller Deposition, D.I. 47, Ex. 7 at 29:4-12.) On beginning her employment with Bennett, Nichols signed a document entitled "Condition of Employment," which provided that "Bennett Security has the right to move any security officer to another job site at any time." (D.I. 47, Ex. 1 at A001.) On December 11, 2003, Nichols, who served as a supervisor of other guards, had an altercation with Joseph Joshua Whiteman, one of her subordinates. (Nichols Deposition, D.I. 47, Ex. 4 at 39:21-40:9.) Nichols had received a call from Raymond Miller[5] asking her to send Whiteman to see him. (*Id*. at 39:24-40:2.) According to

---

[3] The following rendition of background information does not constitute findings of fact and is cast in the light most favorable to the non-moving party.

[4] Wayne Keller is the Vice-President at Bennett. (Keller Deposition, D.I. 47, Ex. 7 at 4:14.)

[5] Raymond Miller is the manager of human resources for Allen's Harbeson, Delaware plant. (Miller Deposition, D.I. 47, Ex. 5 at 4:16-20.)

2

Nichols, when she told Whiteman to go see Miller, Whiteman argued with her and then pushed her. (*Id*. at 40:3-22.) Nichols pushed him back, and the two continued to push each other back and forth until Whiteman pushed Nichols into a file cabinet and CB radio. (*Id*. at 40:22-41:3.)

Eventually, Whiteman went to speak with Miller, at which point Nichols called the police to report her altercation with Whiteman. (*Id*. at 41:7-9.) Although Nichols informed her superiors at Bennett, Mark Habicht[6] and Wayne Keller, that she had called the police, she did not inform Miller. (*Id*. at 47:19-21.) When the police arrived, Nichols knocked at Miller's office door to inform Whiteman that the police were there and wanted to speak to him.[7] (*Id*. at 41:9-19.) The police took a statement from Whiteman. (*Id*. at 41:19-22.) Whiteman later apologized to Nichols, and no charges were filed. (*Id*. at 42:7-17.)

Later that same day, Miller called Habicht to discuss the incident. Habicht recalled that Miller stated,

> I called out to the guardhouse a couple of times and [Nichols] answered the phone and there was yelling in the background and then she slammed the phone down. And I called back and she did the same thing ... I can't have that out there ... Enough is enough, she's got to go.

---

[6] Mark Habicht is the Vice-President of Operations at Bennett. (D.I. 47, Ex. 6 at 5:22-24.)

[7] Miller asserts that he was alone in his office when he was informed that the State Police were on the premises. (Miller Deposition, D.I. 47, Ex. 5 at 10:16-19.) Miller testified that when he heard about the incident, he went to the security post and spoke to both Nichols and a state trooper about the incident. (*Id*. at 11:10-12:13.) The discrepancy between Miller's and Nichols's recollection in that regard is not material to the outcome of the motions for summary judgment.

3

(Habicht Deposition, D.I. 47, Ex. 6 at 20:8-15.) The next day, Habicht and Keller went to meet with Miller. (*Id.* at 22:6-18.) Miller "reiterated the fact that [Nichols] had to go, that he couldn't have that kind of activity going on in his plant, it was too disruptive." (*Id.* at 23:15-19.)[8] Miller had previously requested the transfer of two other Bennett security guards, David Leggins, a black male, and Daniel Steele, a white male. (Habicht Deposition, D.I. 44, Ex. A at 41:3-42:24.)

Miller, Habicht, and Keller agreed that, to avoid further disruption, Nichols could finish her work week, but that she would not return to the plant the following week. (Keller Deposition, D.I. 47 at 22:4-8.) On December 15, Nichols received a message from Bennett telling her not to return to work at Allen the next day. (Nichols deposition, D.I. 47, Ex. 4 at 42:18-23.) Bennett replaced Nichols at the Harbeson Plant with another African-American woman. (D.I. 44, Ex. A at 43-44.)

Bennett did not immediately have another job for her to go to. (D.I. 47, Ex. 4 at 101:24-102:1.) Within days, Bennett offered Nichols a thirty-two hour a week job working at another customer's site, and she was set to start training for that position around December 19, 2003. (Keller Deposition, D.I. 47, Ex. 7 at 32:21-24.) However,

_____

[8] There is a dispute between Allen and Bennett as to who initially suggested that Nichols be transferred. Keller confirms Habicht's testimony, stating that it was Miller who initially suggested that Nichols be transferred. (Keller Deposition, D.I. 47, Ex. 7 at 16:23-17:2.) Miller, however, testified that Keller and Habicht suggested the transfer, and that he simply agreed. (Miller Deposition, D.I. 49, Appendix at B38-39, 39:10-12, 39:24-40:9.) Miller claims that he was upset that the police were called because it "created kind of a disruptive environment. And when you hear about these things out of the blue, you don't know if some act of violence may have taken place or exactly what, if somebody got hurt on the job. You just don't know. And so that was my concern." (Miller Deposition, D.I. 47, Ex. 5 at 15:4-10.) The source of the suggestion that Nichols be transferred, however, is not material, as it has no bearing on the outcome of the motions for summary judgment. *See infra* note 11 and accompanying text.

4

she called out sick the first day of training, and, because the customer needed someone to start immediately, Bennett put another officer in that position. (*Id*. at 33:19-34:4.) On December 23 and 24, Nichols filled in for another officer at yet another location, and she worked there again on December 29. (*Id.* at 35:3-22.) When the security guard for whom she was filling in returned to work on December 29, however, Bennett was once more without a position for Nichols. (Nichols Deposition, D.I. 47, Ex. 4 at 106:19-107:1.) On January 5, 2004, Nichols called Bennett and informed them that she was going to resign in two weeks. (*Id*. at 107:15-18.) Nichols last day of employment at Bennett was January 19, 2004. (*Id*. at 29:2-15.)

While Nichols says that she cannot "say for a fact" that Whiteman told his version of the incident to Allen employees (*id*. at 54:24-55:4), she nevertheless alleges that someone at Allen questioned Whiteman about the December 11 incident but that no one ever allowed her to tell her side of the story. (*Id*. at 53:24-54:2.) Miller claims, however, that he spoke only to Nichols about the incident, and that he never spoke to Whiteman about it. (Miller Deposition, D.I. 47, Ex. 5 at 11:22-12:24.)

Nichols also alleges that, at some point in the days after the incident, she had a conversation with Valerie Brittingham, an Allen employee who worked for Miller. According to Nichols, their conversation was as follows:

[Brittingham said] What in the world happened? ... [Whiteman] talk[ed] to Mr. Miller, and Mr. Miller is down there telling everybody that everything was your [Nichols's] fault, and like, you know, I wasn't capable of doing

5

my job.  And I was: Well, why in the world would Mr. Miller say something like that about me?  And she was like: Well, you know, he's a racist.

(*Id*. at 58:1-12.)[9]

On January 19, 2004, Nichols began training to become a certified nursing assistant ("CNA").  (Nichols Deposition, D.I. 47, Ex. 4 at 108:15-18.)  During the period of her training, Nichols was paid seven dollars an hour, and when her training was completed, she was paid about nine dollars and thirty-five cents an hour (*id*. at 109:4-19), which was more than the seven dollars an hour she made at Bennett (*id*. at 122:8-16).  Nichols worked as a CNA until May 2004.  (*Id*. At 20-24.)  Nichols subsequently worked as a school bus driver from September 2004 until April 2005, and as a security guard for Allied Security for about two weeks in April 2005.  (*Id*. at 110:1-113:14.)  She has been unemployed since leaving the job at Allied Security.  (*Id*. at 113:15-17.)

## III.    STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no genuine issue of material fact exists.  *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue

---

[9] Brittingham recalls things differently.  She testified at her deposition that she never talked to Nichols about the incident, and that she never told Nichols that Miller was a racist.  (Brittingham Deposition, D.I. 47, Ex. 8 at 10:24-11:13.)

is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir.

1995) (internal citations omitted).  If the moving party has demonstrated an absence of

material fact, the nonmoving party then "must come forward with 'specific facts showing

that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  The court will "view the

underlying facts and all reasonable inferences therefrom in the light most favorable to

the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.

1995).  However, a court should not make credibility determinations or weigh the

evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## IV.  DISCUSSION

### A.  Discrimination in Violation of 42 U.S.C. § 1981 and the Delaware Discrimination Act

Nichols has alleged that both Bennett and Allen discriminated against her based

on her race, in violation of § 1981, and that Bennett also discriminated against her

based on her race and sex, in violation of the DDA.[10]  Claims under 42 U.S.C. § 1981

---

[10] In her Answering Brief to Allen's Motion for Summary Judgment, Nichols asserts, apparently for the first time, a claim against Allen for discrimination under the DDA. (D.I. 49 at 13-14.)  However, Nichols cannot assert a claim against Allen under the DDA for a number of reasons.  First, she did not assert such a claim in her complaint. (D.I. 1 at ¶¶ 23-25 ("Defendant Bennett discriminated against Plaintiff with regard to the terms and conditions of her employment on the basis of her race and sex in violation of 19 *Del. C.* § 710 et seq.").)  Second, Allen asserts, and Nichols has presented no evidence to the contrary, that Nichols never filed a claim of discrimination with the Delaware Department of Labor, a necessary prerequisite to filing a complaint under the DDA. 19 *Del. Code* § 712(b).  Finally, even had she filed a claim of discrimination, Nichols cannot make a claim under §711(a) of the DDA against Allen, because such claims are cognizable only against an "employer." *See* 19 *Del. Code* § 711(a).  Although Nichols argues that Allen was her "joint employer" because Allen exercised control over aspects of her employment and because she interacted on a daily basis with Miller, her argument is contradicted by Allen's contract with Bennett,

7

and claims under the DDA, 19 *Del. C.* § 710 et seq., both must be evaluated according
to the burden-shifting analysis set forth by the United States Supreme Court in
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Jones v. Sch. Dist. of
Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999) ("disparate treatment race discrimination
claims under Title VII [and] section 1981 ... require application of the familiar
burden-shifting framework the Supreme Court articulated in *McDonnell Douglas Corp.
v. Green*"); *Giles v. Family Court of Delaware*, 411 A.2d 599, 602 (Del. 1980) (applying
*McDonnell Douglas* burden-shifting to claim under the DDA). That analysis proceeds in
three steps. First, the plaintiff "must carry the initial burden ... of establishing a prima
facie case of ... discrimination." *McDonnell Douglas*, 411 U.S. at 802. "The burden
then must shift to the [defendant] to articulate some legitimate, nondiscriminatory
reason for the [plaintiff]'s rejection." *Id*. The burden then shifts again to the plaintiff "to
show that [the defendant's] stated reason for respondent's rejection was in fact pretext."
*Id*. at 804.

## 1. § 1981 Claims

42 U.S.C. § 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same
> right in every State and Territory to make and enforce contracts, to sue,
> be parties, give evidence, and to the full and equal benefit of all laws and
> proceedings for the security of persons and property as is enjoyed by
> white citizens, and shall be subject to like punishment, pains, penalties,
> taxes, licenses, and exactions of every kind, and to no other.

which provided that "[i]t is mutually understood that Bennett is an independent
contractor and that all guards employed by Bennett to perform the services as herein
provided are and shall be employees of Bennett and not employees of [Allen]." (D.I. 47,
Ex. 2 at A004.) Accordingly, Nichols has not and cannot state a claim of discrimination
against Allen under the DDA, 19 *Del. C.* § 711(a).

8

To establish a prima facie case of racial discrimination under 42 U.S.C. § 1981, Nichols must show "(1) that [she] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts[.]" *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001); *see also Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 569 (3d Cir. 2002). The United States Court of Appeals for the Third Circuit has also stated that "the elements of employment discrimination under Title VII are identical to the elements of a section 1981 claim." *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 499 (3d Cir. 1999). Those elements are (1) that the plaintiff is a member of a protected class; (2) that she is qualified for the position; (3) that she suffered an adverse employment action; (4) under circumstances that give rise to an inference of unlawful discrimination. *Jones*, 198 F.3d at 410-11. It appears that the Third Circuit applies the first standard where there is a claim under § 1981, but not an accompanying claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. *See Brown*, 250 F.3d at 797; *Pryor*, 288 F.3d at 569. However, it appears that Court applies the second standard when there is an accompanying Title VII claim. *Jones*, 198 F.3d at 411-12; *Schurr*, 196 F.3d at 499. Because Nichols has not made a claim under Title VII here, I will use the standard set out in *Brown* and *Pryor*.

A claim under § 1981 requires proof of purposeful or intentional discrimination. *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982) ("We conclude, therefore, that § 1981, like the Equal Protection Clause, can be violated only

by purposeful discrimination."). Additionally, proof of "discrimination concerning one or more of the activities enumerated in the statute" is required to establish a claim under § 1981. *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001). The statute defines the term "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

### a.    Allen

Nichols appears to base her allegation that Allen discriminated against her under § 1981 on her assertion that Miller requested she be transferred.[11]  Nichols cannot show, however, that Allen discriminated against her under § 1981, as Nichols has not shown that Allen's actions interfered with any contract she may have had with Bennett. Nichols's "Condition of Employment" agreement with Bennett provided that Bennett "has the right to move any security officer to another job site at any time." (D.I. 47, Ex. 1 at A001.) Assuming that Miller requested that she be moved, that did not interfere with the performance, modification, or termination of her employment relationship with Bennett. Even if one were to characterize that relationship as being governed by a contract, it specifically provided for her transfer. (D.I. 47, Ex. 1 at A001 ("Bennett Security has the right to move any security officer to another job site at any time.").) In other words, Miller's request that she be transferred could not constitute an interference

---

[11] Nichols asserts that the disagreement over whether Miller requested that she be transferred, or whether Keller and Habicht suggested it, creates a genuine issue of material fact that precludes summary judgment. However, as I hope will be clear from the analysis here, determining who suggested that Nichols be transferred is not relevant to the outcome of this motion, and thus, there is no genuine issue of material fact.

10

with her enjoyment of the benefits, privileges, terms or conditions of her contractual

relationship since she had no right to remain at Allen. Hence, Nichols fails to establish

the third prong of the three-part test for the establishment of a prima facie case.

Even if Nichols could establish a prima facie case, however, summary judgment

for Allen would still be appropriate. Had Nichols established a prima facie case of

discrimination, the burden would shift to Allen to establish a legitimate, non-

discriminatory reason for requesting her transfer. *See McDonnell Douglas Corp.*, 411

U.S. at 802. Allen asserts that Miller requested Nichols's transfer not because of her

race, but "because of the disruptive environment Ms. Nichols's call to the police caused

and her failure to notify [Miller] of the call." (D.I. 46 at 14.) Miller's statements to Keller

and Habicht that "[Nichols] had to go, that he couldn't have that kind of activity going on

in his plant, it was too disruptive" support Allen's assertion that Miller requested

Nichols's transfer because she was disruptive. (Habicht Deposition, D.I. 47, Ex. 6 at

23:15-19.) Nichols bears the burden of showing that this explanation is merely a

pretext for discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 804.

However, Nichols has come forward with no evidence to meet that burden. In

support of her claims, Nichols relies heavily on her own testimony that Brittingham told

her that Miller is a racist who "[told] everybody that everything was [Nichols's] fault, and

... [that she] wasn't capable of doing [her] job." (Nichols Deposition, D.I. 47, Ex. 4 at

58:1-12.) Assuming that Nichols version of that conversation were true,[12] Nichols's

testimony about what Brittingham told her is hearsay and cannot be considered on a

_____

[12] Again, Nichols's testimony in that regard is flatly contradicted by Brittingham's
own testimony. (*Supra* note 9.)

11

motion for summary judgment. *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 (3d Cir. 1996) ("the hearsay statement ... is not capable of being admissible at trial, and could not be considered on a motion for summary judgment") (internal citations and quotation marks omitted). Thus, even viewing the facts in the light most favorable to Nichols, I may not consider that hearsay testimony.

The only admissible evidence in the record that can be stretched to connect Nichols's transfer, or Miller's other actions, to her race is the fact that Whiteman, who is a white man, was not transferred while Nichols, an African-American woman, was. Previously, however, Bennett, at Miller's request, transferred Daniel Steele, a white man, and David Leggins, a black man from Allen. Thus, the sole fact that Nichols was transferred while Whiteman was not is insufficient to rebut Allen's proffered reason for requesting Nichols transfer. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir. 1998) ("a black plaintiff cannot establish racial discrimination by singling out one white person who was treated more favorably when there were other white persons who were treated less favorably than other black persons"). Therefore, Allen's Motion for Summary Judgment on Nichols's claim of discrimination under 42 U.S.C. § 1981 would be granted, even if Nichols had provided a prima facie case of discrimination.

### b. Bennett

Again, viewing the facts in the light most favorable to Nichols, it still appears that Bennett did nothing more than transfer Nichols to placate an angry client. The transfer, however, raises more complicated issues with respect to Bennett than it does with respect to Allen. Allen said it wanted her off its site. It said nothing about, and had no

12

input into, what happened to her next. Bennett did have that control, and though it had the right to transfer Nichols, and worked to find her a new position, it did not find her one right away, and the two positions it offered her were part-time positions. Thus, Nichols's transfer, while not an interference with any contractual right Nichols had, could be seen as an adverse employment action. *See infra* section IV.A.2.

Nevertheless, Nichols cannot show that her transfer was evidence of an intent to discriminate on the basis of race on the part of Bennett. In fact, in her deposition, Nichols stated that she did not believe that Keller or Habicht intended to discriminate against her on the basis of her race. (D.I. 47, Ex. 4 at 116:5-14.)[13] Again, the only connection between Nichols race and her transfer is that she was transferred while Whiteman was not. However, Bennett had, in the past, transferred at least two other employees at Miller's request, a white man and a black man. Moreover, Bennett replaced Nichols with another African-American woman. (D.I. 44, Ex. A at 43-44.) Thus, Nichols has not shown that Bennett intended to discriminate against her on the basis of her race. *Lin v. Rohm and Haas Co.*, 293 F. Supp. 2d 505, 518 (E.D. Pa. 2003) (finding insufficient evidence of intent to discriminate where the defendant identified employees outside of the protected class that were treated similarly to

---

[13] Nichols testified as follows:

Q: Do you believe that Bennett's actions in this matter against you were actions based on their intent to discriminate [against] you on the basis of your race?

A: Do you mean Mark [Habicht] and Wayne [Keller] or by –

Q: I mean Bennett, the company.

A: The company?

Q: Yes.

A: Other than Josh [Whiteman] at the time – I don't think Mark [Habicht] and Wayne [Keller]; but Josh [Whiteman] my coworker that I had the incident from or with. (D.I. 47, Ex. 4 at 116:5-14.)

plaintiff). Consequently, Nichols has failed to make out a prima facie case of discrimination against Bennett, and Bennett's Motion for Summary Judgment will be granted as to Nichols's claims under § 1981.

Even if Nichols had made out a prima facie case of discrimination, however, Nichols cannot show that Bennett's stated reason for transferring her was a pretext for discrimination. Bennett asserts that Nichols, by calling the police to the plant after her altercation with Whiteman, caused a disruption that caused a potential breakdown in Bennett's client relationship with Allen. (D.I. 44 at 17.) Therefore, in order to maintain that relationship, it was necessary to transfer Nichols. (*Id.*) Nichols has come forward with no evidence to show that that explanation was a pretext for discrimination. Again, the only evidence that connects her transfer to her race is that Whiteman was not transferred, while Nichols was, and again, that fact alone is not sufficient to rebut Bennett's non-discriminatory reason for transferring Nichols. *See Simpson*, 142 F.3d 639, 646. Therefore, summary judgment will be granted to Bennett on Nichols's claim under § 1981.

### 2.    DDA Claim Against Bennett

To establish a prima facie case of discrimination under the DDA, a plaintiff must establish the same elements as are required for a claim under Title VII. *Giles*, 411 A.2d at 601-02 ("While the *McDonnell Douglas* test was developed in the context of Title VII cases, in our view it is appropriate for a § 711(a) action [under the DDA] as well, because the language of the Delaware statute is substantially the same as the Title VII language defining an unlawful employment practice."). Those elements are (1) that the

14

plaintiff is a member of a protected class; (2) that she is qualified for the position; (3) that she suffered an adverse employment action; (4) under circumstances that give rise to an inference of unlawful discrimination. *Jones*, 198 F.3d at 410-11. The precise elements to be proven, however, will vary with the facts of the case. *McDonnell Douglas*, 411 U.S. at 802 n.13 (1973) ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.")

Nichols alleges that Bennett discriminated against her on the basis of her race and sex in violation of the DDA. (D.I. 1 at ¶¶ 24-25.) At least for the purposes of this motion, Bennett does not dispute that Nichols is a member of a protected class, and that she was qualified for her position. (D.I. 44 at 16-21.) However, Bennett asserts that Nichols cannot establish a prima facie case of discrimination under the DDA, 19 *Del. C.* § 711(a), because she did not suffer an adverse employment action, and because there can be no inference of discrimination because her position was filled by an African American woman. (D.I. 44 at 10-15.) Additionally, Bennett asserts that even if Nichols can establish a prima facie case of discrimination, her claims must fail because she cannot show that Bennett's legitimate, non-discriminatory reason for transferring her was pretextual. (*Id.* at 16-21.)

An "adverse employment action is one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001). A job transfer can be considered an adverse employment action. *Torre v. Casio, Inc.*, 42 F.3d 825, 831 n.7

15

(3d Cir. 1994) ("It is clear, however, that a transfer, even without loss of pay or benefits, may, in some circumstances, constitute an adverse job action"). As already noted, *supra* at section IV.A.1.b., Nichols's transfer could be viewed as an adverse employment action.[14] When Bennett transferred Nichols, it did not immediately have another position for her. (Nichols deposition, D.I. 47, Ex. 4 at 101:24-102:1.) Further, both of the positions it offered her were part-time positions (Keller Deposition, D.I. 47, Ex. 7 at 32:21-35:22), while her position at Allen was full-time. Thus, for the purposes of this motion, Nichols has provided sufficient evidence to raise a material issue of fact as to whether she suffered an adverse employment action.

But Bennett also contends that the circumstances of Nichols's transfer cannot give rise to an inference of discrimination. (D.I. 44 at 15.) Nichols was transferred from Allen after an altercation with Whiteman, which, viewing the facts in the light most favorable to her, was caused by Whiteman. (Nichols Deposition, D.I. 47, Ex. 4 at 40:3-41:3.) Whiteman was not disciplined after this incident, while Nichols, a black female, was transferred and reassigned only to part-time positions. (Habicht Deposition, D.I. 47, Ex. 6 at 29:2-5.) While these circumstances may not be sufficient to show that a business explanation was merely a pretext for discrimination, they may be sufficient at the prima facie stage of the analysis to allow a reasonable jury to infer that unlawful discrimination took place. *See Simpson*, 142 F.3d at 646 (finding that an "inference of discrimination anytime a single member of a non-protected group was allegedly treated

---

[14] I emphasize that, at this stage, I am required to view these circumstances in the light most favorable to Nichols.

more favorably than one member of the protected group ... may be acceptable at the prima facie stage of the analysis").

However, even assuming that Nichols could make out a prima facie case, for the reasons enumerated *supra* in section IV.A.1.b., Nichols cannot show that Bennett's legitimate, non-discriminatory reason for transferring her was a pretext for discrimination. This is true as to discrimination on the basis of both her race and her sex, as Bennett replaced her with an African-American woman and had previously transferred a white male and a black male from Allen. Therefore, summary judgment will be granted to Bennett on Nichols's DDA claim.[15]

### B.    Tortious Interference with Contract

Allen has also moved for summary judgment on Nichols's claims that Allen tortiously interfered with Nichols's contract with Bennett. (D.I. 46 at 14-17.) A plaintiff alleging a claim for tortious interference with contract must prove: "(1) a valid contract;

---

[15] It is noteworthy that Nichols actually resigned her position at Bennett. To establish that her transfer was actually a constructive discharge, Nichols

must be able to show that [her] former employer deliberately made [her] working conditions intolerable, and thereby forced [her] to quit. Demotion can constitute a constructive discharge, especially where the demotion is essentially a career-ending action or a harbinger of dismissal. However, mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.

*James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 378 (4th Cir. 2004) (internal citations and quotations omitted). Nichols argues only that the fact that no full-time position was made available to her after her transfer was "a sufficiently undesirable and abhorrent action to cause a reasonable person to feel compelled to terminate her employment." (D.I. 51 at 12.) In her briefing, Nichols has brought nothing to my attention to show that her transfer was "essentially a career-ending action or a harbinger of dismissal" or that the discrimination she experienced made her work situation intolerable.

17

(2) about which the defendants have knowledge; (3) an intentional act by the defendants that is a significant factor in causing the breach of the contract; (4) done without justification; and (5) which causes injury." *Gill v. Delaware Park, LLC*, 294 F. Supp. 2d 638, 645 (D. Del. 2003).

Allen asserts that Nichols cannot make out any of the elements of a prima facie case of tortious interference with contract. Allen claims that Nichols did not have a contract with Bennett, that, even if she did, Miller did not know about it, that Miller committed no intentional act to interfere with any contract, that Miller was justified, and that Nichols was not injured. (D.I. 46 at 14-17.) Nichols claims that she did have a contract with Bennett, even though she was an employee at will, that Miller's actions in asking for her transfer were not justified, and that Miller's demand that she be transferred interfered with her otherwise healthy employment relationship with Bennett. (D.I. 49 at 14-17.)[16]

The Delaware Supreme Court has not addressed the issue of whether an at-will employee can make a claim of tortious interference with contract. *Nelson v. Fleet Nat. Bank*, 949 F.Supp. 254, 261 (D. Del. 1996). However, this court has previously predicted that "the Supreme Court of Delaware would hold an action for tortious

---

[16] Nichols also appears to assert that her toritous interference claim can be maintained because at-will employees are entitled to good faith and fair dealing in their employment relationships, and that the claim is sustainable under 42 U.S.C. § 1981. (*Id.* at 17-18.) However, Nichols has not pleaded a claim for breach of the covenant of good faith and fair dealing. Additionally, she cannot make out a claim for tortious interference with contract based on § 1981 alone; she must establish all of the elements of the tortious interference claim. Thus, neither of those arguments provide a reason to deny summary judgment. Furthermore, she cannot sustain her § 1981 claims against Allen or Bennett and, therefore, even if § 1981 provided a legal basis to make a tortious interference claim, that claim could not be made against Allen here.

18

interference with contract may be maintained in conjunction with an at-will employment contract." *Id*. Thus, Nichols's action is not subject to summary judgment simply because she is an at-will employee.

However, in *Nelson*, although the employees were employees at-will, they apparently had some sort of employment contract. *Id*. (noting that the plaintiff's manager presented her "with a less favorable employment contract than her previous one, and threatened to fire her if she did not sign it"). To make out a claim that Allen, through Miller, tortiously interfered with her employment contract with Bennett, Nichols must show both that she had some such contract with Bennett and that Allen was aware of that contract. *Gill v. Delaware Park, LLC*, 294 F. Supp. 2d at 645.[17]

At that last point, at least, Nichols suffers a failure of proof. Even if Nichols could show that the "Condition of Employment" document she signed (D.I. 47, Ex. 1) amounts to an employment contract, she has put forward no facts to show that Miller, or anyone else at Allen, was aware of the "Conditions of Employment." Moreover, Nichols has provided no evidence that Miller committed an intentional act that was a significant factor in causing a breach of her contract with Bennett. The "Conditions of Employment" document explicitly states that "Bennett Security has the right to move any security officer to another job site at any time." (*Id*. at A001.) Thus, even if this document is considered an employment contract, Miller's request that Nichols be transferred did not cause a breach of that contract, since such a transfer was explicitly allowed by the contract.

_____

[17] Both Nichols and Keller testified that she had no such contract. (D.I. 47, Ex. 4 at 62:1-5; *id*., Ex. 7 at 39:16-19.)

Furthermore, Nichols has presented no evidence that she was injured by her transfer, as is required to make out a claim of tortious interference with contact. After being transferred, Nichols resigned from Bennett, and immediately started a new job making more money than she had made while working for Bennett. Nichols leaves it to speculation that she suffered a loss during the brief period between her transfer and resignation. For all of these reasons, summary judgment will be granted to Allen on Nichols's tortious interference with contract claim.

### C.    Defamation

To establish a cause of action for defamation in Delaware, a plaintiff must show that defendant made a "false and defamatory statement of fact concerning the plaintiff ... in an unprivileged publication to a third party. But a statement is not defamatory unless it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Ramunno v. Cawley*, 705 A.2d 1029, 1035 (Del. 1998) (internal quotation marks omitted). "[T]he general rule is that oral defamation is not actionable without special damages." *Spence v. Funk*, 396 A.2d 967, 970 (Del. 1978). However, where the defamatory oral statement "(1) malign[s] one in a trade, business or profession, (2) impute[s] a crime, (3) impl[ies] that one has a loathsome disease, or (4) impute[s] unchastity to a woman," a cause of action for slander can be maintained without proof of special damages. *Id.*

Here, Nichols alleges that Miller told people that she could not do her job and blamed her for the incident with Whiteman, thus maligning her in her business or

profession. (D.I. 49 at 18-19.) However, Nichols's only evidence of Miller's alleged statements is her own hearsay testimony about what Brittingham told her. (*Id.*) As was stated above, that hearsay is inadmissible and cannot be considered in support of her motion. *Philbin*, 101 F.3d at 961. Therefore, Nichols has no evidence to support her claim of slander, and summary judgment on this claim will be granted to Allen.

## V.    CONCLUSION

Accordingly, Bennett's Motion for Summary Judgment (D.I. 43) and Allen's Motion for Summary Judgment (D.I. 45) will be granted. An appropriate order will follow.